IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | | |
| | | |
| v. | | No. 4:25-CR-259-P |
| | | |
| BENJAMIN SONG | (01) | |
| CAMERON ARNOLD | (02) | |
|   a/k/a "Autumn Hill" | | |
| SAVANNA BATTEN | (03) | |
| NATHAN BAUMANN | (04) | |
| ZACHARY EVETTS | (05) | |
| JOY GIBSON | (06) | |
| BRADFORD MORRIS | (07) | |
|   a/k/a "Meagan Morris" | | |
| MARICELA RUEDA | (08) | |
| ELIZABETH SOTO | (09) | |
| INES SOTO | (10) | |
| DANIEL ROLANDO SANCHEZ-ESTRADA | (11) | |

## APPENDIX IN SUPPORT OF RESPONSE TO DEFENSE MOTIONS FOR BILL OF PARTICULARS

| Exhibit | Description | App. Pages |
|---------|-------------|------------|
| A | Redline of Original Indictment and Superseding Indictment | APP002 – APP066 |
| B | *United States v. Barker*, No. 3:16-CR-516-D, 2017 WL 4167512 (N.D. Tex. Sept. 20, 2017) | APP067 – APP084 |
| C | *United States v. Bethany*, No. 3:18-CR-0297-S, 2020 WL 1976827 (N.D. Tex. Apr. 23, 2020) | APP085 – APP088 |
| D | *United States v. Dominguez*, No. CR H-17-651-4, 2018 WL 2057442 (S.D. Tex. May 3, 2018) | APP089 – APP099 |
| E | *United States v. Fleifel*, No. 3:12-CR-318-D 3, 2014 WL 6633049 (N.D. Tex. Nov. 24, 2014) | APP100 – APP104 |
| F | *United States v. Hagen*, Crim. No. 3:19-CR-0146-B, 2020 WL 1929848 (N.D. Tex. Apr. 21, 2020) | APP105 – APP117 |
| G | *United States v. Hillis*, No. 4:23-CR-00164-ALM-AGD-13, 2025 WL 2078433 (E.D. Tex. July 7, 2025) | APP118 – APP124 |
| H | *United States v. Johnson*, No. CR 14-238, 2017 WL 930633 (E.D. La. Mar. 9, 2017) | APP125 – APP143 |

Dated: November 18, 2025

Respectfully submitted,

RYAN RAYBOULD
UNITED STATES ATTORNEY

*s/ Matthew Capoccia*
Matthew Capoccia
Assistant United States Attorney
Texas State Bar No. 24121526
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone: 817-252-5200
Email: matthew.capoccia@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2025, I electronically filed the foregoing document with the clerk for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorney of record who has consented in writing to accept this Notice as service of this document by electronic means. A courtesy copy of the filed motion has also been emailed to the above-mentioned defense counsel.

*s/ Matthew Capoccia*
Matthew Capoccia
Assistant United States Attorney

# Exhibit A

The Grand Jury Charges:

## **The Attack**

1. ~~I.~~ Late at night on ~~the Fourth of~~ July 4, 2025, a North Texas Antifa Cell (Antifa Cell) of at least eleven operatives ~~clad in black and donning masks, some of whom were wearing body armor and carrying firearms,~~ rioted and attacked the Prairieland Detention Center (Prairieland) in Alvarado, Texas. ~~The~~ which the U.S. Department of Homeland Security was using ~~Prairieland~~ to house illegal aliens awaiting deportation. Members of the Antifa Cell wore "black bloc"—dark clothing with head and face coverings that concealed their identities. This tactic is designed not only to hide each individual member's identity but also to aid and abet those members engaged in illegal acts by making individual members indistinguishable from one another to law enforcement. Some members also brought body armor and firearms to Prairieland. After arriving, the Antifa Cell began shooting and throwing fireworks (explosives) towards ~~the facility~~Prairieland and vandalizing vehicles and a guard shed ~~.~~ on Prairieland property:

 

~~Indictment~~

 

Alarmed at the presence of ~~people near the facility~~unauthorized persons on Prairieland property, late at night, unarmed DHS correctional officers inside the facility went outside to investigate. Other DHS personnel called local police for assistance. Within minutes, an officer from the Alvarado Police Department arrived on scene, stepped out of his police cruiser, and began issuing commands to Nathan Baumann, (a coconspirator not named as defendant herein) who was one of the rioters vandalizing government property. Baumann, who was dressed in black-~~clad figure running~~ bloc, continued to run towards ~~another~~**Benjamin Song**, who was dressed in black-~~clad figure~~ bloc and holding a rifle. ~~One Antifa member Coconspirator 1~~**Song** yelled, ~~"~~"get to the rifles.~~"~~"

2. seconds!" and then, moments later, Coconspirator 1 opened fire on the officers, striking the Alvarado police officer in the neck area as the unarmed DHS correctional officers ducked and ran for cover. The wounded officer fell to the ground but was able to return a few shots. Coconspirator 1 continued to fireSong fired additional rounds at the wounded officer and the DHS correctional officers until his rifle jammed. The attackersAntifa Cell then leftfled the scene.

2.3.    Police arrested most of the Antifa Cell shortly after the attack, many near the scene of the attack, including **Zachary Evetts**, **Bradford Morris, Elizabeth Soto, Ines Soto, Savanna Batten, and Maricela Rueda**, and Seth Sikes, Baumann, and Joy Gibson (coconspirators not named as defendants herein). Police arrested **Cameron Arnold** the following day. Song escaped and remained at large with the help of others until his capture on July 15, 2025.

### The Antifa Cell

3.4.    Antifa is a militant enterprise made up of networks of individuals and small groups primarily ascribing to a revolutionary anarchist or autonomous Marxist ideology, which explicitly calls for the overthrow of the United States Government, law enforcement authorities, and the system of law. Antifa adherents have espoused insurrection and advocated violence to affect the policy and conduct of the U.S. government by intimidation and coercion. Beginning in 2025, Antifa adherents have increasingly targeted agents and facilities related to DHS's ImmigrationDHS's Immigration and Customs Enforcement (I.C.E.) in opposition to I.C.E.'s deportation actions and the U.S. government'sgovernment's policy on the removal of illegal aliens. The Antifa campaign involves coordinated efforts to obstruct

Indictment

Case 4:25-cr-00259-P   Document 79   Filed 10/15/25   Page 4 of 31   PageID 56

enforcement of Federal law through organized riots, violent assaults, and armed confrontations

with I.C.E. and law enforcement officers.

4.   Others inMost of the Antifa Cell looked to Coconspirator 1Song as a
leader. Coconspirator 1

5.   also trainedSong and others recruited for the Antifa Cell members on firearmsfrom

various ideologically aligned groups. For example, **Ines Soto, Elizabeth Soto**, and **Batten**

were part of a group that created and distributed insurrectionary materials called "zines." Song

also recruited at gun ranges and close-quarters combat training sessions he conducted.

Indictment

5.6.    The Altogether, members of the Antifa Cell was heavily armed with acquired over 50 firearms that they purchased in Fort Worth, Grand Prairie, Dallas, and elsewhere. Coconspirator 1 Song, for example, bought and built numerous AR-platform rifles, some of which he distributed to his co-defendants, and at least one of which featured a binary trigger. A binary trigger is a device that allows a firearm to fire more rapidly by causing two bullets to fire with each trigger cycle.

> **Formatted:** ... [19]
> **Formatted:** Left, Indent: Left: 0", First line: 0", Right: 0", Space Before: 12 pt, Line spacing: Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5", Tab stops: Not at 0.75"

6.    The To hide their involvement in illegal conduct, the Antifa Cell emphasized and practiced "operational security" or "opsec" in their communications. For example, members used an encrypted messaging app to coordinate with each other.

> **Formatted:** ... [20]

7.    Some of these apps This app allowed for group chats, and some had auto-delete or and delete-after-a-defined-time functions, which caused communications among the Antifa Cell to be permanently deleted. Most Antifa Cell members used monikers in the chat groups to further hide their true identities group chats to hide their true identities. Group chats dedicated to planning direct actions were limited to trusted participants and, even among trusted participants, were exclusive to those with a need-to-know.

> **Formatted:** ... [21]
> **Formatted:** List Paragraph, Indent: Left: 0", First line: 0", Right: 0", Line spacing: Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

**The Defendants**

8.    Song was a resident of Dallas and used the monikers "Champaigne" and "Delete."

9.    Arnold, a/k/a Autumn Hill, was a resident of Dallas and used the moniker "Not Beating the Little Creature Allegations."

10.    Batten was a resident of Fort Worth.

11.    Baumann was a resident of College Station and used the moniker "Bible."

12.    Evetts was a resident of Waxahachie and used the moniker "Jon ValJon."

13.    Gibson was a resident of Dallas and used the monikers "FoxGlove" and "Rowan."

Indictment

14.    **Morris**, a/k/a Meagan Morris, was a resident of Dallas and used the moniker "Herald of the Mad God."

15.    **Rueda** was a resident of Fort Worth and used the moniker "mal crieda."

16.    **Elizabeth Soto** was a resident of Fort Worth.

17.    **Ines Soto** was a resident of Fort Worth and used the moniker "N."

18.    **Daniel Sanchez Estrada** was a resident of Fort Worth.

19.    Seth Sikes was a resident of Kennedale and used the moniker "Wise."

**The Plan**

20.    In the days prior to July 4, ~~2025,~~ the Antifa Cell planned and coordinated the riot and attack against Prairieland using several group chats on an encrypted messaging app. ~~The goal of the attack~~ One chat—which was ~~to destroy U.S. government property and commit acts dangerous to human life intended to influence the policy~~ named the "4th of July Party!" chat—consisted of the ~~U.S. government and affect government conduct by intimidation and coercion. As one member~~ core group that planned the action (the "Core Chat").

~~7.~~    The Core Chat originally had eight participants, but two dropped out for "opsec reasons" after they stated ~~in an encrypted chat, "I'm done with peaceful protests" and "Blue lives don't matter."~~ they would not attend the July 4 action. The six remaining members were **Evetts**, **Song**, **Morris**, Gibson, **Rueda**, and Sikes. Members in the Core Chat conducted detailed reconnaissance and planning. For example, **Evetts** and **Rueda** attended a peaceful protest at Prairieland earlier in the day on July 4 in order to scout the facility. **Evetts** relayed in the Core Chat details about the fences and

~~Indictment—~~

gates, including the time it took for the gates to open and close and how long it took trash pickup to get in and out of the facility. **Rueda** circulated a picture of a security camera at the entrance to the facility and noted that a nearby house had a doorbell camera. **Evetts** assessed that "signs, laws, and social pressure are the only things keeping someone from getting right up to the fence." **Rueda** posted a Google map that showed the location of local police departments in relation to Prairieland,

> **Formatted:** Font: Times New Roman, Font color: Auto, Character scale: 105%

**Indictment—**

8.   Some Antifa Cell members discussed logistics, previous site reconnaissance, and locations of security cameras at the facility. They exchanged a map of

21.   Prairieland and the surrounding area that showed the locations of nearby police stations. And they The members of the Core Chat planned what materials to bring to the riot and attack, including firearms, medical kits, and fireworks. One Antifa Cell member, for For example, said in one Evetts asked the Core Chat group chat that if they would be "“doing black bloc and rifles?” Gibson stated that they would be wearing bloc and keeping “kit” on hand, “bringing a wagon to hold armor and rifles." Coconspirator-1 told the group that they would use rifles to ." When Rueda suggested that “rifles might make the situation more hot,” Song replied that rifles would be used to intimidate law enforcement, saying, "stating, “Cops are not trained or equipped for more than one rifle so it tends to make them back off."”

22.   Some members of Song also advertised the Antifa Cell July 4 riot on a larger chat (the “Large Chat”) but left out certain details in an effort to avoid being identified as one of the organizers. As Rueda warned in the Core Chat, “if anyone pins us for ‘organizing’ that’s where we’d lose.”

23.   The Large Chat included Song, Arnold, Baumann, Evetts, Gibson, Morris, Rueda, Ines Soto, and dozens of “trusted” individuals. Song circulated a flyer for the Prairieland riot in the Large Chat, stating “Share with trusted folks only. Do not Post. Mask up! Be

Indictment

loud!" Members of the Large Chat discussed the event as a "noise demonstration" involving fireworks.

24.     Participants in the Large Chat expressed concerns about law enforcement's response to the action. For example, Baumann noted that the area around Prairieland was "pretty rural so it will be difficult to lose [I.C.E] if shi[t] hits the fan. Plus seems like a lot of the locals in the area will not be happy about our presence." **Ines Soto** responded that they were probably "more likely to deal with local PD than I.C.E." but suggested that "the level of concern seems way over the top to me." Throughout the Large Chat, **Ines Soto** and **Rueda** attempted to downplay concerns about law enforcement, urging action and referring to noise demonstrations as "low risk."

25.     In addition to the encrypted messaging group chats, **Song**, **Arnold**, **Morris**, and others met in person on July 3 at a "gear check" at **Morris** and **Arnold's** residence. There, **Arnold** asked **Song** if they would be bringing guns to the July 4 action. **Song** replied that they would because he would not be going to jail. **Song** repeated words to this effect multiple times throughout the evening, putting everyone there on notice of his intent to shoot at police rather than be arrested.

~~9.~~26.  **Song**, **Arnold**, **Evetts**, Gibson, **Morris**, and **Rueda** staged at ~~a~~**Morris** and **Arnold's** house on the evening of ~~the planned attack. The members of the Antifa Cell at Prairieland that night were dressed in "black bloc." They~~ July 4 and carpooled to Prairieland. **Elizabeth Soto**, **Ines Soto**, and **Batten** drove together and arrived at Prairieland a little later than **Song** and the others. Baumann drove by himself from College Station. The Antifa Cell brought a total of ~~ten~~eleven firearms ~~to Prairieland~~, four of which ~~were~~had been purchased by ~~Coconspirator 1. The~~

~~Indictment~~

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 10 of    PageID 58

firearm Coconspirator 1 used to shoot at the victim officers was an AR platform rifle that had a functioning binary trigger. Song.

10.27. Paragraphs 1 through 926 are incorporated in each Count of this Indictment.

**[Remainder of page intentionally left blank]**

Indictment

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 11 of    PageID 59

Count One

Riot

Providing Material Support to Terrorists

(Violation of 18 U.S.C. § 2339A)

§§ 2101 and around June and 2)

On or about July 4, 2025, in the Northern District of Texas and elsewhere, the defendants, **Cameron Arnold**, also known as Autumn Hill, and **Zachary Evetts**, conspired and agreed with **Benjamin Song, Savanna Batten, Bradford Morris**, also known as Meagan Morris, **Maricela Rueda, Elizabeth Soto, Ines Soto**, aiding and abetting each other, used a facility of interstate commerce, that is, the internet, cell phones, and automobiles, with intent to organize, participate in, and carry on a riot, as that term is defined in 18 U.S.C. § 2102; with intent to commit an act of violence in furtherance of a riot; and with intent to aid and abet each other and others in participating in and carrying on a riot and committing any act of violence in furtherance of a riot; and during the course of such use and thereafter performed and attempted to perform other overt acts, including engaging in acts of violence which acts constituted a clear and present danger of damage and injury to the property and person of another, including but not limited to:

- Shooting and throwing fireworks and explosives at the Prairieland Detention Center and its perimeter fence;

- Slashing tires on a government vehicle;

- Spray painting graffiti on government and private property and vehicles;

Indictment

Formatted [72]
Formatted [74]
Formatted [73]
Formatted [75]
Formatted [76]
Formatted [77]
Formatted [78]
Formatted [79]
Formatted [80]
Formatted [81]
Formatted [82]
Formatted [83]
Formatted [84]
Formatted [85]
Formatted [86]
Formatted [87]
Formatted [88]
Formatted [89]
Formatted [90]
Formatted [91]
Formatted [92]
Formatted [93]
Formatted [94]
Formatted [95]
Formatted [96]
Formatted [97]
Formatted [98]
Formatted [99]
Formatted [100]
Formatted [101]
Formatted [102]
Formatted [103]
Formatted [104]
Formatted [105]
Formatted [106]
Formatted [107]
Formatted [108]
Formatted [109]
Formatted [110]
Formatted [111]
Formatted [112]
Formatted [113]
Formatted [114]

- Destroying a closed circuit camera;

- Shooting at a police officer and unarmed DHS correctional officers; and

- Dressing in black bloc in order to prevent law enforcement from identifying individuals engaging in the acts described above.

All in violation of 18 U.S.C. §§ 2101 and 2, and *Pinkerton v. United States*, 66 S. Ct. 1180 (1946).

**[Remainder of page intentionally left blank]**

Indictment-

APP013

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 13 of    PageID 59

## Count Two

Providing Material Support to Terrorists and other persons known and unknown, to provide and attempt

(Violation of 18 U.S.C. § 2339A)

On or about July 4, 2025, in the Northern District of Texas, the defendants, **Cameron Arnold**, also known as Autumn Hill, **Zachary Evetts, Benjamin Song, Savanna Batten, Bradford Morris**, also known as Meagan Morris, **Maricela Rueda, Elizabeth Soto**, and **Ines Soto**, provided and attempted to provide material support and resources, as those terms is are defined in 18 U.S.C. §§ 2339A(b)(1), and to did conceal and disguise the nature of the material support and resources, including property, services, training, communications equipment, weapons, explosives, personnel (including themselves), and transportation, knowing and intending that they were to be used in preparation for, and in carrying out, violations of 18 U.S.C. §§ 844(f), 1361 and 1114, and in preparation for and carrying out the concealment of an escape from such violations.

All in violation of 18 U.S.C. § §§ 2339A.

Indictment

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 14 of    PageID 60

Count Two

Attempted Murder of Officers and Employees of the *Pinkerton v. United States*

(Violation of 18 U. 66 S.C. §§ 1 1 14(a)(3) and 2) Ct. 1180 (1946).

On or about July 4, 2025, in the Northern District of Texas, Coconspirator-1, aided and abetted by **Cameron Arnold**, also known as Autumn Hill, **Zachary Evetts**, and others known and unknown, did, with malice aforethought, unlawfully attempt to kill Correctional Officer-1, a federal officer and employee engaged in and on account of the performance of his/her official duties.

In violation of 18 U.S.C. §§ 1114(a)(3) and 2.

Indictment

Case 4:25-cr-00259-P   Document 79   Filed 10/15/25   Page 15 of   PageID 61

Indictment—

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 16 of    PageID 61

Count Three
Conspiracy to Use and Carry an Explosive
(Violation of 18 U.S.C. § 844(m))

In and around June and July 2025, in the Northern District of Texas, the defendants, **Cameron Arnold**, also known as Autumn Hill, **Zachary Evetts, Benjamin Song, Savanna Batten**, Bradford Morris, also known as Meagan Morris, **Maricela Rueda, Elizabeth Soto**, and **Ines Soto**, along with others known and unknown, did knowingly combine, conspire, confederate and agree to engage in conduct in violation of 18 U.S.C. §§ 844(h)(1) and (2), namely to: use an explosive to commit a felony and carry an explosive during the commission of a felony, that is, a riot, in violation of 18 U.S.C. § 2101.

All in violation of 18 U.S.C. § 844(m) (18 U.S.C. §§ 844(h)(1) & (2)).

Count Four
Use and Carry an Explosive
(Violation of 18 U.S.C. §§ 844(h)(1) and (2))

Indictment—

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 17 of    PageID 61

On or about July 4, 2025, in the Northern District of Texas, the defendants, **Cameron Arnold**, also known as Autumn Hill, **Zachary Evetts**, **Benjamin Song**, **Savanna Batten**, **Bradford Morris**, also known as Meagan Morris, **Maricela Rueda**, **Elizabeth Soto**, and **Ines Soto**, aiding and abetting each other, did knowingly use an explosive to commit any felony (a riot); and did carry an explosive during the commission of any felony (a riot).

In violation of 18 U.S.C. §§ 844(h)(1) & (2) and 2, and *Pinkerton v. United States*, 66 S. Ct. 1180 (1946).

Indictment—

## Count Five

Attempted Murder of Officers and Employees of the United States
(Violation of 18 U.S.C. §§ 1114(a)(3) and 2)

On or about July 4, 2025, in the Northern District of Texas, Coconspirator 1 Benjamin Song, aided and abetted by **Cameron Arnold**, also known as Autumn Hill, **Zachary Evetts**, **Bradford Morris**, also known as Meagan Morris, and **Maricela Rueda**, did, with malice aforethought, unlawfully attempt to kill Correctional Officer-1, a federal officer and employee engaged in and on account of the performance of his/her official duties.

In violation of 18 U.S.C. §§ 1114(a)(3) and 2, and *Pinkerton v. United States*, 66 S. Ct. 1180 (1946).

Indictment

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 19 of    PageID 61

Count Six

Attempted Murder of Officers and othersEmployees of the United States
(Violation of 18 U.S.C. §§ 1114(a)(3) and 2)

**Benjamin Song**, aided and abetted by **Cameron Arnold**, also known and unknownas

Autumn Hill, **Zachary Evetts, Bradford Morris**, also known as Meagan Morris, and **Maricela**

**Rueda**, did, with malice aforethought, unlawfully attempt to kill Correctional Officer-2, a

federal officer and employee engaged in and on account of the performance of his/her official

duties.

In violation of 18 U.S.C. §§ 1114(a)(3) and 2, and *Pinkerton v. United States*, 66 S. Ct.

1180 (1946).

Indictment

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 20 of    PageID 61

## Count Seven

~~Indictment~~

**Formatted:** Font: Times New Roman, 13 pt, Underline, Underline color: Auto, Font color: Auto

**Formatted:** Font: 13 pt, Underline

**Formatted:** Normal, Indent: Left: 0", Right: 0", Space Before: 0 pt

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 21 of    PageID 62

Count Four

Attempted Murder of Officers and Employees of the United States
(Violation of 18 U.S.C. §§ 1 1 141114(a)(3) and 2)

On or about July 4, 2025, in the Northern District of Texas, coconspirator 1Benjamin Song, aided and abetted by **Cameron Arnold**, also known as Autumn Hill, **Zachary Evetts**, and others**Bradford Morris**, also known as Meagan Morris, and unknown**Maricela Rueda**, did, with malice aforethought, unlawfully attempt to kill Alvarado Police Department Officer-11, a person assisting a federal officer and employee engaged in and on account of the performance of his/her official duties.

In violation of 18 U.S.C. §§ 1114(a)(3) and 2, and *Pinkerton v. United States*, 66 S. Ct. 1180 (1946).

Indictment

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 22 of    PageID 63

Count Five

**Formatted:** Font: Times New Roman, 13 pt, Underline, Underline color: Auto, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Formatted:** Font: 13 pt, Underline

**Formatted:** Normal, Indent: Left:  0", Right:  0"

Indictment-

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 23 of    PageID 63

## Count Eight

Discharging a Firearm During, in Relation to, and in Furtherance of a Crime of Violence

(Violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.)

On or about July 4, 2025, in the Northern District of Texas, Coconspirator 1 **Benjamin Song**, aided and abetted by **Cameron Arnold**, also known as Autumn Hill, **Zachary Evetts**, and others **Bradford Morris**, also known as Meagan Morris, and **Maricela Rueda**, knowingly discharged a firearm, namely a rifle, during and in relation to a crime of violence, namely, attempted murder of a federal officer, in violation of 18 U.S.C. § 1114, as charged in Count Five of this Indictment, for which the defendants may be prosecuted in a court of the United States.

In violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2, and *Pinkerton v. United States*, 66 S. Ct. 1180 (1946).

## Count Nine

Indictment-

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 24 of    PageID 63

**Discharging a Firearm During, in Relation to, and in Furtherance of a Crime of Violence** ~~unknown~~

**(Violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.)**

On or about July 4, 2025, in the Northern District of Texas, **Benjamin Song**, aided and abetted by **Cameron Arnold**, also known as Autumn Hill, **Zachary Evetts**, **Bradford Morris**, also known as Meagan Morris, and **Maricela Rueda**, knowingly discharged a firearm, namely a rifle, during and in relation to a crime of violence, namely, attempted murder of a federal officer, in violation of 18 U.S.C. § 1114, as charged in Count ~~Two~~Six of this Indictment, for which the defendants may be prosecuted in a court of the United States.

In violation of 18 U.S.C. §§ 924(c)(~~1~~)(A)(iii) and 2 ~~.~~, and *Pinkerton v. United States*, 66 S. Ct. 1180 (1946).

~~Indictment-~~

Count Six

Count Ten

Discharging a Firearm During, in Relation to, and in Furtherance of a Crime of Violence

(Violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.)

On or about July 4, 2025, in the Northern District of Texas, Coconspirator 1 Benjamin Song, aided and abetted by **Cameron Arnold**, also known as Autumn Hill, **Zachary Evetts**, and others known and unknown, knowingly discharged a firearm, namely a rifle, during and in relation to a crime of violence, namely, attempted murder of a federal officer, in violation of 18 U.S.C. § 1114, as charged in Count Three of this Indictment, for which the defendants may be prosecuted in a court of the United States.

In violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.

Indictment

## Count Seven

**Bradford Morris** ~~Discharging a Firearm During, in Relation to, and in Furtherance of a Crime of Violence~~ (Violation of 18 U.S.C. §§ 924(c)(l)(A)(iii) and 2.)

~~On or about July 4, 2025, in the Northern District of Texas, Coconspirator 1, aided and abetted by~~ **Cameron Arnold**, also known as ~~Autumn Hill, Zachary Evetts, and others known and unknown~~ Meagan Morris, and **Maricela Rueda**, knowingly discharged a firearm, namely a rifle, during and in relation to a crime of violence, namely, attempted murder of a person assisting a federal officer, in violation of 18 U.S.C. § 1114, as charged in Count ~~Four~~ Seven of this Indictment, for which the defendants may be prosecuted in a court of the United States, and in so doing knowingly discharged said firearm in furtherance of the commission of this offense.

In violation of 18 U.S.C. §§ 924(c)(~~1~~)(A)(iii) and 2, and *Pinkerton v. United States*, 66 S. Ct. 1180 (1946).

~~Indictment~~

**Count Eleven**
**Corruptly Concealing a Document or Record**
**(Violation of 18 U.S.C. § 1512(c)(1))**

Between on or about July 5 and 6, 2025, in the Northern District of Texas and elsewhere, the defendant, **Daniel Rolando Sanchez Estrada**, did corruptly conceal a record, document, and other object, and attempted to do so, with the intent to impair its integrity and availability for use in an official proceeding, that is, **Daniel Rolando Sanchez Estrada** transported a box that contained numerous Antifa materials, such as insurrection planning, anti-law enforcement, anti-government, and anti-immigration enforcement documents and propaganda, from his residence in Garland, Texas, to a location in Denton, Texas, intending to conceal the contents of the box and impair its availability for use in a federal grand jury and federal criminal proceeding.

In violation of 18 U.S.C. § 1512(c)(1).

**Count Twelve**
**Conspiracy to Conceal Documents**
**(Violation of 18 U.S.C. § 1512(k))**

Indictment —

Between on or about July 5 and 6, 2025, in the Northern District of Texas and elsewhere, the defendants, **Daniel Rolando Sanchez Estrada** and **Maricela Rueda**, and others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree to corruptly conceal a record, document, and other object with the intent to impair its availability for use in an official proceeding, in violation of 18 U.S.C. § 1512(c)(1).

### Purpose of the Conspiracy

The purpose of the conspiracy was for **Sanchez** and **Rueda** to conceal documents and other objects that would implicate **Rueda** in the riot and shooting at the Prairieland Detention Center that occurred on July 4, 2025.

### Manner and Means

**Sanchez**, **Rueda**, and others known and unknown, sought to accomplish the purpose of the conspiracy by having **Sanchez** conceal incriminating evidence, including a box that contained Antifa materials, such as insurrection planning, anti-law enforcement, anti-government, and anti-immigration enforcement documents and propaganda, which was connected to **Rueda**. **Sanchez** moved this evidence from his residence in Garland, Texas, to a location in Denton, Texas. **Sanchez** did so intending to conceal the contents of the box and impair its availability for use in an official proceeding, that is, a federal grand jury and a federal criminal proceeding.

### Overt Acts

In furtherance of the conspiracy and to effect its purpose, on or about July 6, 2025, in the Northern District of Texas and elsewhere, **Sanchez** took the box of Antifa materials described above from his residence in Garland, Texas, and moved it to an apartment in Denton, Texas.

All in violation of 18 U.S.C. § 1512(k).

Indictment

A TRUE BILL.

_(signature)_

---

FOREPERSON

NANCY E. LARSON
ACTING UNITED STATES ATTORNEY

SHAWN SMITH                                    FRANK L. GATTO

NANCY E. LARSON
ACTING UNITED STATES ATTORNEY

_(signature)_

FRANK L. GATTO
Assistant United States Attorney

Assistant United States Attorney

!ssistant United States Attorney

Texas State Bar No. 24033206

Texas State Bar No. 24033206

Texas State Bar No. 24062396 80 I

801 Cherry Street, Suite 1700

801 Cherry Street, Suite 1700

801 Cherry Street, Suite 1700

Fort Worth, Texas 76102

Fort Worth, Texas 76102

Fort Worth, Texas 76102

Telephone: 817-252-5200

Telephone: 817-252-5200

Telephone: 817-252-5200

Email: Shawn.Smith2@usdoj.gov

Email: Shawn.Smith2@usdoj.gov

Email: Frank.Gatto@usdoj.gov Frank.Gatto@usdoj.gov

Indictment

Formatted: Header, Line spacing: single

IN THE UNITED STATES DISTRICT COURT  FOR THE NORTHERN DISTRICT OF TEXAS  FORT WORTH DIVISION

Formatted: Font: (Default) Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

Formatted: Normal, Indent: Left:  0", First line:  0", Right:  0", Line spacing: single

THE  UNITED  STATES  OF  AMERICA

v.

CAMERON  ARNOLD  (01)

a/k/a "Autumn Hill" ZACHARY EVETTE (02)

INDICT

MENT  18

U.S.C.

§ 2339A
Providing Material Support to Terrorists
Count 1

18 U.S.C. §§ 1114(a)(3) and 2
Attempted Murder of Officers and Employees of the United
States Counts 2-4

18 U.S.C. §§ 924(c)(l)(A)(iii) and 2
Discharging a Firearm During, in Relation to, and in Furtherance of a Crime of
Violence Counts 5-7

A true bill rendered

FORT  WORTH                                    \Nv ( ) M/ .  r

FOREPERSON

Formatted: Font: 10 pt, Bold

Filed in open court this 15th day of October, 2025.

Formatted: Footer, Line spacing: single

APP031

Case 4:25-cr-00259-P    Document 79    Filed 10/15/25    Page 31 of 31    PageID 66

Formatted: Header, Line spacing: single

In Federal custody.

_____

*Hal K. Ray, Jr.*

UNITED STATES MAGISTRATE JUDGE

Pending Criminal Matter: 4:25-MJ-452-BJ

Formatted: Font: 13 pt

Formatted: Normal, Left, Indent: Left: -0.08", Space Before: 0 pt

Formatted: Font: 10 pt, Bold

Formatted: Footer, Line spacing: single

APP032

**Page 1: [1] Style Definition**          **Author**

List Paragraph: Font: (Default) Courier 10cpi, 10 pt, Indent: Left:  0.5", First line:  0", Don't add space between paragraphs of the same style, Widow/Orphan control

**Page 1: [2] Formatted**          **Author**

Font: Times New Roman, 13 pt, Not Bold, Underline

**Page 1: [3] Formatted**          **Author**

Normal, Centered, Space Before:  0 pt, No widow/orphan control

**Page 1: [4] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 1: [5] Formatted**          **Author**

Font: (Default) Times New Roman, 13 pt, Bold, Underline, Underline color: Auto, Font color: Auto, Character scale: 100%

**Page 1: [6] Formatted**          **Author**

Normal, Centered, Right:  0", Space Before:  0 pt

**Page 1: [7] Formatted**          **Author**

Font: Times New Roman, 13 pt, Bold, Underline

**Page 1: [8] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 1: [9] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 1: [10] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 1: [11] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 1: [12] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 1: [13] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 1: [14] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 1: [15] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 1: [16] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 1: [17] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**          **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**                                    **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 2: [18] Formatted**            **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 2: [18] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale: 105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale: 105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale: 105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale: 105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale: 105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale: 105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale: 105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale: 105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale: 105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale: 105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

```
Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%
```

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
| --- | --- |

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [19] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Custom Color(RGB(8,8,8)), Character scale:
105%

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [20] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 5: [21] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 6: [22] Formatted | Author |
|---|---|

Font: (Default) Times New Roman, 13 pt, Bold, Underline, Underline color: Auto, Font color: Custom Color(RGB(8,8,8))

| Page 6: [23] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [24] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [25] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [26] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [27] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [28] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [29] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [30] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [31] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [32] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [33] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [34] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [35] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [36] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [37] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [38] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [39] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [40] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [41] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [42] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [43] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [44] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [45] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [46] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [47] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [48] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [49] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [50] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [51] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [52] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [53] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [54] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [55] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [56] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 6: [57] Formatted | Author |
|---|---|

Left, Right:  0", Line spacing:  Double,  No bullets or numbering, Tab stops: Not at  0.75"

| Page 6: [58] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%

| Page 6: [59] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Character scale: 105%, Not Expanded by / Condensed by

| Page 8: [60] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 8: [61] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 8: [62] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 8: [63] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 8: [64] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 8: [65] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 8: [66] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 8: [67] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 8: [68] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 8: [69] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 8: [70] Formatted | Author |
|---|---|

Font: Times New Roman, Font color: Auto, Not Expanded by / Condensed by

| Page 8: [71] Formatted | Author |
|---|---|

Font: Times New Roman, Character scale: 105%

| Page 11: [72] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Underline, Underline color: Auto, Font color:
Auto, Character scale: 100%

| Page 11: [73] Formatted | Author |
|---|---|

Normal, Indent: Left:  0", Right:  0"

| Page 11: [74] Formatted | Author |
|---|---|

Font: 13 pt, Underline

| Page 11: [75] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [76] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 11: [77] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [78] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 11: [79] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [80] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 11: [81] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [82] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 11: [83] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [84] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [85] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 11: [86] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [87] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [88] Formatted | Author |
|---|---|

Font: (Default) Times New Roman, 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 11: [89] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 11: [90] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [91] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [92] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 11: [93] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 11: [94] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [95] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 11: [96] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 11: [97] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 11: [98] Formatted**                          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 11: [99] Formatted**                          **Author**

Font: 13 pt, Not Bold, Font color: Auto, Character scale: 100%

**Page 11: [100] Formatted**                         **Author**

Font: Times New Roman, 13 pt, Not Bold, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 11: [101] Formatted**                         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 11: [102] Formatted**                         **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 11: [103] Formatted**                         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 11: [104] Formatted**                         **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 11: [105] Formatted**                         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 11: [106] Formatted**                         **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 11: [107] Formatted**                         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 11: [108] Formatted**                         **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 11: [109] Formatted**                         **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 11: [110] Formatted**                         **Author**

Font: 13 pt, Not Bold, Font color: Auto, Character scale: 100%

**Page 11: [111] Formatted**                         **Author**

Font: Times New Roman, 13 pt, Not Bold, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 11: [112] Formatted**                         **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 11: [113] Formatted**                         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 11: [114] Formatted**                         **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 13: [115] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 13: [116] Formatted | Author |
|---|---|

Normal, Indent: Left:  0", First line:  0", Right:  0", Line spacing:  Double

| Page 13: [117] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 13: [118] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%, Not
Expanded by / Condensed by

| Page 13: [119] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 13: [120] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 13: [121] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%, Not
Expanded by / Condensed by

| Page 13: [122] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 13: [123] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%, Not
Expanded by / Condensed by

| Page 13: [124] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 13: [125] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 13: [126] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 13: [127] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 13: [128] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 13: [129] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 13: [130] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 13: [131] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

**Page 13: [132] Formatted**               **Author**
Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 13: [133] Formatted**               **Author**
Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 13: [134] Formatted**               **Author**
Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 13: [135] Formatted**               **Author**
Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 13: [136] Formatted**               **Author**
Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**               **Author**
Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**APP052**

**Page 18: [137] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [137] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**           **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 18: [138] Formatted**            **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 18: [138] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 18: [138] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 18: [138] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 18: [138] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 18: [138] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 21: [139] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Underline, Underline color: Auto, Font color: Auto

| Page 21: [140] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 21: [141] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 21: [142] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 21: [143] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 21: [144] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 21: [145] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 21: [146] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 21: [147] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 21: [148] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 21: [149] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 21: [150] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [151] Formatted**                              **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

**Page 21: [152] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [153] Formatted**                              **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

**Page 21: [154] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [155] Formatted**                              **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

**Page 21: [156] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [157] Formatted**                              **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

**Page 21: [158] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [159] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [160] Formatted**                              **Author**

Normal, Indent: Left:  0", Right:  0", Space Before:  0 pt, Line spacing:
single

**Page 21: [161] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [162] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [163] Formatted**                              **Author**

Normal, Indent: Left:  0", First line:  0.5", Right:  0", Line spacing:
Double

**Page 21: [164] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [165] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [166] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [167] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [168] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 21: [169] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**        **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**APP057**

**Page 23: [170] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [170] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [171] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [171] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**                              **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**             **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 23: [172] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 24: [173] Formatted**          **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

**Page 24: [174] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 24: [175] Formatted**          **Author**

Normal, Indent: Left:  0", First line:  0.5", Right:  0", Line spacing: Double

**Page 24: [176] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 24: [177] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 24: [178] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 24: [179] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**          Author

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [180] Formatted**         **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [181] Formatted**         **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [181] Formatted**         **Author**

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**         **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

**Page 25: [182] Formatted**        **Author**

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 25: [182] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 25: [182] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 25: [182] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 25: [182] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 25: [182] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [183] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 26: [184] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [185] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 26: [186] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [187] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 26: [188] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [189] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 26: [190] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [191] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 26: [192] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [193] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by / Condensed by

| Page 26: [194] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [195] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 26: [196] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [197] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 26: [198] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [199] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 26: [200] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [201] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 26: [202] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [203] Formatted | Author |
|---|---|

Normal, Indent: Left:  0", First line:  0.5", Right:  0", Line spacing:
Double

| Page 26: [204] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Not Bold, Font color: Auto, Character scale:
100%

| Page 26: [205] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [206] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [207] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 26: [208] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 29: [209] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%, Not
Expanded by / Condensed by

| Page 29: [210] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 29: [211] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%, Not
Expanded by / Condensed by

| Page 29: [212] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%, Not Expanded by /
Condensed by

| Page 29: [213] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%, Not
Expanded by / Condensed by

| Page 29: [214] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 29: [215] Formatted | Author |
|---|---|

Font: 13 pt, Font color: Auto, Character scale: 100%

| Page 29: [216] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%, Not
Expanded by / Condensed by

| Page 29: [217] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 29: [218] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

| Page 29: [219] Formatted | Author |
|---|---|

Normal, Indent: Left:  0", First line:  0", Right:  0", Space Before:  0 pt,
Line spacing:  single

| Page 29: [220] Formatted | Author |
|---|---|

Font: Times New Roman, 13 pt, Font color: Auto, Character scale: 100%

# Exhibit B

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 71 of 146    PageID 1694

2017 WL 4167512
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

UNITED STATES of America, Plaintiff,

v.

Wade Neal BARKER (3), Wilton McPherson Burt (4),
Jackson Jacob (8), Douglas Sung Won (9), Michael
Bassem Rimlawi (10), David Daesung Kim (11), William
Daniel Nicholson, IV (12), Shawn Mark Henry (13),
Mrugeshkumar Kumar Shah (14), Andrew Jonathan
Hillman (19), and Semyon Narosov (20), Defendants.

Criminal No. 3:16-CR-516-D
|
Signed 09/20/2017

**Attorneys and Law Firms**

Andrew O. Wirmani, Katherine Elizabeth Pfeifle, Mark
Joseph Tindall, United States Attorney's Office, Dallas, TX,
for Plaintiff.

Mark S. Werbner, Samuel T. Acker, Sayles Werbner, Lea F.
Courington, Edwin J. Tomko, Dykema Cox Smith, David
M. Finn, Milner Finn Price, Lindsay A. Hedrick, Jones Day,
James T. Jacks, Law Office of James T. Jacks, Richard B.
Roper, III, Thompson & Knight LLP, William Kim Wade,
The Wade Law Firm PC, Camille M. Knight, Michael P.
Gibson, Burleson Pate & Gibson LLP, Phillip W. Hayes, Law
Office of Phillip Hayes, Sarah Q. Wirskye, Meadows Collier
Reed Cousins & Blau LLP, Glenn D. Tucker, Law Office
of Glenn D. Tucker PC, Paul Edward Coggins, Kelly R.
Vickers, Locke Lord LLP, Jeffrey M. Tillotson, Tillotson Law,
Ronald W. Breaux, Stacy L. Brainin, Haynes & Boone LLP,
Thomas M. Melsheimer, Grant Kojis Schmidt, Scott Cashion
Thomas, Matthew D. Orwig, Winston & Strawn LLP, Jim
Burnham, Law Office of Jim Burnham, William B. Mateja,
Jason C. Hoggan, Polsinelli PC, Christopher Monroe Knox,
Law Office of Chris Knox, Jeffrey J. Ansley, Bell Nunnally &
Martin LLP, Ronald D. Wells, Law Office of Ronald D. Wells,
Ezekiel Tyson, Jr., Tyson Law Firm PLLC, Cody Lee Skipper,
Law Office of Cody L. Skipper, James S. Bell, James S.
Bell PC, Marlo P. Cadeddu, Law Office of Marlo P. Cadeddu
PC, Jay Ethington, Law Offices of Jay Ethington, Michael
Charles Elliott, Elliott Sauter, PLLC, Toby L. Shook, Toby
Shook Law, William C. McMurrey, Mark L. Watson, Dallas,
TX, Heath Enix Hyde, Law Office of Heath Hyde, Sulphur
Springs, TX, Sharon Beth Appelbaum, Law Offices of Sharon

Appelbaum, Santa Monica, CA, Thomas A. Mesereau, Jr.,
Mesereau Law Group, Los Angeles, CA, Dan L. Cogdell,
Cogdell Law Firm, Houston, TX, Oliver Benton Curtis, III,
Broad and Cassel, Miami, FL, Adam Lake Kobs, Law Office
of Adam Kobs, San Antonio, TX, for Defendants.

MEMORANDUM OPINION AND ORDER

SIDNEY A. FITZWATER, UNITED STATES DISTRICT
JUDGE

**\*1** Several defendants who are charged in a multi-count
indictment alleging various crimes related to an alleged
health care bribe and kickback scheme move under Fed. R.
Crim. P. 12(b)(1) to dismiss certain counts of the indictment.
Concluding that the indictment sufficiently states the offenses
charged and that no other reasons warrant dismissal, the court
denies the motions. [1]

I

Defendants are physicians or other individuals who were
associated with the now-closed Forest Park Medical Center
Dallas ("FPMC"), a physician-owned surgical hospital. The
indictment charges defendants with various health care and
financial crimes. In nine motions, several defendants move
to dismiss Count 1 [2] of the indictment, which charges
a conspiracy to pay and receive health care bribes and
kickbacks, in violation of 18 U.S.C. § 371, and/or to dismiss
Counts 12, 13, 15, and 17, which allege violations of the
Travel Act, 18 U.S.C. § 1952, and are predicated on violations
of Texas law. [3] The government opposes the motions. [4]

II

**\*2** Defendants Andrew Jonathan Hillman ("Hillman"),
Semyon Narosov ("Narosov"), Michael Bassem Rimlawi
("Rimlawi"), Douglas Sung Won ("Won"), Mrugeshkumar
Kumar Shah ("Shah"), Shawn Mark Henry ("Henry"), and
Jackson Jacob ("Jacob") move to dismiss Count 1 of the
indictment, which alleges a conspiracy to pay and receive
health care bribes and kickbacks, in violation of 18 U.S.C. §
371.

Case 4:25-cr-00259-P     Document 112-1     Filed 11/18/25     Page 72 of 146     PageID 1695

A

Some or all defendants maintain that the indictment relies on conduct that is barred by the five-year statute of limitations that applies to violations of 18 U.S.C. § 371, or neglects to disclose that certain defendants did not engage in alleged criminal conduct or participate in the alleged conspiracy within the limitations period; that to the extent defendants were involved in a conspiracy, it was a separate conspiracy that was completed before the limitations period began; that although the government may generally rely on a presumption of continuity to show that participation continued into the limitations period in the absence of overt acts by a defendant, the government is barred from doing so here because its own evidence conclusively establishes that defendants terminated their participation in the alleged conspiracy before the limitations period; that the indictment purports to charge one general conspiracy but actually charges several, separate conspiracies (e.g., three separate conspiracies, or twelve separate conspiracies); and that the indictment fails to adequately allege that the defendant in question was involved in a conspiracy or in any unlawful conduct. The court will consider defendants' motions together.[5]

B

To be sufficient, an indictment must " 'allege each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding.' " United States v. Lawrence, 727 F.3d 386, 397 (5th Cir. 2013) (quoting United States v. Morrow, 177 F.3d 272, 296 (5th Cir. 1999)). "Thus, an indictment is sufficient if it 'contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend.' " Id. (quoting United States v. Fuller, 974 F.2d 1474, 1480 (5th Cir. 1992)). "It is not necessary for an indictment to go further and to allege in detail the factual proof that will be relied upon to support the charges." United States v. Crippen, 579 F.2d 340, 342 (5th Cir. 1978) (citations omitted). "Generally, an indictment which follows the language of the statute under which it is brought is sufficient to give a defendant notice of the crime of which he is charged." United States v. Thomas, 348 F.3d 78, 82 (5th Cir. 2003) (internal quotation marks and citations

omitted); see also United States v. Massey, 849 F.3d 262, 264 (5th Cir. 2017); United States v. Hagmann, 950 F.2d 175, 182-83 (5th Cir. 1991). When the court decides a motion to dismiss the indictment for failure to state an offense, it is required to " 'take the allegations of the indictment as true and to determine whether an offense has been stated.' " United States v. Kay, 359 F.3d 738, 742 (5th Cir. 2004) (quoting United States v. Hogue, 132 F.3d 1087, 1089 (5th Cir. 1998)).

C

**\*3** 18 U.S.C. § 371—one of several federal conspiracy statutes—provides, in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. Count 1, which explicitly incorporates the preceding 41 paragraphs of the indictment, includes 104 paragraphs of its own (¶¶ 42-145), 47 paragraphs (¶¶ 99-145) of which allege overt acts. Paragraph 43 specifically identifies the offenses against the United States that defendants allegedly conspired to commit:

> From in or around early 2008, through in or about January 2013, the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of Texas and elsewhere, [defendants] and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other to commit certain offenses against the United States, that is: a.

United States v. Barker, Not Reported in Fed. Supp. (2017)

2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 73 of 146    PageID 1696

to violate 42 U.S.C. § 1320a-7b(b)(2) ...; b. to violate 42 U.S.C. § 1320a-7b(b)(1) ...; c. to violate 42 U.S.C. § 1320a-7b(b)(1) ...; and d. to violate 18 U.S.C. § 1952[.]

Indictment ¶ 43.

The court concludes that Count 1 of the indictment is sufficient "because it contains the elements of the offense charged and fairly informs the defendants of the charge against which they must defend." *United States v. Petras, 2016 WL 1054597, at \*2 (N.D. Tex. Mar. 17, 2016)* (Fitzwater, J.) (citing *United States v. Persing, 318 Fed.Appx. 152, 154 (4th Cir. 2008)* (per curiam) ("Because the indictment filed against [the defendant] alleged the essential elements of the offense, and tracked the statutory language, we find that the indictment was valid.")), *appeals docketed*, Nos. 16-11631 and 16-11648 (5th Cir. Nov. 16, 2016).

### D

As noted, defendants also contend that Count 1 is barred by the statute of limitations, as applied to them. The force of this argument depends, however, on the conclusion that Count 1 of the indictment charges multiple, independent conspiracies. The court agrees with the government that the allegations of Count 1, taken as true, charge a single, overarching conspiracy from in or around early 2008 through in or about January 2013. *See, e.g., United States v. Lokey, 945 F.2d 825, 831 (5th Cir. 1991)* (addressing constructive amendment challenge based on assertion that defendants were convicted of multiple conspiracies, not single conspiracy charged in indictment, and stating that "[w]hether the evidence proved one or more conspiracies turns on (1) whether there was a common goal, (2) the nature of the scheme, and (3) the overlap among the participants in the various dealings."). Because the court concludes that Count 1 sufficiently charges a single, overarching conspiracy, it holds that Count 1 cannot be dismissed on the basis that it charges an offense that is time-barred. This is so because the indictment charges that the last overt act occurred on September 28, 2012, within the limitations period. *See* Indictment ¶ 125.

**\*4** Accordingly, the court denies Hillman and Narosov's April 21, 2017 motion to dismiss indictment; Rimlawi's May 25, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Won's May 26, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Shah's May 31, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Henry's June 13, 2017 motion to dismiss count 1 of the indictment; and the part of Jacob's June 30, 2017 motion to dismiss indictment count one and the Travel Act Counts (13 through 18) and to join codefendants motions to dismiss that addresses count one.

### III

Defendants Henry, Kim, Nicholson, Rimlawi, Won,[6] Barker, Jackson, and Wilton McPherson Burt ("Burt") move to dismiss the Travel Act counts—Counts 12, 13, 15, and 17.[7] In four motions to dismiss, some or all defendants maintain that the indictment fails to state Travel Act offenses against the Surgeon Defendants[8] because it relies on the conduct of other defendants to satisfy the Act's most basic elements; the indictment cannot rely on the Texas Commercial Bribery Statute ("TCBS"), Tex. Penal Code Ann. § 32.43 (West 2017), as the predicate state-law violation because the TCBS is preempted by the federal Anti-Kickback Statute since the TCBS criminalizes conduct that the Anti-Kickback Statute specifically identifies as lawful and shields from prosecution under numerous "safe harbors"; the TCBS conflicts with a later-enacted and more specific Texas law—the Texas Solicitation of Patients Act ("TSPA"), Tex. Occ. Code Ann. § 102.001 (West 2012)—which incorporates federal safe harbors and governs the arrangements at issue in this case; the TCBS is unconstitutionally vague because it fails to provide adequate notice of the conduct it prohibits and encourages arbitrary and discriminatory enforcement; allowing the federal government to prosecute a health care provider under TCBS via the Travel Act would violate principles of federalism and Supreme Court precedent, given that the State of Texas has never prosecuted health care providers under the TCBS; the TCBS applies only to certain acts undertaken by a "fiduciary" in relation to the affairs of his "beneficiary," and it is clear from the face of the statute that Burt is neither a "fiduciary" under the statute nor did he have a fiduciary-beneficiary relationship with any of FPMC's patients; and the Travel Act count against Kim (Count 13) should be dismissed because it is barred by the

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 74 of 146    PageID 1697

statute of limitations. In the Surgeon Defendants' motion to dismiss the Travel Act counts in the superseding indictment, in addition to reasserting the arguments of their previous motions, they maintain that the new Counts 19, 20, and 21 must be dismissed for failing to properly allege a use of a facility in interstate commerce, as required under the Travel Act.

IV

The court considers first the contention that the indictment fails to state Travel Act offenses against the Surgeon Defendants—either as principals or as aiders and abettors—because it relies on the conduct of other defendants to satisfy the Act's most basic elements. Defendants contend that the indictment should be dismissed because the Travel Act counts fail to allege facts that would show the use of a facility in interstate commerce, the requisite *mens rea*, and the subsequent performance of an unlawful act covered by the statute. As noted above, to be sufficient, an indictment must "allege each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding." *Lawrence*, 727 F.3d at 397 (citation omitted); *see supra* § II(B). The court concludes that the Travel Act counts are sufficiently alleged because they include the elements of the charged crime and therefore allow defendants to prepare their defenses.

A

**\*5** The Travel Act prohibits use of interstate facilities to promote or carry on certain unlawful activities. *See* 18 U.S.C. § 1952(a). The Act provides:

(a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform—

(A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both[.]

*Id.* When defining "unlawful activity," the statute lists "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." *Id.* at § 1952(b). To sustain a conviction under the Travel Act, the government must prove (1) travel in interstate or foreign commerce, or use of the mail (or any facility) interstate or foreign commerce; (2) with specific intent to promote, manage, establish, carry on—or distribute the proceeds of—unlawful activity; and (3) knowing and willful commission of an act in furtherance of that intent subsequent to the act of travel. *United States v. Logan*, 949 F.2d 1370, 1380-81 (5th Cir. 1991) (citing *United States v. Hernandez-Palacios*, 838 F.2d 1346, 1350 (5th Cir. 1988)). Ultimately, because the Travel Act " 'fully and unambiguously sets out the essential elements of the offense, indictments drafted substantially in its language are sufficient.' " *Hagmann*, 950 F.2d at 183 (quoting *United States v. Stanley*, 765 F.2d 1224, 1239 (5th Cir. 1985)).

18 U.S.C. § 2, which governs guilt as an aider and abettor, provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2. It does not define a separate crime. *United States v. Walker*, 621 F.2d 163, 166 (5th Cir. 1980). Instead, it merely makes punishable as a principal one who aids or abets another in the commission of a substantive offense. *Id.* (citing *United State v. Cowart*, 595 F.2d 1023, 1031 n.10 (5th Cir. 1979)). To prove that a defendant is guilty as an aider and abettor, the government must prove that "the elements of the substantive offense occurred; and the defendant 'associate[d] himself with the venture, ... participate[d] in it as something ... he wishe[d] to bring about, ... [and sought] by his actions to make it succeed.' " *United States v. McDowell*, 498 F.3d 308, 313 (5th Cir. 2007) (brackets and ellipses in original) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed.

United States v. Barker, Not Reported in Fed. Supp. (2017)

2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 75 of 146    PageID 1698

919 (1949)). In this way, aiding and abetting liability requires "knowledge of all elements of the underlying crime." *Id.* at 315 (citing *United States v. Longoria,* 569 F.2d 422, 425 (5th Cir. 1978)). At the indictment stage, " 'the rule is well-established, both in this circuit and others, that one who has been indicted as a principal may be convicted on evidence showing that he merely aided and abetted the commission of the offense.' " *United States v. Davis,* 97 Fed.Appx. 486, 487 (5th Cir. 2004) (per curiam) (quoting *United States v. Bullock,* 451 F.2d 884, 888 (5th Cir. 1971)); *Walker,* 621 F.2d at 166.

**\*6** Paragraph 149 of the Indictment (¶ 147 of the superseding indictment) asserts Travel Act violations under an aiding and abetting theory of liability. It charges, in relevant part:

> From on or about November 15, 2011 through in or about January 2013 ... Toussaint, Barker, Beauchamp, Burt, Jacob, Henry, Kim, Foox, Won, Gonzales, and Nicholson, aiding and abetting one another and others known and unknown to the Grand Jury, used and caused to be used facilities in interstate commerce with the intent to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of an unlawful activity, that is, Commercial Bribery in violation of [the TCBS], and thereafter, to perform and attempt to perform acts to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of such unlawful activity[.]

Indictment ¶ 149. Paragraph 149 also contains a table with more specific factual allegations. The table is divided into six columns with the following titles: Count, Bribe or Kickback Payors, Bribe or Kickback Recipient, Use of Facility in Interstate Commerce, Acts Performed Thereafter, and Check #. Each row alleges specific facts for Counts 12 through 18.

### B

The Surgeon Defendants maintain that the Travel Act counts (Counts 12, 13, 15, and 17 of the Indictment) should be dismissed. Their multifaceted arguments can be divided into two larger theories.

First, they contend that the indictment fails to allege any of the three essential elements of § 1952. The Surgeon Defendants assert that they did not perform any of the uses of a facility in interstate commerce alleged in the indictment. Similarly, they posit that none of the indictment's allegations of intent is "linked to a Surgeon Defendant traveling or using a facility of interstate commerce ... with the intent to distribute the proceeds of an unlawful activity[.]" Ds. (Surgeon Defendants) Br. 10. The Surgeon Defendants also maintain that the indictment fails to demonstrate that they took any subsequent overt action to satisfy the third element of § 1952.

Second, the Surgeon Defendants contend on three grounds that the Travel Act counts are insufficient even under an aiding and abetting theory. They primarily assert that the Travel Act counts fail to specifically charge them with aiding and abetting violations of § 1952. Relatedly, they contend that the indictment does not demonstrate that they aided and abetted each material element of the alleged offense, instead relying on the acts of others. Finally, the Surgeon Defendants assert that an aiding and abetting theory fails because the indictment does not allege that any principal committed a Travel Act violation.

The government contests all grounds. It first responds that indictment provides the Surgeon Defendants with "unambiguous notice that they are charged under an aiding and abetting theory." Gov't Br. 10. Accordingly, the government argues that there is no requirement that a person who aids and abets a Travel Act violation have knowledge of the use of specifically interstate facilities, nor that the aider and abettor have specific intent regarding the use of those facilities. Instead, the government contends that the indictment sufficiently provides required notice to the Surgeon Defendants through the facts alleged in ¶ 149 and by further identifying the Surgeon Defendants' receipt of

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 76 of 146    PageID 1699

specific bribes, satisfying the Travel Act's subsequent overt act requirement.


C

**\*7**  The court concludes that the indictment sufficiently states the elements of the offense to provide the Surgeon Defendants with the notice required to prepare their defense. First, the indictment provides explicit notice of the government's intent to pursue an aiding and abetting theory of guilt. Not only does the relevant section of the indictment specify 18 U.S.C. § 2, but the text of ¶ 149 specifically charges that defendants were "aiding and abetting" one another, in violation of the Travel Act. [9] Paragraph 149 then proceeds to allege all of the essential elements of a § 1952 charge. The indictment's plain language tracks the language of 18 U.S.C. § 1952, alleging that the Surgeon Defendants—aiding and abetting themselves and the other defendants charged—used and caused to be used facilities in interstate commerce with the intent to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of an unlawful activity, (commercial bribery, in violation of the TCBS), and, thereafter, to perform and attempt to perform acts to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of such unlawful activity. The accompanying table then provides more notice to the Surgeon Defendants by specifying how each allegedly aided and abetted violations of the Travel Act by receiving specific bribe payments. Thus the Surgeon Defendants are capable of both asserting defenses against these charges, and, if necessary, invoking double jeopardy in the future.

Moreover, the indictment's notice of an aiding and abetting theory is not lessened or negated by the any of the Surgeon Defendants' contentions. Accepting the allegations of the indictment as true, ¶ 149's overarching factual basis and Travel Act charge indicates that the Surgeon Defendants had the required "knowledge of all the elements of the underlying elements of the offense" in order to aid and abet its commission. McDowell, 498 F.3d at 316. To sustain a conviction at trial, the government will of course need to prove that the Surgeon Defendants "aided and abetted each material element of the alleged offense[s]." United States v. Morrison, 833 F.3d 491, 501 (5th Cir. 2016) (brackets in original) (quoting United States v. Lombardi, 138 F.3d 559,

561 (5th Cir. 1998)). At the indictment stage, however, all that is required is notice that "enable[s] the accused to prepare his defense." Lawrence, 727 F.3d at 397. The Travel Act counts of the indictment satisfy this standard.

The Surgeon Defendants' final objection is that the indictment for aiding and abetting is insufficient because it fails to name a principal who committed all elements of the offense. A defendant cannot be convicted of aiding and abetting if there was no crime committed to aid or abet. See United States v. Barfield, 447 F.2d 85, 89 (5th Cir. 1971). But the court can find no authority in this circuit or others for the premise that an indictment for aiding and abetting must name a specific principal, nor do the Surgeon Defendants cite to any such authority. On the contrary, the Fifth Circuit has held that "it is not necessary [for aiding and abetting criminal culpability] that the principal be convicted or *even that the identity of the principal be established.*" Hendrix v. United States, 327 F.2d 971, 975 (5th Cir. 1964) (emphasis added); *see also* United States v. Lopez-Monzon, 2015 WL 13401899, at \*5 (S.D. Tex July 8, 2015) (citing Hendrix). As the foregoing analysis demonstrates, taken as true, the allegations of ¶ 149, and its accompanying table, sufficiently demonstrate that Travel Act violations took place. [10] Therefore, the indictment adequately alleges each essential element of the offense charged and enables the Surgeon Defendants to prepare their defense, and to invoke the double jeopardy clause in any subsequent proceeding.


V

**\*8**  The Surgeon Defendants attack the validity of the TCBS itself on a number of grounds. The court considers together defendants' contentions that the TCBS cannot support a Travel Act charge because it is preempted by federal law, conflicts with another Texas statute, and is unconstitutionally vague. [11]


A

The TCBS makes it unlawful for a fiduciary "without the consent of [the] beneficiary, [to] [ ] intentionally or knowingly solicit[ ], accept[ ], or agree[ ] to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 77 of 146    PageID 1700

affairs of [the] beneficiary." Tex. Penal Code Ann. § 32.43(b). Section 32.42(a) lists physicians among the various roles and professions that qualify as fiduciaries. Id. § 32.43(a)(2)(C).

B

The court first examines whether the TCBS is preempted under federal law. "Under the doctrine of federal preemption, a federal law supersedes or supplants an inconsistent state law or regulation." United States v. Zadeh, 820 F.3d 746, 751 (5th Cir. 2016). The Supreme Court has identified three types of preemption: express, field, and conflict. Id. Conflict preemption occurs either "(i) when compliance with both state and federal law is impossible" or "(ii) when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. [12] The Surgeon Defendants maintain that the obstacle component of conflict preemption applies here. What qualifies as a sufficient obstacle is a matter of judgment "informed by examining the federal statute as a whole and identifying its purpose and intended effects." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Indeed, "the purpose of Congress is the ultimate touchstone in every pre-emption case." Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (quoting Medtronic v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). The court approaches all preemption cases with the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Castro v. Collecto, Inc., 634 F.3d 779, 784 (5th Cir. 2011) (quoting Wyeth, 555 U.S. at 565, 129 S.Ct. 1187) (internal quotation marks omitted).

1

Defendants contend that the TCBS is preempted by federal law. They maintain that it is an obstacle to the accomplishment and goals of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and regulations promulgated under it, 42 C.F.R. § 1001.952. The Surgeon Defendants first contend that the TCBS criminalizes activity that federal law protects under safe harbor provisions. The federal safe harbor provisions under the Anti-Kickback Statute—both statutory and regulatory—arose from a "concern ... among a number of health care providers that many relatively innocuous, or even beneficial, commercial arrangements are technically covered by the [Anti-Kickback Statute] and are, therefore, subject to criminal prosecution." Proposed Rule: OIG Anti-Kickback Provisions, 54 Fed. Reg. 3088-01, 3088 (Jan. 23, 1989). The TCBS, in contrast, has no safe harbor provisions. Second, the Surgeon Defendants note that while the federal Anti-Kickback statute requires a "knowing and willful" mens rea, the TCBS reaches only "knowing" conduct.

2

*9 Because the Surgeon Defendants' conflict preemption contention depends on the "full purpose and objectives of Congress," the court begins with a brief overview of the Anti-Kickback Statute's text and history. Entitled "Criminal penalties for acts involving Federal health care programs," the current statute provides:

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind —

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(1). The statute's subsequent section also prohibits "knowingly and willingly" offering or paying any remuneration for the same purposes. Id. § 1320a-7b(b)(2). The offense can be reduced to three elements: (1) knowingly and willfully (2) soliciting or receiving a remuneration (3) in return for inducing business related to a federal health care program. See United States v.

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 78 of 146    PageID 1701

*Shoemaker*, 746 F.3d 614, 626-27 (5th Cir. 2014); *United States v. Turner*, 561 Fed.Appx. 312, 318 (5th Cir. 2014). The statute includes several safe harbors that specify situations that are exempt from these kickback prohibitions. ⚑ 42 U.S.C. § 1320a-7b(b)(3). The U.S. Department of Health and Human Services ("HHS") has also promulgated over twenty regulatory safe harbors. *See* 42 C.F.R. 1001.952.

The current statute originated as part of the Social Security Amendments of 1972. *See* Social Security Amendments of 1972, Pub.L. No. 92-603, § 242(b), 86 Stat. 1329, 1419 (1972). It has been periodically revised, with additional amendments specifying prohibited conduct and adding the "knowingly and willingly" *mens rea* element, for example. *See, e.g.,* Omnibus Reconciliation Act of 1980, Pub.L. No. 96-499, § 917, 94 Stat. 2599, 2625 (1980). The statute is one of "several important tools used to protect patients and the Federal health care programs from fraud[.]" 80 Fed. Reg. 66726, 66726 (Oct. 29, 2015); *see also* Office of Inspector Gen., *Fact Sheet: Federal Anti-Kickback Law and Regulatory Safe Harbors* (Nov. 1999) ("[T]he federal anti-kickback law's main purpose is to protect patients and the federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions.").

Relevant to this case, Congress began expanding the safe harbors to the anti-kickback provisions in 1977. There, Congress was responding to a concern that "the existing language of these penalty statutes [was] unclear and need[ed] clarification." ⚑ *United States v. Porter*, 591 F.2d 1048, 1054 (5th Cir. 1979) (quoting H.R. Rep. No. 95-393(II), at 53 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 3039, 3055) (internal quotation marks omitted). Congress again expanded the Anti-Kickback Statute's provisions in 1987. *See* Medicare and Medicaid Patient and Program Protection Act of 1987, Pub.L No. 100-93, §§ 4, 14, 101 Stat. 680, 688-89, 697-98 (1987). The Act directed the HHS Office of Inspector General ("HHS OIG") to establish "regulations specifying those payment practices that will not be subject to prosecution under [the federal Anti-Kickback Statute]." 56 Fed. Reg. 35952, 35952 (July 29, 1991); *see also* Pub.L No. 100-93, § 14 (1987). Similarly, in 1996 Congress directed the HHS OIG to create additional safe harbors in accordance with specified criteria in order to further "the interest of preventing fraud and abuse in Federal health care programs," while at the same time sparing "relatively innocuous commercial arrangements" from criminal prosecution. 79 Fed. Reg. 59717, 59718 (Oct. 3, 2014); *see also* Health Insurance Portability and Accountability Act of 1996, Pub.L. 104-191 § 205 (1996). To date, HHS OIG has specified 25 regulatory safe harbor provisions. *See* 42 C.F.R. 1001.952; Jennifer Maul, et al., *Health Care Fraud*, 54 Am. Crim. L. Rev. 1443, 1457-77 (2017).

**\*10** During the notice and comment period for several of these safe harbor proposals, commenters "requested that OIG clarify the relationship between the statute and various State laws." 56 Fed. Reg. 35952 (July 29, 1991); *see also* 71 Fed. Reg. 45110, 45115 (Aug. 8, 2006). Responding to these concerns in the 1987 expansion, the HHS OIG stated:

> Issues of state law are completely independent of the federal anti-kickback statute and these regulations. There is no federal preemption provision under the statute. Thus, conduct that is lawful under the federal anti-kickback statute or this regulation may still be illegal under State law. Conversely, conduct that is lawful under State law may still be illegal under the federal anti-kickback statute.

56 Fed. Reg. 35952 (July 29, 1991). Responding to a similar question in 2006, the HHS OIG again advised commenters that the Anti-Kickback Statute's new safe harbors did "not create an exception to or preempt any other Federal law or any State law" unless incorporated by reference. 71 Fed. Reg. 45110, 45115 (Aug. 8, 2006). In addition, Executive Order 13132 has required all federal agencies since 1999 to satisfy additional prerequisites before promulgating rules that have federalism implications or that preempt state or local law. Exec. Order No. 13132, 64 Fed. Reg. 43255 (Aug. 10, 1999). In compliance with this Executive Order, all subsequent HHS OIG promulgations of anti-kickback safe harbor provisions explicitly state that the regulations "do not ... preempt State or local law[.]" 71 Fed. Reg. 45110, 45135 (Aug. 8, 2006); 72 Fed. Reg. 56632, 56643 (Oct. 4, 2007); 81 Fed. Reg. 88368, 88399 (Dec. 7, 2016). Congress itself has offered no additional guidance on the preemptive character of the Anti-Kickback Statute.

3

United States v. Barker, Not Reported in Fed. Supp. (2017)

2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 79 of 146    PageID 1702

In support of their assertion that the TCBS is an obstacle to the purpose of the federal Anti-Kickback statute, the Surgeon Defendants rely heavily on *State v. Harden*, 938 So.2d 480 (Fla. 2006), the only reported case holding that the federal Anti-Kickback Statute preempts state law. In *Harden* the Supreme Court of Florida held that federal law preempted Florida's anti-kickback statute, which had no safe harbors and required only a "knowing" *mens rea*. [13] The court looked to the legislative history and found that the state law "criminalize[d] conduct that federal law specifically intended to be lawful and shielded from prosecution." *Id.* at 492-93. Comparing *Harden* to this case, however, demonstrates how obstacle preemption is an ill-fitting argument for the Surgeon Defendants.

The Florida statute and the federal Anti-Kickback Statute addressed the same conduct performed by the same individuals. Both provisions applied only to kickbacks related to a federal health care program, such as Medicaid. *Compare* Fla. Stat. Ann. § 409.920(2)(e) (2000) (prohibiting solicitation, offer, payment, or receipt of any remuneration in return for referring an individual "under Medicaid"), *with* 18 U.S.C. § 1320a-7b(b)(1) (prohibiting remuneration in return for referrals for which payment may be made under a "Federal health care program"). Moreover, both the Florida statute and federal law applied to any person who accepted kickbacks in relation to these federal funds, not just fiduciaries. *See* 18 U.S.C. § 1320a-7b(b)(1); Fla. Stat. Ann. § 409.920(2)(e) (2000). While the targets of both the federal and state statutes were aligned, the manner in which each pursued the targets differed. In this way, the Florida statute's lack of safe harbor provisions and lower *mens rea* requirement created a stronger case for obstacle preemption. It took the same actors' conduct that federal law had exempted and exposed it to state criminal liability. [14]

**\*11** Unlike the Florida statute, both the conduct and persons regulated by the TCBS are different from those the federal Anti-Kickback statute targets. The TCBS is broader than the Anti-Kickback Statute in some respects and narrower in others. The TCBS applies across industries, whereas federal law applies only to federal health care programs. *See* Tex. Penal Code Ann. § 32.43(b). But the TCBS is also narrower than federal law because it applies only to fiduciaries; the Anti-Kickback Statute has no such limitations. *Compare id.* with 18 U.S.C. § 1320a-7b(b)(1). Therefore, the TCBS's lack

of safe harbor provisions is of less consequence than in the Florida case. Congress and the Texas state legislature are using these statutes to address different types of conduct performed by different potential actors. Taken together with consistent regulatory guidance that "[i]ssues of state law are completely independent of the federal [A]nti-[K]ickback [S]tatute and [its] regulations," 56 Fed. Reg. 35952 (July 29, 1991); *see also* 71 Fed. Reg. 45110, 45115 (Aug. 8, 2006) (advising the relevant anti-kickback safe harbor did not provide authority to preempt state law); 72 Fed. Reg. 56632, 56643 (Oct. 4, 2007) (same); 81 Fed. Reg. 88368, 88399 (Dec. 7, 2016) (same), and the absence of Congressional intent to the contrary, the TCBS's differing subject matter and reach suggest that it is not an obstacle to the federal Anti Kickback Statute's purpose and goals.

None of the other cases the Surgeon Defendants cite suggests otherwise. As in *Harden*, preemption in each of these cases resulted from a direct conflict or obstruction of the express goals of an agency or statute. *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), is particularly illustrative. In *Geier* the Court held that a state common-law tort action asserting that an auto manufacturer should have equipped a car with airbags —which federal standards did not require at the time— was preempted by federal law. Congress had specifically deferred to the Department of Transportation ("DOT") on the matter of airbag implementation, and the DOT had explicitly chosen not to require airbags in all cars in order to slowly phase them in over time. *Id.* at 875, 883, 120 S.Ct. 1913. The other cited cases offer similarly direct conflicts with federal goals. *See Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, ___ U.S. ___, 137 S.Ct. 1421, 197 L.Ed.2d 806 (2017) (holding that state statute requiring power of attorney to have explicit statement of intent to arbitrate before representative could consent to arbitration directly undermined Congressional intent behind Federal Arbitration Act: that arbitration agreements be treated equally to other contractual provisions); *Witty v. Delta Airlines, Inc.*, 366 F.3d 380 (5th Cir. 2005) (holding that failure-to-warn suit's requested warning of risk of injury resulting from sitting long periods of time on an airline would directly obstruct federal policy that passengers stay in their seats).

In contrast, the court finds no direct obstruction of federal goals here. Nothing in the federal Anti-Kickback statute or its regulations indicates that Congress intended the federal Anti-

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 80 of 146    PageID 1703

Kickback Statute to be the *exclusive* means of prosecuting health care fraud—indeed, the long coexistence of the federal statute with parallel state statutes suggests the opposite. Moreover, the alleged "conflict" here does not arise from criminalizing exact conduct federal law protects, as in *Harden*. Instead, it is based on criminalizing behavior the federal law does not address.

The directness of the TCBS's conflict aside, the Surgeon Defendants still contend that where the TCBS and the federal Ant-Kickback Statute do overlap, the TCBS is preempted because it "criminalizes numerous arrangements that are permitted—even encouraged—under federal law" through the safe harbor provisions. Ds. (Surgeon Defendants) Br. 14. But the TCBS does not place the federal safe harbors out of a Texas physician's reach. Even where such a physician is dealing with Medicare patient, and a safe harbor provision is applicable (a hypothetical that does not match this case), the physician, with the patient's consent, can accept a benefit that the TCBS otherwise prohibits. *See* Tex. Penal Code Ann. § 32.43(b) ("A person who is a fiduciary commits an offense if, *without the consent of his beneficiary ...*") (emphasis added). In a field defined by its cooperative federalism, this extra step does not qualify as a preemptive obstacle to Congress's "full purpose and objectives" for the Anti-Kickback Statute or its safe harbors.

**\*12** For the court to infer preemption in this case, the obstacle to a federal goal must be clear enough to overcome the strong presumption against displacing the state's traditional police powers. *See Castro*, 634 F.3d at 784-85. Based on the foregoing analysis, the court cannot reach that conclusion, and therefore holds that federal law does not preempt the TCBS. [15]

## C

Defendants next challenge the TCBS as invalid under state law on that basis that it was superseded by the TSPA. Under the TSPA, a person commits a misdemeanor if he "knowingly offers to pay or agrees to accept, directly or indirectly, overtly or covertly any remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency." Tex. Occ. Code Ann. § 102.001(a). The TSPA incorporates all of the safe harbors under the federal Anti-Kickback Statute. *Id.* § 102.003. Defendants

contend that this statute, and its incorporation of the federal safe harbor provisions, supplant the earlier-passed TCBS.

## 1

Where, as here, the proper resolution "turns on the interpretation of Texas law, 'we are bound to apply [Texas] law as interpreted by the state's highest court.' " *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel L.L.C.*, 620 F.3d 558, 564 (5th Cir. 2010) (brackets in original) (quoting *Barfield v. Madison Cnty., Miss.*, 212 F.3d 269, 271-72 (5th Cir. 2000)). Not unlike their federal counterparts, [16] Texas courts aim to give full effect to the Legislature's intent and assume "[t]he plain language of a statute is the surest guide to the Legislature's intent." *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 507 (Tex. 2012); *see also In re Lee*, 411 S.W.3d 445, 451 (Tex. 2013); *Am. Zurich Ins. Co. v. Samudio*, 370 S.W.3d 363, 368 (Tex. 2012). The court takes "the Legislature at its word, and the truest measure of what it intended is what it enacted," and looks at "the language of the specific section at issue, as well as the statute as a whole." *In re Office of Attorney Gen.*, 422 S.W.3d 623, 629 (Tex. 2013). "[U]nambiguous text equals determinative text," and " '[a]t this point, the judge's inquiry is at an end.' " *Id.* (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 652 (Tex. 2006)). A court should not resort to rules of construction or extratextual information to construe a statute when its language is clear and unambiguous. *Id.*

**\*13** Where the text is ambiguous, however, the Texas Legislature has codified several rules of construction. Under the Texas Construction Code Act, "if statutes enacted at the same or different session of the legislature are irreconcilable, the statute latest in date of enactment prevails." Tex. Gov't Code Ann. § 311.025(a). When a specific provision and a general provision appear to conflict, "the provisions shall be construed, if possible, so that effect is given to both." *Id.* § 311.026(a). Thus "a court should first attempt to harmonize apparently conflicting statutes." *Green v. JPMorgan Chase Bank, N.A.*, 937 F.Supp.2d 849, 858 (N.D. Tex. 2013) (Godbey, J.); *see also Argonaught Ins. Co. v. Baker*, 87 S.W.3d 526, 531 (Tex. 2002). If this attempt at reconciliation fails, Texas law provides that "the special or local provision prevails as an exception to the general provision, unless the

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 81 of 146    PageID 1704

general provision is the later enactment and the manifest interest is that the general provision prevail." 🚩 Tex. Gov't Code Ann. § 311.026(b). A court may consider several factors in construing a statute, including the circumstances of the statute's enactment, the legislative history, object aimed to be attained, and the consequences of a particular construction.

*Id.* § 311.023. This doctrine of *in pari materia* codified in 🚩 § 311.026, however, only applies if the two statutes "deal with the same general subject, have the same general purpose, or relate to the same person or thing or class of person or things." *Jones v. State*, 396 S.W.3d 558, 561 (Tex. Crim. App. 2013); *see also Shear v. State*, 2014 WL 1882757, at *1 (Tex. Crim. App. May 8, 2014).

2

The Surgeon Defendants maintain that the TCBS and the TSPA are irreconcilable. Because the TSPA incorporates all of the federal Anti-Kickback Statute's statutory and regulatory safe harbors, they contend that the TSPA "conflicts with the [TCBS] by permitting conduct that would plainly violate [the TCBS]." Ds. (Surgeon Defendants) Br. 17. Applying both 🚩 § 311.025 and 🚩 § 311.026, they contend that between the two conflicting statutes, the TSPA is the more specific and the TCBS is the more general. While the TCBS is the state's general bribery provision, the TSPA applies only to those who knowingly refer or solicit health care patients. They also note that the TSPA is the later enacted statute. Thus the Surgeon Defendants posit that, under Texas law, the TSPA and its incorporated federal safe harbors should control over the TCBS.

The court concludes that neither 🚩 § 311.025 nor 🚩 § 311.026 applies to this case because, under their plain text, the TCBS and the TSPA are not irreconcilable. [17] Like the TCBS and the federal Anti-Kickback Statute, the TCBS and the TSPA can be read together without undermining either's effect. Their language indicates that the two statutes require different elements of proof and apply to different potential actors, which negates any conflict. Under the TSPA, any "person" who knowingly pays or accepts remunerations for securing or soliciting heath care patients commits a misdemeanor. *See* Tex. Occ. Code Ann. § 102.001(a). This includes not only physicians, but any individual or legal entity. *See* 🚩 Tex. Gov't Code Ann. § 311.005(2) (defining "person" to include any corporation or legal entity). The

TCBS, in a health care setting, specifically applies to physicians or other fiduciaries. Tex. Penal Code Ann. § 32.43(a). Moreover, to incur culpability, the physician needs to accept a benefit "on agreement or understanding that the benefit will influence the conduct of the fiduciary" relating to a patient without receiving that patient's consent. *Id.* § 32.43(b). Thus in the health care context, the TCBS applies to both narrower conduct and a narrower group of actors.

That physicians could fall under both statutes does not raise an irreconcilable conflict —just as it did not with the TCBS and the federal Anti-Kickback Statute. Here, physicians as fiduciaries have an additional duty under the TCBS either to obtain the consent of their patients before receiving a benefit that affects the patients' care or to refrain from receiving the benefit. That physicians must accomplish this extra step does not make the TSPA's incorporated safe harbors unattainable for physicians—their role as fiduciaries would simply require them to comply with additional requirements. As a result, there is no irreconcilable conflict between the statutes.

**\*14** The Surgeon Defendants rely primarily on 🚩 *Lee,* 411 S.W.3d at 451, to argue, first, that the TCBS and TSPA conflict, and, second, that §§ 311.025-026 apply. In 🚩 *Lee* the Supreme Court of Texas held that 🚩 § 153.0071 of the Family Code controlled a court's ability to overturn a mediated settlement agreement—as opposed to other provisions of the Family Code. But the 🚩 *Lee* court—although mentioning §§ 311.025-026 in its analysis —grounded its decision on the plain language of the Family Code. In addition to plainly stating a procedure for reviewing mediated settlement agreements, 🚩 § 153.0071 "unambiguously states that a party is 'entitled to judgment' on [a mediated settlement agreement] that meets the statutory requirements 'notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law.' " 🚩 *Id.* at 453 (quoting 🚩 Tex. Fam. Code Ann. § 153.0071). The 🚩 *Lee* court held that "[t]he use of the word 'notwithstanding' indicates that the Legislature intended 🚩 section 153.0071 to be controlling." 🚩 *Id.* at 454. Here, the Surgeon Defendants point to no such language in the TSPA, and analysis of the relevant text indicates that there is no conflict. Because the two statutes are not irreconcilable, the court holds that the TSPA does not control over the TCBS.

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 82 of 146    PageID 1705

D

The Surgeon Defendants' final challenge to the TCBS is that it is unconstitutionally vague as applied.

1

The application of a criminal statute fails to comport with the Fifth Amendment's Due Process Clause if the statute " 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.' " *United States v. McRae*, 702 F.3d 806, 837 (5th Cir. 2012) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010)). "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975) (citation omitted). Moreover, when considering an as-applied challenge, the court analyzes "whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.' " *Holder*, 561 U.S. at 18-19, 130 S.Ct. 2705 (brackets in original) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)); *see also* *McRae*, 702 F.3d at 837.

2

Defendants rely on several reasons to contend that the TCBS is unconstitutionally vague. First, they maintain that the statute is vague as applied here because it is being used to criminalize conduct that is explicitly legal under the TSPA. The court disagrees, for the reasons explained *supra* at § V(C).

Second, defendants argue that the statute—which prohibits accepting or soliciting a benefit "on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary," Tex. Penal Code Ann. § 32.43(b)—is unconstitutionally vague

because it does not define "influence the conduct of the fiduciary." Defendants posit that this opens individuals to criminal prosecution for innocuous arrangements, especially in the health care industry. In their brief, defendants present the following hypothetical: "a pharmaceutical company provides a physician with free samples—technically a benefit —and the physician prescribes the drug to her patients after noticing its efficacy in those who received samples." Ds. (Surgeon Defendants) Br. 19. Would the physician in this hypothetical be subject to criminal culpability under the TCBS? Surgeon Defendants maintain that the answer is unknowable from the TCBS's text, and that the statute is therefore unconstitutionally vague. The court disagrees.

" '[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.' " *Holder*, 561 U.S. at 19, 130 S.Ct. 2705 (quoting *Hoffman Estates*, 455 U.S. at 495, 102 S.Ct. 1186) (reversing court of appeals' decision in an as-applied vagueness challenge for considering a "statute's application to facts not before it"). Regardless of the Surgeon Defendants' hypothetical, the term "influence" is not vague in respect to their conduct. [18] Taking the allegations of the indictment as true, the Surgeon Defendants accepted bribe payments from officers of FPMC in exchange for referring patients to FPMC. But for these payments, the Surgeon Defendants would have referred the patients elsewhere. To a person of ordinary intelligence, the officers of FPMC paid the Surgeon Defendants with the mutual understanding that doing so would influence the Surgeon Defendants' care of their patients. Because this conduct aligns with the elements of a TCBS violation, the TCBS provided fair notice of what was prohibited.

**\*15** Third, defendants contend that the TCBS is vague because it does not require proof that the beneficiary or patient was harmed. Defendants cite no case law supporting the theory that harm is required to criminalize bribery. Nor do the myriad federal bribery and corruption statutes mandate such a particularized showing of harm to a victim. *See, e.g.,* 18 U.S.C. § 201(b) (criminalizing corrupt promise or transfer of anything of value to influence official act of federal official); 18 U.S.C. § 201(c) (criminalizing transfer of anything of value to federal official for or because of official act); 18 U.S.C. § 203 (prohibiting members of Congress from receiving compensation for representational services); 18 U.S.C. § 208 (prohibiting executive branch officials

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 83 of 146    PageID 1706

from participating in government decisions in which they have a financial interest). These public corruption statutes often embody the concept that any action induced by a bribe harms the public because the bribe recipient has "set aside the public trust for private advantage." Daniel Hays Lowenstein, *Political Bribery and the Intermediate Theory of Politics*, 32 UCLA L. Rev. 784, 806 (1985). If the term "public" is replaced by "beneficiaries," the same logic applies to a fiduciary. Similarly, legislatures sometimes enact bright-line prophylactic prohibitions of an activity because of that activity's common tendency to lead to more specific harms.

*See, e.g.,* 🚩*United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 550, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) (allowing "prophylactic" penal statute to stand because it was the evident intent of Congress). Rather than muddle notice, such prophylactic rules arguably give potential defendants *more* notice by clearly delineating their rights and duties, as opposed to a statute conditioning punishment on a subsequent harm that may or may not occur. The TCBS is one such statute. Therefore, the court rejects this argument.

Fourth, defendants contend that the TCBS encourages arbitrary enforcement because of its vagueness. Defendants posit that the statute "defers to a prosecutor where to draw the line between, on the one hand, a minor influence on a physician who would have referred her patients to a particular hospital anyway, and on the other hand, a significant influence[.]" Ds. (Surgeon Defendants) Br. 20-21.

The Surgeon Defendants cite 🚩*Women's Medical Center of Northwest Houston v. Bell*, 248 F.3d 411 (5th Cir. 2001), for the proposition that the TCBS impermissibly "subjects a person to sanctions based on the subjective viewpoints of others, not their own behavior." Ds. (Surgeon Defendants) Reply Br. 16. They appear to contend that 🚩*Bell* prohibits a prosecutor's subjective (and potentially inconsistent) application of prosecutorial discretion in cases like theirs, and that the statute is therefore unconstitutionally vague. But 🚩*Bell* is wholly unrelated to prosecutorial discretion. Instead, the Fifth Circuit in 🚩*Bell* addressed a Texas statute that penalized behavior when a patient did not receive quality care, defined as "[t]he degree to which care meets or exceeds the expectations set by the patient." 🚩*Bell*, 248 F.3d at 422. *Bell* is irrelevant here. And defendants have not cited any other case that would suggest that exercise of prosecutorial discretion is inappropriate based on the prosecutor's view of the severity of the offense.

The Surgeon Defendants do not present any other new reason why the TCBS encourages arbitrary enforcement; instead, their argument incorporates defendants' other vagueness arguments that the court has rejected. Accordingly, the court denies the Surgeon Defendants' motion to dismiss on vagueness grounds.

VI

Defendants advance an additional argument for why the government's Travel Act counts should not rely on the TCBS: federalism. According to defendants, Texas has never prosecuted a health care provider under the TCBS, and "[a]llowing the Government to transform a state law ignored by state prosecutors into a federal crime would impermissibly alter sensitive federal-state relationships[.]" Ds. (Surgeon Defendants) Br. 21 (internal quotation marks and citations omitted). But this federalism concern is misplaced and has been rejected by the Supreme Court. "Because [Travel Act] offenses are defined by reference to existing state as well as federal law, it is clear beyond doubt that Congress intended to add a second layer of enforcement supplementing what it found to be inadequate state authority and state enforcement."

🚩*Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). Similarly, "[b]ecause the Travel Act was within Congress' constitutional prerogative to enact, commercial bribery coupled with a sufficient interstate nexus is a matter of federal concern." 🚩*United States v. Welch*, 327 F.3d 1081, 1093 (10th Cir. 2003). This reasoning has led multiple federal appellate courts to reject federalism challenges to the Travel Act. *See, e.g.,* 🚩*id.*; 🚩*United States v. Nader*, 542 F.3d 713, 721-22 (9th Cir. 2008) (holding that interpreting the Travel Act broadly to encompass intrastate telephone calls does not offend principles of federalism); *United States v. Halloran*, 664 Fed.Appx. 23, 26 (2d Cir. 2016) (rejecting federalism challenge "without evidence that prosecutors affirmatively declined to prosecute similar schemes in the past"), *cert. denied sub nom. Tabone v. United States*, ––– U.S. ––––, 137 S.Ct. 1361, 197 L.Ed.2d 523 (2017)

**\*16** Nor does the Surgeon Defendants' reliance on 🚩*United States v. Ferber*, 966 F.Supp. 90 (D. Mass. 1997), undermine this reasoning. The 🚩*Ferber* court dismissed Travel Act charges that were predicated on Massachusetts's state gratuity statute. 🚩*Id.* at 106. Because the predicate offense for a

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 84 of 146    PageID 1707

Travel Act violation must be "extortion, bribery, or arson in violation of the laws of the States in which it is committed," 18 U.S.C. § 1952(b), federal prosecutors argued that such a gratuities violation constituted "bribery" under Massachusetts law. The court disagreed, determining that the defendant's specific conduct did not constitute "bribery" under Massachusetts criminal law, and therefore could not be a predicate offense under the Travel Act without "upset[ting] the delicate balance between the powers of the federal and state sovereigns." 🚩 *Ferber*, 966 F.Supp. at 103. In the present case, however, the Surgeon Defendants do not contest that the TCBS is not bribery under Texas law. And even the 🚩*Ferber* court stated that "[t]here is no doubt that a violation of the Massachusetts bribery statute is a valid predicate offense under the Travel Act." 🚩*Id.* at 103. Therefore, because commercial bribery coupled with a sufficient interstate nexus is a matter of federal concern, the court concludes that the Travel Act counts do not run afoul of federalism principles.

VII

Burt contends that the Travel Act counts against him—Counts 12, 13, 15, and 17— cannot apply because the government has not alleged that he (1) had any identifiable beneficiary and (2) that his conduct towards an alleged beneficiary was influence to a sought benefit. Burt maintains that this means the government cannot show that he violated the TCBS, and therefore cannot establish a Travel Act violation. The court disagrees.

The indictment specifically charges that Burt, and the other defendants, aided and abetted each other's Travel Act offenses. It is irrelevant that Burt himself might not be liable under the TCBS; if he aided and abetted another who can be guilty, he may be punished as if he committed the crime. *See* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.") Because the court concludes *supra* at § IV(C) that the indictment sufficiently charges a Travel Act violation, it denies Burt's motion to dismiss on this ground.

VIII

Kim also contends that the Travel Act count he is charged with —Count 13—is barred by the five-year statute of limitations. The statute of limitations begins to run when "all elements of the crime are first satisfied." *United States v. Ongaga*, 820 F.3d 152, 159 (5th Cir. 2016).

According to Kim, Count 13 is based only on an email allegedly sent on November 14, 2011. The statute of limitations would have run on November 14, 2016—two days before the indictment was returned. The government responds that the final element of the Travel Act charge, a subsequent act, was not satisfied until December 5, 2011. The indictment charges that an "act[ ] performed thereafter" occurred "[o]n or about December 5, 2011, [when] a check for $125,000 cleared a bank account controlled by Kim. The payment was made to Kim in exchange for his referring patients to FPMC as opposed to other facilities." Indictment ¶ 149. This allegation sufficiently alleges that the elements of the crime were not complete until December 5, 2011, and therefore the statute of limitations had not run when the indictment was filed. *See supra* § II(B).

IX

In the Surgeon Defendants' motion to dismiss the Travel Act counts in the superseding indictment, they raise a new argument: that the new counts do not allege a use of a facility in interstate commerce, as required by § 1952. [19] They assert that the clearing of a check over interstate wires to an Atlanta server—when the transaction is otherwise between two Texas banks—does not qualify as a "use of a facility in interstate commerce" because the interstate nature is too incidental to the alleged criminal activity.

**\*17** There is "no requirement that the use of interstate facilities be essential to the scheme: it is enough that the interstate travel or use of interstate facilities makes easier or facilitates the unlawful activity." 🚩*United States v. Perrin*, 580 F.2d 730, 736 (5th Cir. 1978), *aff'd*, 🚩444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979); *see also* 🚩*United States v. Jones*, 642 F.2d 909, 913 (5th Cir. 1981) ("As long as the interstate travel or use of the interstate facilities and the subsequent facilitating act make the unlawful activity easier, the jurisdictional requisites under § 1952 are complete.");

🚩*United States v. Pecora*, 693 F.2d 421, 424-25 (5th Cir. 1982) (citing 🚩*Perrin* and 🚩*Jones*). Moreover, Fifth

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 85 of 146    PageID 1708

Circuit cases establish that because the terms "facilities of interstate commerce" and "facilities in interstate commerce" are synonymous, federal statutes using the latter phrase reach purely intrastate uses of interstate commerce facilities. *See* United States v. Marek, 238 F.3d 310, 317-18 (5th Cir. 2001) (en banc). Thus the purely intrastate use of the mail is sufficient to invoke federal jurisdiction under the Travel Act because it is a specified example of a facility in interstate commerce under the statute. *See* United States v. Heacock, 31 F.3d 249, 254-55 (5th Cir. 1994).

The Surgeon Defendants rely on United States v. Blake, 684 F.Supp. 441, 444-45 (S.D. Miss. 1988), which held that the "clearing of local checks given by a local resident to local residents which happened to have crossed state lines in the clearing process is too tenuous a connection with interstate commerce to support Travel Act jurisdiction." In *Blake*, however, the court only minimally engaged in *Perrin*'s rule, instead differentiating the *Blake* case from *Perrin* factually and relying on out-of-circuit authority for its holding. *See* id. at 443-45; United States v. Isaacs, 493 F.2d 1124, 1146-49 (7th Cir. 1974) (holding that where check passed between two Illinois banks, but was cleared through St. Louis, Missouri, "the use of interstate facilities [ ] was so minimal [and] incidental" to the scheme that there was

no jurisdiction under the Travel Act). But the *Perrin* court, in devising its rule, specifically rejected *Isaac*'s focus on the nature and degree of interstate activity. *See* Perrin, 580 F.2d at 735-36. Therefore, to the extent *Blake* contradicts Fifth Circuit precedent, the court declines to follow *Blake*'s approach.

Applying Fifth Circuit precedent to this case, the court holds that depositing a check—where the check's data were wired to an Atlanta server and back to Texas—is a use of facility in interstate commerce. Under the indictment, this use facilitated the alleged bribe payment from the FPMC officers to the Surgeon Defendants. Therefore, the court holds that the Travel Act counts sufficiently alleges a use of a facility in interstate commerce.

\* \* \*

For the reasons explained, the court denies defendants' motions to dismiss.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4167512

---

## Footnotes

1    This memorandum opinion and order decides all motions addressed to the indictment and a September 14, 2017 motion to dismiss the Travel Act counts in the superseding indictment, filed by the Surgeon Defendants (*see infra* note 6 for a definition of the term "Surgeon Defendants"). On August 30, 2017 the grand jury handed up a superseding indictment. The superseding indictment adds Travel Act counts (new Counts 19, 20, and 21) and makes other changes that, *inter alia*, affect paragraph numbers that this memorandum opinion and order cites from the indictment. The court has determined that it should not deny the pending motions as moot or require additional briefing given the substantial similarities between the indictment and the superseding indictment, and the delay and expense associated with requiring new motions and briefing. If, in addition to the Surgeon Defendants, other defendants move to dismiss the superseding indictment on the grounds set out in the present motions, the court will apply today's memorandum opinion and order to those motions to the extent it applies.

2    The indictment refers to this count as "Count One." For consistency—the other counts are designated by numerals—the court will refer to this count as "Count 1."

United States v. Barker, Not Reported in Fed. Supp. (2017)
2017 WL 4167512

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 86 of 146    PageID 1709

3    The following motions are addressed in this memorandum opinion and order: Andrew Jonathan Hillman and Semyon Narosov's April 21, 2017 motion to dismiss indictment; Michael Bassem Rimlawi's May 25, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Douglas Sung Won's May 26, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Mrugeshkumar Kumar Shah's May 31, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Surgeon Defendants' (Drs. Henry, Won, Rimlawi, Kim, and Nicholson's) June 5, 2017 motion to dismiss the Travel Act counts; Wade Neal Barker's June 7, 2017 motion to dismiss the Travel Act counts; Shawn Mark Henry's June 13, 2017 motion to dismiss count one of the indictment; Jackson Jacob's June 30, 2017 motion to dismiss indictment count one and the Travel Act Counts (13 through 18) and to join codefendants motions to dismiss; Wilton McPherson Burt's July 7, 2017 motion to dismiss the Travel Act counts (12, 13, 15, and 17) in the indictment and to join in codefendants' motion to dismiss; and Surgeon Defendants' September 14, 2017 motion to dismiss the Travel Act counts in the superseding indictment.

4    Some defendants have requested oral argument. These requests are denied based on the court's determination that oral argument would not aid the court's decisional process. *See* N.D. Tex. Crim. R. 47.1(g) ("Unless otherwise directed by the presiding judge, oral argument on a motion will not be held.").

5    In some respects, defendants' motions read more like post-verdict challenges to the sufficiency of the evidence than to pretrial challenges to the sufficiency of the indictment.

6    Drs. Henry, Kim, Nicholson, Rimlawi, and Won filed a joint motion in which they refer to themselves collectively as the "Surgeon Defendants."

7    In Jackson's motion, he challenges Counts 13 through 18. The court's decision applies to all such counts.

8    *See supra* note 6 for the defendants who are included in the group of "Surgeon Defendants."

9    The Surgeon Defendants contend that the table of specific Travel Act counts only states that defendants Beauchamp, Touissant, Barker, Burt, and Jacob were "aiding and abetting" each other, without mentioning the Surgeon Defendants. But this isolated text does not detract from the notice provided in ¶ 149, which explicitly lists the Surgeon Defendants as aiders and abettors. Moreover, this text is only found in the "Bribe or Kickback Payors" column, after Beauchamp, Touissant, Barker, Burt, and Jacob are listed as bribe or kickback payors. Having been preceded by ¶ 149, the logical inference from this text is that Beauchamp, Touissant, Barker, Burt, and Jacob specifically worked together as bribe payors—not that they were the only aiders and abettors to the Travel Act violations as a whole.

10   The indictment can, in fact, be read as naming specific principals. In the table of specific counts, the column entitled "Acts Performed Thereafter" lists the third element of the Travel Act for each count. The indictment alleges these claims in the passive voice, which serves to highlight the alleged receipt of a bribe by each Surgeon Defendant. In order for one to receive a bribe, however, someone else must pay the bribe. The table specifies "Bribe or Kickback Payors" for each specific count. If, as the indictment charges, the bribe payors made the payments listed in the "Acts Performed Thereafter" column—and made separate uses of facilities in interstate commerce—they committed all three elements of the Travel Act, and therefore acted as principals, as charged in the indictment.

11   The government contends that the court should not consider challenges to the state statute because state law only serves a definitional purpose under the Travel Act. The court need not consider this issue because it rejects each of defendants' challenges to the TCBS.

12   Defendants do not contend that the TCBS is preempted under express preemption or field preemption.

13    The court in 🏴 *Harden* noted that case law on this issue is very thin, possibly because many states' anti-kickback statutes were drafted to align with the federal law. 🏴 *Harden*, 938 So.2d at 492 n.9.

14    While acknowledging the comparative strength of the preemption claim in 🏴 *Harden*, the court here takes no position on the Supreme Court of Florida's ultimate holding in that case.

15    As noted, the Surgeon Defendants also argue that preemption applies because the TCBS imposes a higher *mens rea* requirement than does federal law. Because the court concludes that the two statutes regulate and criminalize different conduct, it is immaterial whether the requisite *mens rea* differs.

16    Federal courts interpreting statutes also place a premium on the statute's plain language. *See, e.g., Teter v. Warder*, 1997 WL 86454, at *2 (N.D. Tex. Feb. 20, 1997) (Fitzwater, J.) (citing 🏴 *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("It is perhaps the cardinal rule of statutory interpretation that when a statute is unambiguous, it should be interpreted in accord with its plain meaning.")); *see also* 🏴 *Conserv Ltd. Liam. Corp. v. Sw. Bell. Tel. Co.*, 350 F.3d 482, 486 (5th Cir. 2003) ("We begin, as we always do in matters of statutory interpretation, with the plain language and structure of the statute."); 🏴 *Carder v. Cont'l Airlines, Inc.*, 636 F.3d 172, 175 (5th Cir. 2011) ("Statutory interpretation begins with the statute's plain language.").

17    Although there is some confusion in the briefing as to how the doctrine of *in pari materia* affects the application of §§ 311.025-026, the court need not reach this issue. Once the statutes are deemed not to be irreconcilable under the plain text of the statute, the question is moot.

18    Even if the Surgeon Defendants were making a facial challenge, a plain reading of the TCBS indicates that their hypothetical would not incur criminal culpability. The statute requires an "agreement or understanding that the benefit will influence the conduct of the fiduciary." Tex. Penal Code Ann. § 32.43(b). In the Surgeon Defendants' hypothetical, there is no such agreement or understanding. While the pharmaceutical company may have intended to influence the physician, the two parties did not come to an understanding that the physician would ultimately prescribe the medicine to any patient. The physician did not intend to immediately prescribe the drugs to patients—instead, the physician decided to prescribe the drug only after observing the drug's efficacy. The mutuality requirement undermines both the Surgeon Defendants' hypothetical and their contention that the lack of definition of "influence" is unconstitutionally vague. It could not extend to conduct unless *both* parties involved had the intention to influence the fiduciary's behavior. Moreover, a physician could always remain within the confines of the law by first obtaining the patient's consent.

19    The new motion to dismiss also alleges that Counts 19, 20, and 21 fail because they do not allege that a Surgeon Defendant actually used any facilities in interstate commerce, instead relying on the conduct of "non-Surgeon Defendants." Ds. (Surgeon Defendants) Mot. to Dis. Superseding Indictment Br. 4-5. As explained above, this is not required under an aiding and abetting theory. *See supra* § IV(C)

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit C

United States v. Bethany, Not Reported in Fed. Supp. (2020)
Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 89 of 146    PageID 1712
2020 WL 1976827

2020 WL 1976827
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

UNITED STATES of America

v.

Desmond Kintwana BETHANY (1)

CRIM. ACTION NO. 3:18-CR-0297-S

|

Signed 04/23/2020

**Attorneys and Law Firms**

Cara Foos Pierce, US Attorney's Office, Dallas, TX, for
United States of America.

Federal Public Defender, Dallas, TX, for Desmond Kintwana
Bethany.

**MEMORANDUM OPINION AND ORDER**

KAREN GREN SCHOLER, UNITED STATES DISTRICT
JUDGE

**\*1** The Order addresses Defendant Desmond Kintwana
Bethany's Motion to Dismiss Count Four for Lack of
Specificity or, Alternatively, Motion for Bill of Particulars
[ECF No. 116]. For the following reasons, the Court **DENIES**
the Motion.

**I. BACKGROUND**

Defendant's Motions arise out of the Superseding
Indictment charging Defendant Desmond Kintwana Bethany
("Defendant") with: (1) Sex Trafficking of Children; (2)
Conspiracy to Commit Sex Trafficking; (3) Sex Trafficking
Through Force, Fraud or Coercion; and (4) being a Felon
in Possession of a Firearm. *See* ECF No. 61 at 1-5. The
Superseding Indictment states in Count Four that:

> From on or about July 4, 2015
> through on or about May 25, 2018,
> in the Dallas Division of the Northern
> District of Texas and elsewhere, ...
> [Defendant] ..., having been convicted

of a crime punishable by imprisonment
for a term exceeding one year, did
knowingly and unlawfully possess in
and affecting interstate and foreign
commerce a firearm, namely a Ruger,
Model LCP, 380 caliber pistol,
bearing Serial Number 371-407298. In
violation of 18 U.S.C. §§ 922(g)(1)
and 924(a)(2).

ECF No. 61 at 5. On February 6, 2020, Defendant filed
the present Motion to Dismiss Count Four for Lack of
Specificity or, Alternatively, Motion for Bill of Particulars
(the "Motion"), which is now ripe and before the Court.

**II. ANALYSIS**

**A.** *Motion to Dismiss*

An indictment is sufficient where it "contains the elements
of the offense charged and fairly informs the defendant of
the charge against which he must defend." *United States
v. Lawrence*, 727 F.3d 386, 397 (5th Cir. 2013) (quoting
*United States v. Fuller*, 974 F.2d 1474, 1480 (5th Cir. 1992)).
"Generally, an indictment [that] follows the language of
the statute under which it is brought is sufficient to give
a defendant notice of the crime of which he is charged."
*United States v. Thomas*, 348 F.3d 78, 82 (5th Cir. 2003)
(quoting *United States v. Ramirez*, 233 F.3d 318, 323 (5th
Cir. 2000)). When the court decides a motion to dismiss the
indictment for failure to state an offense, it must "take the
allegations of the indictment as true and ... determine whether
an offense has been stated." *United States v. Kay*, 359 F.3d
738, 742 (5th Cir. 2004) (quoting *United States v. Hogue*,
132 F.3d 1087, 1089 (5th Cir. 1998)). In the present case, the
Superseding Indictment follows the language of 18 U.S.C.
§ 922(g)(1), which makes it "unlawful for any person ... who
has been convicted in any court of, a crime punishable by
imprisonment for a term exceeding one year ... to ... possess in
or affecting commerce, any firearm or ammunition." *See* ECF
No. 61 at 5 (charging Defendant with, "having been convicted
of a crime punishable by imprisonment for a term exceeding
one year, ... knowingly and unlawfully possess[ing] in and
affecting interstate and foreign commerce a firearm, namely

United States v. Bethany, Not Reported in Fed. Supp. (2020)
2020 WL 1976827

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 90 of 146    PageID 1713

a Ruger ... pistol"). Accordingly, the Court finds that the Superseding Indictment sufficiently states an offense and denies Defendant's Motion to Dismiss. *See* Thomas, 348 F.3d at 82 (quoting Ramirez, 233 F.3d at 323).

### B. *Motion for Bill of Particulars*

**\*2** Federal Rule of Criminal Procedure 7(f) permits a defendant to "move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits." The district court has discretion over whether to grant the request. *United States v. Shults*, No. 3:14-cr-00298-M, 2018 WL 5023779, at \*1 (N.D. Tex. Sept. 18, 2018). "The purpose of a bill of particulars is to inform an accused of the charge with sufficient precision to reduce trial surprise, to enable adequate defense preparation, and critically, by the fleshing out of the charges to illuminate the dimensions of jeopardy." *United States v. Davis*, 582 F.2d 947, 951 (5th Cir. 1978) (citations omitted). A bill of particulars cannot, however, be used "to discover all overt acts th[at] might be proved at trial," or "to secure for the defense the Government's explanation of its theory of the case." *Shults*, 2018 WL 5023779, at \*1. In determining whether to order the Government to provide a defendant with a bill of particulars, the Court "must balance the needs of the defendant against the [Government's] right not to disclose its witnesses, evidence[,] or legal theories." *United States v. Campbell*, 710 F. Supp. 641, 642 (N.D. Tex. 1989) (quoting *United States v. Miller*, 210 F. Supp. 716, 717 (S.D. Tex. 1962)).

A bill of particulars is unnecessary where " 'the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges against him to enable him to prepare for trial.' " *United States v. Faulkner*, Crim. No. 3:09-CR-249-D(02), 2011 WL 2880919, at \*2 (N.D. Tex. July 15, 2011) (quoting *United States v. Martinez*, Crim. No. 3:09-CR-170-D (01), 2010 WL 2025226, at \*7 (N.D. Tex. May 21, 2010)). However, "even if the indictment does not furnish sufficient information to enable the defendant to prepare a defense and to avoid surprise at trial, where the [G]overnment has provided the necessary information in another satisfactory form, such as through discovery, a bill of particulars is unnecessary." *Id.* (citing *United States v. Kirkham*, 129 F. App'x 61, 72 (5th Cir. 2005)).

In the present case, the Court finds that Count Four of the Superseding Indictment sufficiently sets forth the elements

of the offense charged and sufficiently apprises Defendant of the charge against him because "it states the offense using the words of the statute itself." *United States v. Hagen*, Crim. No. 3:19-CR-0146-B, 2020 WL 1929848, at \*12 (N.D. Tex. Apr. 21, 2020) (quoting *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 176 (6th Cir. 1992)). Additionally, the Court finds that Defendant is seeking to use Rule 7(f) to obtain generalized discovery and the Government's theory of the case, by requesting, among other information: "specific dates that ... [D]efendant allegedly possessed the firearm"; "specific location(s) related to those specific dates ... where ... [D]efendant allegedly possessed the firearm"; "specifics on how the gun was possessed"; "specifics on whether the gun was possessed by anyone other than [Defendant]"; the identify of "the witnesses that can identify the gun"; and "proof of the firearm named in Count Four was the one possessed." Mot. 2-3. "A bill of particulars containing these details is not necessary" to inform Defendant of the charges against him, to avoid surprise, or to clearly allow jeopardy to be invoked. *Shults*, 2018 WL 5023779, at \*2. Rather, "requiring [the] disclosure [of this information] would wrongly infringe upon the Government's right not to disclose all of its evidence, witnesses, [and] theory of the case." *Id.* (citing *Campbell*, 710 F. Supp. at 642).

Furthermore, the Court finds that a bill of particulars is not necessary in this case, because "[t]he Government has provide[d] and will continue to provide full discovery to [Defendant] in this case" pursuant to its " 'open file' policy" that grants Defendant "access to the evidence, photographs, and numerous witness statements and grand jury testimony regarding when and where [Defendant] possessed the firearm at issue." Resp. 10-11; *see also* Faulkner, 2011 WL 2880919, at \*2 (explaining that a bill of particulars is not necessary "where the [G]overnment has provided the necessary information in another satisfactory form"). Accordingly, the Court denies Defendant's Motion for a Bill of Particulars.

### III. CONCLUSION

**\*3** For the foregoing reasons, the Court **DENIES** Desmond Kintwana Bethany's Motion to Dismiss Count Four for Lack of Specificity or, Alternatively, Motion for Bill of Particulars.

**SO ORDERED.**

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 91 of 146    PageID 1714

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1976827

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit D

APP089

United States v. Dominguez, Not Reported in Fed. Supp. (2018)
2018 WL 2057442

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 93 of 146    PageID 1716

2018 WL 2057442
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

UNITED STATES of America
v.
Melisa DOMINGUEZ in custody

Criminal Action H–17–651–4
|
Signed 05/03/2018

**Attorneys and Law Firms**

Adam Laurence Goldman, Financial Litigation, Zahra Jivani
Fenelon, Department of Justice United States Attorney for the
Southern District of Texas, Houston, TX, for United States of
America.

Joseph A. Connors, III, Attorney at Law, McAllen, TX, Terry
Canales, Terry Canales Attorney at Law, P.L.L.C., Edinburg,
TX, for Melisa Dominguez in custody.

**ORDER**

Gray H. Miller, United States District Judge

**\*1** Pending before the court are the following motions,
all filed by defendant Melisa Dominguez: (1) motion for
copy of all audio recordings and transcripts thereof (Dkt.
176); (2) motion to discover criminal records of defendants
(Dkt. 177); (3) motion for government to reveal agreements/
concession/leniency/immunity to witnesses (Dkt. 178); (4)
motion to dismiss Counts 1, 7, 12, 13, 18, 19, 20, 22 and 27
(Dkt. 179); (5) motion to dismiss Counts 1, 7, 13, 18, 19,
22 and 27 (Dkt. 180); (6) motion for discovery under Rule
16(a) (Dkt. 182); (7) motion to exclude evidence barred by
evidence Rule 403 (Dkt. 183); (8) motion to exclude evidence
barred by evidence under Rule 404(b) (Dkt. 184); (9) motion
to produce tapes or CD–ROMs of conversations recorded
by consent or wiretap authorization and bilingual translation
transcripts thereof (Dkt. 185); (10) motion for pretrial notice
of Rule 404(b) evidence (Dkt. 186); and (11) motion to adopt
objections of co–defendants (Dkt. 187). The United States of
America (the "Government") has filed a response to these
motions in which it states that all of the motions should
be denied because they are either meritless or moot. Dkt.
274 at 1. After considering the motions, the Government's

response, and the applicable law, the court is of the opinion
that the motions at docket entries 179, 180, and 183, should
be **DENIED**; the motions at docket entries 176, 178, and 182,
should be **GRANTED IN PART AND DENIED IN PART**;
and the motions at docket entries 177, 184, 185, 186, and 187
should be **GRANTED AS UNOPPOSED**.

**I  MOTION FOR COPY OF ALL
AUDIO RECORDINGS AND
TRANSCRIPTS THEREOF (DKT. 176)**

Dominguez moves for an order requiring that the Government
produce "a top quality true copy" of the following: "(1) all
audio and video recordings made during the investigation
in this case on which this Defendant is seen or heard; (2)
an index listing the specific time(s) and specific date(s) the
Government posits or opines that this Defendant can be
seen or heard; and (3) bilingual transcripts of all such
recordings in both the Spanish language and English language
where a word, phrase, sentence, or, expression is heard in
the Spanish language on the original recording." Dkt. 176.
The Government states that it will provide true copies of
all recordings made in this cases as well as transcribed
translations of those recordings that are not in English. Dkt.
274 at 1. However, it objects to the request for "top quality"
recordings. *Id.*

Under Federal Rule of Criminal Procedure 16(a)(1)(B)(i),

Upon a defendant's request, the government must disclose
to the defendant, and make available for inspection,
copying, or photographing, all of the following:

(i) any relevant written or recorded statement by the
defendant if:

• the statement is within the government's possession,
custody, or control; and

• the attorney for the government knows—or through due
diligence could know—that the statement exists....

Fed. R. Crim. P. 16(a)(1)(B)(i). The rule does not require the
Government to make the copies, much less a "top quality"
copy. Thus, the Government's objection to the imposition
of a burden to ensure the copies are "top quality" is
**SUSTAINED**. The rule also does not require the Government
to list the specific times or dates the defendant can be heard
on the recordings. Dominguez's motion is **GRANTED IN**

United States v. Dominguez, Not Reported in Fed. Supp. (2018)
2018 WL 2057442

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 94 of 146    PageID 1717

**PART AS UNOPPOSED AND DENIED IN PART**. It is **GRANTED AS UNOPPOSED** to the extent that the Government has already agreed to provide the recordings and transcripts Dominguez requests. It is **DENIED** to the extent Dominguez seeks for the court to impose an additional burden on the Government of producing "top quality" copies of the recordings and to the extent Dominguez requests the Government provide her with an index. The copies the Government provides shall be true and correct copies of the original.

## II. MOTION TO DISCOVER CRIMINAL RECORDS OF WITNESSES (DKT. 177)

**\*2** Dominguez requests disclosure of the criminal records of the Government's witnesses. Dkt. 177. The Government responds that it will disclose the criminal records of testifying witnesses it intends to call at trial. Dkt. 274 at 2. The motion is therefore **GRANTED AS UNOPPOSED.**

## III. MOTION FOR THE GOVERNMENT TO REVEAL AGREEMENTS/ CONCESSION/LENIENCY/IMMUNITY TO TESTIFYING WITNESSES (DKT. 178)

Dominguez requests that the court order the Government to disclose any agreement, concession, leniency, and immunity provided to any witnesses that the Government plans to call at trial. Dkt. 178. She seeks an order requiring the Government to reveal any deal or agreement "that could conceivably influence said witness' testimony." *Id.* As a basis for her request, Dominguez cites *Giglio v. United States*, *Brady v. Maryland*, *Williams v. Dutton*, and *Davis v. Alaska. Id.*

The Government responds that it intends to comply with its obligations under Rule 16, as well as the requirements of *Brady*, *Giglio*, the Jencks Act, and the U.S. Constitution. Dkt. 274. The Government agrees to make available any agreements or promises made to the witnesses it intends to call at trial. *Id.* at 3. However, the Government opposes Dominguez's request to provide any and all "conceivable" deals made because it argues the term is vague and not rooted in law. *Id.*

Federal Rule of Criminal Procedure 16 states that a criminal defendant may obtain discovery of items are "material to preparing the defense"; items that the Government "intends to

use ... in its case-in-chief at trial"; or items that were "obtained from or belong[ ] to the defendant." Fed. R. Crim. P. 16(a)(1)(E)(i). Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194 (1963). In *Giglio*, the U.S. Supreme Court extended the "*Brady* rule to evidence affecting the credibility of key government witnesses." *United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010) (discussing *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972) ). "[W]hen the reliability of a witness is determinative of guilt or innocence, evidence affecting credibility of that witness falls within *Brady*'s rule." *United States v. Navarro*, 169 F.3d 228, 234 (5th Cir. 1999) (citing *Giglio*, 405 U.S. at 154–55).

In *Williams v. Dutton*, the Fifth Circuit noted that *Brady* "imposes an affirmative duty on the prosecution to produce at the appropriate time requested evidence which is materially favorable to the accused either as direct or impeaching evidence." *Williams v. Dutton*, 400 F.2d 797, 800 (1968). The prosecution argued that *Brady* did not apply because there was no showing that the evidence was favorable to the defendant. *Id.* The Fifth Circuit, however, determined that in such circumstances the trial court must determine whether the evidence is favorable *in camera. Id.* "The *Dutton* in camera procedure is a suggestion, not a constitutional procedural mandate that the trial judge rummage through all government evidence prior to trial." *United States v. Harris*, 458 F.2d 670, 677 (5th Cir. 1972).

**\*3** In *Davis v. Alaska*, the U.S. Supreme Court determined that the defendant's right to a meaningful confrontation includes the right to impeach a witness at trial during cross examination with the witness's juvenile record. *Davis v. Alaska*, 415 U.S. 308, 319–20, 94 S. Ct. 1105 (1974). The Court held that the "State's policy interest in protecting the confidentiality of juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination of an adverse witness." *Id. at 320.*

These cases do not use the term "conceivably"; they require the Government to disclose any evidence that is "materially favorable." Accordingly, Dominguez's motion is **GRANTED IN PART AND DENIED IN PART**. It is **GRANTED AS UNOPPOSED** to the extent that the Government has already

United States v. Dominguez, Not Reported in Fed. Supp. (2018)
2018 WL 2057442

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 95 of 146    PageID 1718

agreed to make available any agreements or promises made to the witnesses it intends to call at trial and to comply with the requirement to provide evidence that is "materially favorable." It is **DENIED** to the extent Dominguez uses the term "conceivably" because that is not the recognized legal standard.

## IV. OPPOSED MOTION TO DISMISS COUNT(S) 1, 7, 12, 13, 18, 19, 20, 22 AND 27 (DKT. 179)

Dominguez moves for the court to "make [the] Government... elect ... which conspiracy and substantive counts and/or conviction(s) Defendant will be sentenced on, since the indictment suffers from multiplicity." Dkt. 179. She then "objects to being convicted of" [1] the following: (1) Count 1 Conspiracy as well as Counts 7, 13, 18, 19, 20, and 22, which she contends are lesser included offenses of Count 1; and (2) Count 27, which relates to importation of aliens for immoral purposes, as well as Counts 12, 19, and 20, which she contends are lesser included offenses of Count 1. *Id.* She cites *Ball v. United States*, *Brown v. Ohio*, *Rutledge v. United States*, *Richardson v. United States*, and *United States v. Bazan* in support of her positions. *Id.*

The Government first notes that the " 'double jeopardy concerns implicated by multiplicitous counts do not arise unless a defendant is actually *convicted of*, rather than charged with, multiplicitous counts.' " Dkt. 274 (quoting *United States v. Josephberg*, 459 F.3d 350, 355–56 (2d Cir. 2006) ) (emphasis added). Thus, there is no concern about a violation of the Double Jeopardy Clause due to simultaneous prosecutions; this will not be a concern unless this case reaches the punishment phase. *Id.* The Government concedes that the remedy for the concern over punishment for multiplicitous counts is dismissal of the count that creates the multiplicity, but it asserts that "the remedy is not to dismiss counts in the indictment but to allow the jury to deliberate with the proper jury instructions." *Id.* It points out that if the jury still returns convictions on both counts, the court could dismiss the count that created the multiplicity at that point. *Id.* The Government argues that "because the convictions complained of have yet to occur, and because a remedy can be fashioned at the time of the charge conference, the motion is premature and should be dismissed due to a lack of ripeness." *Id.* The Government also argues that Counts 7, 12, 13, 18, 19, 20, 22, and 27 are not multiplicitous or lesser included offenses of Count 1. Dkt. 274.

The first case relied upon by Dominguez, *Ball v. United States*, considers whether "a felon possessing a firearm may be convicted and concurrently sentenced under 18 U.S.C. § 922(h)(1), for receiving that firearm, and under 18 U.S.C. App. § 1202(a)(1) for possessing the same weapon." *Ball*, 470 U.S. 856, 857, 105 S. Ct. 1668 (1985). The *Ball* defendant was charged on both counts, which both rested on the same conduct. *Id.* He was then convicted on both counts and sentenced to consecutive terms of imprisonment. *Id.* at 857–58. The defendant challenged the validity of the consecutive sentences on appeal. *Id.* at 858. When the case reached the U.S. Supreme Court, the Court noted that it was "clear that a convicted felon may be prosecuted simultaneously for violations of §§ 922(h) and 1202(a) involving the same firearm," and pointed out that the Government has "broad discretion to conduct criminal prosecutions, including ... power to select the charges to be brought in a particular case." *Id.* at 859. However, it clarified, to "say that a convicted felon may be prosecuted simultaneously for violation of §§ 922(h) and 1202(a) ... is not to say that he [or she] may be convicted and punished for two offenses." *Id.* at 861. The Court ultimately concluded that the remedy for the fact that the defendant was convicted under both statutes was to vacate one of the underlying convictions. *Id.* at 864. It then emphasized that the Government "may seek a multiple-count indictment against a felon for violations of §§ 922(h) and 1202(a) involving the same weapon where a single act established the receipt and possession, [but] the accused may not suffer two convictions or sentences on that indictment." *Id.* at 865. The Court instructed that district judges may, if a jury returns guilty verdicts on both counts, enter judgment on only one of the offenses. *Id.*

**\*4** This case does not help Dominguez as it indicates that the mulitiplicitous counts issue is currently not ripe.

The next case Dominguez relies on is *Brown v. Ohio*. In *Brown*, the defendant was caught joyriding in a vehicle he had stolen nine days earlier—a 1965 Chevrolet. He pled guilty to the crime of joyriding, and he served thirty days in jail. *Brown*, 432 U.S. 1561, 163, 97 S. Ct. 2221 (1977). After he was released, he was indicted for theft of the

United States v. Dominguez, Not Reported in Fed. Supp. (2018)
2018 WL 2057442

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 96 of 146    PageID 1719

1965 Chevrolet and joyriding on the day of the theft (rather than nine days later). *Id.* The defendant objected on double jeopardy grounds, and the state district court overruled his objection. *Id.* The state court of appeals affirmed, finding that the misdemeanor of joyriding was included in the felony of auto theft but found that the two prosecutions were based on two separate acts of the defendant because they occurred on separate days. *Id.* at 164. The state supreme court denied leave to appeal, and the U.S. Supreme Court granted *certiorari. Id.*

The U.S. Supreme Court considered whether the *Brown* facts met the test for whether "two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment" stated in ⚑ *Blockburger v. United States,* 284 U.S. 299, 304, 52 S. Ct. 180 (1932):

> "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not ...."

*Id.* (quoting ⚑ *Blockburger,* 284 U.S. at 304). The *Brown* Court determined that if the judge "is forbidden to impose cumulative punishment for two crimes at the end of a single proceeding, the prosecutor is forbidden to strive for the same result in successive proceedings." *Id.* at 166. With regard to the fact that the offenses occurred on separate days, the Court held that the "Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units." *Id.* at 169.

Again, this case does not support Dominguez's motion to dismiss. The instant case does not involve successive prosecutions.

Dominguez's third case is *Rutledge v. United States.* The *Rutledge* Court considered whether a district court erred in sentencing a defendant to two concurrent life sentences for convictions of (1) participating in a conspiracy to distribute a controlled substance; and (2) conducting a continuing criminal enterprise. ⚑ *Rutledge,* 517 U.S. 292, 294, 116 S. Ct. 1241 (1996). The continuing criminal enterprise was distribution of cocaine, and the count charged the defendant with acting in concert with at least five other people. ⚑ *Id.* at 295. The conspiracy charge involved conspiring with four

others to unlawfully distribute cocaine. *Id.* The "overt act" in the conspiracy count was delivery, purchase, or distribution of cocaine. *Id.* The jury found the defendant guilty of both counts, and the court imposed concurrent life sentences. *Id.* The defendant appealed, asserting that the concurrent life sentences punished him twice for the same offense. ⚑ *Id.* at 296. The Court found that the conspiracy was a lesser included offense of the continuing criminal enterprise, and that one of the convictions and life sentences must be vacated. ⚑ *Id.* at 307.

**\*5** This case again relates to *convictions,* not *charges,* and is thus not on point.

The next case is *Richardson v. United States.* This case is about what the jury must find in order to convict a defendant of a continuing criminal enterprise. *See* ⚑ *Richardson,* 526 U.S. 813, 817, 119 S. Ct. 1707 (1999); Dkt. 179. It is unclear how this case supports dismissing any of the counts in the indictment.

The final case Dominguez relies on is ⚑ *United States v. Bazan,* 807 F.2d 1200, 1205–06 (5th Cir. 1987). Dkt. 179. The *Bazan* defendant was convicted of conspiracy to possess with intent to distribute over one kilogram of cocaine and conspiracy to possess with intent to distribute over fifty kilograms of marijuana. ⚑ *Bazan,* 807 F.2d at 1205–06. These convictions were both based on a single agreement, and the defendant argued that being convicted of two separate conspiracy counts based on the same agreement violates the Double Jeopardy Clause of the Fifth Amendment. ⚑ *Id.* at 1206. The Fifth Circuit determined that only one conspiracy was proven, not two, and thus the Double Jeopardy Clause bars conviction for two conspiracies. *Id.* Here, Dominguez has not been convicted of any charges, so *Bazan* is not on point.

The court agrees with the Government that none of these cases stand for the proposition that the court should dismiss counts that may be lesser-included offenses at this stage of the case. While there is a possibility that allowing convictions of some of the charged counts would be impermissible with other counts, it is not a question that the court need reach at this time. Dominguez's motion to dismiss multiplicitous counts is **DENIED AS PREMATURE**.

United States v. Dominguez, Not Reported in Fed. Supp. (2018)
2018 WL 2057442

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 97 of 146    PageID 1720

## V. OPPOSED MOTION TO DISMISS
## COUNT(S) 1, 7, 13, 18, 19, 22 AND 27 (DKT. 180)

Dominguez next moves for an order of dismissal of duplicitous counts or alternatively for an order requiring the Government to elect which offense it expects to prove at trial. Dkt. 180. She notes that she is objecting generally to the indictment to avoid waiver under Federal Rule of Criminal Procedure 12(e). *Id.* She argues that a "duplicitous [count] is a single count that charges two separate crimes." *Id.* (citing

🔖 *United States v. Adesida*, 129 F.3d 846, 849 (6th Cir. 1997) ). She asserts that "duplicitous indictments obscure the specific charges, thereby preventing the jury from separately deciding the issue of guilt or innocence, with respect to each particular offense and creating uncertainty as to whether the defendant's conviction was based on a unanimous jury decision." *Id.* (citing 🔖 *United States v. Holley*, 942 F.2d 916, 929 (5th Cir. 1991) ). Additionally, she contends that the duplicitous counts (1) may hinder her ability to argue double jeopardy in any subsequent prosecutions; (2) raise the risk of prejudicial evidentiary rulings during trial; and (3) may prevent appropriate sentencing because the basis of the defendant's conviction is uncertain. *Id.* Her objections to duplicity relate generally to the Government incorporating various portions of the indictment by reference into other parts or charged in the conjunctive. *Id.*

**\*6** The Government argues that Dominguez's duplicity claims are meritless. Dkt. 274. The Government points out that incorporations by reference of allegations in the introductory paragraphs is completely proper. *Id.* It notes that reference to the introductory paragraphs does not result in two or more distinct crimes being charged in each of the conspiracy counts and does not lead to the possibility that the jury would render a general verdict when it is unsure as to which specific crime is being charged in each count. *Id.* Additionally, the Government contends that Dominguez's complaints that the United States charged in the conjunctive and incorporated overt acts into the conspiracy counts is actually permissible, encouraged, and does not constitute duplicative counts. *Id.* Moreover, the Government asserts that even if duplicity were established, the remedy is to fashion an appropriate jury charge, not dismiss the counts. *Id.* (citing

🔖 *Holley*, 942 F.2d at 916, and distinguishing the other cases cited by Dominguez).

"An indictment may be duplicitous if it joins in a single count two or more distinct offenses." *United States v. Baytank (Houston), Inc.*, 924 F.2d 599, 608 (5th Cir. 1991). "If an indictment is duplicitous and prejudice results, the conviction may be subject to reversal." *Id.* "Objections to duplicity must be raised before trial. *Id.* "[I]n determining whether an indictment is duplicative, the inquiry is 'whether [the indictment] can be read to charge only one violation of each count.' " ⚠ *United States v. Caldwell*, 302 F.3d 399, 407 (5th Cir. 2002). Alleging a conspiracy to commit several crimes in one count is not duplicitous, as "the conspiracy is the crime, and that is one [crime], however diverse its objects." 🔖 *United States v. Mauskar*, 557 F.3d 219, 225 (5th Cir. 2009) (citations and quotations omitted). Moreover, an indictment is not rendered duplicitous merely because it "alleges more than one means conspirators 'sought to accomplish [a] scheme.' " *Id.* at 226 (quoting *United States v. McDermot*, 58 F.3d 636 (5th Cir. 1995) (unpublished) ).

Dominguez objects to what she considers duplicity in Counts 1, 7, 13, 18, and 22, contending that each of these counts incorporates paragraph 2 of the Introduction section, and paragraph 2 relates to *four* distinct crimes: sex trafficking, smuggling illegal aliens into and within the United States, drug trafficking, and the sale of illegal and stolen weapons. Dkt. 180. Count 1 alleges conspiracy to engage in sex trafficking by means of force, threats, fraud, and coercion. Dkt. 1, Count 1. It begins by incorporating Paragraphs 1 through 26 of the indictment and Counts 2 through 6 of the indictment. *Id.* Paragraph 2 alleges that the members of a criminal organization called Southwest Cholos are engaged in sex trafficking, smuggling, drug trafficking, and the sale of illegal and stolen weapons. *Id.* Counts 7, 13, 18, and 22 similarly at some point incorporate the Introduction, including paragraph 2, while in the process of setting forth the allegations that the defendant engaged in the specific crime discussed in that count. *See id.*, Counts 7, 13, 18, 22. It is clear that the introduction was incorporated into each of these counts to provide background facts and not to allege a crime, as each count labels the specific crime alleged and realleges facts relevant to that specific count. Moreover, to the extent Dominguez is concerned a jury may not understand that these counts do not relate to only the crime specifically alleged in that count because they incorporate paragraph 2's list of various crimes, this can be easily cured with jury instructions.

Dominguez next contends that Counts 1, 7, 13, 18, and 22 are each duplicitous "by charging the numerous distinct and

separate criminal offenses and criminal acts in its realleged and incorporated in its 'Sex Trafficking and Prostitution Scheme' Sections ¶ 7–17." *Id.* While it is not altogether clear what Dominguez is trying to argue here, it appears she is stating that the incorporation of paragraphs 7 through 17 of the Introduction, which outline all of the facts relating to the alleged "sex trafficking and prostitution scheme," cause the counts that only relate to one part of that scheme, such as Count 13, which alleges conspiracy to entice and coerce another to travel in interstate or foreign commerce for prostitution, and Count 18, which alleges conspiracy to bring in, transport, move, conceal, harbor, and shield from detection illegal aliens, to be duplicitous since facts not relating to that specific count are incorporated. Again, the Introduction provides the factual background, but these counts specifically state which crime they are alleging. Any issues with a jury being confused as to what they should consider for each count can be cured with the jury instructions.

 **\*7** Dominguez similarly argues that Counts 1, 7, 13, and 22 suffer from duplicity because of the incorporation of the "Alien Smuggling" section of the Introduction (paragraphs 18 through 26). *Id.* Like with the sex trafficking and prostitution scheme section, any issue with a jury being confused as to what they should consider for each count because the facts alleged in the introduction are incorporated can be cured with the jury instructions.

Dominguez next argues that Count 1 suffers from duplicity because it charges that the defendants conspired to " 'knowingly recruit, entice, harbor, provide, obtain, and maintain by any means ... and to knowingly benefit financially and receive anything of value from participation in a venture which recruited, enticed, harbored, transported, provided, obtained, and maintained ... NGL, MAVM, EMR, AP, and ABP, knowing and in reckless disregard of the fact that force, threats of force, fraud, and coercion would be used to cause NGL, MAVM, EMR, AP, and ABP to engage in commercial sex acts, and knowing and in reckless disregard of the fact that NGL had not attained the age of 18 years and that NGL would be caused to engage in a commercial sex act.' " *Id.* (quoting Dkt. 1, Count 1) (alterations in original). Count 1 is a conspiracy charge, and alleging a conspiracy with multiple objects is not duplicitous.

Dominguez next contends that Count 7 "suffers from duplicity by charging defendant with [the] offense of conspiracy and the offense of aided and abetted by each other, did knowingly transport and cause the transportation

of 'MAVM, EMR, AP, ABP, and BAS' with intent that such individuals engage in prostitution, when count 7 specifically incorporated into itself counts 8–12." *Id.* Count 7 is "Conspiracy to Conduct Transportation to Engage in Prostitution." Dkt. 1, Count 7. It states that the "unlawful conspiracy was accomplished in the manner and means alleged in paragraphs 1 through 26 of the Indictment, and Counts 8 through 12 of [the] Indictment, which are re-alleged and incorporated herein by reference." *Id.* Count 7 is a conspiracy charge, and alleging a conspiracy with multiple objects is not duplicitous. Thus, it is not inappropriate to incorporate Counts 8 through 12 as the manner and means of the alleged conspiracy.

Dominguez next argues that Count 13 "suffers from duplicity by charging defendants conspired to knowingly induce, entice and coerce others to travel." Dkt. 180. Again, since this is a conspiracy allegation, the conspiracy is the charge.

Dominguez argues that Count 18 similarly "suffers from duplicity by charging defendant with [the] offense of conspiracy and the offenses of aided and abetted by each other, did knowingly transport, move, conceal, harbor, shield from detection a certain alien within the United States, and did so in furtherance of the aliens entering or remaining in the United States in violation of law, and did so for the purpose of commercial advantage and private gain, when count 18 specifically incorporated into itself counts 19–21." Dkt. 180. Count 18 incorporates Counts 19 through 21 as the manner and means of the conspiracy. Dkt. 1. The incorporation of these counts into the conspiracy charge does not give rise to a duplicity issue because Count 18 is alleging the crime of conspiracy with the crimes in Counts 19 through 21 being the manner and means.

Dominguez asserts that Counts 18 also "suffers from duplicity by twice charging defendants conspired to knowingly transport, move, conceal, harbor, and shield from detection." Dkt. 180. Count 18 states that the charged defendants "did knowingly and intentionally combine, conspire, confederate, and agree with each other ... to knowingly and in reckless disregard of the fact that certain aliens had come to ... the United States in violation of the law, transport, move, conceal, harbor, shield from detection, and conspire to transport, move, conceal, harbor, and shield from detection such aliens within the United States ...." Dkt. 1, Count 18. It appears Dominguez is arguing that this count charges in the conjunctive because it lists violations of the different sections in the statute— including the conspiracy section—as the manner and means

United States v. Dominguez, Not Reported in Fed. Supp. (2018)

2018 WL 2057442

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 99 of 146    PageID 1722

of the conspiracy. The Government argues that it is permitted and encouraged to charge in the conjunctive and that this does not render a charge duplicative. Dkt. 274. The court agrees that "[i]t is well-established in this Circuit that a disjunctive statute may be charged conjunctively and proved disjunctively." *United States v. Haymes*, 610 F.2d 309, 310 (5th Cir. 1980) (per curiam); *see also United States v. Holley*, 831 F.3d 322, 328 (5th Cir. 2016) ("Although the indictment listed these different ways of violating § 841(a) using 'and' rather than 'or,' the Government still only had to prove that [the defendant] conspired to violate the statute in *one* of these four possible ways."). The fact that a statute uses the disjunctive and the indictment is plead conjunctively does not render the Count duplicitous.

**\*8** Dominguez contends that Counts 19 and 20 suffer "from duplicity by charging [the] offense of conspiracy and the offense of aided and abetted by each other, did knowingly transport, move, conceal, harbor, and shield from detection." Dkt. 180. Count 19 is "Transporting, Moving, Concealing, Harboring, Shielding from Detection, and Conspiring to Transport, Move, Conceal, Harbor and Shield from Detection Aliens. Dkt. 1, Count 19. It charges, specifically, that "defendants herein, aided and abetted by each other, did knowingly and in reckless disregard of the fact that a certain alien had come to, entered, or remained in the United States in violation of law, transport, move, conceal, harbor, shield from detection, and conspire to transport, move, conceal, harbor, and shield from detection such alien within the United States, and did so in furtherance of the aliens entering or remaining in the United States in violation of the law, and did so for the purpose of commercial advantage and private gain ....

in violation of Title 8, United States ... Code, Sections 1324(a)(1)(A)(ii), (iii) and (v), and 1324(a)(1)(B)(I)." Dkt. 1. Count 20 is the same as Count 19, except on a different date and with different codefendants and with an additional allegation in Count 20 that the defendants allegedly placed the lives and physical safety of the aliens in jeopardy. Dkt.

1. Subsection (ii) of § 1324 makes it a federal offense to knowingly or in reckless disregard transport or move or attempt to transport or move an illegal alien within the United States. 8 U.S.C. § 1324(a)(1)(A)(ii). Subsection (iii) makes it a federal offense to knowingly or in reckless disregard conceal, harbor, or shield from detection or attempt to conceal, harbor, or shield from detection an illegal alien in any place including a building or means of transportation. 8 U.S.C. § 1324(a)(1)(A)(iii). Subsection (v) prohibits

conspiring to commit any of the criminal acts in subsections (i)–(iv). 8 U.S.C. § 1324(a)(1)(A)(v). The charges in Counts 19 and 20 are, thus, charges of aiding and abetting to violate § 1324(a)(1)(A), with the relevant subsections pled in the conjunctive. Pleading in the conjunctive does not render a count duplicative.

Dominguez contends that Count 22 suffers from duplicity by charging for conspiracy, aiding and abetting, and the underlying offense. Dkt. 180. Count 22 is for "Conspiracy to Import Aliens for Immoral Purposes." Dkt. 1. It alleges that this conspiracy began on January 10, 2009, and continued until May 5, 2017, and that the manner and means of the conspiracy and overt acts in furtherance of the conspiracy are alleged in the introduction and Counts 23 through 26. *Id.* Since the charge is for conspiracy, the incorporation of these other Counts into the conspiracy Count does not give rise to a duplicity issue because Count 23 alleges the crime of conspiracy and the incorporation of the other Counts simply provide the manner and means or overt acts in furtherance of that Conspiracy.

Dominguez contends that Count 27 suffers from duplicity because it charges aiding and abetting in importing BAS for the purpose of prostitution, holding BAS as an alien for the purpose of prostitution, holding BAS in pursuance of the importation of BAS into the United States for the purpose of prostitution, and keeping, maintaining, controlling, supporting, or employing BAS in pursuance of the importation of BAS into the United States for the purpose of prostitution. Dkt. 180. Count 27 is a charge of importation of alien for immoral purposes. Dkt. 1. It alleges that the charged defendants, aided and abetted by each other, violated 8 U.S.C. § 1328 and 18 U.S.C. § 2. The former, 8 U.S.C. § 1328, is the statute that makes importing aliens for immoral purposes a federal offense. 8 U.S.C. § 1328. The latter, 18 U.S.C. § 2, indicates that anyone who "aids, abets, counsels, commands, induces or procures [a federal crime's] commission, is punishable as a principal." 18 U.S.C. § 2. Dominguez's complaint appears to be that the United States charged in the conjunctive. The Government argues that it is permitted and encouraged to charge in the conjunctive and that this does not render a charge duplicative. Dkt. 274. The court agrees that the Government may charge conjunctively and that this does not render the Count duplicitous.

Because none of these counts is actually duplictious, Dominguez's motion to dismiss duplicitous counts is

**DENIED**. Additionally, even if there were issues with duplicity, a "duplicitous indictment can be cured by a limiting jury instruction." *Holley*, 942 F.2d at 928 (5th Cir. 1991).

## VI. LIMITED CONTINUING MOTION FOR DISCOVERY AND INSPECTION (DKT. 182)

Dominguez next moves for an order requiring the Government to comply with numerous different discovery requests. *See* Dkt. 182. She notes in her motion that the Government had advised that the request was moot and the Government would abide by all of its discovery requirements. *Id.*

The Government responds that it has complied and fully intends to comply with its obligations under Federal Rule of Criminal Procedure 16 and its duty to reveal exculpatory and mitigating evidence under *Brady*, *Giglio*, the Jencks Act, and the U.S. Constitution. Dkt. 274. The only specific requests made by Dominguez that the Government opposes are (1) the request to turn over a witness list to the extent it seeks more information than the name of a particular witness who is a cooperating individual or informer and to the extent it requests all addresses and phone numbers of persons with knowledge pertaining to the case as such information is not required (citing *United States v. Ortiz–Garcia*, 553 F. Supp. 2d 119, 120–21 (D.P.R. 2008) ); and (2) the request for written statements of individuals that the United States does not intend to call as witnesses unless required by *Brady*, *Giglio*, the Jencks Act, or Rule 16 (citing *United States v. Carter*, 621 F.2d 238, 240 (6th Cir. 1980) ). Dkt. 274. The Government argues that because the defendant is already receiving all the discovery to which she is entitled, her motion should be denied as moot. *Id.*

 **\*9** With regard to the Government's first objection, the court will first consider the request for more than the name of a confidential informant. "When granting or denying disclosure of the identity or location of an informant, the court's discretion is guided by three factors: (1) the level of involvement in the alleged criminal activity, (2) the helpfulness of disclosure to any asserted defense, and (3) the government's interest in non-disclosure." *United States v. Wilson*, 77 F.3d 105, 111–12 (5th Cir. 1996). The Government states that it is "opposed [to] any additional disclosure of this individual," and discusses the factors the court must balance. Dkt. 274 at 28–29 n.3. However, the Government

does not provide the court with any information regarding its interest in nondisclosure. Similarly, Dominguez does not state why this information would be helpful to her defense. The court finds that it does not have enough information about this particular witness or why the Government needs to keep his or her location confidential to rule on Dominguez's motion. Therefore, the court **DEFERS** ruling on this aspect of Dominguez's motion for discovery. The court encourages the Government and Dominguez to work together to resolve this issue. Dominguez shall advise the court within ten (10) days of the date of this ruling on the status of this issue. If it is not resolved, the court will set a hearing date for arguments.

The Government also objects to providing the addresses and phone numbers of people who have information about this case. [2] Dkt. 274 at 29. "[T]here is no constitutional right to pretrial discovery of witnesses in non-capital cases." *United States v. Aguilar*, 503 F.3d 431, 434 (5th Cir.2007) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837 (1977) ). "Rule 16 ... makes no provision for the production of the names and addresses of witnesses for the government." *United States v. Fischel*, 686 F.2d 1082, 1091 (5th Cir.1982). In certain cases, however, due process or the supervisory powers of the court may require "the divulgence of information in the government's hands." *Id.* For instance, the Government may be required to provide discovery not otherwise required by the rules if it is exculpatory or if it relates to confidential informants who have relevant and helpful information. *Id.* (citing *Weatherford*, 429 U.S. at 559; *Brady*, 373 U.S. at 83; and *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623 (1957) ).

Dominguez has not provided any indication that she has a particularized need for the addresses or phone numbers of the people who have information about the case. Absent such a showing, the Government's willingness to provide a list of names is sufficient.

The Government's second objection, that it will only turn over written statements of individuals it does not intend to call as witnesses if it is required to do so under *Brady*, *Giglio*, the Jencks Act, or Rule 16, refers to Dominguez's request that the Government provide "[w]ritten statements of all persons described in Paragraph 6 who the Government does not plan to call as witnesses." Dkt. 182. Paragraph 6 requests information about persons who have knowledge pertaining to this case who the Government or its agents have interviewed.

United States v. Dominguez, Not Reported in Fed. Supp. (2018)
2018 WL 2057442

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 101 of 146    PageID 1724

*Id.* Dominguez provides no authority for her request for these statements. The Government shall disclose any information it must disclose under Rule 16, *Brady*, *Giglio*, the Jencks Act, and the U.S. Constitution, but it is otherwise not required to provide these statements.

**\*10** Dominguez's motion for discovery is **GRANTED IN PART AND DENIED IN PART**. It is, for the most part, **GRANTED AS UNOPPOSED**. However, the court **DEFERS** ruling on Dominguez's motion to the extent she requests disclosure of more than the name of the informant and **ORDERS** the parties to confer about this issue and provide the court with an update within ten days of the date of this order as discussed above. Additionally, Dominguez's request for the addresses and phone numbers of all individuals who may have information about this case is **DENIED**. Dominguez's request for written statements of all persons who have knowledge pertaining to this case who the Government does not plan to call as witnesses is **GRANTED IN PART AND DENIED IN PART**. It is **GRANTED AS UNOPPOSED** to the extent that the Government shall provide these statements if they contain information that the Government is required to disclose under Rule 16, *Brady*, *Giglio*, the Jencks Act, and the U.S. Constitution. It is otherwise **DENIED**.

### VII. FIRST MOTION TO EXCLUDE EVIDENCE BARRED BY EVIDENCE RULE 403. (DKT. 183)

Dominguez requests that the Government be prohibited from mentioning the type of evidence that is barred by Federal Rule of Evidence 403. Dkt. 183. The Government responds that it will comply with any rulings the court makes under Rule 403. Dkt. 274 at 30. Federal Rule of Evidence Rule 403 allows the court "to exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. The court has not made any rulings under Rule 403 and likely will not do so until the pretrial conference or at trial. Therefore, this motion is not yet ripe and is therefore **DENIED AS PREMATURE**.

### VIII. FIRST MOTION TO EXCLUDE EVIDENCE BARRED BY EVIDENCE RULE 404(b) (DKT. 184)

Dominguez requests that the court prohibit the Government from mentioning evidence that is barred by Federal Rule of Evidence 404(b). Dkt. 184. The Government responds that it will comply with the rules, but also reserves the right to use evidence admissible under Rule 404(b)(2), upon notification to the defendant. Dkt. 274 at 30. Because evidence admissible under Rule 404(b)(2) is by default not barred by Rule 404(b), Dominguez's motion is **GRANTED AS UNOPPOSED**.

### IX. OPPOSED MOTION TO PRODUCE TAPES OR CD-ROMS OF CONVERSATIONS RECORDED BY CONSENT OR WIRETAP AUTHORIZATION AND BILINGUAL TRANSLATION TRANSCRIPTS THEREOF (DKT. 185)

Dominguez requests that the court order the Government to make available upon request for inspection and copying tapes or CD–ROMs of conversations recorded by consent or wiretap authorization. Dkt. 185. The Government responds that it intends to furnish such recordings, as well as transcriptions of recordings that are in any language other than English. Dkt. 274 at 31. Because the Government agrees to comply with the rules of discovery, the motion is **GRANTED AS UNOPPOSED**.

### X. FIRST MOTION FOR PRETRIAL NOTICE OF 404(b) EVIDENCE (DKT. 186)

Dominguez moves for an order requiring the Government to disclose any evidence it plans on introducing under Federal Rule of Evidence 404(b). Dkt. at 186. The Government responds that it will comply. Dkt. 274 at 31. The motion is therefore **GRANTED AS UNOPPOSED**.

### XI. MOTION TO JOIN CO-DEFENDANTS' MOTIONS (DKT. 187)

Dominguez moves for the court's permission to join and adopt as her own her co-defendants' non–Rule 16 motions, objections, requests, and proposed jury instructions, to the extent they apply to Dominguez. Dkt. 187. The Government is unopposed to this motion except that it states that any co-defendant's motion under 18 U.S.C. § 3145 requires individualized determination. Dkt. 274. This statute relates to detention orders, and the court agrees that Dominguez must assert any motions relating to detention on her own. *See* 18

United States v. Dominguez, Not Reported in Fed. Supp. (2018)
2018 WL 2057442

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 102 of 146    PageID 1725

U.S.C. § 3145. Dominguez's motion is therefore **GRANTED AS UNOPPOSED** except that Dominguez may not adopt any of her co-defendant's motions under 18 U.S.C. § 3145.

**CONCLUSION**

**\*11**  The motions at docket entries 179, 180, and 183, are **DENIED**. The motions at docket entries 176, 178, and 182,

are **GRANTED IN PART AND DENIED IN PART**, as further explained above. The motions at docket entries 177, 184, 185, 186, and 187 are **GRANTED AS UNOPPOSED**.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2057442

---

**Footnotes**

1    Dominguez has not been convicted.

2    The only authority the Government cites to support its argument that it need not provide addresses is a case from a federal district court in Puerto Rico. In that case, the Government asserted that the names of witnesses the FBI interviewed during its investigation were not exculpatory and that the defendant already had any information that was exculpatory or may be used to impeach a witness. *United States v. Ortiz–Garcia*, 553 F. Supp. 2d 119, 119 (D.P.R. 2008). The Government also provided information it contended demonstrated an increased potential for the witnesses to be harassed and intimidated if the name and contact information were disclosed. *Id.* The court reviewed the evidence *in camera* and determined that the names and information were not evidence or exculpatory and that the defendants were thus not entitled to obtain the information under *Brady. Id.* The court additionally pointed out that disclosing a witness list prior to trial was not required under Rule 16 or the Jencks Act, and while the court may compel the prosecution to furnish a witness list prior to trial, it must weigh the government's reasons for nondisclosure against the defendant's showing of particularized need. *Id.* at 121. It noted that it "would also be improper to order discovery of witness lists if coercion or other harm would likely result to prospective witnesses." *Id.*

---

**End of Document**                                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit E

2014 WL 6633049
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

UNITED STATES of America, Plaintiff,
v.
Fabian C. FLEIFEL, Defendant.

Criminal No. 3:12–CR–318–D(3).
|
Signed Nov. 24, 2014.

**Attorneys and Law Firms**

Candina S. Heath, John J. De La Garza, III, U.S. Attorney's Office, Dallas, TX, for Plaintiff.

*MEMORANDUM OPINION AND ORDER*

SIDNEY A. FITZWATER, District Judge.

*1 Defendant Fabian Fleifel ("Fleifel") has filed several pretrial motions that the court decides by this memorandum opinion and order. [1]

I

*Motion for Disclosure of Rule 404(b) Evidence
and its Purpose and Motion* in Limine
*Regarding Uncharged Acts of Misconduct*

Fleifel moves the court to require the government to disclose any evidence that it intends to offer at trial under Fed.R.Evid. 404(b), and to state the general purpose for which any such evidence is offered. He also requests that the court convene an evidentiary hearing before trial to determine the admissibility of any Rule 404(b) evidence that the government intends to offer at trial. In a separate motion *in limine,* Fleifel requests that the court instruct the attorney for the government, and, through such counsel, any and all government witnesses, to refrain from mentioning, directly or indirectly, in the jury's presence any uncharged acts of misconduct alleged to have been committed, or engaged in, by him, until a hearing has been held outside the jury's presence.

The government responds that it will comply with Fleifel's disclosure request to the extent required by Rule 404(b)—that is, that it will provide a statement of the general nature of the evidence and the purpose for which it is being offered—and it states that it will do so at the time pretrial material is due under the court's scheduling order, i.e., 14 days prior to trial. The government opposes the motion to the extent Fleifel's request exceeds the scope of Rule 404(b). It also opposes Fleifel's request for a pretrial hearing, although it does not oppose a brief, appropriate hearing outside the jury's presence during trial.

To the extent the government has agreed to comply with its obligations under Rule 404(b), Fleifel's motion is denied as moot. To the extent Fleifel's request exceeds what Rule 404(b) requires, the motion is denied. The government must provide the notice required by Rule 404(b) no later than 14 days before the date the trial commences (i.e., Tuesday, January 20, 2015, because 14 days before February 2, 2015 is a federal holiday).

The court denies Fleifel's request for a pretrial evidentiary hearing to determine the admissibility of Rule 404(b) evidence. A pretrial hearing is not required, and a ruling on the admissibility of Rule 404(b) evidence often requires that the court assess proof offered, or positions taken, by a party during the trial itself. Instead, the court will grant Fleifel's related motion *in limine* to the extent that the government must not disclose Rule 404(b) evidence to the jury until it has obtained a ruling outside the jury's presence that the evidence is admissible.

Except to the extent the court is granting Fleifel's motion for disclosure of Rule 404(b) evidence and its purpose, and motion *in limine* regarding uncharged acts of misconduct, the motions are denied.

II

*Motion for Evidence Favorable to Defendant*

Fleifel moves the court to order the government to disclose any evidence that is exculpatory or favorable to him and that could lead to evidence that is exculpatory or favorable. He identifies 15 particular categories that he maintains would be exculpatory. Fleifel also requests that the government's attorney be ordered to examine her files and to question government agents, informants, or other persons working

*U.S. v. Fleifel, Not Reported in F.Supp.3d (2014)*
2014 WL 6633049

with the government in this case regarding their knowledge of any such evidence or materials. He also requests that he be allowed to question the government's attorney and the government's agents concerning their knowledge of exculpatory evidence and diligence in attempting to locate such evidence.

**\*2** In response, the government states that it will comply fully with its obligations under Fed.R.Crim.P. 12(b)(4), 16, and 26.2, the Jencks Act, 18 U.S.C. § 3500, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and its progeny. The government objects to the motion to the extent that Fleifel's requests exceed the scope of any disclosures required by law, or place a greater burden on the government than the law provides.

To the extent Fleifel requests discovery that the government is required, or has offered, to disclose under Rules 12(b)(4), 16, and 26.2, the Jencks Act, 18 U.S.C. § 3500, *Brady* and its progeny, and/or *Giglio* and its progeny, the motion is denied as moot. The government will be expected to comply with its obligations under *Brady, Giglio,* and the Jencks Act, and these rules. To the extent Fleifel's requests exceed what is required by these authorities, the motion is denied. The government need not produce Jencks Act materials or statements discoverable under Rule 26.2 until the deadline specified *infra* at § VII.

III

*Motion for Early Designation of Government's Expert Witnesses*

Fleifel moves the court to require the government to designate no later than January 5, 2015 whom, or at least what category of expert witness, the government intends to call in its case-in-chief, the credentials of such expert witness, any documentation that the expert has reviewed to give his opinion, and a general summary of the testimony sought from the expert. The government responds that it does not oppose Fleifel's motion. It agrees to designate its experts, if any, by January 5, 2015. It also requests that the court order Fleifel to designate his experts by January 12, 2015.

Because the government does not oppose Fleifel's motion, the court denies the motion as moot, on the assumption that the government will comply with its Rule 16(a)(1)(G) expert obligations no later than January 5, 2015.

The court grants the government's request that Fleifel be ordered to designate his experts, except that the court sets January 20, 2015 as the deadline for him to make any such designation.

IV

*Motion for Disclosure of Plea Bargain Agreements*

Fleifel moves the court to require the government to disclose plea agreements, and/or drafts thereof, between the government and any person who will be a witness for the government. He also requests related information regarding witnesses who have reached other understandings with the government in exchange for their testimony. Fleifel specifically requests that the government be required to produce contemporaneous notes made by case agents during proffer sessions or notes or reports of interviews of cooperating witnesses.

The government responds that it will comply with Fleifel's requests by producing all plea agreement documents and any documents reflecting promises made to testifying witnesses. It also identifies two other cases in which coconspirators charged in the instant case are also charged. The government opposes the motion to the extent Fleifel seeks disclosure beyond that to which he is legally entitled by law or places a greater burden on the government than the law provides. It states that it will comply with its obligations under *Giglio* and its progeny, and all court orders.

**\*3** To the extent the government has agreed to comply with its obligations under *Brady* and *Giglio,* the court denies the motion as moot. To the extent Fleifel's motion exceeds the government's obligations under *Brady* and *Giglio,* the motion is denied.

Regarding Fleifel's requests for contemporaneous notes made by agents during proffer sessions or notes or reports of interviews of cooperating witnesses, the court orders the government to disclose any agent notes to the extent required to do so by *Brady* or *Giglio.* Additionally, the government must disclose any material that qualifies as a "statement"

under the Jencks Act or Rule 26.2(f). To the extent Fleifel's motion seeks more than that to which the government has agreed, or that exceeds the government's obligations under *Brady* or *Giglio,* the Jencks Act, or Rule 26.2, the motion is denied. The government need not produce any discoverable statements covered by the Jencks Act or Rule 26.2 until the deadline specified *infra* at § VII.

V

*Motion for Early Production of Statements of Witnesses*

Fleifel moves the court to require the government to produce 18 U .S.C. § 3500 witness statements—i.e., Jencks Act statements—14 days prior to trial. In response, the government agrees to fully comply with 18 U.S.C. § 3500, but it opposes any requirement that it disclose such materials sooner than one day before the witness to whom the material pertains testifies, citing the long-standing practice in the Dallas Division of this court.

18 U.S.C. § 3500(b) (which pertains to the government) and Rule 26.2(a) (which pertains to the government and to a defendant) do not authorize the court to compel a party to produce a witness statement any earlier than after a witness has testified on direct examination. In this district, however, it is the custom for Jencks Act-type materials, including statements under Rule 26.2(a), to be disclosed at the end of the business day preceding the date on which the defendant will begin his cross-examination of a witness. Therefore, the court orders the government to comply with the Jencks Act and Rule 26.2(a) no later than the business day preceding the date on which Fleifel will begin his cross-examination of the witness whose statement is being produced. To the extent Fleifel requests greater relief, the motion is denied.

VI

*Motion for Hearing on Admissibility of Statements Made by Unavailable Witnesses or Alleged Coconspirators*

Fleifel moves for a pretrial hearing to determine the admissibility of any statements made by unavailable witnesses or alleged coconspirators. Although he refers generally to unavailable witnesses, he focuses in his motion on evidence that he maintains the government intends to offer under Fed.R.Evid. 801(d)(2)(E), the coconspirator exception to the hearsay rule. Fleifel requests that the court order that a pretrial hearing [2] be conducted to determine that such evidence is admissible before it is introduced at trial.

**\*4** The government responds that a separate hearing is not mandatory under *United States v. James,* 590 F.2d 575 (5th Cir.1979) (en banc); that the court retains the discretion to decide whether to conduct such a hearing; and that the court is authorized to, and should, carry its ruling on the existence of a conspiracy, the identities of the members of the conspiracy, and the admissibility of coconspirator statements against certain defendants, subject to the government's later connection in its case-in-chief.

In *James* the Fifth Circuit held that coconspirator statements are admissible as non-hearsay under Rule 801(d)(2)(E) only if substantial independent evidence of a conspiracy exists. *James,* 590 F.2d at 581. But "[a] *James* hearing, conducted outside the presence of the jury, is *one potential method* by which the district court may ensure [that] the Government can satisfy the predicate facts needed to prove the conspiracy independent of the statements." *United States v. Williams,* 264 F.3d 561, 576 (5th Cir.2001) (emphasis added). Deciding "[w]hether a *James* hearing is necessary in a particular case [is] within the discretion of the trial court." *Id.* "*James* has *never required* a hearing outside the presence of the jury." *United States v. Fragoso,* 978 F.2d 896, 899 (5th Cir.1992) (emphasis added). In this case, the court concludes that convening such a hearing would be burdensome and effectively result in a mini-trial of potentially considerable length, given that one of Fleifel's requests is that the government be required to prove at the hearing the existence of a conspiracy and of Fleifel's participation in it at the time the statement was allegedly made. Presumably, Fleifel would insist that the government make this showing through the witnesses whom the government intends to call to testify at trial. The government is not obligated in a conspiracy case involving Rule 801(d)(2)(E) evidence to participate in a form of elaborate pretrial discovery conducted under the guise of requiring that it satisfy the predicate facts needed to prove the admissibility of coconspirator statements. Accordingly, the court denies the motion.

The court recognizes that, during the trial, it must "whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it [pursuant

to Rule 801(d)(2) (E) ] before admitting declarations of a coconspirator." *Fragoso,* 978 F.2d at 900. In complying with Rule 801(d)(2) (E), the court must determine whether there is sufficient " 'evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course and in furtherance of the conspiracy.' " *Id.* (quoting ⚑ *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (internal quotation marks omitted)). The court will adhere to these requirements in trying this case.

VII

Except to the extent that the Jencks Act and Rule 26.2(a) permit later disclosure, the government must comply no later than December 29, 2014 with its disclosure and discovery obligations imposed by this memorandum opinion and order and by the government's agreement to produce what Fleifel has requested. Concerning material that qualifies as a "statement" under the Jencks Act or Rule 26.2(f), in accordance with the custom in this district, the government must comply with the Jencks Act and Rule 26.2(a) no later than the business day preceding the date on which Fleifel will begin his cross-examination of the witness whose statement is being produced.

**\*5  SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6633049

---

### Footnotes

1    On November 21, 2014, eight of the ten defendants filed an unopposed motion for continuance of trial. Any deadline included in this memorandum opinion and order that is set for a specific date is based on the current trial setting of February 2, 2015. If the continuance motion is granted, the court will reset any specific date based on the new trial setting. If the court denies the continuance motion, any such specific date will continue to apply.

2    This type of hearing is referred to as a *James* hearing. *See* ⚑ *United States v. James,* 590 F.2d 575 (5th Cir.1979) (en banc).

---

**End of Document**                                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit F

United States v. Hagen, Not Reported in Fed. Supp. (2020)
2020 WL 1929848

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 109 of 146    PageID 1732

2020 WL 1929848
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

UNITED STATES of America, Plaintiff,
v.
Leah HAGEN (1), Michael Hagen (2), Defendants.

CRIMINAL NO. 3:19-CR-0146-B
|
Signed 04/21/2020

**Attorneys and Law Firms**

Brynn Schiess, U.S. Department of Justice, Washington, DC, Carlos Antonio Lopez, U.S. Department of Justice, Dallas, TX, for Plaintiff.

Jason S. Lewis, Marina Stefanova, DLA Piper US LLP, Dallas, TX, for Defendant Leah Hagen.

Sean Robert McKenna, Spencer Fane LLP, David W. Klaudt, Greenberg Traurig LLP, Dallas, TX, for Defendant Michael Hagen.

**MEMORANDUM OPINION AND ORDER**

JANE J. BOYLE, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are Defendant Leah Hagen's and Defendant Michael Hagen's Motion to Dismiss the Indictment and Superseding Indictment and Brief in Support (Doc. 52) and Motion for Bill of Particulars (Doc. 63). For the following reasons, the Court **DENIES** the Hagens' motions.

**I.**

**BACKGROUND**

On March 27, 2019, Leah and Michael Hagen were indicted on one count of conspiring to defraud the United States and to pay and receive health care kickbacks under the Anti-Kickback Statute. *See* Doc. 1, Indictment, 5 (alleging violations of 18 U.S.C. § 371 and 42 U.S.C. §§ 1320a-7b(b)(1)–(2) (the "Anti-Kickback Statute")). On September 12, 2019, the Government filed a superseding indictment that included an additional count against the Hagens for conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h). Doc. 50, Superseding Indictment, 11.

Generally, the superseding indictment alleges that from around March 2016 to January 2019, the Hagens knowingly conspired to pay illegal kickbacks and bribes to Herb Kimble's international call-center businesses in exchange for completed, signed prescriptions for durable medical equipment ("DME") and other Medicare-required documents (collectively referred to in the superseding indictment as "doctors' orders"). *Id.* ¶¶ 20–31. The Hagens purportedly operated this scheme through two DME companies: Metro DME Supply and Ortho Pain Solutions. *Id.* at 1.

The superseding indictment alleges the following scheme. The Hagens enrolled Metro DME Supply as a Medicare provider. *Id.* ¶ 22. In doing so, they promised to comply with all the Medicare rules and regulations, including compliance with the Anti-Kickback Statute. *Id.* Then, through Metro DME Supply, the Hagens paid illegal kickbacks and bribes—totaling around $6.6 million—to Herb Kimble in exchange for the completed doctors' orders. *Id.* ¶ 23. Metro DME Supply purportedly provided services to Medicare beneficiaries from Dallas County, Texas; and Metro DME Supply would bill Medicare for these services. *Id.* ¶ 24.

Around August 2017, as the result of an audit, Centers for Medicare and Medicaid Services (CMS) suspended Medicare payments to Metro DME Supply. *Id.* ¶ 25. CMS notified Leah Hagen of this suspension. *Id.* In September 2017, "Metro DME Supply voluntarily terminated its operations and its certification with original fee-for-service Medicare." *Id.* ¶ 26.

However, purportedly in the same month that Metro DME Supply terminated its operations, the Hagens began paying illegal kickbacks and bribes through their other DME company, Ortho Pain Solutions, to Kimble's companies in exchange for doctors' orders. *Id.* ¶ 27. These payments allegedly totaled to approximately $8.2 million. *Id.*

The superseding indictment alleges that the doctors' orders that the Hagens received from their agreement with Kimble's companies were "generated often in the absence of any preexisting doctor-patient relationship or physical examination, and frequently based solely on a short telephonic conversation." *Id.* ¶ 28. Yet, the Hagens would "submit[ ] claims to fee-for-service Medicare and Medicare

United States v. Hagen, Not Reported in Fed. Supp. (2020)
2020 WL 1929848

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 110 of 146    PageID 1733

Advantage plan sponsors for reimbursement based on" these orders. *Id.*

**\*2** The superseding indictment further alleges that the Hagens, with Kimble's and others' help, attempted to conceal their scheme from Medicare and state regulators by creating "sham contracts, invoices, and other documentation that disguised the payments as for marketing and business process outsourcing[.]" *Id.* ¶ 29. And the superseding indictment describes a number of overt acts that the Hagens purportedly committed, with Kimble and others, and in furtherance of the conspiracy. *Id.* ¶ 31. First, on April 4, 2016, Leah Hagen, on behalf of Metro DME Supply, signed a Business Process Outsourcing and Call Center Services Agreement and a Marketing Services Agreement with Kimble's companies. *Id.* ¶¶ 31(b), (c). Thereafter, on April 7, 2016, Leah Hagen emailed Kimble, Michael Hagen, and others, stating: "We are ready to get this marketing campaign rolling.... We approved the sample telemed RX that were sent over. We agree to do lumbar and wrist—Medicare for now." *Id.* ¶ 31(d). Next, on August 5, 2016, Leah Hagen emailed Kimble and others, "expressing her concern that the number of doctors' orders was not on target." *Id.* ¶ 31(e). Then, on September 20, 2017, Leah Hagen emailed representatives of one of Kimble's companies, Kimble, and Michael Hagen to provide signed agreements for marketing and business process outsourcing services, this time on behalf of Ortho Pain Solutions. *Id.* ¶ 31(f). Last, the superseding indictment alleges that on January 26, 2019, the Hagens discussed with Kimble that they had "paid him approximately $280 per DME product in exchange for completed doctors' orders." *Id.* ¶ 31(a).

Overall, Count One alleges that the Hagens submitted "approximately $17 million in claims to original fee-for-service Medicare for DME, the vast majority of which were the product of illegal kickbacks and bribes," and based on doctors' orders that the Hagens received from Kimble in exchange for illegal kickbacks and bribes. *Id.* ¶ 30.

Count Two of the superseding indictment alleges that the Hagens knowingly and willfully conspired with others, including Kimble, to knowingly transfer money and funds from "a place in the United States to a place outside of the United States with the intent to promote" the conspiracy alleged in Count One. *Id.* ¶¶ 32–33.

Pending before the Court are the Hagens' motion to dismiss the superseding indictment and motion for a bill of particulars. Doc. 52, Defs.' Mot. to Dismiss; Doc. 63, Defs.' Mot. Bill of

Particulars. All briefing has been received on these motions, and as such, they are ripe for review.

## II.

## LEGAL STANDARD

*A. Sufficiency of an Indictment*

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged...." "The purpose of an indictment is 'to allege each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding.' " *United States v. Lawrence*, 727 F.3d 386, 397 (5th Cir. 2013) (quoting *United States v. Morrow*, 177 F.3d 272, 296 (5th Cir. 1999)). "Thus, an indictment is sufficient if it 'contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend.' " *Id.* (quoting *United States v. Fuller*, 974 F.2d 1474, 1480 (5th Cir. 1992)). "It is not necessary for an indictment to go further and to allege in detail the factual proof that will be relied upon to support the charges." *United States v. USPlabs, LLC*, 338 F. Supp. 3d 547, 557 (N.D. Tex. 2018) (quoting *United States v. Crippen*, 579 F.2d 340, 342 (5th Cir. 1978)). "Generally, an indictment [that] follows the language of the statute under which it is brought is sufficient to give a defendant notice of the crime of which he is charged." *Id.*

(alterations in *United States v. USPlabs*) (quoting *United States v. Thomas*, 348 F.3d 78, 82 (5th Cir. 2003)).

"[A] motion to dismiss an indictment for failure to state an offense is a challenge to the sufficiency of the indictment[.]" *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004). "When the court decides such a motion, it is required to 'take the allegations of the indictment as true and to determine whether an offense has been stated.' " *United States v. Daniels*, 316 F. Supp. 3d 949, 953 (N.D. Tex. 2018) (quoting *Kay*, 359 F.3d at 742). "The propriety of granting a motion to dismiss an indictment ... by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact[.]" *Id.* (quoting *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011)). "A court must deny a motion to dismiss if the motion relies on disputed facts." *USPlabs*, 338 F. Supp. 3d

United States v. Hagen, Not Reported in Fed. Supp. (2020)
2020 WL 1929848

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 111 of 146    PageID 1734

at 557 (citing, *inter alia*, 🚩 *United States v. Covington*, 395 U.S. 57, 60 (1969)).

### B. Bill of Particulars

**\*3** Under Federal Rule of Criminal Procedure 7(f), a defendant "may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits." Fed. R. Crim. P. 7(f). The district court has discretion over whether to grant the request. *United States v. Shults*, 2018 WL 5023779, at \*1 (N.D. Tex. Sept. 18, 2018). "The purposes of a bill of particulars are to provide the defendant with sufficient notice of the charges against him so that he can prepare an adequate defense, to minimize surprise to the defendant at trial, and to enable the defendant to plead double jeopardy in the event of a subsequent prosecution." *United States v. Faulkner*, 2011WL 2880919, at \*1 (N.D. Tex. July 15, 2011) (citing, *inter alia*, 🚩 *United States v. Carlock*, 806 F.2d 535, 550 (5th Cir. 1986)). "A bill of particulars cannot be used, however, to 'obtain a detailed disclosure of the government's evidence prior to trial[.]' " *Id.* (quoting 🚩🅰 *United States v. Kilrain*, 566 F.2d 979, 985 (5th Cir. 1978)); *see also United States v. Davis*, 582 F.2d 947 951 (5th Cir. 1978) ("[I]t is well established that generalized discovery is not a permissible goal of a bill of particulars."). Instead, the Court "must balance the needs of the defendant against the [G]overnment's right not to disclose its witnesses, evidence or legal theories." *Shults*, 2018 WL 5023779, at \*1 (quoting *United States v. Campbell*, 710 F. Supp. 641, 642 (N.D. Tex. 1989)).

"In determining whether a bill of particulars is necessary, the court examines 'whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges against him to enable him to prepare for trial.' " *Faulkner*, 2011 WL 2880919, at \*2 (quoting *United States v. Martinez*, 2010 WL 2025226, at \*7 (N.D. Tex. May 21, 2010)). "Moreover, even if the indictment does not furnish sufficient information to enable the defendant to prepare a defense and to avoid surprise at trial, where the government has provided the necessary information in another satisfactory form, such as through discovery, a bill of particulars is unnecessary." *Id.* (citing 🚩 *United States v. Kirkham*, 129 F. App'x 61, 72 (5th Cir. 2005)).

### III.

### ANALYSIS

The Court starts with the Hagens' motion to dismiss the superseding indictment. The Hagens lodge three objections to the superseding indictment. First, they argue that the Government has not sufficiently alleged facts to state a claim for either offense charged in the superseding indictment. Second, they argue that the superseding indictment is unconstitutionally vague. Third, they argue that the rule of lenity protects them against prosecution under the particular circumstances of this case. Addressing each argument in turn, the Court determines that the motion to dismiss should be **DENIED**.

The Hagens' motion for a bill of particulars reprises many of the same arguments raised in their motion to dismiss. Specifically, they argue that because the superseding indictment fails to sufficiently allege a scheme to defraud or a conspiratorial agreement, they cannot adequately prepare a defense. For the much of the same reasons the Court denies the Hagens' motion to dismiss on sufficiency grounds, the Hagens' request for a bill of particulars is **DENIED**.

### A. Motion to Dismiss the Superseding Indictment

#### 1. Sufficiency of the Superseding Indictment

The superseding indictment charges the Hagens with two counts: (1) conspiring to defraud the United States and to pay and receive health care kickbacks; and (2) conspiring to commit money laundering. Doc. 50, Superseding Indictment, ¶¶ 18–33. Reviewing each count separately, the Court decides whether the superseding indictment "contains the elements of the offense charged and fairly informs the defendant[s] of the charge against which [they] must defend." 🚩 *Lawrence*, 727 F.3d at 397 (quoting *Fuller*, 974 F.2d at 1480).

#### i. Conspiring to defraud the United States under 18 U.S.C. § 371

The Hagens first contend that the Government has failed to sufficiently allege any element of Count One: Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks. Doc. 52, Mot. to Dismiss, 5. The Court starts with an overview of the law, then proceeds to summarize the allegations as to this Count in the superseding indictment, and finally considers the parties' arguments.

United States v. Hagen, Not Reported in Fed. Supp. (2020)

2020 WL 1929848

Case 4:25-cr-00259-P     Document 112-1     Filed 11/18/25     Page 112 of 146     PageID 1735

**\*4** The elements for a conspiracy under 18 U.S.C. § 371 are: "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Njoku*, 737 F.3d 55, 63–64 (5th Cir. 2013) (quoting *United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009)). 42 U.S.C. § 1320a-7b(b), the Anti-Kickback Statute, "criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program." *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004). Section 1320a-7b(b)(1) provides, in full, that:

Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind —

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b)(1). Similarly, § 1320a-7b(b)(2) provides that:

Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

*Id.* § 1320a-7b(b)(2).

Count One of the superseding indictment alleges that from around March 2016 to January 2019, the Hagens knowingly and willfully conspired with each other and others to commit the following offenses:

a. to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program; and

b. to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and

c. to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

United States v. Hagen, Not Reported in Fed. Supp. (2020)

2020 WL 1929848

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 113 of 146    PageID 1736

**\*5** Doc. 50, Superseding Indictment, 5–6. The superseding indictment proceeds to allege the objective of the conspiracy; the manner and means by which the Hagens sought to accomplish the objective of the conspiracy; and the overt acts the Hagens and their coconspirators committed in furtherance of the conspiracy. *Id.* at 6–10; *see also supra* at 2–3.

The Court now proceeds to the parties' arguments. In considering these arguments, the Court emphasizes that it is required to take the allegations just outlined as true. *See Daniels*, 316 F. Supp. 3d at 953 (quoting *Kay*, 359 F.3d at 742).

First, as to the elements of conspiracy under § 371, the Hagens argue, without support, that "[d]ue to the potentially broad reach of 18 U.S.C. § 371, the law requires that the Government allege *specific facts* in an indictment as to how the conspiracy came about." Doc. 52, Mot. to Dismiss, 5. The Hagens proceed to assert that the superseding indictment fails to allege "the existence of a conspiratorial agreement." *Id.* at 6. They also dispute that the superseding indictment has sufficiently alleged: "with whom" the Hagens made an agreement; "when" the alleged agreement was made; "how the agreement was made"; and "whether the agreement was made knowingly." *Id.* Finally, the Hagens argue that the Government's allegation that the purpose of the conspiracy was to receive kickbacks is too conclusory. *Id.*

The Hagens next dispute that the Government has sufficiently alleged facts that show that the Hagens knew of the unlawful objective of the conspiracy and voluntarily agreed to join it. *Id.* In fact, the Hagens contend, the Government's allegations do not amount to inherently unlawful activity because "the intent to compensate advertisers" is permissible under the Anti-Kickback Statute. *Id.* at 7 (quoting *United States v. Shoemaker*, 746 F.3d 614, 628 (5th Cir. 2014)). And the Hagens claim that the agreements they made with marketing companies were merely for marketing and business processing services, not doctors' orders. *Id.* Last, the Hagens argue that "no overt act in furtherance of the objective of the conspiracy has been alleged." *Id.* at 8. Like their previous argument, the Hagens maintain that the payments they made to marketing companies were lawful, and thus cannot be considered overt acts in furtherance of a conspiracy. *Id.*

The Government responds that the Hagens have misconstrued the facts alleged in the superseding indictment. Doc. 59, Gov't's Resp., 6. First, the Government notes that the superseding indictment properly sets forth the elements and tracks the language of the statute in charging the Hagens. *Id.* at 5 ("An indictment tracking the language of the statute is sufficient to charge a violation of 18 U.S.C. § 371." (quoting *United States v. Gordon*, 780 F.2d 1165, 1171 (5th Cir. 1986))). Next, the Government asserts that the Hagens "simply disregard the superseding indictment's reference to specific allegations that properly charge them with each element of each offense." *Id.* at 6–7. The Government goes on to chart the Hagen's purported mischaracterizations. *See id.* at 7–8. For example, when the Hagens assert in their motion that the superseding indictment fails to allege "with whom either Leah Hagen or Michael Hagen reached an agreement," the Government points to multiple paragraphs where the indictment notes that "Leah Hagen and Michael Hagen reached an agreement with Herb Kimble, among others." *Id.* at 7 (comparing Doc. 52, Defs.' Mot., 10 with Doc. 50, Superseding Indictment, ¶¶ 23, 27, 29–31).

**\*6** Next, the Government claims that the Hagens misconstrue the law with respect to the sufficiency of an indictment. Specifically, the Government argues that the Hagens' challenge that the superseding indictment does not prove that the Hagens acted knowingly and willfully is a challenge to the sufficiency of the evidence to be presented at trial, not a challenge to the sufficiency of the allegations in the indictment. *Id.* at 10–11 (collecting cases). The Government asserts that, at this stage, it need not provide the Hagens with every piece of evidence it plans to rely on at trial to prove its case. *Id.* at 11 (citing *Crippen*, 579 F.2d at 342). And the Government distinguishes the authority that the Hagens rely on for their claim that more specific information is required. *Id.* at 11–12.

Finally, the Government contends that the Hagens' arguments related to defenses they might be able to prove at trial are irrelevant in deciding their motion to dismiss. *Id.* at 12. The Government maintains that the Hagens' defenses—*e.g.*, that the Hagens' agreements with Kimble's businesses were for lawful marketing and business services contracts—are arguments for the jury to consider at trial or for the Court to consider on a motion for a judgment of acquittal. *Id.* But the Government asserts that it is "not required to anticipate affirmative defenses or negate statutory exceptions" in an indictment. *Id.* at 12–13 (collecting cases).

The Court concludes that the superseding indictment is sufficient as to Count One "because it contains the elements of the offense charged and fairly informs [the Hagens]

United States v. Hagen, Not Reported in Fed. Supp. (2020)

2020 WL 1929848

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 114 of 146    PageID 1737

of the charge against which [they] must defend." *United States v. Robinett*, 2018 WL 1640116, at *3 (N.D. Tex. Apr. 5, 2018) (citation omitted). As laid out above, the superseding indictment tracks the specific language of both 18 U.S.C. § 371 and the Anti-Kickback Statute in charging the Hagens. *See supra* at 8–10 (comparing 18 U.S.C. § 371 and 42 U.S.C. §§ 1320a-7b(b)(1)–(2) with Doc. 50, Superseding Indictment, 5–10). "[A]n indictment which follows the language of the statute under which it is brought is sufficient to give [the] defendant[s] notice of the crime which [they are] charged." *United States v. Massey*, 849 F.3d 262, 264 (5th Cir. 2017) (citation omitted). Here, the superseding indictment provides the Hagens with more than enough information to give them notice that they are charged with conspiring to defraud the United States and to violate the Anti-Kickback Statutes. The superseding indictment charges the Hagens with "knowingly and willfully" conspiring with each other, Kimble, and others to commit certain offenses against the United States, specifically, defrauding the Department of Health and Human Services (HHS) and violating the Anti-Kickback Statute provisions by soliciting, receiving, offering, and paying remuneration in return for doctors' orders. Doc. 50, Superseding Indictment, ¶ 19(a)–(c). Moreover, the superseding indictment lays out the objective of the conspiracy, *id.* ¶ 20 ("to unlawfully enrich themselves and others"); the manner and means by which the objective of the conspiracy was accomplished, *id.* ¶¶ 21–30 [1]; and specific overt acts committed in furtherance of the conspiracy. *Id.* ¶ 31; *see also supra* at 2–3, 9–10.

The Court agrees with the Government that the Hagens' challenges to the superseding indictment are either (1) mischaracterizations of the contents of the pleading; or (2) not appropriate for resolution at this stage of the proceeding.

**\*7** To start, as the Government points out, the Hagens cite to no authority that supports their contention that a greater degree of specificity is required for this count. *See* Doc. 52, Mot. to Dismiss, 5; Doc. 59, Gov't's Resp., 11–12. Indeed, it is well-established in the Fifth Circuit that "[i]t is not necessary for an indictment to go further and to allege in detail the factual proof that will be relied upon to support the charges." *Robinett*, 2018 WL 1640116, at *2 (quoting *Crippen*, 579 F.2d at 342). Thus, absent countervailing authority, the Hagens' argument that more is required is without merit.

Aside from demands for more detailed allegations, the Hagens' reply reveals that their chief complaints boil down

to factual disputes about the veracity of the allegations in the superseding indictment. For example, in their motion, the Hagens argue that "there are no allegations that the Hagens made payments with the intent to induce any unlawful prescription or that they were even aware of any such arrangement." Doc. 52, Mot. to Dismiss, 6. The Government then responds by pointing to two examples of overt acts from the superseding indictment that purportedly reflect the Hagens' intent—first, to the Hagens discussing with Kimble that they paid him approximately $280 per DME product in exchange for completed doctors' orders; and second, to a August 5, 2016, email where Leah Hagen expressed her "concern that the number of doctors' orders was not on target." Doc. 59, Gov't's Resp., 7–8 (citing Doc. 50, Superseding Indictment, ¶¶ 31(a), (e)). [2] In their reply, the Hagens argue that these allegations "do not reveal an intent to induce." Doc. 62, Defs.' Reply, 7. Instead, they assert, these communications are "in line with legitimate marketing practices" because they indicate, for example, the amount of marketing required to yield patient interest under the allegedly legitimate marketing agreements with Kimble's companies. *Id.* Indeed, this *could* be a potentially innocent explanation for these discussions. But the communications could also be evidence of overt acts that the Hagens committed to make payments to Kimble's companies with the intent to induce doctors' orders. Regardless, the Hagens' reply amounts to no more than factual disputes about how to construe the communications. And factual disputes are not fit for resolution on a motion to dismiss. *See USPlabs*, 338 F. Supp. 3d at 557 (collecting cases) ("A court must deny a motion to dismiss if the motion relies on disputed facts.").

**\*8** This conclusion also applies to the Hagens' argument that the Government has failed to "identify the existence of a conspiratorial agreement[.]" Doc. 62, Defs.' Reply, 3. The Hagens strenuously assert that the Government cannot refer to allegations related to the personal services and business agreements made between the Hagens' companies and Kimble's companies as allegations of a conspiratorial agreement. *Id.* at 3–6. But this argument is again just another argument that the Hagens' business relationship with Kimble was legitimate. The Court acknowledges, as the Hagens point out, that the Fifth Circuit has held that "the mere fact that the good or service provider compensates the advertiser following each purchase is insufficient to support the provider's *conviction* for making a payment 'to refer an individual to a person' under" the Anti-Kickback Statute. *Shoemaker*, 746 F.3d at 628 (emphasis added) (quoting

United States v. Hagen, Not Reported in Fed. Supp. (2020)
2020 WL 1929848

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 115 of 146    PageID 1738

*Miles*, 360 F.3d at 480). But, as the Government responds and the Court's emphasis makes clear, the *Shoemaker* court was deciding whether the evidence presented at trial was sufficient to support a conviction under the Anti-Kickback Statute. *Id.* at 619, 628. [3] Here, on a motion to dismiss, the Court must take the Government's allegations with respect to the Hagens' dealings with Kimble as true. The Hagens' motion thus again falls short on this ground.

Likewise, insofar as the Hagens' arguments go to a defense they might assert at trial—*e.g.*, that one of the safe harbors to the Anti-Kickback Statute "exempts their personal service agreements," see Doc. 52, Mot. to Dismiss, 7–8—the Government is not required to address and rebut those defenses in the superseding indictment. *See United States v. Davis*, 2014 WL 6679199, at *5 (S.D. Tex. Nov. 25, 2014) (denying motion to dismiss indictment on ground that the Government did not have to address affirmative defenses regarding safe-harbor provisions of the Anti-Kickback Statute (citing *United States v. Sisson*, 399 U.S. 267, 288 (1970))).

In sum, the Court finds that the superseding indictment is sufficient as to Count One because it provides all the elements of the offense charged and fairly informs the Hagens of the charge against which they must defend. Additionally, the Hagens' arguments for dismissing the superseding indictment amount to challenges to the factual sufficiency of the allegations; and such challenges are not appropriate for the Court to consider on a motion to dismiss. Accordingly, the Hagens' motion to dismiss Count One of the superseding indictment on sufficiency grounds is **DENIED.**

*ii. Conspiring to commit money laundering*

The Hagens move to dismiss Count Two of the superseding indictment on similar grounds. Specifically, the Hagens argue that the Government has failed to provide sufficient substantive allegations in support of this charge and that the only allegations the Government offers in support of the charge are "conclusory and impermissibly vague[.]" Doc. 52, Mot. to Dismiss, 8.

Count Two of the superseding indictment charges the Hagens with conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h). Doc. 50, Superseding Indictment,

11. "To establish conspiracy to commit money laundering, the government must prove (1) that there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006) (citation omitted). "The Government need not prove an overt act in furtherance of the conspiracy." *United States v. Calderon*, 665 F. App'x 356, 359 (5th Cir. 2016) (per curiam) (citing *Fuchs*, 467 F.3d at 906). [4]

**\*9**  With respect to Count Two, the superseding indictment charges:

> From in or about March 2016 through in or about January 2019, in the Dallas Division of the Northern District of Texas and elsewhere, Leah Hagen and Michael Hagen did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, including Herb Kimble, to commit offenses under Title 18, United States Code, Section 1956, namely, to knowingly transport, transmit and transfer monetary instruments and funds from a place in the United States to a place outside of the United States, with the intent to promote the carrying on of specified unlawful activity, namely, conspiracy to defraud the United States and to pay and receive health care kickbacks, in violation of Title 18, United States Code, Section 371, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

All in violation of Title 18, United States Code, Sections 1956(h) and 2. Doc. 50, Superseding Indictment, ¶ 33.

As stated, the Hagens argue that these allegations are too conclusory and vague to provide them fair notice of the conduct against which they must defend. Doc. 52, Mot. to

United States v. Hagen, Not Reported in Fed. Supp. (2020)
2020 WL 1929848

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 116 of 146    PageID 1739

Dismiss, 8. The Hagens complain that the allegations do not "provide any notice of what financial transactions are at issue, whether or how the transactions involved the proceeds of unlawful activity, whether any circumstances indicate the Hagens knew these transactions involved the proceeds of unlawful activity, and whether they had the requisite intent to promote or further unlawful activity...." *Id.* at 9.

The Government first responds that Count Two adequately alleges the elements of conspiring to commit money laundering. Doc. 59, Gov't's Resp., 9. The Government also argues that Count Two re-alleges the specific factual allegations contained in Count One regarding the underlying unlawful activity—*i.e.*, the activity related to paying illegal kickbacks and bribes to Kimble's international companies in exchange for completed doctors' orders for DME—thus providing more factual content for the basis of the money laundering allegations. *Id.* (citing Doc. 50, Superseding Indictment, ¶ 32). Last, the Government asserts that the Hagens' claim that Count Two fails to allege the specific financial transactions at issue, along with details of those transactions, is "critically flawed" because it assumes that a "conspiracy must also describe the elements of the substantive crime that is the object of the conspiracy." *Id.* Undercutting this assumption, the Government maintains that because conspiring to commit a crime is a separate offense from the underlying crime that is the object of the conspiracy, the superseding indictment need not allege facts like the details of the financial transactions, which the Hagens argue are absent. *Id.* at 9–10. In reply, the Hagens seem to concede that the superseding indictment need not plead the elements of the underlying money laundering offense. Doc. 62, Defs.' Reply, 8–9. The Hagens instead resort to arguing that Count Two fails to allege a purported agreement to commit money laundering or facts necessary to show that the Hagens knowingly entered into such an agreement with the intent to further the illegal purpose. *Id.*

**\*10** The Court finds that the superseding indictment sufficiently alleges the crime set out in Count Two. The Court agrees with the Government that the superseding indictment captures and tracks the language of 🔖 § 1956(h), such that it includes all the elements of the offense. *See* Doc. 59, Gov't's Resp., 9. The superseding indictment alleges that the Hagens knowingly and willfully agreed, with Kimble and others, to commit money laundering by knowingly transferring funds from somewhere in the United States to a place outside the United States, with the intent to promote the unlawful activity alleged in Count One. Doc. 50, Superseding

Indictment, ¶¶ 32–33. The Hagens also have sufficient notice that the purportedly unlawful activity that they attempted to promote by transferring money from their companies in the United States to Kimble's international companies involves defrauding the United States and violating the Anti-Kickback Statute, as described in Count One. *See id.* ¶ 32 (incorporating the previous allegations in the superseding indictment).

Thus, like with Count One, the Court concludes that Count Two is sufficient "because it contains the elements of the offense charged and fairly informs [the Hagens] of the charge against which [they] must defend." *Robinett*, 2018 WL 1640116, at \*3 (citation omitted). Accordingly, the Hagens' motion to dismiss Count Two of the superseding indictment on sufficiency grounds is **DENIED**.

2. Vaguenesss Challenge to the Anti-Kickback Statute [5]

The Hagens' next argument is that Count One of the superseding indictment should be dismissed because the Anti-Kickback Statute, 🔖 42 U.S.C. § 1320a-7b(b), is unconstitutionally vague. Doc. 52, Defs.' Mot. to Dismiss, 10. But the Hagens cite to no authority that supports this assertion. *See id.* The Government responds that courts in this circuit and others have "repeatedly and universally rejected vagueness challenges to the Anti-Kickback Statute." Doc. 59, Gov't's Resp., 14 (collecting cases). The Hagens fail to address any of this authority in their reply. *See* Doc. 62, Defs.' Reply, 9–10.

The Court agrees with the Government that the established law in this circuit, and for that matter in all other circuits, forecloses the Hagens' vagueness challenge. *See United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013) (per curiam); *see also, e.g., United States v. Nagelvoort*, 856 F.3d 1117, 1129–30 (7th Cir. 2017); 🔖*United States v. LaHue*, 261 F.3d 993, 1008 (10th Cir. 2001). While the Court acknowledges that a constitutional vagueness challenge is considered "as applied to the particular facts at issue," 🔖 *Robinson*, 505 F. App'x at 387 (citation omitted), the Hagens complain only that the statute is vague because it "does not specify that marketing arrangements such as the Hagens' can subject them to criminal liability." Doc. 52, Mot. to Dismiss, 10. But as other courts have noted, a defendant's "attempt to camouflage an underlying agreement to exchange remuneration for patient referrals" with other purportedly legitimate agreements "is the very conduct contemplated by

United States v. Hagen, Not Reported in Fed. Supp. (2020)

2020 WL 1929848

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 117 of 146    PageID 1740

the [Anti-Kickback Statute.]" *LaHue*, 261 F.3d at 1005 (citing *United States v. Day*, 223 F.3d 1225, 1228–29 (10th Cir. 2000)). And here, the superseding indictment alleges essentially the same conduct against the Hagens. *See* Doc. 50, Superseding Indictment, ¶ 29. Thus, with no other arguments that the Anti-Kickback Statute is vague as applied to them, the Court rejects the Hagens' vagueness challenge, and **DENIES** their motion on this ground as well.

### 3. Rule of Lenity

**\*11** The Hagens' last argument is that the rule of lenity insulates them from prosecution based on the particular circumstances of their case. Doc. 52, Mot. to Dismiss, 10–12. Specifically, the Hagens assert that the rule of lenity protects them against "a deprivation of liberty based on activities that remain the subject of continuous revision and debate by the Department of Health and Human Services Office of Inspector General." *Id.* at 10. The Hagens continue by explaining that the agreements they entered into with Kimble's companies "are the type of agreements that the OIG has recognized should be exempt from [Anti-Kickback Statute] liability," based on proposed rule changes to the safe harbor provisions of the Anti-Kickback Statute. *Id.* at 11–12.

The Government has two arguments in response. First, the Government argues that the "proposed" amendments to the statute are irrelevant because they are merely proposals. Doc. 59, Gov't's Resp., 16–17. Because these proposals have not yet been adopted and because it is not known whether they will in fact be adopted, or what form they will take if adopted, the Government argues that "it is inappropriate for this Court to consider them in the context of deciding the [Hagens'] motion to dismiss." *Id.* at 17. Second, the Government asserts that the current proposed amendments state that they "would provide only prospective protection." *Id.* (citing 84 Fed. Reg. 55694-01, 55696 (Oct. 17, 2019)). Thus, the Government claims, the proposed amendment would have no bearing on this prosecution because "the superseding indictment does not allege any ongoing conduct...." *Id.*

In reply, the Hagens argue that the Government "fails to recognize that the OIG's justification for the proposed revisions to the [Anti-Kickback Statute] safe harbor provisions (even if those are not adopted), attests to the fact that the [Anti-Kickback Statute] ... gives rise to vagueness and ambiguities." Doc. 62, Defs.' Reply, 10 (emphasis omitted).

The Court believes that the Hagens' rule-of-lenity challenge is far too premature. In deciding this objection, the Court still takes the allegations in the superseding indictment as true. *See United States v. Thomas*, 724 F.3d 632, 640–41 (5th Cir. 2013). And doing so, the Court cannot assume, as the Hagens assert, that the marketing contracts they entered into with Kimble were legitimate marketing and business service agreements. At this juncture, the Court finds that the Anti-Kickback Statute is not ambiguous as applied to the conduct alleged in Count One—*i.e.*, that the Hagens paid illegal kickbacks and bribes to Kimble's companies in exchange for completed doctors' orders with which they used to submit fraudulent claims to Medicare.

The Court also notes that it tends to agrees with the Government that the HHS-OIG's proposed amendment has no bearing on this prosecution at all. *See* Doc. 59, Gov't's Resp., 17 (citing to language that indicates that the proposed amendment would have no retroactive effect). And, indeed, it seems that proposed rules generally do not come into play when courts decide whether the rule of lenity should apply to a statute. *See Barber v. Thomas*, 560 U.S. 474, 488 (2010) ("[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute[.]" (citation and quotations omitted)); *see also E.P.A. v. Brown*, 431 U.S. 99, 104 (1977) (refusing to review nonfinal regulations as such a practice "would be wholly novel"). The Hagens cite to no authority to the contrary, let alone a case where an indictment was dismissed based on ambiguities in a statute presented by a proposed rule. *See* Doc. 52, Mot. to Dismiss, 10–12; Doc. 62, Defs.' Reply, 9–10. Moreover, the Hagens point to no specific and current ambiguity in the text of the Anti-Kickback Statute. *See, e.g., Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987) ("It is well settled that 'the starting point for interpreting a statute is the language of the statute itself.' " (citation omitted)). Accordingly, the Court **DENIES** the Hagens' motion to dismiss the superseding indictment based on their rule-of-lenity challenge.

### B. Motion for a Bill of Particulars

**\*12** The Hagens move for a bill of particulars under Federal Rule of Criminal Procedure 7(f). Doc. 63, Defs.' Mot. for Bill of Particulars. More specifically, in a litany of complaints, the Hagens object to the lack of factual specificity underlying the conspiracy, the kickback and the money laundering counts,

United States v. Hagen, Not Reported in Fed. Supp. (2020)
2020 WL 1929848

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 118 of 146    PageID 1741

and the identity of unindicted coconspirators. *Id.* at 1. The Government opposes the motion, arguing that their requests can be chalked up to attempting to use a bill of particulars as a fishing expedition. Doc. 64, Govt's Resp., 7. And the Government states that there is more than enough factual detail for their allegations in the superseding indictment. *Id.* at 8. The Hagens' arguments here are essentially the same as the arguments made in support of their motion to dismiss. And, as stated above, the superseding indictment provides the Hagens with ample information to give them notice as to what they are charged with and to allow them to prepare a defense against those charges. *See supra* at 12, 18–19.

Rule 7(f) of the Federal Rules of Criminal Procedure gives the Court authority to direct the Government to file a bill of particulars. Fed. R. Crim. P. 7(f). Yet, a bill of particulars is not a matter of right, and the district court will be reversed for refusing to grant a request for a bill only if the defendant was "actually surprised" at trial and "thereby incurred prejudice to his substantial rights." *United States v. Williams*, 679 F.2d 504, 510 (5th Cir. 1982). "The purpose of a bill of particulars is to inform an accused of the charge with sufficient precision to reduce trial surprise, to enable adequate defense preparation, and critically, by the fleshing out of the charges to illuminate the dimensions of jeopardy." *United States v. Davis*, 582 F.2d 947, 951 (5th Cir. 1978). It is not to discover the theory of the case or the evidentiary facts to support it. *United States v. Kilrain*, 566 F.2d 979, 985 (5th Cir. 1978); *United States v. Hajecate*, 683 F.2d 894, 898 (5th Cir. 1982).

"In determining whether a bill of particulars is necessary, the court examines 'whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges against him to enable him to prepare for trial.' " *Faulkner*, 2011 WL 2880919, at *2 (quoting *United States v. Martinez*, 2010 WL 2025226, at *7 (N.D. Tex. May 21, 2010)). In general, an indictment is constitutionally adequate if "it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). " 'An indictment will usually be sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all of the elements of the offense.' " *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 176 (6th Cir. 1992)

(citing *Hamling*, 418 U.S. at 117). A general description of the offense "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offen[s]e, coming under the general description, with which he is charged." *Hamling*, 418 U.S. at 117–18 (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)).

The superseding indictment, as set forth in detail above, tracks the proper statutory language for both Counts One and Two. Doc 50, Superseding Indictment, 5–6, 11. And it sets forth a sufficient factual basis for the conspiratorial agreements, the scheme to defraud, and the money laundering charges. *Id.* at 6–12. In sum, there is ample information in the superseding indictment to inform the Hagens of the charges against them and for them to prepare a defense against. Much of this factual detail is set out above in the section regarding the motion to dismiss and it will not be repeated in detail here. That information is incorporated by reference here.

**\*13** Specifically, the superseding indictment states the objective of the conspiracy was for the Hagens to "unlawfully enrich themselves by "offering, paying, soliciting and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiary information that could be used to submit false claims to Medicare on behalf of Metro DME Supply and Ortho Pain Solutions." Doc. 50, Superseding Indictment, ¶ 20. So far as the factual support for the conspiracy and Anti-Kickback count, the manner and means section states that, in seeking to unlawfully enrich themselves, the Hagens "paid illegal kickbacks and bribes to Herb Kimble through Company A and Company B, in exchange for completed, signed prescriptions for DME...." *Id.* ¶ 23. It goes on to say that the Hagens paid kickbacks and bribes to Herb Kimble through Metro DME Supply and Ortho Pain Solutions in exchange for doctors' orders. *Id.* ¶¶ 23, 27. The overt acts section details what they did with Herb Kimble to carry out their scheme, such as discussing with Herb Kimble the payment of $280 per DME in exchange for doctors orders, and e-mailing Kimble stating they were "ready to get this marketing campaign rolling." *Id.* ¶ 31. There are many more facts in the superseding indictment, which were laid out in detail above, see, *e.g.*, *supra* at 2–3, and will not be repeated here. Suffice it to say that the factual specificity more than satisfies their burden under the Notice Clause of the Sixth Amendment. *See Russell v. United States*, 369 U.S. 749, 761–63 (1962); *Hamling*, 418 U.S. at 117.

United States v. Hagen, Not Reported in Fed. Supp. (2020)
2020 WL 1929848

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 119 of 146    PageID 1742

With regard to the money laundering charge there is no difference. Again, in connection with the motion to dismiss, there is a discussion above of the money laundering count and the facts supporting it which is incorporated by reference here. *See supra* at 16–19. With that in mind, the Court finds it a simple matter to hold that the money laundering charge, like the others, is legally and factually supported. All of the factual detail in the superseding indictment preceding the money laundering count, is incorporated by reference into that Count. Doc. 50, Superceding Indictment, ¶ 32. Then, it goes on to allege that the Hagens knowingly and willfully agreed, with Herb Kimble and others, to commit money laundering by knowingly transferring funds from somewhere in the United States to a place outside the United States, with the intent to promote the unlawful activity of conspiring to defraud the United States and to pay and receive health care kickbacks. *Id.* at ¶¶ 32–33. From this and all of the facts preceding it, it is easy to surmise that they are being charged with committing money laundering with Herb Kimble and others with the intent to promote the conspiracy to defraud the United States and engage in a healthcare kickback scheme. In short, it is more than enough to inform the Hagens of the offenses with which they are charged and against which they must defend.

In sum, for all of the reasons set forth above, their request for a bill of particulars is **DENIED**.

Finally, with respect to the Hagen's request for the names of unindicted coconspirators as well as other information pertaining to them, the Court is aware of the case law, cited by the Defendants, that a bill of particulars is a proper tool for discovering the names of unindicted coconspirators. *Faulkner*, 2011 WL 2880919, at *3. But it is not to be granted simply to acquire a list of the Government's witnesses. *Id.* The Hagens seek the names of these people, exactly when they were involved in the conspiracy, and any meetings or conversations they had, that the Government will rely on in their case against them. Doc. 63, Def.'s Mot. for

Bill of Particulars, 12–13. The Government responds that it will disclose the names of these individuals as trial witnesses approximately twenty days before trial, as this Court's scheduling order already requires. Doc. 64, Gov't's Resp., 15–16. The Hagens do not describe why they need immediate disclosures of these names or what they are going to do with them, and the Court will not speculate. Doc. 63, Def.'s Mot. for Bill of Particulars, 12–13. Since the Government is going to disclose to them all the names of unindicted coconspirators who will testify at trial, and the Defendants have wholly failed to state what they need the names for at this time, the Court denies their request for the names of the unindicted coconspirators. *See Faulkner*, 2011 WL 2880919, at *3 (denying similar request where defendant did not "explain why [these names] [were] necessary to help him prepare for trial"). For these reasons, the Court will not grant the Hagens' request for the unindicted coconspirators' names through a bill of particulars.

### IV.

### CONCLUSION

**\*14** For the foregoing reasons, the Court **DENIES** Defendant Leah Hagen's and Defendant Michael Hagen's Motion to Dismiss the Indictment and Superseding Indictment and Brief in Support (Doc. 52). Further, the Court **DENIES** the Defendants' Motion for Bill of Particulars and Brief in Support (Doc. 63).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1929848

---

### Footnotes

1    This includes, but is not limited to, specific allegations that the Hagens enrolled Metro DME Supply as a Medicare provider; promised to comply with all Medicare rules and regulations; paid millions in illegal kickbacks to Kimble's companies in exchange for doctors' orders; billed Medicare for DME services; and concealed these kickbacks through sham documentation disguised as payment for marketing and business services. *Id.*

United States v. Hagen, Not Reported in Fed. Supp. (2020)
2020 WL 1929848

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 120 of 146    PageID 1743

2    Moreover, although the Government does not rely on them, there are general allegations in the superseding indictment that the Hagens "knowingly and willfully" conspired to commit certain offenses, including "knowingly and willfully soliciting and receiving remuneration" and "offering and paying remuneration" in return for doctors' orders. Doc. 50, Superseding Indictment, ¶¶ 19(a)–(c). There are also at least two paragraphs of the superseding indictment that specifically allege that the Hagens used their DME companies to pay illegal kickbacks to Kimble's companies "in exchange for" completed doctors' orders. *Id.* ¶¶ 23, 27. Finally, the superseding indictment alleges that the Hagens attempted to conceal their bribes to Kimble's companies through "sham contracts" and documents that disguised their payments as for legitimate business services. *Id.* ¶ 29. Along with the overt acts the Government points to, these allegations also contradict the Hagen's assertion that "there are no allegations that the Hagens made payments with the intent to induce any unlawful prescription or that they were even aware of any such arrangement." Doc. 52, Mot. to Dismiss, 6.

3    Additionally, in *Miles*, the case on which *Shoemaker* relies, the Fifth Circuit reversed convictions under the Anti-Kickback Statute because the court held that "the evidence adduced at trial" did not show that payments were made "as an inducement or kickback for sending patients...." 🚩 *Miles*, 360 F.3d at 480. Thus, *Miles* too is inapposite from the issue before the Court here.

4    As the Government notes, see Doc. 59, Gov't's Resp., 8, the Hagens list the incorrect elements in their motion. *See* Doc. 52, Mot. to Dismiss, 8. Instead, the Hagens provide the elements for money laundering. *See id.* (citing 🚩 *United States v. Garza*, 42 F.3d 251, 253 (5th Cir. 1994)). However, in their reply, the Hagens focus on the proper elements. *See* Doc. 62, Defs.' Reply, 8.

5    In addition to specifically challenging the Anti-Kickback Statute, the Hagens also argue in this section of their motion that Counts One and Two are "so vague, indefinite, uncertain, and confusing that they fail to adequately advise the Hagens of the offenses with which they are charged." Doc. 52, Mot. to Dismiss, 9. The Government notes, however, that this argument is "merely a repackaging of their sufficiency claim." Doc. 59, Gov't's Resp., 10 n.4. The Court agrees with the Government and thus rejects the Hagens' vagueness challenge to Counts One and Two for the reasons provided in Section III.A above. This includes the Hagens' blanket argument that "the Superseding Indictment denies the Hagens due process of law in violation of the Fifth and Sixth Amendments[.]" Doc. 62, Defs.' Reply, 9.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit G

2025 WL 2078433
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

UNITED STATES of America
v.
Paul Wade HILLIS (13)

CASE NO. 4:23-CR-00164-ALM-AGD-13
|
Signed July 7, 2025

**Attorneys and Law Firms**

Heather Harris Rattan, Assistant U.S. Attorney, DOJ-United States Attorney's Office, Plano, TX, for United States of America.

Derek Ryan Staub, Frost Brown Todd LLP, Dallas, TX, for Paul Wade Hillis.

**REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

AILEEN GOLDMAN DURRETT, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before the Court is Defendant Paul Wade Hillis's Motion to Dismiss the Indictment or, In the Alternative, Motion for Bill of Particulars ("Defendant's Motion") [Dkt. 212]. Defendant moves to dismiss the Indictment under Federal Rule of Criminal Procedure 12(b) because it lacks adequate specificity. Alternatively, Defendant requests, under Rule 7(f), an order directing the Government to provide a bill of particulars [Dkt. 212]. The Government opposes Defendant's requests [Dkt. 243]. United States Chief District Judge Amos L. Mazzant referred Defendant's Motion to the undersigned for consideration and a recommended disposition [Dkt. 341]. After reviewing Defendant's Motion [Dkt. 212], the Government's response [Dkt. 243], and all other relevant filings, the court recommends that Defendant's Motion be **DENIED**.

**APPLICABLE BACKGROUND**

On July 12, 2023, the grand jury returned a one-count indictment charging Defendant, in Count 1, with Conspiracy to Manufacture and Distribute and Possess with the Intent to Manufacture and Distribute Methamphetamine, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846 [Dkt. 1, sealed]. Thereafter, on December 14, 2023, the grand jury returned a two-count First Superseding Indictment, charging Defendant in Count One with conspiracy to Manufacture and Distribute and Possess with the Intent to Manufacture and Distribute Methamphetamine, Heroin, and Fentanyl, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846 [Dkt. 97, sealed]. [1]

In his motion, Defendant argues that the Indictment should be dismissed because it lacks adequate specificity to provide Defendant with notice of the charges against him under Rule 12(b)(3)(B)(iii) [Dkt. 212 at 4]. Specifically, Defendant contends that the conspiracy charge "lacks essential details that would afford [Defendant] adequate notice—specifically, information regarding the specific manner and means by which the alleged conspiracy was supposed to operate, any particular acts undertaken in furtherance of the conspiracy, and the respective roles assigned to the purported co-conspirators." *Id.* Defendant argues that because the Indictment lacks specificity, he is "unjustly facing charges based on facts that were not presented to the grand jury, a violation of his Fifth Amendment rights." [Dkt. 212 at 5]. Finally, Defendant asserts that without the requisite specificity, he cannot "protect himself from double jeopardy." [Dkt. 212 at 7].

Should the court disagree with Defendant's arguments to dismiss the charging instrument, Defendant requests the court direct the Government to provide Defendant with a list of particulars alleged to be essential to his ability to prepare his defense at trial [Dkt. 212 at 7-9]. Specifically, Defendant contends the Government should be required to provide him: "the names of his alleged co-conspirators, known or unknown in the alleged conspiracy" and "all overt acts not already identified in the Indictment (including times, locations of, and participants in meetings and conversations) allegedly committed in furtherance of the conspiratorial agreement alleged in Count One" [Dkt. 212 at 8-9]. Defendant insists that "[t]his information is necessary for [Defendant] to prepare for trial and gain an understanding of his role in and the scope of the alleged conspiracy" [Dkt. 212 at 9].

**\*2** The Government argues Defendant is not entitled to the requested relief [Dkt. 243]. The Government contends that allegations of specific overt acts are not necessary in the

prosecution of drug crime conspiracies [Dkt. 243 at 4-5], nor is the Government required to allege the roles of the co-conspirators [Dkt. 243 at 5]. Likewise, the Government continues that a bill of particulars should not issue when Defendant is seeking to obtain a list of the Government's witnesses [Dkt. 243 at 6].

## LEGAL STANDARD AND ANALYSIS

### *Rule 12(b) Motion to Dismiss*

Rule 12 of the Federal Rules of Criminal Procedure provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). This includes a pre-trial motion challenging the indictment for lack of specificity. FED. R. CRIM. P. 12(b)(3)(B)(iii).

"The indictment ... must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." FED. R. CRIM. P. 7(c)(1). An indictment is legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal to bar a subsequent prosecution. *United States v. Heon Jong Yoo*, No. 6:18CR16, 2018 WL 9362570, at *2 (E.D. Tex. Nov. 8, 2018) (quoting *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004)) (" '[I]t is well settled that an indictment must set forth the offense with sufficient clarity and certainty to apprise the accused of the crime with which he is charged.' The test for sufficiency is 'not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimum constitutional standards[.]' "). Stated differently, "[t]he sufficiency of an indictment is judged by whether (1) each count contains the essential elements of the offense charged, (2) the elements are described with particularity, without any uncertainty or ambiguity, and (3) the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense." *United States v. Lightner*, No. H-18-513, 2018 WL 6602183, at *2 (S.D. Tex. Dec. 17, 2018) (quoting *United States v. Lavergne*, 805 F.2d 517, 521 (5th Cir. 1986)).

Relevant herein, even though the indictment must contain "the essential facts" of the charged crime, the defendant is not entitled to "the evidentiary details by which the government

plans to establish his guilt." FED. R. CRIM. P. 7(c)(1); *United States v. Gordon*, 780 F.2d 1165, 1172 (5th Cir. 1986) (citation omitted). The Fifth Circuit has explained that "the language of the statute may guarantee sufficiency if all required elements are included in the statutory language." *Gordon*, 780 F.2d at 1171 (citation omitted). Indeed, "[a] defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence, for an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on the merits." *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)), *cert. denied*, 423 U.S. 1087 (1976). Allowing courts to evaluate the quality of evidence prior to trial runs "counter to the whole history of the grand jury institution," and, thus, courts cannot rule on motions to dismiss based on the sufficiency of the evidence. *United States v. Strouse*, 286 F.3d 767, 773 (5th Cir. 2002) (citation omitted).

**\*3** Accordingly, the central issue in considering Defendant's instant request to dismiss the [First Superseding] Indictment is whether Count One of the [First Superseding] Indictment properly and adequately states the elements of the charged crime. *See United States v. Luna*, No. DR-06-CR-972-AM, 2014 WL 12861730, at *2 (W.D. Tex. Jan. 9, 2014) (quoting *United States v. Ramirez*, 233 F.3d 318, 323 (5th Cir. 2000)) ("Generally, an indictment which follows the language of the statute under which it is brought is sufficient to give a defendant notice of the crime of which he is charged.").

The conspiracy provision of the Controlled Substances Act, 21 U.S.C. § 846, reads: "any person who ... conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the ... conspiracy." 21 U.S.C. § 846. The First Superseding Indictment alleges that Defendant conspired to violate 21 U.S.C. § 841, which provides that "it shall be unlawful for any person knowingly or intentionally ... to ... distribute ... a controlled substance." 21 U.S.C. § 841(a)(1). The elements for a controlled substance conspiracy charge are as follows:

1. "That two or more persons, directly or indirectly, reached an agreement to" manufacture and distribute and possess with the intent to manufacture and distribute controlled substances;

2. "That the defendant knew of the unlawful purpose of the agreement;"

3. "That the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose;"

4. "That the overall scope of the conspiracy involved at least" [insert quantity] of methamphetamine, heroin, and fentanyl; and

5. "That the defendant knew or reasonably should have known that the scope of the conspiracy involved at least" [insert quantity] of methamphetamine, heroin, and fentanyl.

*See Pattern Crim. Jury Instr. 5th Cir. 2.97* (2024).

According to the First Superseding Indictment, Defendant:

> (Count One) from sometime in or about January 2021, and continuously thereafter up to and including the date of the First Superseding Indictment, in the Eastern District of Texas and elsewhere, [Defendant] [and other co-defendants] ... did knowingly and intentionally combine, conspire, and agree with each other and other persons known and unknown to the United States Grand Jury, to knowingly and intentionally, manufacture and distribute and possess with intent to manufacture and distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 50 grams or more of methamphetamine (actual), 1 kilogram or more of a mixture or substance containing a detectable amount of heroin, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl or 100 grams or more of a mixture or substance containing a detectable amount of any fentanyl analogue, a violation of 21 U.S.C.

§ 841(a)(1). In violation of 21 U.S.C. § 846.

[Dkt. 146, sealed]. The First Superseding Indictment tracks the elements of §§ 841 and 846; Count One meets the relatively low standard established by Rule 7(c)(1). *See United States v. Campbell*, 685 F.2d 131, 132 (5th Cir. 1982) ("In order to dismiss an indictment for failure to state an offense, the court must find that the indictment does not contain the elements of the offense intended to be charged."); *United States v. Adcox*, No. 15-00036, 2017 WL 2489998, at *2-3 (W.D. La. June 7, 2017) (describing general standards for evaluating sufficiency of indictment as relatively lenient and/or low). To reiterate, the court is limited to determining whether the First Superseding Indictment meets the minimum constitutional standards, in that it contains the essential elements of the charged offense and fairly informs Defendant of the charge against him so that he can defend against the charge. Defendant has not shown that the First Superseding Indictment fails to meet this standard. *See Luna*, 2014 WL 12861730, at *2 (denying a request to dismiss an indictment on an § 841 charge); *United States v. Rodriguez*, No. 4:18-CR-00216-ALM-CAN-18, 2020 WL 4689193, at *3 (E.D. Tex. July 27, 2020) (same), *report and recommendation adopted*, No. 4:18-CR-216, 2020 WL 4674141 (E.D. Tex. Aug. 12, 2020) (Mazzant, J.); *United States v. Vogel*, No. 4:08-CR-224, 2009 WL 10673439, at *6 (E.D. Tex. Sept. 2, 2009) (same) (Crone, J.). Therefore, any request to dismiss the [First Superseding] Indictment should be denied.

### *Rule 7(f)* *Bill of Particulars*

**\*4** Federal Rule of Criminal Procedure 7(f) provides a basis for defendants to obtain a bill of particulars. FED. R. CRIM. P. 7(f) ("The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits."). The purpose of a bill of particulars is to inform an accused of the charge with sufficient precision to reduce trial surprise, to enable adequate defense preparation, and critically, by the fleshing out of the charges to illuminate the dimensions of jeopardy. *See e.g., Rodriguez*, 2020 WL 4689193, at *4 (citing *United States v. Kirkham*, 129 F. App'x 61, 72 (5th Cir. 2005) (citation omitted)); *see also United States v. Mackey*, 551 F.2d 967, 970 (5th Cir. 1977) (citation omitted) ("The purposes of a bill of particulars are to obviate surprise at trial, enable the defendant to prepare his defense with full knowledge of the charges against him, and

to enable double jeopardy to be pled in case of a subsequent prosecution."). "A defendant possesses no right to a bill of particulars[.]" *United States v. Burgin*, 621 F.2d 1352, 1358 (5th Cir. 1980). Indeed, the granting or denial of a bill of particulars is within the sound discretion of the trial court. *Mackey*, 551 F.2d at 970. To that end, a court abuses its discretion in denying a motion for a bill of particulars only when the denial results in actual surprise at trial and prejudice to a defendant's substantial rights. *See* ⚑ *United States v. Hughes*, 817 F.2d 268, 272 (5th Cir. 1987). Conversely, "the trial court should only grant a bill of particulars when the information is necessary for the defendant to prepare for trial." *United States v. Little*, No. 11-189-01, 2012 WL 566805, at *1 (W.D. La. Feb. 19, 2012) (citation omitted).

Defendant urges that there is a lack of specificity in the [First Superseding] Indictment, and thus a bill of particulars is necessary to allow him to properly prepare his defense to the charges. As noted above, Defendant seeks "the names of his alleged co-conspirators, known or unknown in the alleged conspiracy" and "all overt acts not already identified in the Indictment (including times, locations of, and participants in meetings and conversations) allegedly committed in furtherance of the conspiratorial agreement alleged in Count One" [Dkt. 212 at 8-9].

### i. Overt Acts

Defendant requests that the Government identify "all overt acts not already identified in the Indictment (including times, locations of, and participants in meetings and conversations) allegedly committed in furtherance of the conspiratorial agreement alleged in Count One" [Dkt. 212 at 8-9]. Defendant in essence asks the Government to provide all the overt acts it will seek to prove. A bill of particulars is not a discovery device. *United States v. Djuga*, No. 14-140, 2015 WL 1412100, at *2-3 (E.D. La. Mar. 25, 2015) (citing ⚑ 🅐 *United States v. Kilrain*, 566 F.2d 979, 985 (5th Cir. 1978)); *Burgin*, 621 F.2d at 1359 (outlining that a bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial"). A defendant is not entitled to use a bill of particulars to discover all overt acts that might be proved at trial. *United States v. Bethany*, No. 3:18-CR-0297-S, 2020 WL 1976827, at *2 (N.D. Tex. Apr. 23, 2020) (citing *United States v. Shults*, No. 3:14-cr-00298-M, 2018 WL 5023779, at *1 (N.D. Tex. Sept. 18, 2018)); *United States v. Licciardi*, No. 14-284, 2016 WL 815509, at

*4 (E.D. La. Mar. 2, 2016) (citing ⚑ 🅐 *Kilrain*, 566 F.2d at 985); ⚑ *United States v. Murray*, 527 F.2d 401, 411 (5th Cir. 1976) (citations omitted) ("[T]here is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge[.]"). Here, the First Superseding Indictment properly discloses the purpose of the alleged conspiracy, its timing, the drugs purportedly involved, and alleges Defendant joined the agreement knowingly and voluntarily. The First Superseding Indictment states in relevant part: "defendants, did knowingly and intentionally combine, conspire and agree with each other and other persons known and unknown to the United States Grand Jury, to knowingly and intentionally, manufacture and distribute and possess with intent to manufacture and distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 50 grams or more of methamphetamine (actual), 1 kilogram or more of a mixture or substance containing a detectable amount of heroin, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl or 100 grams or more of a mixture or substance containing a detectable amount of any fentanyl analogue" [Dkt. 146 at 2, sealed]. This is sufficient.

**\*5** Moreover, as set forth *supra*, Defendant is charged under ⚑ 21 U.S.C. §§ 841(a)(1), 846. A § 846 conspiracy charge does not require proof that Defendant actually distributed or possessed with intent to distribute any controlled substance, or proof of an overt act to show participation in a drug conspiracy. Thus, the Government is not required to allege or prove at trial any specific overt acts by Defendant; the important element of a § 846 conspiracy charge is the agreement. ⚑ *United States v. Shabani*, 513 U.S. 10, 11 (1994) ("This case asks us to consider whether 21 U.S.C. § 846, the drug conspiracy statute, requires the Government to prove that a conspirator committed an overt act in furtherance of the conspiracy. We conclude that it does not."); *United States v. Addison*, No. 14-1168, 2015 WL 1245556, at *4 (E.D. La. Mar. 18, 2015) (citing ⚑ *United States v. Turner*, 319 F.3d 716, 721 (5th Cir. 2003)) (same). To be clear, "the fact that [Defendant] was charged [ ] with conspiracy reduces the level of factual detail to which he is entitled with respect to the offenses which were the objects of the conspiracy." *Addison*, 2015 WL 1245556, at *4.

Encompassed within each request to identify the overt acts, Defendant also seeks the dates and locations Defendant

is alleged to have committed each overt act [Dkt. 212 at 9]. This information (the precise date of the offense and/or the exact location of the act) similarly need not be alleged in the charging documents. Alleging that an offense occurred on or about a certain date is sufficient. *United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991). Indeed, any date within the statute of limitations and before the return of the First Superseding Indictment will support a conviction. *United States v. Bowman*, 783 F.2d 1192, 1197 (5th Cir. 1986). Defendant is also not entitled to any further specificity as to the location of the crime than is alleged in the First Superseding Indictment. *See Djuga*, 2015 WL 1412100, at *3 (Holding that defendant's "request [for a bill of particulars] impermissibly crosses the line and it seeks a detailed account of government evidence which need not be provided in response to a motion for a bill of particulars[,]" where plaintiff requested the "dates, times, and places at which the Defendant is alleged to have combined, conspired, confederated, and agreed.... to commit the narcotics violations alleged[.]"); *United States v. Sherriff*, 546 F.2d 604, 606 (5th Cir. 1977) (Denying request for bill or particulars and holding indictment was sufficiently informative where plaintiff "sought '(t)he exact location, including the street address, of the alleged illegal sale, receipt, transportation, and concealment of automobiles charged in all counts of the indictment.' "). The Government argues that they have provided Defendant with reasonable notice of the approximate dates and locations of the charged offenses as outlined in the First Superseding Indictment [Dkt. 243 at 4-5]. The court agrees. Accordingly, the information provided in the First Superseding Indictment is sufficient and does not warrant a bill of particulars.

### ii. Identity of Co-Conspirators

Defendant's Motion also requests the Government identify "the names of his alleged co-conspirators, known or unknown in the alleged conspiracy." The Government responds that it will provide a witness list to Defendant at the appropriate time and that such list will include the identity of any co-conspirators that the Government intends to offer as a witness [Dkt. 243 at 6].

"[A] bill of particulars is a proper procedure for discovering names of co[-]conspirators the Government plans to call as witnesses at trial." *Addison*, 2015 WL 1245556, at *4 (citing *Hughes*, 817 F.2d at 272); *see also Little*, 2012 WL 566805, at *1. But "a motion for a bill of particulars will

not be granted when it is being used only to obtain a list of the government's witnesses." *United States v. Faulkner*, No. 3:09-CR-249-D(02), 2011 WL 2880919, at *3 (N.D. Tex. July 15, 2011) (citing *United States v. Holy Land Found. for Relief and Dev.*, No. 3:04-CR-240-G, 2007 WL 328833, at *3 (N.D. Tex. Feb.1, 2007) (Fish, C.J.) (citing *United States v. Pena*, 542 F.2d 292, 294 (5th Cir. 1976))). "Rather, the trial court should grant the motion for a bill of particulars 'when the information is necessary' for the defendants to prepare for trial." *Id.* (quoting *United States v. Barrentine*, 591 F.2d 1069, 1077 (5th Cir. 1979)). "[D]efendant[ is] obliged to show that [he] will be prejudiced if [he does] not receive the information sought[.]" *Id.* Defendant does not articulate why the names are necessary to help him prepare for trial, or any specific prejudice he will suffer if his request is denied and/or if he does not receive the names at this time. *See United States v. Garibalde-Barron*, No. EP-12-CR-1406-KC, 2013 WL 427389, at *5 (W.D. Tex. Feb. 4, 2013) (Denying bill of particulars "[b]ecause [defendant] does not indicate why his remaining requests for factual details, witnesses, and informants are necessary to prepare for trial or prevent double jeopardy[.]"). Further, as already referenced in connection with Defendant's request for overt acts, a conspiracy charge may be sustained by showing that a defendant entered into an agreement, whether or not that defendant's co-conspirators are identified. "[I]n order for [the defendant] to be convicted of conspiracy it [i]s not necessary for the government to prove that he knew all of the members of the conspiracy." *United States v. Pofahl*, 990 F.2d 1456, 1470 (5th Cir. 1993); *Rodriguez*, 2020 WL 4689193, at *6 (citing *Faulkner*, 2011 WL 2880919, at *3). Additionally, a bill of particulars regarding the identity of co-conspirators is largely obviated by the provision of a witness list before trial. *See Hughes*, 817 F.2d at 272; *United States v. Hagen*, No. 3:19-CR-146-B, 2020 WL 1929848, *13 (N.D. Tex. Apr. 21, 2020). As such, the information provided in the First Superseding Indictment is sufficient and does not warrant a bill of particulars.

### CONCLUSION AND RECOMMENDATION

**\*6** For the foregoing reasons, the court recommends that Defendant Paul Wade Hillis's Motion to Dismiss the Indictment or, In The Alternative, Motion for Bill of Particulars ("Defendant's Motion") [Dkt. 212] is **DENIED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written

objections to the findings and recommendations of the magistrate judge. ⚑ 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the uncontroverted factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See* ⚑ *Douglass v United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), superseded by statute on other grounds, ⚑ 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**All Citations**

Slip Copy, 2025 WL 2078433

---

### Footnotes

1    Defendant filed his motion to dismiss the Indictment on January 29, 2024, over one month after the grand jury returned the First Superseding Indictment. Additionally, Defendant appeared before the court and was arraigned on the First Superseding Indictment over one month prior to filing his motion to dismiss the Indictment. However, the arguments raised in the motion to dismiss the Indictment are still applicable to the First Superseding Indictment and will be considered by the court herein.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit H

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 129 of 146    PageID 1752

2017 WL 930633
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

UNITED STATES of America

v.

Rufus JOHNSON, et al.

CRIMINAL ACTION NO. 14-238
|
Signed 03/08/2017
|
Filed 03/09/2017

**Attorneys and Law Firms**

Mark A. Miller, Michael B. Redmann, U.S. Attorney's Office, New Orleans, LA, for United States of America.

Kevin Vincent Kelly, Kevin Kelly & Associates, New Orleans, LA, for Rufus Johnson, et al.

SECTION "B"(4)

**ORDER AND REASONS**

IVAN L.R. LEMELLE, SENIOR UNITED STATES DISTRICT JUDGE

**\*1**  Before the Court are four motions. First, Defendants Rufus and James Johnson filed a "Motion to Dismiss Count 1." Rec. Doc. 199. The Government filed a response. Rec. Doc. 219. Second, Defendant Rufus Johnson filed a "Motion to Dismiss Counts 2 and 3 of the Indictment." Rec. Doc. 233. The Government filed a response (Rec. Doc. 242) and Defendant Rufus Johnson filed a reply memorandum (Rec. Doc. 245). Third, Defendant Rufus Johnson filed a "Motion to Dismiss Counts 1, 2, 3, and 4." Rec. Doc. 257. The Government timely filed a response. Rec. Doc. 261. Finally, Defendant Rufus Johnson also filed a "Motion to Dismiss Counts 5, 6, and 7 because they are Multiplicitous." Rec. Doc. 198. Again, the Government filed a response. Rec. Doc. 218. Oral arguments on these motions were heard on January 4, 2017 (see Rec. Doc. 266) and post-hearing memoranda were filed by Defendant Rufus Johnson (Rec. Doc. 267), Defendant James Johnson (Rec. Doc. 268) and the Government (Rec. Doc. 269).

For the reasons discussed below,

IT IS ORDERED that the motion to dismiss Count 1 (Rec. Doc. 199) is DENIED.

IT IS FURTHER ORDERED that the motion to dismiss Counts 2 and 3 (Rec. Doc. 233) is DENIED.

IT IS FURTHER ORDERED that the motion to dismiss Counts 1, 2, 3, and 4 (Rec. Doc. 257) is DENIED.

IT IS FURTHER ORDERED that the motion to dismiss Counts 5, 6, and 7 (Rec. Doc. 198) is GRANTED IN PART.

IT IS FURTHER ORDERED that the motion to disqualify counsel (Rec. Doc. 200) is DISMISSED AS MOOT.

**I. MOTION TO DISMISS COUNT 1 (REC. DOC. 199)**

Count 1 of the indictment alleges that Defendants conspired to commit mail, wire, and honest services fraud in violation of 18 U.S.C. § 1349. Rec. Doc. 8 at 33.

**A. FACTUAL BACKGROUND
AND PROCEDURAL HISTORY**

The indictment alleges a complex conspiracy to fraudulently obtain money in exchange for facilitating the release of inmates from Orleans Parish Prison. Rec. Doc. 8 at 20. Specifically, Defendants Rufus Johnson, James Johnson, Perry Becnel, Josephine Spellman, and other co-conspirators are accused of operating a bail bond business in New Orleans that "used various means, permeated by fraud, in order to obtain inmate releases for customers, including executing commercial surety bail bond contracts; illegally requesting for-profit recognizance releases from public officials; and bribing public employees to release inmates and disclose confidential law enforcement information." Id. at 9.

**1. Bail Bond Scheme**

To solicit and negotiate bail bonds in this state, a person must obtain a Louisiana bail producer license, issued by the Louisiana Department of Insurance, and an appointment from an insurance company to sign powers of attorney. See LA. REV. STAT. ANN. § 22:1556(A). The indictment alleges

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 130 of 146    PageID 1753

that Defendant Rufus Johnson did not have a license or an appointment, as required by Louisiana law. Rec. Doc. 8 at 22. Instead, he purportedly hired employees who did possess the necessary qualifications, or required employees to acquire such qualifications, in order to operate his bail bond business under their licenses and sign their names to documents. *Id.*

**\*2**  The indictment further alleges that Insurance Companies A and B were Florida companies authorized by the Louisiana Department of Insurance to act as commercial sureties in bail bond contracts. Rec. Doc. 8 at 9-11. Both companies used commercial carriers to send and receive powers of attorney with local bail bondsmen. *Id.* The Government also alleges that Defendant James Johnson, who was (1) an attorney, (2) a Louisiana licensed bail bondsman from October 2000 to approximately January 2010, and (3) an appointed bail agent for Insurance Company A from August 1, 2003 to approximately February 2010, appointed several sub-agents who allowed Defendant Rufus Johnson to use their licenses for the conspiracy. *Id.* at 12, 14-5.

According to the indictment, commercial bail bonds at Criminal District Court were processed through the Magistrate Clerk's Office. Rec. Doc 8 at 7. A bond clerk in that office would prepare a typed bail bond form at the request of a bail bondsman. *Id.* This form included the name of the inmate, his or her criminal charge(s), the bail amount, and the name of the insurance company acting as surety. *Id.* The bail bondsman was required to present an executed power of attorney that authorized him or her to sign bail bonds on the insurance company's behalf. *Id.* Then the bondsman would sign the bail bond form in the presence of the bond clerk, who would also sign the bond to certify that he or she witnessed the bondsman signing and that it was indeed the named bondsman who signed. *Id.* From there, the bondsman would take the bail bond and the insurance power of attorney to the "bond window" at the prison. *Id.* at 8. Prior to being released, the inmate was required to sign the bail bond as the principal obligor of the bond. *Id.* Upon his or her release, the executed bail bond and insurance power of attorney became a part of the defendant's official court record for the criminal case and was entered into the Sheriff's computerized system. *Id.* The bondsman was also required to send copies of the executed powers of attorney back to the insurance companies through the U.S. mail or common carrier. *Id.* at 22.

Defendant Rufus Johnson is alleged to have operated a bail bond business that used various names, without a proper license, from a building at 538 South Broad Street in New

Orleans from "sometime in 2000 and continuing through in or around September 2014." Rec. Doc. 8 at 11. He is accused of having signed bail bonds under his employees' names, licenses, and insurance appointments. *Id.* at 14-16.

### 2. Honest Services Scheme

As part of the conspiracy, Defendant Rufus Johnson also allegedly bribed public officials within the Magistrate Clerk's Office in exchange for (1) "obtaining bail bonds that had been pre-signed and pre-certified by a bond clerk" and (2) "delivery of unexecuted bail bonds, court documents, and information." Rec. Doc. 8 at 17-19. Purportedly, these public officials were also bribed to obtain released on his or her own recognizance ("R.O.R.") bonds, change inmates' bail status to either lower the set bail amount or change to an R.O.R., or to forge and fabricate official documents indicating that a judge had ordered an inmate's R.O.R. [1]  *Id.* at 20-33. Additionally, Defendants are accused of bribing these public officials in exchange for "obtaining confidential, official-use law enforcement information from limited access computer databases." *Id.* at 21.

### 3. Procedural History

**\*3**  Defendants previously moved to dismiss Count 1. *See* Rec. Docs. 116, 143, 154. In the first motion to dismiss, Defendant James Johnson argued that Count 1(a), the mail fraud scheme, "fails to allege that the defendants had the specific intent to obtain cash, premium payments or insurance powers of attorney by fraud" and therefore should be dismissed. Rec. Doc. 116-1 at 2. The motion was denied by Judge Berrigan on December 10, 2015. Rec. Doc. 130. Thereafter, Defendant Rufus Johnson moved to dismiss Count 1(a) because the mailings referred to in the indictment were "not sufficiently closely related" to the alleged scheme to bring Defendant's conduct within the confines of 18 U.S.C. § 1341. Rec. Doc. 143-1 at 2. He also moved to dismiss Count 1(b), the honest services fraud scheme, because (1) the indictment failed to allege that he used interstate commercial carriers or the U.S. Postal Service in furtherance of the scheme and (2) the actions described in the indictment did not violate independent state laws. Rec. Doc. 154. This Court denied both motions on March 11, 2016. Rec. Doc. 168.

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 131 of 146    PageID 1754

## B. THE PARTIES' CONTENTIONS

First, Defendants Rufus and James Johnson argue that Count 1 should be dismissed because it does not allege a scheme to defraud a victim of anything of value, as required by *Cleveland v. United States*, 531 U.S. 12 (2000). Rec. Doc. 199 at 1. As to the bail bond scheme, Defendants contend that "it cannot be said that [ ] any person or entity was deprived of money or property, as each received precisely what he bargained for: the inmate was released from prison, and the surety company received its portion of the premium payments." Rec. Doc. 199-1 at 3-4. As to the honest services scheme, Defendants admit that the citizens of New Orleans are identified as the victims and that they were deprived of honest services, but they argue that no misrepresentation was made. *Id.* at 5. "[E]ach of the licensed bondsmen gave permission to the unlicensed bondsman, *e.g.*, Rufus Johnson, to sign the bond ... [and then] the true signatory, Rufus Johnson, signed the bond before the clerk, and there was no misrepresentation to the court as to who was actually signing the bond." *Id.* Finally, Defendants assert that "it is impossible to tell what mailing, if any, was used to further the [honest services scheme]." *Id.* The Government suggests that these arguments were already made by Defendants and rejected by the Court. Rec. Doc. 219 at 3, 5.

In his post-hearing memorandum, Defendant James Johnson reiterates that the indictment fails to allege a victim of the conspiracy. Rec. Doc. 268 at 1. According to him, if the victim is supposed to be the insurance companies, then any injury suffered is too "intangible or attenuated for the alleged behavior to reach the threshold of fraud." *Id.* at 7 (citing *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970); *United States v. Takhalov*, 827 F.3d 1307 (11th Cir.), *as revised* (Oct. 3, 2016), *opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016)). In response, the Government maintains that the indictment "alleged that the conspiracy constituted a violation of the public's right of honest services and, further, alleged a harm to non-governmental victims: the citizenry and the insurance companies who issued the powers of attorney." Rec. Doc. 269 at 9.

Second, and alternatively, Defendants argue that Count 1 should be dismissed because it alleges three conspiracies in a single count. Rec. Doc. 199-1 at 5. According to

Defendants, each sub-section of section (B)(1) of Count 1 describes a different scheme. *Id.* at 6-7. The first supposed conspiracy is the bail bond scheme outlined in sub-section B(1)(a), in which Defendants allegedly used mail services to "carry out a scheme to defraud an unnamed victim of unspecified 'cash, premium payments, and insurance powers of attorney.' " *Id.* at 6. However, Defendants argue that this scheme did not involve bribes or public employees and presumably only involved Nicole Carrie, Tynekia Buckley, and Janet Smith (licensed bondsmen operating out of the bail bonding office where Defendant Rufus Johnson worked). *Id.* at 6-7. [2] The second supposed conspiracy, outlined in sub-section B(1)(b), is the mail fraud that deprived citizens of the honest services of various public employees (including Lear Enclarde, Gilishia Garrison, and Patricia Tate) and involved bribes paid by Defendants Rufus Johnson and Perry Becnel to Tate and Garrison, respectively. *Id.* at 7. The third supposed conspiracy, outlined in sub-section B(1)(c), is the wire fraud that allegedly deprived citizens of the honest services of Garrison and involved bribes paid to Garrison for her unauthorized use of a computer system. *Id.*

**\*4** Third, and alternatively, Defendants argue that Count 1 should be dismissed because the conspiracy alleges multiple objects, namely mail fraud, honest-services mail fraud, and honest-services wire fraud. *Id.* at 8. According to Defendants, this "violates basic notions of notice and procedural due process because it puts the defendants in a situation where they must defend against all three objects, but the jury may convict them of any single object, or worse, non-unanimously of more than one object." *Id.*

In response to the second and third arguments made by Defendants, the Government maintains that this Court previously recognized that Count 1 involves a "single conspiracy that, although complex, had a single goal—to make money by releasing Orleans Parish inmates" under fraudulent and illegal means. Rec. Doc. 219 at 7 (citing Rec. Doc. 168 at 2). In the Government's words "[t]his is not a case of unrelated schemes with distinct participants, but rather a single-minded operation to illegally exploit the criminal justice system by any and all means available in order to [fraudulently] cash in on jail releases." *Id.* at 8.

Fourth, during oral argument, Defendant James Johnson raised federalism concerns, suggesting that recent Supreme Court cases demonstrate that the Government must prove some sort of "federal nexus" to justify bringing charges like the honest services count charged here. *Id.* at 2

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 132 of 146    PageID 1755

(citing 🚩*Skilling v. United States*, 561 U.S. 358 (2010); 🚩*McDonnell v. United States*, 136 S. Ct. 2355 (2016)). According to the Government, "the *McDonnell* Court made no broad pronouncement concerning federalism," but instead "provides guidance and clarification as to what constitutes an 'official act.'" *Id.* at 9-10.

### C. LAW AND ANALYSIS

In sum, this Court must address four separate arguments made by Defendants in attempts to dismiss Count 1 of the indictment. First, Defendants Rufus and James Johnson argue that Count 1 does not allege a scheme to defraud a victim of anything of value, as set forth in 🚩*Cleveland v. United States*, 531 U.S. 12 (2000). Even though the Government argues that the Court has already heard this argument and decided against Defendants, this Court's earlier Order focused on Defendants' requisite intent, not necessarily whether or not a scheme to defraud must deprive its victim of something of value. *See* Rec. Doc. 130. Second, Defendants argue that Count 1 alleges three conspiracies and that an "indictment is duplicitous when it joins two or more distinct and separate offenses in a single count." Rec. Doc. 199-1 at 5 (citing 🚩*United States v. Morrow*, 177 F.3d 272, 296 (5th Cir. 1999)). Third, Defendants rely on 🚩*Yates v. United States*, 354 U.S. 298 (1957), *overruled on other grounds by* 🚩*Burks v. United States*, 437 U.S. 1 (1978) for the proposition that Count 1 should be dismissed for alleging multiple objects of the conspiracy. Rec. Doc. 199-1 at 7-8. Finally, Defendant James Johnson raises various federalism concerns. Rec. Doc. 268 at 1-2.

### 1. Does Count 1 allege a scheme to defraud victim(s) of something of value?

In *Cleveland*, the petitioner was charged under the federal mail fraud statute, 🚩18 U.S.C. § 1341, after he made false statements in an application submitted to the 🚩Louisiana State Police. 531 U.S. at 15. The Supreme Court held that such licenses did not qualify as "property" under § 1341 in the hands of the official licensor and that "[i]t does not suffice ... that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute,

the thing obtained must be property in the hands of the victim." *Id.* Thus, because the parish's property rights were not affected, the defendant's acts did not constitute mail fraud. *Id.*[3]

**\*5** Defendants also rely heavily on 🚩⚠*United States v. Ratcliff*, 488 F.3d 639, 643-44 (5th Cir. 2007), in which the defendant

> devised a scheme (1) to conceal campaign finance violations from the Board of Ethics, which would (2) deceive the voting public about the campaign contributions he received, which would (3) secure his reelection to office, which would (4) cause Livingston Parish to pay him the salary and other financial benefits budgeted for the parish president.

*Id.* at 645. The Fifth Circuit ultimately determined that "it cannot be said that the parish would be deprived of this money by means of [the defendant's] misrepresentations, as the financial benefits budgeted for the parish president go to the winning candidate regardless of who that person is." *Id.*

Relying on these cases, Defendants seem to argue that even if misrepresentations were made to the court and/or sheriff, neither the court nor the sheriff was deprived of money or property, so Count 1 must be dismissed. Rec. Doc. 199-1 at 4. However, Defendants overlook *United States v. McMillan*, in which the appellants were convicted of misrepresenting the financial condition of a Louisiana health maintenance organization ("HMO") known as The Oath. 🚩600 F.3d 434, 440-41 (5th Cir. 2010). Specifically, the appellants filed false insurance reports with the state, which allowed the HMO to operate and collect insurance premiums from insured customers. 🚩*Id.* at 441-42. On appeal, they argued that the misrepresentation was made to the state, which was not deprived of any money or property (because it did not have a property interest in the license), such that there was a clear *Cleveland* problem. 🚩*Id.* at 447. Ultimately, the Fifth Circuit noted that it did "not read *Ratcliff* as requiring that the victim who loses money or property in a mail fraud scheme also be the party that was deceived by the defendant's scheme."

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 133 of 146    PageID 1756

*Id.* at 449. It further stated that "[i]t is irrelevant for our purposes whether alleged misrepresentations about The Oath's financial condition were made to the state Department of Insurance or directly to the alleged victims of the scheme. The issue is whether the victim's property rights were *affected* by the misrepresentations." *Id.* (emphasis added). In that case,

> The scheme alleged ... was for the defendants to obtain money from The Oath and the insureds in the form of management fees and premiums, respectively, which was possible only because of The Oath's continued operation as a result of the fraudulent statements, and then to retain the money rather than pay it out to satisfy claims of the medical providers. We think this satisfies *Cleveland*'s requirement that the object of the fraud be actual money or property in the hands of the victim.

*Id.*

Here, assuming that Defendants accurately construe the indictment and that misrepresentations were made to the court and/or sheriff, the victims nevertheless likely include (1) customers who paid for Defendants' services thinking that they were obtaining legitimate bail bonds not subject to attack as fraudulent documents and (2) the insurance companies that unknowingly became liable for unknown sums of money as a result of illegally obtained bonds.[4] Thus, the victim's property rights were affected by the misrepresentations that Defendants allegedly made to the court and/or sheriff and this is sufficient under *McMillan*.

**\*6** In a similar vein, Defendant James Johnson's post-hearing memorandum relies on *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970) and *United States v. Takhalov*, 827 F.3d 1307 (11th Cir.), *as revised* (Oct. 3, 2016), *opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016) to suggest that the alleged actions of Defendants in the instant action do not amount to fraud.

In *Regent Office Supply Company*, salesmen used false representations, including, for example, that they were referred by a friend or another firm or that someone had died and excess stationery needed to be disposed of, to "get by" secretaries on the telephone and "to get to the purchasing agent...." 421 F.2d at 1176-77. When the government indicted the company for fraud, the company stipulated that these false statements were made and agreed to an immediate trial. *Id.* at 1176. During the ensuing one-day trial, the government rested its case on the company's stipulations. *Id.* One of its theories was that the customers were defrauded because they were "entitled to give [their] patronage based on honest information;" however, "no proof of any such situation" was actually presented to the court. *Id.* at 1177. Nonetheless, the trial court found that the defendant's conduct constituted a scheme to defraud. *Id.* The Second Circuit reversed. *Id.* at 1179. It found that "solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain, [does not] constitute a 'scheme to defraud' or 'obtaining money by false pretenses' within the prohibition of 18 U.S.C. § 1341." *Id.* at 1179. In other words, "the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing *his assessment of the value of the bargain to him...*." *Id.* at 1182 (emphasis added). The court specifically noted that "this is not to say that we could not, on different facts or more specific proof, arrive at a different conclusion." *Id.* at 1179.

In *Takhalov*, the defendants hired Eastern European women "to pose as tourists, locate visiting businessmen, and lure them into the defendants' bars...." 827 F.3d at 1310. The government also alleged that bar employees engaged in other illicit behavior, including, for example, forging signatures on credit card receipts. *Id.* Defendants requested that the court instruct the jury that "[f]ailure to disclose the financial arrangement between [the women] and the Bar, in and of itself, is not sufficient to convict a defendant of any offense[.]" *Id.* at 1311. The district court refused to give the instruction. *Id.* The Eleventh Circuit reversed and remanded, finding that the proposed instruction was an accurate statement of the law and that the district court's refusal to give it was an abuse of discretion that did not amount to harmless error. *Id.* at 1316, 1319-26. According

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 134 of 146    PageID 1757

to the Eleventh Circuit, "to *defraud*, one must intend to use deception to cause some injury...." 🚩*Id.* at 1312 (emphasis in original). In other words, "the defendant might lie about the price ... or he might lie about the characteristics of the good" and that, in each case, "the defendant has lied about the nature of the bargain and thus ... has committed wire fraud." 🚩*Id.* at 1313-14.

**\*7** Unlike the misrepresentations in *Regent Office Supply Company* and *Takhalov*, Defendants' alleged misrepresentations in this case amount to fraud. Their false representations (1) fundamentally altered both the insurance companies' and the customers' understanding of the bargain, (2) influenced the insurance companies' and customers' assessment of the value of the bargain to them, and (3) amounted to lies about the "characteristics of the good" at issue (the legitimacy of the bond and the value of any underlying guarantee that the inmates released on these illegitimate bonds would honor their commitment to subsequently appear before the court). The customers in *Regent Office Supply Company* bargained for stationery and were given accurate information regarding the price and quality of the product. Here, the insurance companies agreed to provide insurance on, and Defendants' customers bargained for, legitimate bonds, but instead were bound to, and given, illegitimate ones. If the allegations in the indictment are true, Defendants' conduct amounts to fraud.

The Government does not directly address Defendants' argument that the honest services portion of Count 1 does not allege that misrepresentations were made. *See* Rec. Doc. 199-1 at 5. However, this Court finds this argument to be without merit. On a motion to dismiss an indictment, the "allegations of the indictment must be taken as true." 🚩*Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952); *see United States v. Mann*, 517 F.2d 259, 266 (5th Cir. 1975). Here, if all of the allegations in the indictment are accepted as true, Defendants clearly misrepresented themselves in various ways. For example, even if Rufus Johnson, "the true signatory," signed the bond before the clerk, he misrepresented himself as a person <u>with authority</u> to sign the bond; further, when the bond was subsequently used to release an inmate from prison, the "true signatory," Rufus Johnson, was misrepresented on the document as one of the <u>licensed</u> bondsmen working from his bail bonding office.

Further, the Government is correct that this Court previously considered the argument that "it is impossible to tell what

mailing, if any, was used to further" the honest services scheme. *See* Rec. Docs. 199-1 at 5, 168 at 16. Because this Court previously found that the cited mailings were sufficient, we will not reconsider this argument.

### 2. Does Count 1 charge Defendants with separate offenses?

According to the Fifth Circuit in ⚠️*United States v. Elam*, 678 F.2d 1234 (5th Cir. 1982), there are several factors typically considered when determining if a given endeavor comprises one or more conspiracies, including (1) "the existence among the defendants of a common goal," (2) "the inherent nature of the criminal scheme," and (3) "the interrelationships between the various parts and parties of the scheme." ⚠️*Id.* at 1246. With regard to the first factor, the Fifth Circuit "ha[s] applied the criteria for a common goal broadly, such that the 'test may have become a matter of semantics.' " *United States v. Beacham*, 774 F.3d 267, 273 (5th Cir. 2014) (quoting *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987)). With regard to the second factor, "[w]here the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture ... the existence of a single conspiracy will be inferred." ⚠️*Elam*, 678 F.2d at 1246. As to the third factor, "[w]here members of one enterprise have knowledge, actual or implied, of the existence of members of a related enterprise, and where it is shown that a single 'key man' was involved in and directed illegal activities, while various combinations of other defendants exerted individual efforts toward a common goal, a finding of the existence of a single conspiracy is warranted."

*Id.* (citing *United States v. Morado*, 454 F.2d 167 (5th Cir. 1972)). Notably, "a common plan does not become several plans simply because some members are cast in more vital roles than others or because certain members perform only a single, minor function; likewise, a common plan is not transformed into several plans on account of internal personnel changes." *Id.* (citing *United States v. Michel*, 588 F.2d 986 (5th Cir. 1979), *disapproved of by* ⚠️*United States v. Black*, 605 F. Supp. 1027 (D.D.C. 1985), *aff'd,* 🚩759 F.2d 71 (D.C. Cir. 1985)).

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P   Document 112-1   Filed 11/18/25   Page 135 of 146   PageID 1758

**\*8** Here, even though Defendants attempt to separate the various sections of Count 1 into three unique conspiracies, this Court finds that the indictment alleges specific facts that could reasonably lead to the conclusion that there was but one conspiracy alleged in Count 1. Defendants allegedly had a common goal (namely to derive personal gain from running a bail bonding business by fraudulent means); the various activities (including, for example, allegedly requiring employees to acquire bond licenses and bribing public officials) were each related to each other and the common goal; and the indictment convincingly alleges that Defendant Rufus Johnson was a "key man" who directed these various illegal activities.

### 3. Should Count 1 be dismissed for alleging multiple objects of the conspiracy?

The Government notes that, even though the conspiracy involves multiple objectives, it will not be "required to prove that [the defendants] knew of and furthered each one—it [will only be] required to show that [they] knew of the 'essential nature of the conspiracy' and joined it." Rec. Doc. 219 at 9 (citing *United States v. Gutierrez-Acanda*, 628 Fed.Appx. 642, 645 (11th Cir. 2015)) (quoting *United States v. Garcia*, 405 F.3d 1260, 1270 (11th Cir. 2005)). Indeed, in the Fifth Circuit, the Government only needs to prove one object of the conspiracy to convict on a single count. *See United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009) (citing *United States v. Mann*, 493 F.3d 484, 492 (5th Cir. 2007) ("a general guilty verdict on a multiple-object conspiracy may stand even if the evidence is insufficient to sustain a conviction on one of the charged objects")). Thus, it is largely irrelevant that Count 1 "puts the defendants in a situation where they must defend against all three objects, but the jury may convict them of any single object, or worse, non-unanimously of more than one object." Rec. Doc. 199-1 at 8.

### 4. Does the indictment pose federalism concerns?

Defendant James Johnson summarized his federalism argument in the following way:

> [T]he Government failed to include a single substantive federal or state

statu[t]e in the Indictment that regulates the bond practices that it complains were the subject of the alleged conspiracies. Although defendants do not deny that there are state statutes that govern licensed bail bondsmen, the administration of bonds in Orleans Parish *is a matter of discrete local governance*. In furtherance of setting up the allegations of Count 1 of the Indictment, the Government outlines the bail bond procedures in Criminal District Court in great detail. Thereafter, the "manner and means" and "overt acts" alleged by the Government detail actions that are largely part and parcel of the bond business. In short, the allegations *beg the question as to the federal nexus that justifies the honest services fraud charged by the Government*. At the January 4, 2017 hearing, undersigned counsel argued that the Supreme Court's recent line of cases, including *Skilling* and *McDonnell*, have significantly heightened the burden that the Government must meet to bring such cases.

Rec. Doc. 268 at 1-2 (emphasis added).

However, we agree with the Government that the Supreme Court's decisions in *Skilling* and *McDonnell* do not raise federalism concerns that would prevent this Court from exercising jurisdiction over this matter.

In *Skilling*, former Enron executive Jeffrey Skilling was convicted of, among other things, conspiracy to commit honest-services wire fraud in violation of 18 U.S.C. §§ 371, 1341, 1346. 561 U.S. at 367. The indictment alleged a "scheme to deceive the investing public ... about the true performance of Enron's businesses by: (a) manipulating ... reported financial results; and (b) making public statements ... about ... financial performance ... that were false and misleading." *Id.* at 369. According to the government, Skilling benefitted from this scheme through his "salary, bonuses, grants of stock and stock options, other profits, and

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 136 of 146    PageID 1759

prestige." *Id.* After the Fifth Circuit affirmed the convictions, the Supreme Court granted certiorari. *Id.* at 367. Skilling argued that the honest-services statute, § 1346, was unconstitutionally vague and, alternatively, that his conduct did not fall within the statute's compass. *Id.* at 399. The Supreme Court reviewed the historical development of the honest-services doctrine, recognizing that it previously held in *McNally v. United States* that a scheme in which a state officer selected an insurance agent in exchange for kickbacks paid to companies that the official partially controlled did not amount to mail fraud. *Id.* at 401-02 (citing 483 U.S. 350 (1987)). After *McNally*, however, Congress enacted § 1346. *Id.* at 402. To determine the breadth of § 1346, the *Skilling* Court reviewed the pre- and post-*McNally* case law. *Id.* at 404-09. It determined that "[t]he 'vast majority' of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Id.* at 407.

**\*9** In view of this history, there is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks. Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine. To preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law.

*Id.* at 408-09 (emphasis in original). The Court continued to find that the Government never alleged that Skilling "solicited or accepted side payments from a third party in exchange for making ... misrepresentations [about Enron's financial situation]." *Id.* at 413. Consequently, his conduct did not fall within § 1346's compass, the conspiracy charge was vacated, and the case was remanded. *Id.* at 415.

Defendant James Johnson does not, and cannot, argue that the indictment fails to allege a bribery scheme. We fail to see

how the Supreme Court's decision in *Skilling* would otherwise require us to dismiss Count 1.

Further, the *McDonnell* Court's discussion of federalism concerns consists of a single paragraph: [5]

> The Government's position also raises significant federalism concerns. A State defines itself as a sovereign through "the structure of its government, and the character of those who exercise government authority." *Gregory v. Ashcroft*, 501 U.S. 452, 460 ... (1991). That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents. Here, where a more limited interpretation of "official act" is supported by both text and precedent, we decline to "construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards" of "good government for local and state officials." *McNally v. United States*, 483 U.S. 350, 360 ... (1987) [*superseded by statute as stated in* *Skilling v. United States*, 561 U.S. 358 (2010) ]; see also *United States v. Emmons*, 410 U.S. 396, 410-11 ... (1973) (rejecting a "broad concept of extortion" that would lead to "an unprecedented incursion into the criminal jurisdiction of the States").

136 S. Ct. at 2373. Essentially, the Supreme Court declined to adopt the government's definition of "official act," which would have included actions like hosting functions and making introductions, because the definition was too broad and would consequently encroach upon the state's right to regulate the behavior of public officials. We find nothing in the *McDonnell* opinion, or in the above paragraph, and Defendant James Johnson points us to nothing, to suggest that the instant case raises federalism concerns requiring dismissal of Count 1 of the indictment.

## II. MOTION TO DISMISS COUNTS 2 AND 3 (REC. DOC. 233)

Count 2 alleges that Defendants Rufus Johnson, James Johnson, and Perry Becnel conspired to use interstate transportation in aid of a racketeering enterprise and Count 3 alleges that these same Defendants conspired to commit unauthorized access to a protected computer, both in violation of 18 U.S.C. § 371. Rec. Doc. 8 at 34, 39.

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 137 of 146    PageID 1760

## A. FACTUAL BACKGROUND
## AND PROCEDURAL HISTORY

Count 2 specifically alleges that Defendants Rufus Johnson and Perry Becnel conspired to use a telephone at various times between 2009 and 2010 to call Gilishia Garrison and to facilitate public bribery. Rec. Doc. 8 at 34, 36-38. Count 3 alleges that, between 2009 and 2010, Defendants Rufus Johnson and Perry Becnel conspired to access a protected computer through Gilishia Garrison to obtain cash and other monetary instruments in exchange for manipulating the Orleans Parish Sheriff's computer system to effect the release of criminal defendants by fraudulently changing the defendants' bail status to R.O.R. or parole. *Id.* at 39.

## B. THE PARTIES' CONTENTIONS

**\*10**  In his motion, Defendant Rufus Johnson argues that the indictment ignores "the ancient and accepted practice of allowing a prosecutor to separately charge in different counts of the same indictment a conspiracy as well as substantive violations for the completed acts" and instead charges "an unprecedented conspiracy (Count 1) to conspire (Counts 2 and 3)." Rec. Doc. 233-1. Consequently, Defendant argues that Counts 2 and 3 fail to state an offense. *Id.* Further, Defendant maintains that Counts 2 and 3 overlap (1) with each other and (2) with Count 1, as evidenced by the fact that the conspiracies were allegedly accomplished in an identical manner. *Id.* (citing Rec. Doc. 8 at 20-23, 34-36, 39-41). According to Defendant, seventeen of the eighty-two overt acts alleged in Count 1 relate to Counts 2 and 3 and "there is not a single overt act in either Counts 2 or 3 which is not repeated in Count 1." *Id.* at 3. [6]

The Government recognizes that Defendant essentially asserts a multiplicity argument. Rec. Doc. 242 at 1. It responds that the conspiracy charges in Counts 2 and 3 require proof of a fact which the conspiracy charge in Count 1 does not, such that the charges are not multiplicitous and are therefore without defect. *Id.* at 4.

Defendant replies that his motion asserts not only a claim under the Fifth Amendment's Double Jeopardy clause, but also under its Due Process Clause, and that Counts 2 and 3 are not only multiplicitous by virtue of Count 1, but also with each other. Rec. Doc. 245 at 1-2.

## C. LAW AND ANALYSIS

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." It protects against (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)). "An indictment is multiplicitous if it charges a single offense in separate counts ... [and t]here are at least two species of multiplicity challenges...." *United States v. Woerner*, 709 F.3d 527 (5th Cir. 2013) (internal citations omitted). The first type of challenge "arises when a defendant is charged with violating two different statutes, one of which is arguably the lesser included offense of the other." *Id.* This type of challenge is addressed in *Blockburger v. United States*, 284 U.S. 299 (1932) and its progeny. *Id.* The second type of challenge "arises when charges for multiple violations of the same statute are predicated on arguably the same criminal conduct." *Id.*

The Government argues that only the first type of challenge is at issue here (*see* Rec. Doc. 242 at 2), but Defendant maintains that both challenges are being made (Rec. Doc. 245 at 2). According to Defendant, the first type of challenge is made because Counts 2 and 3 are multiplicitous in light of Count 1; the second type of challenge is made because Count 3 is multiplicitous in light of Count 2. *Id.*

### 1. Are Counts 2 and 3 multiplicitous in light of Count 1?

When confronted with the first type of challenge, we must determine if the two statutes at issue criminalize the same conduct; this is done by examining both statutes to see if one requires proof of a fact that the other does not. *Blockburger*, 284 U.S. at 304. Notably, though, the "test focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial." *Illinois v. Vitale*, 447 U.S. 410, 416 (1980); *see also United States v. Soape*, 169 F.3d 257, 266 (5th Cir. 1999) ("The focus in determining the issue of

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 138 of 146    PageID 1761

multiplicity is on the statutory elements of the offenses, not on their application to the facts of the specific case before the court") (citing 🔖 *United States v. Flores-Peraza*, 58 F.3d 164, 167 (5th Cir. 1995) (citing 🔖 *United States v. Singleton*, 16 F.3d 1419, 1422 (5th Cir. 1994))). We must also determine whether or not the legislative branch intended to punish the defendant cumulatively under both statutes.

*See, e.g.* 🔖 *Albernaz v. United States*, 450 U.S. 333, 344 (1981) (noting that in 🔖 *Whalen v. United States*, 445 U.S. 684, 689 (1980), "[i]n determining the permissibility of the imposition of cumulative punishments for the crime of rape and the crime of unintentional killing in the course of rape, the Court recognized that the 'dispositive question' was whether Congress intended to authorize separate punishments for the two crimes"). "Where Congress intended ... to impose multiple punishments, imposition of such sentence does not violate the Constitution." *Id.* [7]

 **\*11**  Count 1 charges a violation of § 1349, which provides that "[a]ny person who ... conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the ... conspiracy." Thus, here, it requires proof that (1) Defendant and at least one other person made an agreement to commit honest services, mail, and wire fraud; (2) Defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and (3) during the existence of the conspiracy, one conspirator knowingly committed at least one overt act described in the indictment to accomplish some object or purpose of the conspiracy. *See, e.g. United States v. Sanchez*, 502 Fed.Appx. 375, 383 (5th Cir. 2012).

Counts 2 and 3 charge a violation of § 371, which makes it a crime "[i]f two or more persons conspire ... to commit any offense against the United States ... or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy...." Thus, Count 2 would require proof that (1) Defendant and at least one other person made an agreement to commit the crime of using interstate transportation in aid of a racketeering enterprise, as charged in the indictment; (2) Defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and (3) one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment in order to accomplish

some object or purpose of the conspiracy. *See Fifth Circuit Pattern Jury Instruction 2.15A.* Count 3 would require the same proof, except that the Government would have to show that there was an agreement to commit unauthorized access to a protected computer. *See id.*

The Government argues that the elements in the conspiracy charges are different in several ways. First, the conspiracy charges in Counts 2 and 3 under § 371 require proof of an overt act, while the conspiracy charge in Count 1 under § 1349 does not. Rec. Doc. 242 at 4 (citing *United States v. Jones*, 733 F.3d 574, 584 (5th Cir. 2013); 🔖 *United States v. Nowlin*, 640 Fed.Appx. 337, 346 (5th Cir. 2016)). Even though the indictment alleged overt acts in connection with the charge under § 1349, it was not required to do so and those overt acts are not elements of the crime. *Id.* (citing

🔖 *United States v. Covos*, 872 F.2d 805, 810 (8th Cir. 1989)

(quoting 🔖 *United States v. Brown*, 604 F.2d 557, 560 (8th Cir. 1979))); 🔖 *United States v. Thornburgh*, 645 F.3d 1197, 1204 (10th Cir. 2011). Second, § 1349 "requires proof that the conspirators agreed to violate a statute in Chapter 63 of Title 18," while § 371 requires no such proof. *Id.* (citing *United States v. Ngari*, 559 Fed.Appx. 259, 269-70 (5th Cir. 2014)). Third, and perhaps most persuasively, Counts 2 and 3 require proof that the conspirators agreed to violate 18 U.S.C. §§ 1952 and 1030(a)(4), respectively, while Count 1 does not. *Id.* (citing *United States v. Gonzalez*, 834 F.3d 1206, 1220 (11th Cir. 2016)). Plus, we agree with the Government that, in the last three years, the Fifth Circuit has expressly held that an indictment charging a defendant with a conspiracy in violation of § 1349 and a conspiracy in violation of § 371 is not necessarily defective and does not necessarily raise double jeopardy concerns. Rec. Doc. 242 at 3 (citing *United States v. Khan*, 638 Fed.Appx. 380, 381 (5th Cir. 2016); 🔖 *Nowlin*, 640 Fed.Appx. at 345-46; *Ngari*, 559 Fed.Appx. at 269-70; 🔖 *United States v. Njoku*, 737 F.3d 55, 67 (5th Cir. 2013); *Jones*, 733 F.3d at 584).

Because the elements in Counts 1, 2, and 3 are different and must be proven by different evidence (namely regarding honest services, mail, and wire fraud in Count 1, an agreement to use interstate transportation in aid of a racketeering enterprise in Count 2, and an agreement to commit unauthorized access to a protected computer in Count 3), and, given this Fifth Circuit precedent, we find that Counts 2 and 3 are not multiplicitous in light of Count 1.

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 139 of 146    PageID 1762

### 2. Are Counts 2 and 3 multiplicitous in light of each other?

**\*12**  Defendant also argues that Counts 2 and 3 are multiplicitous. Rec. Doc. 245 at 2. [8] Specifically, he contends that, while Count 2 alleged the improper use of a telephone and Count 3 alleged the improper use of a protected computer, the uses "were all a part of the same conspiracy." Rec. Doc. 245 at 3. He further suggests that if he were convicted on both Counts 2 and 3, the Court "would be required to vacate one of the convictions," even if Defendant were only sentenced under one of the counts. Rec. Doc. 245 at 5; *see also* Rec. Doc. 267 at 3-5 (citing *Ball v. United States*, 470 U.S. 856 (1985)).

Charging multiple counts of conspiracy in violation of 18 U.S.C. § 371 is not necessarily multiplicitous; instead, we must first determine if more than one agreement existed. *See, e.g. United States v. Smith*, 424 F.3d 992, 1003 (9th Cir. 2005); *United States v. Delgado*, 256 F.3d 264 (5th Cir. 2001). To make this determination, the Fifth Circuit considers five factors: "1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offense charged that indicates the nature and scope of the activity that the government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place." *Delgado*, 256 F.3d at 272 (citing *United States v. Deshaw*, 974 F.2d 667, 673-74 (5th Cir. 1992) (citing *United States v. Marable*, 578 F.2d 151, 154 (5th Cir. 1978))). [9]

The Government recognizes that Counts 2 and 3 involve the same time frame, the same co-conspirators, and presumably the same place (factors 1, 2, and 5), but nevertheless argues that "the remaining factors strongly establish the existence of multiple conspiracies." Rec. Doc. 269 at 3. As we have already discussed, Count 2 alleges a conspiracy to use interstate transportation in aid of a racketeering enterprise (18 U.S.C. § 1952), while Count 3 alleges a conspiracy to access a protected computer without authorization (18 U.S.C. § 1030). Thus, even though Counts 2 and 3 both allege violations of § 371, they each allege a violation of a different statute. The Government also argues that Count 3 alleges overt acts not alleged in Count 2. Rec. Doc. 269

at 3. Consequently, we agree with the Government that the indictment did not allege a single offense in more than one count; in other words, Count 3 is not multiplicitous in light of Count 2.

Further, Defendant's reliance on *Ball v. United States* is misplaced. In that case, the defendant was convicted of violating (1) a statute that prohibited a convicted felon from receiving a firearm and (2) a separate statute that prohibited a convicted felon from possessing a firearm. 470 U.S. 856, 857 (1985). Both charges related to the same handgun. *Id.* The Supreme Court held that it was proper to try the defendant on both counts, but that he could only be convicted and sentenced under one. *Id.* at 859, 862-64. According to the Supreme Court, "proof of illegal receipt of a firearm *necessarily* includes proof of illegal possession of that weapon." *Id.* at 862 (emphasis in original). [10]

**\*13**  Here, again, proof of any one of these charges does *not necessarily* include proof of another. Proof that Defendants conspired to use a telephone to facilitate public bribery does not *necessarily* include proof that Defendants conspired to access a protected computer. Accordingly, Counts 2 and 3 are not multiplicitous.

Nonetheless, even if we found Counts 2 and 3 multiplicitous, Defendant is mistaken that *Ball* would prevent us from allowing the counts to go to the jury. Rec. Doc. 267 at 4. While Defendant is correct that, if Counts 2 and 3 are multiplicitous, Defendant could not be convicted and sentenced to both counts, he incorrectly suggests that we would have to dismiss one of the counts now. Instead, the Supreme Court in *Ball* explicitly stated that

> while the Government may seek a multiple-count indictment against a felon for violations of §§ 922(h) and 1202(a) involving the same weapon where a single act establishes the receipt and possession, the accused may not suffer two convictions or sentences on that indictment. If, upon the trial, the district judge is satisfied that there is sufficient proof to go to the jury on both counts, he should instruct the jury as to the elements of each offense. Should the jury return guilty

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 140 of 146    PageID 1763

verdicts for each count, however, the district judge should enter a judgment on only one of the statutory offenses.

*Ball*, 470 U.S. at 865 (emphasis added).

Alternatively, Defendant argues that Counts 2 and 3 should be dismissed under the recently-decided Supreme Court case of *McDonnell*, 136 S. Ct. 2355, because "[t]he ministerial acts of the clerk employees complained of herein hardly reach the status of 'official acts,' and the so-called 'protected computer' that affected interstate commerce makes my grandchildren's computers all 'protected computers.' " Rec. Doc. 233-1 at 11.

In *McDonnell*, the petitioner was a former governor charged with, among other things, conspiracy to commit honest services fraud and three counts of honest services fraud in violation of §§ 1343, 1349. 136 S. Ct. at 2365. The theory underlying these charges was that the petitioner accepted bribes. *Id.* Consequently, "[t]he parties agreed that they would define honest services fraud with reference to the federal bribery statute, 18 U.S.C. § 201," which makes it a crime for a public official to seek or receive anything of value in exchange for being "influenced in the performance of any *official act.*" *Id.* (citing § 201(b)(2)) (emphasis added). The "official acts" that the government alleged the petitioner performed included arranging meetings, talking to other officials, and organizing events. *Id.* at 2365-66. The Supreme Court concluded that these were insufficient and that an "official act" is a decision or action on a matter that involves a formal exercise of governmental power and that is pending or may be legally brought before a public official. *Id.* at 2371-72.

The instant case is distinguishable from *McDonnell* because (1) unless there was some agreement between the parties of which the Court is unaware, we have no reason to look to the federal bribery statute, § 201, or its "official act" language; and (2) unlike arranging meetings, organizing an event, or talking to other public officials, the use of government phones and computers to change an inmate's bail status is certainly an "official act" and significant in the context of the conspiracy. [11] However, our findings at this stage would not preclude reconsideration upon a trial request for a judgment or conclusion of law at trial.

### III. MOTION TO DISMISS COUNTS 1, 2, 3, AND 4 (REC. DOC. 257)

#### A. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**\*14**  Counts 1, 2, and 3 were previously discussed. Count 4, however, alleges that Defendants Rufus Johnson, James Johnson, Perry Becnel, and Josephine Spellman conspired to obstruct justice in violation of 18 U.S.C. § 1512(b)(3), all in violation of 18 U.S.C. § 1512(k). Rec. Doc. 8 at 44.

#### B. THE PARTIES' CONTENTIONS

In his motion and supporting memorandum, Defendant Rufus Johnson argues that the mail fraud statute does not reach false statements made in an application for a state license, because the Supreme Court unanimously concluded that permits and licenses do not qualify as "property" under 18 U.S.C. § 1341. Rec. Doc. 257 (citing *Cleveland v. United States*, 531 U.S. 12, 15 (2000)).

In response, the Government argues that the Court has previously considered and rejected this argument, a separate pending motion also relies on *Cleveland* and its progeny, Defendant "mischaracterizes existing precedent and misapprehends the charges in the Indictment," and Defendant fails to extend his *Cleveland* argument to Counts 2, 3, or 4. Rec. Doc. 261 at 1.

#### C. LAW AND ANALYSIS

As was previously mentioned, the *Cleveland* Court determined that the petitioner, who made false statements in an application for a license to operate video poker machines and subsequently mailed those applications, could not be prosecuted under § 1341, because the license was not "property" within that statute's compass. 531 U.S. at 15. The Court recognized that Louisiana law allowed businesses to operate video poker machines, but that prospective owners of such machines had to apply for a license from the state

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 141 of 146    PageID 1764

to ensure that licensees were of good character and sound fiscal integrity. *Id.* (citing LA. REV. STAT. ANN. §§ 27:301 to 27:324). These licenses were non-transferable and had to be renewed annually. *Id.* (citing § 27:311(G), LA. ADMIN. CODE, tit. 42, § 2405(B)(3) (2000)).

The petitioner was an individual who allegedly fraudulently concealed his ownership interest in a limited partnership that applied for, received, and renewed a license to operate such machines, because he had financial problems that could have hindered the partnership's ability to receive a license. *Id. at 16*. Because of these false statements, the petitioner was charged under § 1341. *Id.* Before trial and on appeal, he moved to dismiss the mail fraud counts on the ground that the alleged fraud did not deprive the State of "property." *Id. at 17*. [12] The district court and the Fifth Circuit rejected this argument. *Id. at 18*. [13]

**\*15** The Supreme Court, however, recognized that its earlier decision in *McNally v. United States*, 483 U.S. 350, 360 (1987), *superseded by statute as stated in Skilling*, 561 U.S. 358, limited the scope of § 1341 to the protection of property rights, rather than " 'intangible rights' unrelated to money or property." *Cleveland*, 531 U.S. at 18-19. [14] In *Carpenter v. United States*, 484 U.S. 19, 25 (1987), the Supreme Court reiterated this holding when it upheld the convictions of defendants who "defrauded the Wall Street Journal of confidential business information," which had " 'long been recognized as property.' " *Id. at 19*. In 1988, however, Congress amended the statute to protect "the intangible right of honest services." *Id. at 19-20* (citing Anti-Drug Abuse Act of 1988, § 7603(a), 18 U.S.C. § 1346). Congress did not, however, amend the statute to protect from "diverse forms of public corruption, including licensing fraud." *Id. at 20*.

Turning to the facts of the case, the Supreme Court found that whatever interest the State of Louisiana had in its video poker licenses, "the State's core concern is *regulatory*." *Cleveland*, 531 U.S. at 20 (emphasis in original). Nonetheless, the State argued that, in addition to its regulatory interests, it also had a property interest in the licenses because (1) "the State receives a substantial sum

of money in exchange for each license and continues to receive payments from the licensee as long as the license remains in effect" and (2) "the State has significant control over the issuance, renewal, suspension, and revocation of licenses." *Id. at 21-22*. Recognizing that the State collected a "processing fee" for each new application, a "processing fee" for each renewal application, an "annual fee" from each device owner, a "device operation fee," and a fixed percentage of net revenue from each device, the Supreme Court nevertheless did not see how these fees made the licenses "property" in the State's hands. *Cleveland*, 531 U.S. at 22.

> Licenses pre-issuance do not generate an ongoing stream of revenue. At most, they entitle the State to collect a processing fee from applicants for new licenses. Were ... this ... sufficient ... States [would] have property rights in any license or permit requiring an upfront fee, including driver's licenses, medical licenses, and fishing and hunting licenses.

*Id.* Further, the Court found that the State's right to control the issuance, renewal, and revocation of licenses, "amount to no more and no less than Louisiana's sovereign power to regulate." *Id.* at 23.

The State then compared its interest to a patent holder's interest in an unlicensed patent, but the Court found that the State does not conduct gaming operations itself and it does not "sell" licenses in the "ordinary commercial sense." *Cleveland*, 531 U.S. at 23. Similarly, the Court found that the State could not be compared to a franchisor:

> a franchisor's right to select its franchisees typically derives from its ownership of a trademark, brand name, business strategy, or other product that it may trade or sell in the open market. Louisiana's authority to select video poker licensees ... rests instead upon the State's sovereign right to exclude

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 142 of 146    PageID 1765

applicants deemed unsuitable to run
video poker operations.

*Id.* at 24. According to the Court, "[a] right to exclude
in that governing capacity is not one appropriately labeled
'property'." *Id.*

Ultimately, the Court determined that "[e]quating issuance
of licenses ... with deprivation of property would subject
to federal mail fraud prosecution a wide range of conduct
traditionally regulated by state and local authorities" and,
to the extent that the word "property" is ambiguous,
the ambiguity should be "resolved in favor of lenity."
⚑ *Cleveland*, 531 U.S. at 24-25 (internal citations omitted).
Thus, "§ 1341 requires the object of the fraud to be
'property' in the victim's hands and ... a Louisiana video poker
license in the State's hands is not 'property' under § 1341."
⚑ *Id.* at 26-27.

 ***16** Defendant Rufus Johnson claims that the instant case
is indistinguishable from *Cleveland*. First, similar to licenses
to operate video poker devices, Defendant maintains that bail
bonding licenses have to be obtained from the state, even
though the state does not operate a bail bonding business
itself; the licenses must be renewed every other year; and
applicants have to "meet suitability requirements designed
to ensure that license[e]s have good character and fiscal
integrity." Rec. Doc. 257-1 at 2. Second, like the petitioner in
*Cleveland*, Defendant was accused of fraudulently concealing
the true owners of the bail bonding companies on the license
applications mailed to the state. *Id.* at 4. Third, Defendant
points to ⚑ *United States v. Shotts*, 145 F.3d 1289, 1296 (11th
Cir. 1998), recognized by the Court in *Cleveland* as one of
the preexisting Circuit cases "holding that the government
does not relinquish 'property' for purposes of ⚑ § 1341 when
it issues a permit or license." *See* ⚑ *Cleveland*, 531 U.S. at
17-18. Significantly, the license at issue in ⚑ *Shotts was a
bail bond license. See* 145 F.3d at 1296.

The Government argues, and notes that Defendant himself
recognizes, that *Cleveland* is distinguishable because it did
not involve "the citizenry's right to the honest services of
its public officials." Rec. Doc. 261 at 4. The Supreme
Court in *Cleveland* recognized that Congress had previously
amended the statute to protect against such fraud. *See*

⚑ *Cleveland*, 531 U.S. at 19-20 (citing Anti-Drug Abuse
Act of 1988, § 7603(a), 🚩 18 U.S.C. § 1346). Further,
the Government notes that the indictment does not allege
that the State of Louisiana was a victim of the conspiracy,
that the licenses were state property, or that the state was
deprived of such property. Rec. Doc. 261 at 4-5. "In other
words, Johnson overlooks the fact that, unlike in *Cleveland*
and *Shotts*, the Government has not alleged that the license
at issue[ ] constituted a property interest belonging to the
Government." *Id.* at 5. Instead, the indictment alleges that
citizens were victims of honest services fraud, private entities
(including insurers and underwriters) were victims who
suffered financial exposure, and Defendants' customers were
victims who were "defrauded into making premium payments
to receive bonds that could have been rescinded...." *Id.*
In sum, "[s]ince *Cleveland* applies only to governmental
property, it has no relevance to the allegations against
Rufus Johnson contained in the Indictment." *Id.* (citing
⚑🔺 *United States v. Hedaithy*, 392 F.3d 580, 603 (3d Cir.
2004)) ("There is no suggestion in *Cleveland*, especially
given the Court's holding in *Carpenter*, that the Court's
reasoning with respect to the State of Louisiana could be
extended to the property interests of private entities").

Instead, the Government argues that this case is analogous
to ⚑ *McMillan*, 600 F.3d 434, previously discussed. *Id.* at
6. Finally, the Government notes that Counts 2 through 4
do not concern either ⚑ § 1341 or ⚑ § 1343, conspiracies
to commit violations thereof, or fraud at all, such that "no
issue exists about whether Johnson's alleged criminal conduct
concerned 'money or property.' " *Id.* at 7.

Based on these arguments and the cases discussed herein,
the Court is inclined to agree with the Government. If the
indictment merely alleged that Defendant Rufus Johnson
and his co-conspirators lied to the state in order to obtain
bail bonding licenses, this case might be more analogous
to *Cleveland*. Instead, the indictment details a complex
conspiracy in Count 1 designed to deprive citizens of the
honest services of officials in Criminal District Court, expose
insurance companies to financial liability that they did not
bargain for, and defraud customers into paying for illegitimate
bonds. The Anti—Drug Abuse Act of 1998 specifically
criminalizes honest services fraud and the money belonging
to the allegedly defrauded insurers and customers certainly
constitutes "money or property" within ⚑ § 1341's compass.

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P     Document 112-1     Filed 11/18/25     Page 143 of 146     PageID 1766

Therefore, the Supreme Court's decision in *Cleveland* does not require dismissal of Counts 1 through 4 of the indictment.

### IV. MOTION TO DISMISS COUNTS 5, 6, AND 7 (REC. DOC. 198)

**\*17** Counts 5, 6 and 7 allege that Defendant Rufus Johnson made false statements in violation of 18 U.S.C. § 1001.

### A. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Specifically, Counts 5, 6, and 7 of the indictment relate to allegedly false statements made by Rufus Johnson on March 20, 2012 to an agent of the Federal Bureau of Investigation ("FBI"). Rec. Doc. 8 at 45-46. Count 5 alleges that Rufus Johnson stated "that he did not write a bond after the year 1997 and that on only a very few occasions he had filled out the top portion of a bond form for Janet Smith" (*id.* at 45); Count 6 alleges that he stated "that his employment consisted of cleaning and sweeping up around the office located at 538 South Broad Street" (*id.* at 46); and Count 7 alleges that he stated "that Janet Smith was his employer" (*id.*).

### B. THE PARTIES' CONTENTIONS

In the motion filed by Defendant Rufus Johnson's previous attorney, it is argued that each of the statements were made during the course of a single interview, the evidence of each statement can be found within Agent Krysti Hawkins's FBI Form-302, and that each statement concerned Rufus Johnson's role at the bail bonding office, such that separating the statements into separate counts is multiplicitous. Rec. Doc. 198-1 at 2. Consequently, Defendant requests that the Court require the prosecution to select the count it wishes to proceed to trial on or to seek a superseding indictment consolidating the various counts. *Id.* at 3.

The Government argues that, even though the three statements are included in the "truthful *document* generated by the FBI after the interview," the Counts correspond to the "several false *oral* statements" made by Rufus Johnson. Rec. Doc. 218 at 1. Further, each statement will require evidence not necessary to prove the other statements. *Id.* at 3.

### C. LAW AND ANALYSIS

Again, "[i]n general, 'multiplicity' is the charging of a single offense under more than one count of an indictment." *Soape*, 169 F.3d at 266. "The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." *Id.* (citing *United States v. Cluck*, 143 F.3d 174, 179 (5th Cir. 1998) (internal citations omitted)). "In deciding whether an indictment is multiplicitous, we look to 'whether separate and distinct prohibited acts, made punishable by law, have been committed.' To do so, we must first determine the 'allowable unit of prosecution,' which is the *actus reus* of the defendant." *United States v. Planck*, 493 F.3d 501, 503 (5th Cir. 2007) (internal citations omitted).

Here, under 18 U.S.C. § 1001(a)(2) the actus reus is a false statement, while under § 1001(a)(3) the actus reus is a false writing or document. Rufus Johnson is charged with making three distinct false statements (in violation of § 1001(a)(2)), rather than using a single false writing or document.

Defendant distinguishes two cases that involved false statements on multiple, distinct documents. Rec. Doc. 198-1 at 2 (citing *United States v. Guzman*, 781 F.2d 428, 432 (5th Cir. 1986); *United States v. Aiken*, 575 Fed.Appx. 432, 433 (5th Cir. 2014)). However, those cases are distinguishable simply because they involved multiple documents, rather than multiple statements. Nevertheless, the rationale used in those cases can also be used here. Defendant notes that "[w]here false statements are made in distinct and separate documents requiring different proof as to each statement, the filing of each false document constitutes a crime, and each filing may be alleged in a separate count of the indictment." Rec. Doc. 198-1 at 2 (citing *Guzman*, 781 F.2d at 432). Even though Defendant Rufus Johnson's three statements were recorded on one document, he arguably made three "distinct and separate [statements] requiring different proof as to each statement, [such that] the [making] of each false [statement] constitutes a crime, and each [statement] may be alleged in a separate count of the indictment."

**\*18** Defendant also relies on *United States v. Bonds*, 580 F. Supp. 2d 925, 929-30 (N.D. Cal. 2008). That case involved two perjury counts for "two identical false statements." *Id.* Specifically, in count 6, the defendant was asked if Mr.

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 144 of 146    PageID 1767

Anderson ever gave him anything that he understood to be human growth hormone, to which he responded "No"; in count 7, the defendant was asked if he was obtaining growth hormone from Mr. Anderson, to which he responded "Not at all." *Id.* at 928.

Here, the three statements made by Rufus Johnson each generally pertained to his employment at the bonding office. However, Count 5 alleges that he said he did not write a bond after 1997, Count 6 alleges that he said he was responsible for cleaning the office, and Count 7 alleges that he said he was employed by Janet Smith. The statement in Count 5 is certainly distinct and this Court agrees with the Government that it will require distinct pieces of evidence, it is significant for a distinct reason, and is therefore punishable separately. However, Counts 6 and 7 relate to statements regarding Defendant Rufus Johnson's role in the bail bonding company. If the Government seeks to prove that Defendant Rufus Johnson was not merely responsible for cleaning the office and was not merely an employee, it will have to prove what his role in the office was. In other words, the evidence needed to prove the falsity of the statements in Counts 6 and 7 will be the same. Counts 6 and 7 are therefore multiplicitous and the Government must dismiss one of them.

**V. CONCLUSION**

For the reasons outlined above,

**IT IS ORDERED** that the motion to dismiss Count 1 (Rec. Doc. 199) is **DENIED**.

**IT IS FURTHER ORDERED** that the motion to dismiss Counts 2 and 3 (Rec. Doc. 233) is **DENIED**.

**IT IS FURTHER ORDERED** that the motion to dismiss Counts 1, 2, 3, and 4 (Rec. Doc. 257) is **DENIED**.

**IT IS FURTHER ORDERED** that the motion to dismiss Counts 5, 6, and 7 (Rec. Doc. 198) is **GRANTED IN PART**. The Government must dismiss either Count 6 or Count 7.

**IT IS FURTHER ORDERED** that the motion to disqualify counsel (Rec. Doc. 200) is **DISMISSED AS MOOT**, pursuant to reasons given orally at the January 4, 2017 hearing. *See* Rec. Doc. 266.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 930633

---

**Footnotes**

1    R.O.R. releases for municipal and traffic offenses can be ordered by every elected public official in New Orleans, including members of the Orleans Parish Democratic Executive Committee, of which Defendant James Johnson was a member from February 20, 2008 to February 20, 2012. Rec. Doc. 8 at 3-4, 6, 13. For all other offenses, an R.O.R. can only be ordered by a judge or commissioner and requires a signed Order of Release. *Id.*

2    Defendants appear to admit that the honest services scheme allegedly involved both mail and wire fraud. *Id.* at 6-7.

3    This case is discussed more fully in conjunction with Defendant Rufus Johnson's motion to dismiss Counts 1, 2, 3, and 4 (Rec. Doc. 257). *See infra* pg. 38.

4    Indeed, these arguments were made by the Government in response to Defendants' earlier motions. *See* Rec. Doc. 118 at 4-5. Notably, it is widely understood that "[t]he purpose of bail is to secure the presence of the defendant...." *Unite States v. Parr*, 594 F.2d 440, 442 (5th Cir. 1979) (citing *Smith v. United States*, 357 F.2d 486 (5th Cir. 1966)); *see also Reynolds v. United States*, 80 S. Ct. 30, 32 (1959). In Louisiana, "[t]he amount of bail shall be fixed in an amount that will ensure the presence of the defendant, as required, and the safety of any other person and the community, having regard to:" (1) the seriousness of the charged offense; (2) the weight of the evidence; (3) the defendant's criminal record; (4) the defendant's ability to pay;

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 145 of 146    PageID 1768

(5) the nature and seriousness of the danger to others that would be posed by the defendant's release; (6) the defendant's voluntary participation in a drug testing program; (7) the defendant's drug use; (8) if the defendant is currently out on bail on a previous felony arrest; (9) other circumstances affecting the probability of the defendant's appearance; and (10) the type and form of bail. LA. CODE CRIM. PROC. ANN. art. 334 (2017). By allegedly depriving a neutral arbiter of the opportunity to consider these factors, Defendants probably secured the release of inmates for a sum substantially less than they would have otherwise been forced to pay. As a result, the probability of these defendants subsequently appearing before the court was likely lower and the risk to which the insurance companies exposed greater.

5    *McDonnell* is discussed in more detail below. *See infra* pg. 36.

6    In support, Defendant compared Count 1 overt act 49 with Count 2 overt acts 1-4 and Count 3 overt acts 1-5; Count 1 overt act 50 with Count 3 overt act 60; Count 1 overt act 56 with Count 3 overt act 7; Count 1 overt acts 57-58 with Count 3 overt acts 8-9; Count 1 overt acts 60, 62-72 with Count 2 overt acts 5-16 and Count 3 overt acts 10-21.

7    Defendant argues that "[i]n a conspiracy case, the central issue for double jeopardy purposes is whether there was one agreement and one conspiracy or more than one agreement and more than one conspiracy." *United States v. El-Mezain*, 664 F.3d 467, 546 (5th Cir. 2011), *as revised* (Dec. 27, 2011). He further suggests that

> [t]o determine whether the alleged conspirators entered into more than one agreement, we evaluate five factors: 1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offense charged that indicate the nature and scope of the activity that the government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place.

*United States v. Delgado*, 256 F.3d 264, 272 (5th Cir. 2001) (citing *United States v. Deshaw*, 974 F.2d 667, 673-74 (5th Cir. 1992) (citing *United States v. Marable*, 578 F.2d 151, 154 (5th Cir. 1978), *overruled by United States v. Rodriguez*, 612 F.2d 906, 919 (5th Cir. 1980), *as stated in United States v. Fisher*, 106 F.3d 622, 633 n.11 (11th Cir. 1997); *but see Delgado*, 256 F.3d at 272 n.5 (stating that "[a]lthough a panel of this Court questioned the vitality of the evidence-based standard for measuring double jeopardy claims ... the five-factor test for determining whether separate conspiracies were involved remains a viable part of the analysis with respect to double jeopardy claims involving conspiracies") (internal citations omitted))). The Government responds that this type of analysis, "assessing 'whether the offenses are the same,' " is used when a defendant is charged in multiple instruments with conspiracy. Rec. Doc. 242 at 5. The Government notes that both *El-Mezain* and *Delgado* "concerned defendants who, having been convicted previously of a conspiracy offense, sought to dismiss portions of a subsequent indictment because they claimed they had already been convicted of that same offense." *Id.* at 5-6; *see United States v. Jones*, 733 F.3d 574, 579-84 (5th Cir. 2013) (analyzing whether allegations against the defendant in one indictment were sufficiently similar to his prior conviction using the five-factor test); 584-85 (assessing, under *Blockburger*, defendant's multiplicity contention). Rec. Doc. 242 at 6. The parties appear to agree in their post-hearing memoranda that the *Marable* five-factor test should only be used to determine if Counts 2 and 3 are multiplicitous in light of each other, so it will not be discussed in our analysis of Defendant's argument that Counts 2 and 3 are multiplicitous in light of Count 1. *See* Rec. Docs. 267 at 1-2; 269 at 2-4.

8    Defendant specifically argues that because Counts 2 and 3 allege a violation of the same statute and "§ 371 cannot be considered a lesser included offense to § 371," the *Blockburger* test is inapplicable and we must

United States v. Johnson, Not Reported in Fed. Supp. (2017)

Case 4:25-cr-00259-P    Document 112-1    Filed 11/18/25    Page 146 of 146    PageID 1769

employ the five-factor test announced in 🚩 *Marable,* 578 F.2d 151. Again, the parties seem to agree that this is the appropriate test. *See* Rec. Docs. 267 at 2; 269 at 2-4.

9   *See supra* n. 7 for full *Marable* citation.

10   Stated other ways, "Congress seems clearly to have recognized that a felon who receives a firearm must also possess it, and thus had no intention of subjecting that person to two convictions for the same criminal act" (🚩 470 U.S. at 862) and "[t]he independent but overlapping statutes simply are not 'directed to separate evils' under the circumstances" (🚩 *id.* at 864).

11   If Defendant is making a separate Due Process argument that we have not yet discussed, it is not clear to the Court.

12   Petitioner relied on "several Court of Appeals decisions holding that the government does not relinquish 'property' for purposes of 🚩 § 1341 when it issues a permit or license." 🚩 *Cleveland,* 531 U.S. at 17-18 (citing 🚩 *United States v. Shotts,* 145 F.3d 1289, 1296 (11th Cir. 1998) (license to operate bail bonds business); 🚩 *United States v. Schwartz,* 924 F.2d 410, 418 (2d Cir. 1991) (arms export license); 🚩 *United States v. Granberry,* 908 F.2d 278, 280 (8th Cir. 1990), *superseded by statute as stated in* 🚩 *Schwartz,* 924 F.2d 410 (school bus operator's permit); 🚩 *Toulabi v. United States,* 875 F.2d 122, 125 (7th Cir. 1989), *superseded by statute as stated in* 🚩 *Schwartz,* 924 F.2d 410 (chauffeur's license); 🚩 *United States v. Dadanian,* 856 F.2d 1391, 1392 (9th Cir. 1988), *superseded by statute as stated in* 🚩 *United States v. Little,* 889 F.2d 1367 (5th Cir. 1989) (gambling license); 🚩 *United States v. Murphy,* 836 F.2d 248, 254 (6th Cir. 1988), *superseded by statute as stated in* 🚩 *Schwartz,* 924 F.2d 410 (license to conduct charitable bingo games)).

13   In addition to the Fifth Circuit, two other Circuits had previously "concluded that the issuing authority has a property interest in unissued licenses under 🚩 § 1341." 🚩 *Cleveland,* 531 U.S. at 18 (citing 🚩 *United States v. Bucuvalas,* 970 F.2d 937, 945 (1st Cir. 1992), *abrogated by* 🚩 *Cleveland,* 531 U.S. 12 (entertainment and liquor license); 🚩 *United States v. Martinez,* 905 F.2d 709, 715 (3d Cir. 1990), *abrogated by* 🚩 *Cleveland,* 531 U.S. 12 (medical license)).

14   *McNally v. United States* reversed the mail fraud convictions of individuals charged with participating in a scheme that defrauded 🚩 Kentucky citizens of "the right to have the Commonwealth's affairs conducted honestly." 483 U.S. 350, 352 (1987), *superseded by statute as stated in* 🚩 *Skilling,* 561 U.S. 358.

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.