United States District Court
Northern District of Texas
Fort Worth Division

| | |
|---|---|
| **United States of America** | |
| v. | No. 4:25-CR-259-P |
| Ines Soto (08) | |

### Motion for Jury Questionnaire

**To the Honorable Judge:**

COMES NOW INES SOTO, defendant, by and through undersigned counsel, filing this Motion for Jury Questionnaire and moving this court to allow the use of jury questionnaire the morning of voir dire as outlined below.

**Procedural Mechanics of the Proposed Questionnaire**

Attached is the proposed jury questionnaire. Ines Soto suggests using the questionnaire as follows: The defense will provide sufficient clipboards, pens, and copies of the questionnaire for the venire. The questionnaire will be distributed to the venire when they arrive. The defense team will scan the questionnaires, email them to attorneys and staff for the defense, government, and Court with the Court's keeping the originals for the record. The questionnaire utilizes only scaled questions and is designed to be quickly digestible by experienced attorneys thus enabling its use the day of jury selection.

1

**A Jury Questionnaire Falls Within This Court's Broad Authority and Discretion To Conduct Jury Selection**

The Supreme Court has held that trial judges have broad discretion over jury selection. *See Skilling v. United States*, 130 S. Ct. 2896, 2917 (2010). In *Skilling*, "the District Court initially screened venire members by eliciting their responses to a comprehensive questionnaire drafted in large part by Skilling. That survey helped to identify prospective jurors excusable for cause and served as a springboard for further questions put to remaining members of the array." *Id.* at 2919. The use of the defense questionnaire helped insure biased or prejudiced jurors were not seated in the case: "The questionnaires confirmed that, whatever community prejudice existed in Houston generally, Skilling's jurors were not under its sway." *Id.* at 2920. Skilling was a senior executive of Enron, which at the time of its bankruptcy filing, was "the seventh highest-revenue-grossing company in America[.]" *Id.* at 2906.

A questionnaire meets the requirements of Rule 24(a). "If the court examines the jurors, it must permit the attorneys for the parties to: (A) ask further questions that the court considers proper; or (B) submit further questions that the court may ask if it considers them proper." Fed. R. Crim. P. 24(a)(2).

> While Federal Rules of Criminal Procedure 24(a) gives wide discretion to the trial court, voir dire may have little meaning if it is not conducted at least in part by counsel. The "federal" practice of almost exclusive voir dire examination by the court does not take into account the fact that it is the parties, rather than the court, who have a full grasp of the nuances and the strength and weaknesses of the case. "Peremptory challenges are worthless if trial counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes." Therefore questioning by the court must overall, coupled with its charge to the jury, afford a party the protection it seeks. Experience indicates that in the majority of situations questioning by counsel would be more likely to fulfill this need than an exclusive examination in general terms by the trial court.

*United States v. Ible*, 630 F2d 389, 395 (5th Cir. 1980) (quoting *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977); other citations and footnotes omitted).

**Jury Selection May Be the Most Critical Phase of a Trial**

It is conventional wisdom that jury selection is perhaps the most critical phase of a trial. *See e.g.*, Margaret Covington, *Jury Selection: Innovative Approaches to Both Civil and Criminal Litigation*, 16 St. Mary's L.J. 575, 575–76 (1984) ("Experienced trial lawyers agree that the jury selection process is the single most important aspect of the trial proceedings."). The social scientists who specialize in jury research have confirmed much of this long-accepted truism. *See e.g.*, Jeffery R. Boyle, *Psychological, Cognitive, Personality and Interpersonal Factors in Jury Verdicts*, 15 Law & Psychol. Rev. 163, 176 (1991) (a "case may be [won] or lost at the jury selection stage]"); *see also* Chris F. Denove & Edward J. Imwinkelried, *Jury Selection: An Empirical Investigation of Demographic Bias*, 19 Am. J. Trial Advoc. 285, 285 (1995). Indeed, "experts in the field believe that eighty-five percent of the cases litigated are won or lost when the jury is selected." Herald Price Fahringer, *"Mirror, Mirror on the Wall …": Body Language, Intuition, and the Art of Jury Selection*, 17 Am. J. Trial Advoc. 197, 197 (1993).

**Written Questionnaires Facilitate Judicial Economy and Efficiency**

Jury questionnaires save the justice system time and money. Rather than relying on the lengthy and often tedious process of asking the necessary questions of prospective jurors orally in open court, a written questionnaire can elicit much of the initial information needed by counsel to select an impartial jury and aid in a more focused inquiry during oral voir dire. Although oral voir

dire will always be necessary, a written questionnaire can significantly reduce the amount of court time required for the jury selection process. *See* II Ann Fagan Ginger, *Jury Selection in Criminal and Civil Trials* § 12.21, at 768 (2d ed. 1985) (jury questionnaires prepared by attorneys "save . . . cost"); Nat'l Jury Project, *Jurywork: Systematic Techniques* § 2.08, at 2.44 (2d ed. 1985) (noting that jury questionnaires eliminated the need to repeat the same question to each juror).

> A sworn questionnaire . . . might gather from jurors answers to basic questions about themselves with face-to-face inquiry reduced to certain key issues on which the reactions of the individual and observation of her or his manner are important . . . Face-to-Face questioning would then be reserved for the issues on which probing is necessary, such as prejudice against the litigant or bias arising from the facts of a particular case.

Barbara Allen Babcock, *Voir Dire: Preserving "Its Wonderful Power,"* 27 Stan. L. Rev. 545, 563-64 & n.70 (1975).

The efficiency of a written questionnaire is useful in cases, such as this one, involving controversial and sensitive issues. The allegations in this case arose in the context of a national debate about the treatment of immigrants to this country and in the midst of protests—violent and non-violent—on this topic. Shortly before the filing of this motion, ICE agents shot and killed two protesters in Minneapolis, Minnesota.

**Written Questionnaires Help To Ensure a Fair and Impartial Jury**

Counsel's ability to challenge potential jurors is one of the key mechanisms for ensuring an impartial jury. However, counsel cannot effectively use this tool if jurors do not feel comfortable revealing past experiences and any potential biases or prejudices. Written jury questionnaires do

not expose potential jurors to embarrassment and peer pressure, thus removing the inhibitions that arise with group voir dire.

*Lack of Privacy, Fear of Public Speaking, and Peer Pressure Inhibit Answers During Voir Dire*

Social science researchers have found that jurors' reactions to voir dire are affected by the characteristics of the setting. L.L. Marshall & A. Smith, *The Effects of Demand Characteristics, Evaluation Anxiety, and Expectancy on Juror Honesty During Voir Dire*, 120 J. Psychol. No. 3, at 205 (1986). The courtroom is an unfamiliar place to most individuals who are called to jury duty. The procedures and physical environment are unfamiliar and perhaps somewhat threatening. Yet typically it is in this unfamiliar environment and in front of a group of strangers that citizens are asked to disclose sensitive or personal details about themselves and even their deepest biases and prejudices. Further, when this personal inquiry takes place in a group, the chance of obtaining meaningful information is substantially reduced if not entirely eliminated.

Oral responses during jury selection require jurors to divulge private matters in public. Conversely, written responses afford jurors a much higher level of privacy, because this method does not require the revelation of sensitive matters in front of a group of people. By protecting juror privacy and preventing the embarrassment that comes along with oral responses, jurors become much more candid and reveal information highly relevant to their jury service. *See* Ginger, *supra*, § 12.21, at 768 (jury questionnaire prepared by attorney's "save . . . embarrassment," especially "in big cases raising controversial issues about which jurors seldom want to be questioned in public but on which lawyers need to know juror opinions in order to exercise preemptory challenges wisely."); *id.* § 12.22, at 769 ("Those who would be most distressed at having their

private opinions displayed in public may be among those subject to excusal or challenge almost solely on the basis of their written answers."). Significantly, the experience in the trial of John DeLorean, which utilized a lengthy juror questionnaire, revealed that prospective jurors did not resent the personal nature of many of the questions. Ginger, *supra*, § 12.22, at 769 (citing *United States v. DeLorean*, 561 F. Supp. 797 (C.D. Cal. 1983) *mandamus granted, order vacated sub nom. Associated Press v. U.S. Dist. Court for Cent. Dist. of Cal.*, 705 F.2d 1143 (9th Cir. 1983)).

In addition to revealing highly personal information in an unfamiliar setting, some people have a significant fear of speaking in public. Dale W. Broeder, *Voir Dire Examinations: An Empirical Study*, 38 S. Cal, L. Rev. 503 (1965) (finding that potential jurors lied or failed to speak out during group voir dire because of nervousness). This general fear can only be heightened in the courtroom situation, where prospective jurors are asked to respond to questions put to them by the judge, an authority figure and a stranger, in front of the entire jury panel—their peers—where their answers may result in their suffering the "rejection" of a challenge for cause. *See* Note, *Judges' Nonverbal Behavior in Jury Trials: A Threat to Judicial Impartiality*, 61 Va. L. Rev. 1226 (1975).

There is more at work than fear in the courtroom. Social psychologists have demonstrated the principle that people want to please their peer group. See J.M. Levine, Reaction to Opinion *Deviance in Small Groups*, *in* Psychology of Group Influence (P. Paulus ed., 1980). The persons assembled for voir dire constitute such a group. By listening to others respond in a group, they learn what are the "right" responses to render the jurors acceptable. Nat'l Ctr. for State Courts, Jury Trial Innovations 68 (1976) ("studies about conformity have demonstrated that to avoid calling attention to themselves panel members subjected to collective questioning do not willing-

ly volunteer information about themselves or reveal opinions that deviate from the other panel members"). The Supreme Court of the United States observed that these pressures make prospective jurors less likely to be candid in front of their peer group. *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) (unanimous decision) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact of requiring such a declaration before one's fellows is often its father.").

Prospective jurors begin to rehearse their answers as they hear others provide their own, with the result that after questioning of the initial few prospective jurors, the genuineness of answers begins to decrease. John H. Blume, *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1250 ("Social science research supports individually questioning jurors outside the presence of other jurors as the most effective method to obtain candid answers to questions, especially the more difficult questions."). Socially acceptable responses to voir dire questions are established early in the process and reinforced through the aversive stimuli of removal for cause. *See* Anne M. Payne & Christine Cohoe, *Jury Selection and Voir Dire in Criminal Cases*, 76 Am. Jur. *Trials* 127 (2000) ("Group voir dire increases the probability that some prospective jurors will contrive to be seated or excused"); Neal Bush, *The Case for Expansive Voir Dire*, 2 Law & Psychol. Rev. 9, 14, 20 (1976) (collecting study results showing the learning that takes place during group voir dire and specifically how jurors noticed that other jurors who admitted to, i.e., being crime victims or having police relatives were excused and thus withheld such information when their came in voir dire). Jurors thus learn to provide the socially acceptable answer, even if it is not accurate.

*Adequate Juror Information Allows for the Meaningful Exercise of Jury Challenges*

By lowering the inhibitions that prevent jurors from divulging important, but personal information in public, written questionnaires allow the attorneys to make well-informed jury challenges. Jury challenges help ensure an impartial jury, and courts have long recognized that voir dire is critical to that pursuit. *See Swain v. Alabama*, 380 U.S. 202, 218-20 (1965) *overruled on other grounds by Batson v. Kentucky*, 476 U.S. 79 (1986); *Mu'Min*, 500 U.S. at 431 ("Voir dire examination serves the dual purposes of enabling the court to select and impartial jury and assisting counsel in exercising peremptory challenges."); *Spadafina v. State*, 77 S.W.3d 198, 206 (Tenn. Crim. App. 2000) ("A trial court's method of conducting jury voir dire in a criminal cases must comport with constitutional due process notions of fundamental fairness.").

The essential function of voir dire is "to enable counsel to gather sufficient information to make well-informed judgments about jurors whose biases may interfere with a fair consideration of the evidence." Herald P. Fahringer, *In the Valley of the Blind: A Primer on Jury Selection in a Criminal Case*, 43 L. & Contemp. Probs. 116, 120 (1980). Significantly, written questionnaires are the superior method of obtaining general background information concerning prospective jurors and in determining whether they have prior knowledge of the case or any particular bias or prejudice inconsistent with they ability to serve impartially. They thus constitute an effective tool for the gathering of information, and only with such information can jury challenges for cause and preemptory strikes be exercised in a meaningful fashion.

The importance of these two kinds of jury challenges has long been recognized. *See* Babcock, 27 Stan L. Rev. at 545. Even though preemptory challenges may not be required by the Constitution, the challenge is one of the most important rights of a trial litigant and "a necessary

part of trial by jury." *Swain*, 380 U.S. at 219; *accord United States v. Davis*, 809 F.2d 1194, 1999 (6th Cir. 1987). For this right to be meaningful, "the defendants must, upon request, be permitted sufficient inquiry into the background and attitudes of jurors to enable them to exercise intelligently their preemptory challenges " *United States v. Dellinger*, 472 F.2d 340, 368 (7th Cir. 1972). The preemptory challenge "should not be required to be exercised before an opportunity is given for such inspection and examination of prospective jurors as is reasonably necessary to enable the accused to have some information upon which to base an exercise of that right." *Bailey v. United States*, 53 F.3d 982, 984 (5th Cir. 1931). The "right to be tried by an impartial jury" includes "the right to an examination designed to ascertain possible prejudices of the veniremen . . . ." *United States v. Lewin*, 467 F.2d 1132, 1138 (7th Cir. 1972); *see also Bell v. Baker*, 954 F.2d 400 (6th Cir. 1992) (noting that crippling the device of the peremptory challenge would violate the Sixth Amendment right to an impartial jury).

**Conclusion**

Ines Soto has a Sixth Amendment right to a fair and impartial jury, and his counsel request that they be permitted sufficient inquiry to intelligently exercise their challenges. While oral voir dire alone in other cases may be an adequate method for safeguarding the integrity of the jury trial, in cases like this one involving extensive publicity and contentious and sensitive issues, oral voir dire makes it impossible for defense counsel to select a fair and impartial jury. This written jury questionnaire will provide the most effective and efficient means of eliciting candid and honest responses allowing both the state and defense counsel to make meaningful use of challenges.

        Respectfully submitted,

        /s/ Leigh W. Davis_____
        (Mr.) Leigh W. Davis
        1901 Central Dr. Suite 730
        Bedford, TX 76021
        817.868.9500
        817.591.4701 (fax)
        Texas Bar No. 24029505
        lwd@leighwdavis.com

**Certificate of Conference**

On February 2, 2026, I discussed this motion and its requested relief with AUSA Shawn Smith who is handling this matter for the government. Mr. Smith indicated that the government opposes this motion and its requested relief. Over the course of the previous 6 days all defense counsel informed the undersigned that they did not oppose this motion or its requested relief.

/s/ Leigh W. Davis_____
(Mr.) Leigh W. Davis

**Certificate of Service**

On February 2, 2026, I filed this motion with the court's ECF system which generated a receipt indicating filing of the motion and service of all attorneys of record.

/s/ Legih W. Davis_____
(Mr.) Leigh W. Davis

*Jury Questionnaire*
*4:25-CR-259-P*

**Juror No.** _____

**Juror Name:** _____

1. I have heard of something called Antifa.
   Strongly Agree     Agree     Neutral/No Opinion     Disagree     Strongly disagree

2. I believe an organization called Antifa exists.
   Strongly Agree     Agree     Neutral/No Opinion     Disagree     Strongly disagree

3. Antifa is primarily a violent organization.
   Strongly Agree     Agree     Neutral/No Opinion     Disagree     Strongly disagree

4. Antifa serves no legitimate purpose in opposing fascism.
   Strongly Agree     Agree     Neutral/No Opinion     Disagree     Strongly disagree

5. Illegal Immigration is a real and great danger to our democracy.
   Strongly Agree     Agree     Neutral/No Opinion     Disagree     Strongly disagree

6. Legal immigration is a real and great danger to our democracy.
   Strongly Agree     Agree     Neutral/No Opinion     Disagree     Strongly disagree

7. The First Amendment does not give the right to demonstrators to make noise at a protest.
   Strongly Agree     Agree     Neutral/No Opinion     Disagree     Strongly disagree

8. The First Amendment does not give the right to demonstrators to make noise at a government facility.
   Strongly Agree     Agree     Neutral/No Opinion     Disagree     Strongly disagree

9. The Second Amendment does not give the right to demonstrators to have firearms at a protest.
   Strongly Agree     Agree     Neutral/No Opinion     Disagree     Strongly disagree

*Jury Questionnaire*
*4:25-CR-259-P*

10. People who bring guns to demonstrations intend to use them.

　　Strongly Agree　　　Agree　　　Neutral/No Opinion　　　Disagree　　　Strongly disagree

11. People should not bring guns, even when lawfully owned and carried, to demonstrations.

　　Strongly Agree　　　Agree　　　Neutral/No Opinion　　　Disagree　　　Strongly disagree

12. U.S. Immigration and Customs Enforcement (ICE) is not a danger to law abiding citizens.

　　Strongly Agree　　　Agree　　　Neutral/No Opinion　　　Disagree　　　Strongly disagree

13. U.S. Immigration and Customs Enforcement (ICE) is doing a great job enforcing our immigration laws.

　　Strongly Agree　　　Agree　　　Neutral/No Opinion　　　Disagree　　　Strongly disagree

14. Our current federal government does a good job prosecuting criminals.

　　Strongly Agree　　　Agree　　　Neutral/No Opinion　　　Disagree　　　Strongly disagree

15. Our current federal government should be allowed to conduct surveillance on all people associated with Antifa.

　　Strongly Agree　　　Agree　　　Neutral/No Opinion　　　Disagree　　　Strongly disagree

16. People who are unhappy with the current federal government should leave the country.

　　Strongly Agree　　　Agree　　　Neutral/No Opinion　　　Disagree　　　Strongly disagree

17. Demonstrations and protests against ICE and immigration enforcement are ineffective.

　　Strongly Agree　　　Agree　　　Neutral/No Opinion　　　Disagree　　　Strongly disagree

18. Demonstrations and protests against ICE and immigration enforcement are dangerous and lead to people getting hurt.

　　Strongly Agree　　　Agree　　　Neutral/No Opinion　　　Disagree　　　Strongly disagree