# Anne Speckhard, Ph.D.

Adjunct Associate Professor of Psychiatry (Retired)
Georgetown University Medical Center
6109 Ramshorn Place
McLean, VA 22101



**Re: United States v. Zachary Evetts (in the US District Court for the Northern District of Texas Fort Worth Division: Criminal Action No. 425-CR-00259-P)**

February 2, 2026

### Introduction – Review of Evidence & Psychological Evaluation of Zachary Evetts

This report is based upon review of the continuing government discovery in this case and, in part, upon a forensic psychological examination of Mr. Zachary Evetts. I understand this report may be used by any party in the cause of action listed in the subject line above. I have been asked to apply training, education, experience of interviewing over 800 suspected domestic and international terrorists for the US government and its agencies.

Mr. Evetts is charged in a federal indictment arising from an alleged coordinated attack on the Prairieland Detention Center on July 4, 2025. Specifically, Mr. Evetts is charged with participating in a riot with the intent to commit acts of violence, described in the indictment as involving conduct such as shooting and throwing fireworks and explosives, slashing tires on a government vehicle, spraying graffiti on property and vehicles, destroying a closed-circuit camera, shooting at officers, and dressing in black bloc. In addition, Mr. Evetts has been charged with providing material support to terrorists, defined in the indictment as including the provision of property, services, training, communications equipment, weapons, explosives, personnel (including himself), and transportation. Mr. Evetts is also charged with conspiracy to use and carry an explosive, and with using and carrying an explosive, during the alleged riot.

Mr. Evetts is also charged with attempted murder of officers and employees of the United States, specifically alleging an unlawful attempt to kill with malice aforethought two federal correctional officers and one Alvarado Police Officer. In relation to this he is charged with discharging a firearm during and in furtherance of a crime of violence, namely the alleged attempted murder of those officers.[1]

### Confidentiality and Role

The expert role I have with Mr. Evetts involves an agreement that I will be sharing my objective opinion regarding my assessment of him with the court and thus a commitment to confidentiality does not play a role here.

### Objectivity

I have formed my opinions based on the evidence, documents and interviews/consultations made available to me and I assert full confidence in my report. However, I am open to considering any new evidence and will revise my opinion accordingly.

---

[1] **Antifa Cell Members Indicted in Prairieland Shooting.** *U.S. Department of Justice, U.S. Attorney's Office for the Northern District of Texas,* press release, November 14, 2025,
https://www.justice.gov/usao-ndtx/pr/antifa-cell-members-indicted-prairieland-shooting

**Basis of this Report**

I have prepared this report based on the knowledge, information and insight gained during my evaluation of Mr. Evetts. This evaluation was conducted at the Federal Medical Center facility of Fort Worth, Texas where Evetts had been held, and my examination of Mr. Evetts lasted over three hours during which I had consultations with his legal team, reviewed documents including expert and evidence reports proffered by the government, which was provided to me by Mr. Evetts' legal team.  Below is an incomplete list of items reviewed in drafting this report:

<u>Anne Speckhard- Expertise</u>

I am a researcher and clinician of 40+-years-experience, treating and researching psychological trauma, family dynamics as well as the psychosocial underpinnings of terrorism. During my career, I have studied a wide range of psychological traumas suffered by the victims of the Holocaust, Chernobyl liquidators, victims of terrorism, and by pregnancy loss. I treated clients for PTSD, dissociative and attachment disorders and family dysfunction.

I have a doctorate in Family Social Science and a master's in Child and Family Studies.  I have testified or given reports as an expert witness in various cases involving psychological trauma, family systems issues, terrorism, etc., and I have qualified as an expert witness in courts in the US and overseas including US family court, immigration court, circuit court and have testified to Congress. With regard to terrorism, I have served as an expert witness in the US, Australia, Germany, Norway, Sweden, Ireland and consulted to courts and trained prosecutors and security services in many other countries as well. I am an active member of Harvard's Program in Psychiatry and the Law and have presented on terrorism to their group and to other international Psychiatry and the Law conferences.

Since being retired from 20 years of service as an Adjunct Associate Professor of Psychiatry in the Georgetown University School of Medicine, I continue to be involved in cutting edge research as the Director of the International Center for the Study of Violent Extremism (ICSVE), a think-tank focused on studying terrorism and violent extremism. I am a member in good standing of the American Psychological Association and have worked as a research psychologist of 25+ years' experience researching various traumas as well as the psychosocial underpinnings of terrorism. I am a licensed professional counselor and marriage and family therapist in Virginia, and I have an active clinical practice treating adults, children and families.

I spent the last two decades studying the trajectories of individuals thrust into and that have extracted themselves back out of terrorism, having in-depth interviewed over 800 terrorists and violent extremists, their family members, and close associates around the world. Over the past ten years, I have in-depth interviewed 276 ISIS defectors, returnees, and prisoners: men, women and minors from many countries around the world, including the US, Europe, Balkans and Middle East.  I also in-depth interviewed 16 al Shabaab and hundreds more holding a militant jihadist ideology as well as 56 members of white supremacist and anti-government militias. I also interviewed six Antifa aligned activists who had been involved or endorsed violence against property, Nazis or MAGA while stating their goal of fighting fascism.

My decades of research involved developing a nuanced and more comprehensive theory of terrorism, posited on the proposition that there are four necessary and sufficient factors

involved in the making of a terrorist or a violent extremist. These factors are: the group, the ideology, social support for both, and resonance between the first three with the individual's motivations and vulnerabilities. In this theoretical paradigm, the individual joins the group out of a desire to meet his own needs perhaps due to a desire to belong, have dignity, purpose or significance, to gain social status or social ties or material or other worldly benefits from the group. He is drawn to the group by its ideology, or it is indoctrinated into him once he joins and joining is made easier when there is wide social support for the group or its ideology (something often easily found via the internet these days).

I have traveled extensively and studied the ideological and religious underpinnings of terrorist groups in many countries over my career, and our center the International Center for the Study of Violent Extremism (ICSVE) has an Islamic sheik on staff who writes, studies and consults on Islamic issues related to understanding militant jihadist terrorism. Likewise, we have studied the recruitment strategies of militant jihadists as well as many other terrorist groups, the pathways in and back out of terrorism and violent extremism and we have written extensively on all of the above, publishing in peer reviewed journals and policy papers and academic books on these subjects.

In 2006-2007, I designed the psychological and Islamic challenge components of the *Detainee Rehabilitation Program*, for the U.S. Department of Defense, to be applied to 22,000+ detainees and 800 juveniles held by U.S. forces in Iraq. I also interviewed militant jihadists imprisoned in the Maldives and advised their government on how to deal with prison radicalization, prevention and intervention issues. ICSVE has frequently consulted to Western countries regarding prevention and deradicalization programs, and I led a dedicated deradicalization program for a western country from 2023-2025. I have also consulted with the Syrian Democratic Forces and AANES government which holds over 10,000 ISIS detainees. I have advised to the U.S. Departments of State, Homeland Security, Justice, Defense and the FBI, the European Commission, Canada, Australia and to specific European, Central Asian, Balkan, Asian and Middle Eastern governments and to the OSCE, NATO, EuroPol, InterPol, UN Women, UNODC and UNCTED about terrorist prevention, intervention, repatriation, rehabilitation, and reintegration efforts.

At ICSVE, I direct our various research projects and oversee the *Breaking the ISIS Brand Counter Narrative Project,* which relies on first-hand accounts of ISIS cadres speaking out against ISIS. In this regard, I have been traveling over the past ten years into Iraqi prisons and SDF-run camps and detention centers in Rojava, Northern Syria as well as throughout Iraq, the Balkans, Europe, and Central Asia to interview ISIS returnees and imprisoned cadres from over 100 countries. U.S. State and Justice Departments have had me lecture for and consult with prosecutors in Trinidad and Tobago, Europe, Canada, UK, as well as in the Balkans about ISIS returnees. I have also been the US State Department's CVE expert lecturing in Iraq, Switzerland, Austria, Greece, Trinidad and Tobago, Netherlands, Malaysia, Thailand, Canada and elsewhere. I have also trained key stakeholders in law enforcement and intelligence, educators, and other countering violent extremism professionals on the use of counter-narrative messaging materials produced by ICSVE both locally and internationally as well as studying the use of children as violent actors by groups such as ISIS and consulting on how to rehabilitate men, women and children. I have also advised the Orkesh rehabilitation center in NE Syria regarding adolescent boys of ISIS families and working to accelerate their repatriations.

ICSVE broadened our prevention work into the *Escape Hate Counter Narrative Project* based upon 56 in-depth video interviews with white supremacists and anti-government violent extremists. Facebook partnered with ICSVE on both projects donating hundreds of thousands of Facebook ads and hiring consultants to assist ICSVE in reaching global audiences in the millions with our counter narrative content.

I have published over 100 scholarly articles, many of them peer reviewed, on terrorism and counter terrorism with over 40 peer reviewed articles appearing in prominent journals including: *Studies in Conflict & Terrorism* (Taylor & Francis/Routledge), *Professional Psychology: Research and Practice* (American Psychological Association), *Media, War & Conflict* (SAGE Publications), and the *Journal of Social Issues* (Wiley-Blackwell, on behalf of the Society for the Psychological Study of Social Issues). I have also appeared on CNN, BBC, NPR, Fox News, MSNBC, Scripps News, Islam Channel and in Time, The New York Times, The Washington Post, London Times, Homeland Security Today and many other publications. I often train, teach, speak, and publish articles on the topics of the psychology of radicalization and terrorism, prevention and intervention efforts, etc. and am also the author of seven books, including five on terrorism and violent extremism, including *Homegrown Hate, Talking to Terrorists, Bride of ISIS, Undercover Jihadi and ISIS Defectors: Inside Stories of the Terrorist Caliphate*. My academic publications are found here: https://georgetown.academia.edu/AnneSpeckhard and on the ICSVE website: http://www.icsve.org

Our center has had research and training grants from the European Union, UN Women, the State of Qatar, US Departments of State, Defense, Homeland Security and Justice. I have also worked closely with the FBI and U.S. Department of Justice Special Prosecutors as well as UNITAD and theInternational, Impartial and Independent Mechanism - Syria (IIIM) on the prosecution of various ISIS members who I interviewed in prisons. I have also worked with German federal prosecutors on over 20 prosecutions of ISIS members, as well as with other countries including Norway, Canada, the UK and Australia. I have given expert testimony and written expert reports for various ISIS cases in Australia, Norway, Sweden, Canada, Ireland, the U.S., and Germany.

**Documents Reviewed & Consultations Made on Behalf of this Report:**

1. C-SPAN. *Kyle Mr. Shideler testifies at the Senate Judiciary Subcommittee hearing on political violence.* C-SPAN.org. Retrieved from https://www.c-span.org/clip/senate-committee/user-clip-kyle-shideler-testifies-at-the-senate-judiciary-subcommittee-hearing-on-political-violence/5177494

2. Center for Security Policy's Kyle Mr. Shideler: How to Prosecute the Tesla Bombers. *YouTube*, uploaded by Chicago's Morning Answer, Retrieved from https://www.youtube.com/watch?v=NZMGxpsFH9Q

3. Center for Security Policy. *Organize for Attack.* Retrieved from https://centerforsecuritypolicy.org/organize-for-attack/

4. DRM News. *FULL HEARING: Historic DHS Hearing Erupts in Fury as Kristi Noem Faces Bipartisan Firestorm | AC1G.YouTube Retrieved from https://www.youtube.com/watch?v=M2W5PZ6lpxo*

5. *Mr. Shideler, K. (2020, August 4). Testimony before the United States Senate Judiciary Committee, Subcommittee on the Constitution. Center for Security Policy.*

6. *C-SPAN. Kyle Mr. Shideler testifies at the Senate Judiciary Subcommittee hearing on political violence. C-SPAN.org. Retrieved from https://www.c-span.org/clip/senate-committee/user-clip-kyle-shideler-testifies-at-the-senate-judiciary-subcommittee-hearing-on-political-violence/5177494*

7. *Washington with Tony Perkins. Kyle Mr. Shideler Explains Why Antifa's Designation as a Domestic Terror Group is Correct. YouTube, https://www.youtube.com/watch?v=-txDMPo32Gs*

8. *American Mind. How to Dismantle Far-Left Extremist Networks. Retrieved from https://americanmind.org/memo/how-to-dismantle-far-left-extremist-networks/*

9. *The Bill Walton Show. Episode 151: "The Afghanistan Debacle: What it Means for Americans" with Dr. Stephen Bryen and Kyle Mr. Shideler. Retrieved from https://thebillwaltonshow.com/guest/kyle-shideler/*

10. *Nadales, G., Smith, E., & Vadum, M. (2020). Unmasking Antifa: Five Perspectives on a Growing Threat. Independently published.*

11. *FBI FD-1057 Body Camera Review Memorandum*

12. *Client Initial  Memorandum (Randi Ray)*

13. *Attorney–Client Memorandum. Notes from Meeting with P.J.Mc. (Evetts). Date: July 30, 2025.*

14. *Various Consultations with Mr. Evetts's legal team*

15. *11-12-2025 – 4-hour in person evaluation of Mr. Evetts in the Federal Medical Center facility of Fort Worth, Texas*

16. *12-1-2025 Nathan Baumann statement - GOV_P9_00000963 Bauman Proffer*

## Defining Terms

Given the highly politicized nature of this case, it is likely helpful to define terms upfront.

### First Amendment Protected Rights

The United States Constitution bestows upon individuals a panoply of rights, including the fundamental rights protected under the 1st amendment of the U.S. constitution. These protected Rights are as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.-" The First Amendment thereby guarantees the freedom to practice a religion, freedom of speech, free press, free assembly and free petitioning for redress. The freedoms apply at the federal, state and local level. [2]

---

[2]**U.S. Constitution, Amendment I.** *U.S. Government Publishing Office — Constitution Annotated.* Retrieved from https://constitution.congress.gov/constitution/amendment-1/

**Fascism**

A populist political philosophy and movement that elevates the nation and often race, above the individual, typically manifesting in a centralized, autocratic system led by a dictatorial authority and marked by rigid economic and social control, along with the forcible suppression of political opposition.[3]

**Antifascism**

The opposition to fascism, which is a political system characterized by authoritarian leadership, centralized state control, the elimination of political opposition, and an exaggerated emphasis on racial or national supremacy.[4]

**Antifa**

An acronym for *anti-fascism*. While some groups and online spaces in the United States organize around antifascist ideas, there is no clearly defined organization known as "Antifa" operating as a unified terrorist group within the United States, nor is there a coherent or formally articulated "Antifa" terrorist ideology. These distinctions are examined in detail, with supporting references, later in this report.

**Terrorism**

A contested concept with no single universally accepted definition; scholars and policymakers have identified more than 500 competing definitions, and the United Nations has never reached consensus on a comprehensive definition. In the United States, terrorism is defined through multiple statutory and agency frameworks. The FBI defines *international terrorism* as violent criminal acts committed by individuals or groups inspired by, or associated with, designated foreign terrorist organizations or state sponsors.

Similarly, under U.S. law, international terrorism is defined in 18 U.S.C. § 2331 et seq. as activities that involve violent acts or acts dangerous to human life that violate U.S. or state criminal law, appear intended to intimidate or coerce a civilian population, influence government policy through intimidation or coercion, or affect the conduct of a government through mass destruction, assassination, or kidnapping, and that occur primarily outside the territorial jurisdiction of the United States or otherwise transcend national boundaries in their means, targets, or operational scope.

It is important to note that terrorists generally organize in groups and develop a coherent political ideology that guides their violent actions. They recruit members into their group by conferring a sense of belonging, significance, purpose and mission, possibly offering them material or spiritual gains, escape and adventure, and propelling them down the terrorist trajectory where they are indoctrinated into the group's ideology and put into various roles to serve the group, some including becoming violent actors or even suiciding on behalf of advancing the group's political goals.

---

[3] **Merriam-Webster.** *Fascism.* Merriam-Webster.com Dictionary. Retrieved from https://www.merriam-webster.com/dictionary/fascism
[4] **Cambridge Dictionary.** *Anti-fascism.* Cambridge University Press. Retrieved from https://dictionary.cambridge.org/dictionary/english/anti-fascism

Terrorists typically organize in groups and sometimes secret cells. Truly sole actors are rare, although we have the concept of lone wolf terrorism. So called lone-wolf terrorists are rarely in fact lonely, and generally follow a terrorist group's defined ideology which they often find and study via the internet and they often act with reference to and on behalf of the group and proclaim themselves as representing it, even if they have never met or been formally recruited into the group.

Likewise, lone wolf terrorists often study the mass murders carried out by others having gone before them and try to outdo them and they often broadcast their actions on the internet clearly performing for a virtual imagined group they want to belong to and be admired by.

When I refer to terrorism in this report, I want to emphasize that the important issues include that are that there is a *political motive* for an individual or group to take part in terrorist or extremist violent act(s) which are violent actions generally aimed at civilian persons, although at times aimed only at property or in direct confrontation with military, and they are done so with the *intent* to intimidate, coerce or otherwise move the government or another group into some *political* action desired by the terrorist. Likewise, terror acts are often aimed at small groups of civilians with the intent of causing mass terror across much larger groups and terrorists are often adept at using both social media and mainstream media to broadcast and amplify the terror-inducing effects of their violent actions.

## Domestic Terrorism

Unlike international terrorism, the U.S. currently has no single federal definition nor criminal charge for "domestic terrorism," though domestic criminal acts that appear to have a terrorist intent often receive greater investigative resources, can be prosecuted under other federal statutes and if the crime is a felony, sentencing can be greatly enhanced based on terrorist charges. Recently after the January 6th protests, a federal judge ruled that Proud Boys committed a federal crime of terrorism when they helped destroy a fence outside the U.S. Capitol. Such a ruling can significantly increase both the offense level and criminal history scores of the defendants and result in a dramatically longer sentence.

For the FBI's purposes, domestic terrorism is defined in 18 U.S.C. § 2331(5) as activities that involve acts dangerous to human life that violate federal or state criminal law, appear intended to intimidate or coerce a civilian population, influence government policy through intimidation or coercion, or affect the conduct of government by mass destruction, assassination, or kidnapping, and that occur primarily within the territorial jurisdiction of the United States.

Similarly, the Department of Homeland Security relies on the definition of terrorism set forth in the Homeland Security Act, 6 U.S.C. § 101(18), which is substantially similar though not identical. Under that provision, terrorism is defined as any activity involving acts dangerous to human life or potentially destructive of critical infrastructure or key resources, that violate criminal law, and that appear intended to intimidate or coerce civilians, influence government policy, or affect governmental conduct through mass destruction, assassination, or kidnapping.

In this framework, the FBI and DHS use the term Domestic Violent Extremist (DVE) to describe an individual based and operating primarily within the United States (without foreign terrorist direction) who seeks to advance ideological objectives wholly or in part through unlawful acts of force or violence.

Importantly, the mere advocacy of ideological views or the use of strong or inflammatory rhetoric does not, by itself, constitute violent extremism; in many circumstances, direct or specific threats of violence—or concrete violent acts—are required to trigger federal criminal liability.[5] Terrorism, international or domestic, is NOT in this report referring to First Amendment protected protest activities nor to lawful activities intended to safeguard constitutional and civil liberties and carried out to protect our democratic institutions nor does it refer to donning protective gear or taking self and group defensive protective actions against counter protestors who are enacting violence or security officials who are unlawfully assaulting protestors.

## Insurrection

It is defined as an act or instance of revolting against civil authority or an established government.[6] Again, it is important to note that exercising First Amendment Protected Rights in a lawful manner, particularly with the intent of upholding, insisting upon or protecting our democratic freedoms, rights and institutions is not insurrection.

## Black Bloc

Black bloc is a tactic used by lawful protestors for self-defense against counter protestors and violent unlawful actions by security forces.  It involves a group of protestors organizing to lead, provide a protective cordon and guard the rest of the protestors. Those who engage in black bloc often dress all in black, mask themselves, wear protective gear, carry gas masks and umbrellas to avoid harm by tear gas and increasingly in past years carry weapons.

The idea is self and group protection including protection from tear gas, doxxing, active shooters etc.  Black bloc has been used by those engaging in antifascist protests, by the far right, by animal rights and environmental protestors etc. and is not specifically aligned with any terrorist ideology or group.

## <u>Facts of the Case</u>

Mr. Evetts participated in a noise demonstration involving fireworks at the Prairieland Detention Center on July 4, 2025. During this event, another demonstrator is accused of—and has reportedly admitted to—bringing a firearm to the demonstration and discharging it at law enforcement officers who responded to the scene. One officer was struck and wounded by gunfire but survived.

The government alleges that Mr. Evetts was affiliated with and acted in furtherance of a domestic terrorist group, identified by the prosecution as "Antifa." On this basis, he faces charges including participating in a riot with intent to commit acts of violence, providing material support to terrorists, conspiracy to use and carry an explosive, and using and carrying an explosive during the alleged riot. Mr. Evetts is also charged with attempted murder of officers

---

[5] **Federal Bureau of Investigation & Department of Homeland Security.** *Domestic Terrorism Definitions, Terminology, and Methodology.* FBI.gov (PDF). Retrieved from https://www.fbi.gov/file-repository/counterterrorism/fbi-dhs-domestic-terrorism-definitions-terminology-methodology.pdf
[6] **Merriam-Webster.** *Insurrection.* Merriam-Webster.com Dictionary. Retrieved from https://www.merriam-webster.com/dictionary/insurrection

and employees of the United States, as well as discharging a firearm during and in furtherance of a crime of violence, namely the alleged attempted murder of those officers.[7]

## Psychological Evaluation of Mr. Evetts

### Introduction:

Thirty-seven-year-old Zachary Evetts presented for a psychological evaluation at the request of his defense attorneys in the Federal Medical Center facility of Fort Worth, Texas where he is currently incarcerated. Mr. Evetts was interviewed for approximately four hours in the presence of his attorney Patrick McLain. Mr. Evetts presented as alert, well oriented, polite and cooperative in the evaluation.

He was well-groomed and appeared healthy although distressed by his imprisonment and anxious about his future. There was no evidence in the interview of movement disorders, such as tics, and his speed of speech was at a normal rate and volume. His emotional expression was full and there was no evidence of depressive cognitions, delusions or hallucinations during the interview. Mr. Evetts was oriented to time, place and person and could follow verbal instructions accurately. He appeared extremely forthright and honest throughout, including self-critical at times.

### Family Background:

Zachary Evetts, a resident of Waxahachie, Texas, was born on July 22, 1989, in the Dallas–Fort Worth area. The firstborn of three siblings, he grew up in a middle-class family marked by frequent relocations, parental conflict, and substance abuse. His father struggled with alcoholism and was emotionally absent for much of Mr. Evetts's childhood, while his mother—raised in a fundamentalist Baptist environment—was described as emotionally intense and over-involved, attempting to compensate for familial instability.

Mr. Evetts describes his mother as, "She tried to make up for my Dad, over-did attention." He also states that she was depressed and he played the role of a parentified child. "I took care of her depression so as to help her to take care of me." His parents divorced while he was in college, a period Mr. Evetts later described as emotionally disruptive.

### Developmental Challenges Faced:

From an early age, Mr. Evetts suffered anxiety and experienced feelings of marginalization and insecurity. Smaller and physically weaker than peers during adolescence, he reported being bullied and struggling to conform to traditional expectations of masculinity. He mocked himself in this regard saying, "All men feel this. I have to be big and strong."

However, he was smaller and weaker than most. Sports such as football and wrestling, which he attempted in middle school, resulted in injuries and further alienation. He gravitated instead toward solitary or imaginative pursuits, including video games and cartoons, often identifying with "hero" archetypes centered on protection and moral purpose.

---

[7] **Antifa Cell Members Indicted in Prairieland Shooting.** *U.S. Department of Justice, U.S. Attorney's Office for the Northern District of Texas,* press release, November 14, 2025, https://www.justice.gov/usao-ndtx/pr/antifa-cell-members-indicted-prairieland-shooting

Academically, Mr. Evetts performed well. He completed advanced coursework in high school and later earned a degree in mechanical engineering, graduating with honors after five years. Despite technical competence and participation in multiple research projects, he reported persistent dissatisfaction with engineering as a career, describing burnout and a lack of fulfillment. He later expressed interest in hands-on, practical work such as residential remodeling and sheet-metal fabrication.

**Difficulties Faced as an Adult:**

Mr. Evetts's adult life was shaped by ongoing health and mental-health challenges. He described long-term anxiety, hypersomnia, sleep apnea, and episodes of emotional shutdown, particularly during periods of stress. I have not seen his medical records.

Mr. Evetts describes himself as "horribly shy and lacking self-confidence" with women and as a result did not marry till he was considerably older. He says that only happened because his wife was the aggressor in their relationship. He has been married for approximately thirteen years.

**Political Activation:**

Mr. Evetts described a gradual activation into political protesting shaped by anxiety, social threats, and exposure to polarized environments following events such as the COVID-19 pandemic, the George Floyd protests, and January 6, 2021. He reported increasing fear for the U.S. democracy and that to him it seemed political violence from far-right actors posed a very real threat to vulnerable communities, including immigrants and LGBTQ individuals. These fears contributed to his interest in firearms, emergency preparedness, and self-defense.

After viewing the televised January 6 riots which included rioters bringing a gallows to the U.S. Capitol, breaking windows, storming the Capitol building and assaulting police officers Mr. Evetts became deeply concerned that Americans could lose their democratic way of life. He recalls, "January 6th scared the hell out of me." As a result, he committed to taking part in protests and decided that carrying a firearm was important for self-protection and to protect other protestors against any active shooters that might open fire on the protestors, counter protestors who might cause harm and even security officers who might enact unlawful violence upon the protestors.

At work he reports some co-workers would make statements like, "I can't wait until we can shoot up the libs." Already a survivalist, storing up food, water and supplies for natural disasters, Mr. Evetts' fear of violence from conservatives led him to seek out other like-minded individuals. Given the ubiquity in the U.S. of active shooter events involving mass casualties and the increase in far-right actors arriving to protests armed with AR-15s, his fears when viewed in context do not appear overly exaggerated. Likewise given his anxiety about being able to protect himself in general the group likely bolstered his sense of masculinity. He recalls, "I tried to find people to organize with, for self-defense."

Mr. Evetts grew up in a home that encouraged using and owning firearms. As a youth his father took him to a range to shoot guns, and he was taught safety measures. During the COVID period, Mr. Evetts pursued this further and became involved with the Socialist Rifle Association (SRA), initially through online platforms such as Discord. He described the organization as offering community, skill-sharing, and mutual aid rather than any militancy.

His participation included range days, trauma-medicine training, and discussions around firearms safety. He emphasized that his motivation was defensive rather than offensive, citing fear of mass-casualty violence rather than intent to engage in violence. Mr. Evetts circles brought him in contact with individuals affiliated with groups such as the John Brown Gun. This included Benjamin Song.

Mr. Evetts also peacefully attended protests and counter-protests, some involving armed presence. He described significant anxiety around these events, often leaving early due to police presence or sensory overload. Likewise, he always did reconnaissance before attending to be sure he knew how to exit if violence broke out.

Although he began hanging out with Song and his friends and joined Signal groups in which they chatted he denied identifying as "Antifa," characterizing the term instead as a joke or shorthand for being anti-fascist in belief, not membership. He describes himself as definitely against fascism, but not as part of any antifascist group or following any Antifa ideology.

Mr. Evetts recalled taking part in Air Soft gun battles with Song and his friends, describing these events as filled with "lots of laughter, fun." Yet his anxiety over domestic politics was growing. He recalls, "I felt civil war was on the way. I felt that since January 6th, that vulnerable people will be out – transgender, gender nonconforming, people of color. I had a lot of anxiety that it [current and future times] could be like Hitler."

Before meeting Song and his group of friends, Mr. Evetts recalls, "I had not met a lot of trans people before." As he watched news reports of Proud Boys and Patriot Front attacks on LGBTQ events, he understood that his new friends could be violently attacked and that there was a need for "drag defense." Although he did not attend such drag events, he became willing to be a defender of them.

Mr. Evetts recalls, "I went from concealed carry to open carry" when drag queen and LGBTQ events were attacked and "after George Floyd." Their fears were discussed with Song and others, and the conclusion Mr. Evetts was left with was, "We didn't want the violent right wing to attack so we went black bloc," meaning a group of individuals wore tactical gear and carried firearms to protect the other protestors. Mr. Evetts was also concerned that the police seemed to align with the far right. "The police always have their backs to the far-right protestors."

Mr. Evetts describes his use of black bloc as purely survivalist. Given the ubiquity of active shooter events in the US, he deeply feared that someone might come out to protests and shoot them all. He recalls, "I didn't want a mass shooter to shoot me or to shoot others. I didn't want a mass shooting to occur. I couldn't do anything. I was always very afraid before attending a protest. I'd have to fight through my anxiety. I'd leave in the beginning [of starting to attend protests], too many cops… [Then,] I forced myself to go. I overcame my anxiety because there were people in real danger. I have a responsibility to make the world a better place." When asked if his wish was "to be a protector, to be a good man.?" he affirmed on both.

Mr. Evetts found he didn't belong in the John Brown group, and he wasn't interested in more "direct action" or anything violent. When a Dallas John Brown group member pepper sprayed others, Mr. Evetts was angered and confused by their aggression wondering, "Why the fuck did she do that?" Mr. Evetts left the John Brown group as a result and because "there was so much leftist infighting."

He reports being disgusted at anyone who went to protests to engage in fighting. He states he was not interested in direct action events. "Direct conflict with the right-wing people? I felt it was too risky. You could be arrested or shot or both." Mr. Evetts emphasized the need to be law abiding stating, "Sometimes you have to respect authority. They can end you."

As anti-immigration policies and ICE actions accelerated into increased violence against people of color, immigrants and even American citizens, Mr. Evetts concerns about social justice and protecting our democracy grew. He took self-defense classes. He recalls Ben Song asking him and his friends who were doing something about ICE injustices. At that point he joined a new Signal chat of two to three hundred people also concerned about ICE violence.

Mr. Evetts' fear grew and he recalls telling his wife that he could end up arrested for simply protesting. He recalls going to protests in that time frame without a weapon or dressing in black bloc. Mr. Evetts believes he dressed in black bloc a total of ten times, mostly for "guarding the LGBTQ and drag queen events. Other times I had gear but didn't wear it. It's hot and uncomfortable in summer and [I get] heat exhaustion afterwards." However, he does note that the black bloc mask makes "it hard to be identified, so you won't be doxxed." Mr. Evetts was sure he'd be fired if his protest activities were revealed to his employer. "That's my main reason."

In the period leading up to the Prairieland Detention Center incident, Mr. Evetts reported that those in his Signal group and friends had tried to locate ICE to go and shout at them. As he took part in discussions over Signal with like-minded individuals such an opportunity arose – to carry out a noise demonstration at an ICE facility. Mr. Evetts recalls, "I was free that day, so I volunteered…" Fearing, as usual, that violence could break out and wanting to know where his exits would be he recalls, "I was interested to do it and anxious. I normally checked the satellite of the place and the place [itself]. I like to have a lay of the land beforehand, to soothe my anxiety."

Mr. Evetts recalls taking part in the Signal chat, which I have read and as the transcript confirms, that everyone agreed it would be a low-key event, noise only, and that no one would carry firearms. Everyone agreed to take part without anyone clearly being the leader, this out of fear of being seen as an anti-government agent. The noise demonstration was organized to take place on land clearly outside of the fence surrounding the detention facility and for no incursion into it or altercations with security officials to take place.

Mr. Evetts' record is as a law-abiding citizen. He has no violent history and no criminal charges whatsoever in his record including speeding tickets. He is an engineer and respects following the rules.

While he clearly does not want a fascist government, or authoritarianism in the U.S., a view with which most Americans would agree, he laughs at the idea that anyone would see him or his friends as wanting to take down the government. He explains, "You are not going to win a gun fight [with the U.S. government]." He states, "I didn't ever call myself Antifa." When asked if he agreed with the slogan many antifascists like - Punch a Nazi in the Face – he states, "I would cheer it, but I wouldn't do it. I would fear an assault charge."

When discussing carrying arms to protests, Mr. Evetts states, "I was never going to shoot back at police or shoot them first. That doesn't end well. I knew, you never shoot at police."

When asked about insurgency he answers very genuinely and with fear in his eyes, "I am not interested. It won't end well."

Mr. Evetts went to the noise demonstration at the Prairieland Detention Center with his usual anxiety but expected it to be peaceful, although loud and encouraging to the detainees inside the facility who would hear the fireworks and slogans about, they are not forgotten shouted in Spanish over megaphones. He, like the others, used a Faraday bag and communicated on Signal – operational security practices he had learned in the John Brown gun club and adhered to out of habit and to adhere to practices of the group. But he did not carry a gun or engage in any violence. In fact, he was completely dumbfounded when shots were fired.

Indeed, as Nathan Baumann's statement confirms, the plan was for a noise demonstration which involved fireworks and shouting into a megaphone in Spanish to encourage the detainees who came to the windows and held up signs in response. There was no plan to engage with police or facility security or to be violent.

Mr. Evetts recalls becoming totally terrified when police arrived and shooting commenced. He recalls his terror, "I'm running and see two correction officers, one female and there is gunfire to the left of me. I was afraid I was going to get shot. I was very afraid. I have to run now or I'll die."

While Mr. Evetts is also being accused of de-blocking, he states that he simply removed articles of clothing because he was running from the gunfire as fast as he could and overheated. He seems to have had no plan other than to save his own life at that point and get away from danger.

Mr. Evetts has described himself as conflict-averse, anxious, and motivated by a desire to protect others rather than to harm. This self-characterization appears genuine as Mr. Evetts was quick to criticize himself when warranted and seemed to be timid while at the same time wanting very much to protect others from harms and violence coming both from the far right, and from ICE in particular, violence that seemed to him to be on an accelerating trajectory. He does not appear to harbor any malice toward anyone but easily identifies with potential victims, having himself been intimidated and afraid of violence in his upbringing.

Mr. Evetts does not harbor any anti-government sentiments, rather he seems to want to protect democratic freedoms. He also doesn't come across as aggressive in any manner, rather anxious and somewhat timid, and clearly states he would be afraid to shoot at or engage violently with security forces. His use of black bloc, preplanning for how to disengage from protests if violence breaks out, using Signal and Faraday bags and carrying a firearm to protests appears as compliance with those he was associating and fear-based, but born out of a strong desire to protect those weaker than himself.

## Critique & Rebuttal of Mr. Shideler's Testimony

### Summary of the Critique & Rebuttal of Mr. Shideler's Testimony

This report provides a research-based critique of Mr. Shideler's expert report. It concludes that his opinions fail to meet basic standards of expertise, methodology, reliability, or relevance in a Daubert analysis. By treating ideological opposition to fascism, protest tactics, and loosely affiliated individuals as evidence of a unified terrorist organization, the prosecution uses Mr. Shideler's framework to bridge otherwise unproven gaps in attribution, intent, and

organizational structure. The following critique is therefore necessary to evaluate whether this foundational narrative rests on reliable expertise and admissible methodology, or whether it improperly substitutes ideological interpretation for empirical proof.

First, his report demonstrates that Mr. Shideler lacks the academic training, professional credentialing, and empirical research background required for expertise in criminology, extremism studies, social-movement analysis, or behavioral science. His role at the Center for Security Policy, a political advocacy organization, not a research institution, is shown to reflect ideological positioning rather than recognized scholarly authority.

Second, the report identifies fundamental methodological defects. Mr. Shideler relies on blogs, livestreams, social media, manifestos, anonymous reports, and second-hand anecdotes, without any coding schema, sampling framework, data verification protocol, or analytical model. This constitutes an unscientific consumption of open-source material, not a scholarly, methodical, replicable and falsifiable method for data collection and analysis.

Third, the report demonstrates that his conclusions are built on conflation and circular reasoning. Symbolic expression, literature possession, or participation in decentralized activist spaces is treated as proof of membership in a hierarchical "Antifa organization" despite the absence of any evidence of membership lists, leadership, command structure, recruitment, or operational coordination. Government agencies, including the FBI and DHS, have repeatedly confirmed that Antifa is a way of thinking, perhaps a philosophically aligned social movement to resist fascism in all its forms, but no national Antifa organization exists.

Fourth, Mr. Shideler's report corrects his false historical genealogy linking contemporary antifascist activism to the Comintern and other 20th-century movements. This lineage is historically inaccurate and ignores well-documented modern origins in anti-racist, community-defense organizing. His claims collapse further when applied to case-specific facts: there is no evidence of a group existing for terroristic purposes, coordinated planning, chain of command, or agreement to commit violence, and the shooting at issue reflects the impulsive act of a single individual which was completely unanticipated by the defendant and not previously agreed upon and premediated, plotted terrorist action. In fact, the group had agreed the event was low-risk and to keep their weapons stored rather than displayed in this particular protest.

Finally, the report shows that Mr. Shideler's analysis is driven by ideological bias. Ordinary First Amendment-protected activities, protest planning, jail support, educational material, affinity groups, and encrypted communication are reframed as indicators of terrorism without empirical grounding. This report concludes that Mr. Shideler's testimony constitutes political advocacy and scaremongering as has been his history in analyzing other movements, not expertise; speculation, not science; and narrative construction, not credible analysis. It should therefore be excluded in its entirety under *Daubert* and related evidentiary standards.

## TABLE OF CONTENTS

**EXECUTIVE SUMMARY**

**I.      QUALIFICATIONS & CREDIBILITY CHALLENGES**
    **1.      Lack of demonstrable academic or professional expertise**
    **2.      Inflation of credentials**

**II.     METHODOLOGICAL FAILURE**

    **1.      Mr. Shideler describes his "methodology"**

**III.    CONFLATION & CIRCULAR REASONING**

**IV.     NO EMPIRICAL CAUSAL EVIDENCE**

**V.      IDEOLOGICAL BIAS & NARRATIVE CONSTRUCTION**

**VI.     HISTORICAL MANIPULATION**

**VII.    CASE-SPECIFIC REBUTTALS**

**VIII.   HISTORICAL & CONTEXTUAL REBUTTAL: MISCHARACTERIZATION OF ANTIFASCISM, ANARCHISM, AND ACTIVIST TRADITIONS**

    **1.      False Historical Genealogy**

    **2.      Decentralization does not equal Organization**

    **3.      Anarchism Misrepresented**

    **4.      Activism, Direct Action, and U.S. Foreign Policy**

    **5.      Affinity Groups & First Amendment Rights**

    **6.      Black Bloc is a Tactic, not an Organization**

    **7.      Context Matters**

    **8.      Violence & Proportionality**

    **9.      White Supremacist Threats**

    **10.     How Antifa is Classified Outside the United States**

**IX.     CONCLUSION**

## I.      QUALIFICATIONS & CREDIBILITY CHALLENGES

### 1.      Lack of demonstrable academic or professional expertise

Mr. Shideler's highest degree is a Bachelor of Arts in 2004 with no graduate degrees, no formal training in criminology, counterterrorism, domestic extremism classification frameworks, social movement analysis, or law.

Publicly available records reflect a substantial gap of approximately sixteen years, from 2004 to 2020, in which there is limited evidence of sustained employment, formal training, credentialing, or recognized scholarly output relevant to the subject matter of his testimony. The nature of Mr. Shideler's professional activities during this period remains unclear, including

whether he was engaged in relevant employment, accredited training, paid fellowships, or research roles prior to his affiliation with the Center for Security Policy.

Additionally, Mr. Shideler does not appear to be a member of recognized professional associations in extremism studies, criminology, terrorism research, psychology, or law, but is affiliated with political advocacy organizations.

Finally, there is no record of Mr. Shideler having conducted empirical academic research or published peer-reviewed work in recognized scholarly journals; his books and reports are published through the advocacy organization for which he works, rather than through independent academic or peer-reviewed presses.

## 2. Inflation of credentials

Mr. Shideler attempts to present his role as Director and Senior Analyst at the Center for Security Policy as evidence of academic authority.

**However:**

CSP is a political advocacy organization, not a research institution. Issue advocacy is explicitly stated as part of its mission.

CSP was founded by Frank Gaffney, who was publicly condemned by prominent Republicans, including late Senator John McCain, for fear-mongering conspiracy narratives about Islamist takeover. The Southern Poverty Law Center has designated CSP an anti-Muslim hate group.   CSP engages in fear-based advocacy, not objective science. It is an ideological lobbying entity.

Advocacy experience and congressional testimony are not equivalent to empirical or academic expertise.

Briefing law enforcement or staffers is qualitatively different from producing peer-reviewed and academically published research; it reflects reputation within an ideological network, not scientific credibility.

Editing an anthology and writing opinion articles does not establish subject-matter expertise in criminology, extremism research, sociology, or group-dynamics analysis.

"Unmasking Antifa" is not original scholarship; it is a loose collection of earlier materials and testimony with no new research or peer review.

Mr. Shideler pours contempt on scholarly experts and states that he has been called an "expert" because of testimony, media interviews and Congressional testimony, yet he states that he does not consider himself to be one but rather a "student."  On X he writes, "I have been called an "expert," which is to say I've written books on topics, done media interviews, testified before Congress, etc. but it's not a term I would self-apply. I think of myself as a student in a very niche field."[1]

**Consider:**

Has the "expert" ever published peer-reviewed academically recognized research?

Conducted fieldwork?

Used validated social-science methods? Produced data?

Applied statistical analysis?

If "no," the opinion collapses under *Daubert* as subjective interpretation masquerading as expertise.[8]

## II.     METHODOLOGICAL FAILURE

Mr. Shideler describes his "methodology" as:

- Reading blogs, manifestos, zines

- Watching livestreams

- Reading social media

- Talking to journalists

- Reviewing anonymous "after-action reports"

- Listening to second-hand anecdotes from law enforcement

While Mr. Shideler's method may yield limited information about groups and movements, this is not a scientifically rigorous method of systematic data collection and analysis or a replicable or falsifiable research method. It reflects journalistic consumption of open-source propaganda, not analytical rigor or validated behavioral science.

Mr. Shideler expressly acknowledges that he has not conducted empirical sampling in forming his opinions. His analysis relies on no structured coding framework, no articulated data-verification standards, and no process of peer review.

He does not employ recognized social-scientific methodologies, such as archival research protocols, formal coding schemas, trained or independent coders, or measures of inter-rater reliability.

Nor does his work reflect replicable qualitative or quantitative analysis, statistical testing, or transparent analytic procedures that would permit independent validation. Instead, his conclusions rely primarily on self-published and ideologically driven narratives, which are presented as evidence of organizational structure and threat despite the fact that many of these sources function as internal movement mythology or tactical guidance for protesters rather than neutral, verifiable evidence of coordination, hierarchy, or terrorist intent.

**Questions to be Examined:**

- Does the "Expert" have any recognized social-scientific methodology?

- Archival standards?

- Coding schema? Trained coders?

- Inter-rater reliability?

---

[8] Daubert refers to the standard established by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), which governs the admissibility of expert testimony in federal courts. Under Daubert, judges act as gatekeepers and must ensure that proposed expert evidence is relevant and reliable, based on sufficient facts or data, sound methodology, and principles that have been reliably applied to the facts of the case.

- Replicable qualitative or quantitative data analysis?
- Statistical analysis?

If "no," the opinion collapses under *Daubert*.

## III.    CONFLATION & CIRCULAR REASONING

Mr. Shideler assumes that reading, possessing, or circulating anarchist or antifascist literature is sufficient to establish operational membership in "Antifa," despite the absence of any evidence linking such materials to formal enrollment, command authority, or coordinated action. He defines Antifa as a structured organization and then attempts to substantiate that conclusion by pointing to isolated websites, local groups, and ideologically aligned individuals, even though he does not identify any demonstrable structural links, leadership hierarchy, or governing mechanisms connecting them. He further relies on historical anarchist movements as analogical support, without establishing continuity in membership, organization, or operational control between those movements and contemporary actors.

At the same time, he inconsistently maintains that Antifa operates as an unstructured, flat, and discontinuous network, a characterization that undermines his own claim that it functions as a coherent organization. Finally, Mr. Shideler repeatedly employs guilt-by-association reasoning, treating the presence of stickers, posters, slogans, symbolic imagery, propaganda, philosophical texts, or possession of zines as evidence of terrorist affiliation, despite the absence of proof that such materials establish membership, direction, or participation in coordinated violent activity.

### Questions to be Examined:

Owning a Che Guevara shirt doesn't make someone a Cuban revolutionary any more than an American flag T-shirt confers citizenship.

Does owning a Bible make someone a Crusader?

Does owning *The Anarchist Cookbook* prove intent to bomb?

Does owning a rifle render one a militiaman?

## IV.    NO EMPIRICAL CAUSAL EVIDENCE

Mr. Shideler does not establish that any defendant belonged to an Antifa organization, received orders, or possessed a clear intent to commit or conspired to commit coordinated acts of violence. He presents no evidence of a chain of command, communications directing violence, fundraising mechanisms, or centralized operational planning.

To the contrary, evidence in this case reflects group communications among ideologically aligned individuals who openly disagreed on multiple issues, rejected centralized leadership, and explicitly discussed making independent decisions, including a shared determination not to bring firearms to the protest. The shooting itself appears to have been an impulsive act carried out by a single individual, potentially in response to police presence, which directly contradicts Mr. Shideler's assertion that the events reflect a coordinated, paramilitary organizational structure.

<u>Yet:</u>

The report aggressively stretches historical anecdotes to claim direct, continuous lineage between:

- 1930s German Communist Party paramilitaries
- Spanish Civil War militias
- 1980s punk subculture
- Contemporary decentralized U.S. protest networks
- A logo or slogan traced to an older movement does not demonstrate:
- Shared command structure
- Shared leadership
- Shared training
- Shared ideology
- Shared strategic coordination
- Membership
- Operational plotting or agreement to undertake criminal or terrorist actions

This is false genealogy.

Up to Fall of 2025 when the President decided to unilaterally by Presidential order designate Antifa as a domestic terrorist group, the FBI and DHS have repeatedly stated:

- There is no national Antifa organization,
- No terrorist designation, and
- No demonstrable hierarchy.

Furthermore, there is no federal legal statute defining domestic terrorism.

## V.    IDEOLOGICAL BIAS & NARRATIVE CONSTRUCTION

Mr. Shideler treats political protest, anti-racist organizing, jail support, printing educational materials, and affinity organizing as indicators of terrorism when these are protected First Amendment activities.

Mr. Shideler denies to these persons their First Amendment rights of assembly, speech, press, and association.

Mr. Shideler reframing ordinary behavior as a paramilitary operation is speculative, particularly in a state like Texas where guns are commonly carried in daily life.

The attempt to equate affinity groups with terrorist cells lacks causal evidence.

**Affinity groups are used widely by:**

- Quakers

- Environmental movements
- Non-governmental organizations (NGOs)
- Civil-rights organizations
- Religious cooperatives
- Community defense efforts

## VI.     HISTORICAL MANIPULATION

Claim that modern Antifa descends from the 1930s Comintern is fringe pseudo-history.

The Communist International existed 1919 to 1943.

Fascism definitions were economic, not contemporary.

Modern antifascism developed from community defense against white supremacist skinheads and continues to evolve as a response to violent and aggressive ICE arrests and actions and militarization of U.S. city streets.

Anti-Racist Action and the John Brown Anti-Klan Committee arose in response to actual racist violence and not with the aim of destroying U.S. governance or silencing the majority of Americans.

## VII.    CASE-SPECIFIC REBUTTALS

Available evidence establishes that the shooting was not premeditated or coordinated and may have occurred as an impulsive response to aggressive police action by a single individual, rather than as part of a planned or directed attack. Objective evidence demonstrates that no other defendant agreed to engage in violence or participated in a plan to use firearms or inflict harm on law enforcement. Objective evidence further demonstrates that removing outer clothing while fleeing an active and chaotic shooting scene—particularly under extreme heat conditions—is not, by itself, evidence of intentional "de-blocing" or an effort to evade identification through coordinated tactics.

Available evidence establishes that the defendants prepared for a noise demonstration involving fireworks, which they discussed in advance as a very low-risk event.  Notably, even Mr. Shideler characterizes the anticipated protest activity as "low risk," undermining claims of planned violent escalation.

## VIII.   HISTORICAL & CONTEXTUAL REBUTTAL: MISCHARACTERIZATION OF ANTIFASCISM, ANARCHISM, AND ACTIVIST TRADITIONS

Mr. Shideler's report demonstrates a longstanding pattern in his "research" using fear-based conflation. Historically, his advocacy career reflects a trajectory of identifying successive "enemies" and forum shopping for donors who appear to like applying the terrorism or violent extremist label to Black activists, Muslims and so on. Whether it is fringe Black extremist groups, Radical Islamist organizations, or now Antifa, he has consistently sought to expand the definition of terrorism by demonizing ordinary political figures through selective evidence and exaggeration. This pattern raises serious questions about the credibility of his motives and reliability in evaluating whether he possesses expertise, as defined by the law.

Before accepting any of his claims, it is critical to examine the legitimacy and ideological orientation of the institutions he cites and participates in: Does CSP have a brick-and-mortar presence? Who are the donors? We should be able to find some of this from IRS. National Association of Scholars, what is it, who funds it, what is its academic standing? Clarity Coalition, what is its mission, membership, methodology, and evidentiary basis?

His report repeatedly relies on undefined terms such as "ideological adherent" without articulating measurable criteria. If literature possession, philosophical alignment, or artistic symbolism constitute "ideological adherence," then vast swaths of the American public would qualify as Antifa terrorists, which is precisely why his logic fails constitutional scrutiny, and the reasoning behind it is overbroad, unworkable, and constitutionally untenable.

1.     **False Historical Genealogy**

Mr. Shideler claims that modern Antifa derives from the Communist International (Comintern). This is historically inaccurate.  The Comintern existed from 1919–1943, defining fascism primarily in economic terms (capitalist authoritarianism), which has no direct lineage to contemporary protest culture. By Mr. Shideler's logic, U.S. soldiers in 1944 believed they were fighting "fascism" as well and spoke of it.

His historical narrative ignores well-documented modern origins. In Germany and the punk scene, antifascist groups arose in response to violent white-supremacist skinhead attacks on people of color and immigrants which were greatly accelerated during the reunification of Germany when East German skinheads and racists wanted to expel Turkish immigrants.  In the US, Anti-Racist Action and the John Brown Anti-Klan Committee mobilized to counter serious racist threats to human life and civil rights, threats that most Americans today would recognize as fascist.

A central issue raised by Mr. Shideler's analysis is the absence of a clear, principled distinction between forms of resistance he implicitly treats as legitimate or acceptable and those he characterizes as criminal or terroristic. His report does not articulate objective criteria explaining why certain acts of political dissent, protest, or resistance are normalized or excused, while structurally similar conduct—when associated with disfavored ideologies or symbols—is reframed as evidence of extremism or terrorism. This lack of consistent analytical standards raises concerns about viewpoint-based categorization rather than evidence-driven assessment.

2.     **Decentralization does not equal Organization**

Mr. Shideler states that antifascist groups in Germany, Britain, and the U.S. "moved away from favoring one national-level antifascist group" toward decentralized networks. This is misleading. The reality is that there is no national Antifa anywhere in the world, only informal groups of individuals with shared opposition to fascism, varying in their degrees of support for violence to fight fascism. Likewise, many of these affiliated groups of individuals arose in direct response to neo-Nazis marching on the streets or KKK actions and continue to arise in response to military presence on US streets and ICE violence.

It is true that some with Holocaust history in their families easily endorse the slogan attributed to Antifa of "Punch a Nazi in the face," but likely would not themselves do it.  Others view breaking store windows or other property damage as acceptable forms of political protest while others would refrain. Groups of individuals who coalesce over shared opposition to

fascism does not constitute a terrorist network; it is a shared viewpoint and there is nothing operational about alignment of views.

### 3.    Anarchism Misrepresented

Today's anarchism spans many unrelated philosophical tendencies.  Tech-sector libertarians such as Elon Musk and Peter Thiel espouse radically decentralized governance. White supremacist accelerationists also identify as anarchists. Satanist groups such as The Order of Nine Angles seek cultural destruction.  Mr. Shideler's framework collapses entirely when tested against real-world examples.

### 4.    Activism, Direct Action, and U.S. Foreign Policy

The U.S. State Department has historically promoted grassroots activism and direct action abroad to build democratic movements (in Ukraine, Belarus, and Iraq), actions which Mr. Shideler attributes to terrorists. In 1997–98, U.S. programs explicitly trained and funded citizens to challenge repressive governments through organized protest. I took part in delivering some of these trainings in the former Soviet Union. If direct action constitutes terrorism, then U.S. foreign policy must also be classified that way, something that Russian President Putin has often claimed.

### 5.    Affinity Groups & First Amendment Rights

Affinity groups are not clandestine terror cells; they exist everywhere, from crochet circles to hiking clubs to church ministries.  There is no evidence that one can "join Antifa." There are no:

- Membership list
- Recruitment process
- Leadership structure
- Oath
- Dues
- Headquarters

A group of people with shared moral opposition to injustice cannot legally or logically be classified as a terrorist organization, despite political violence or even terrorist acts being carried out by few among them.

### 6.    Black Bloc is a Tactic, not an Organization

Used for self-defense against armed police and violent counter-protestors.

Those identifying as anti-fascist coming to protests armed is a new thing and in direct result to police firing rubber and actual bullets at protestors, Oath Keepers, Patriot Front and others coming to protests with AR-15s and the ubiquity of active shooting events in the U.S. Black bloc has been engaged as a means of self and group defense from authoritarian security measures and violent extremist counter protestors and is not terrorism.

Here is an example of a heavily armed Oath Keeper at Ferguson, Missouri in 2015.[2]



I interviewed six activists in 2024 who were ideologically aligned with antifacism and they all told me they were beginning to buy arms and apply for concealed carry as they were afraid of protestors like this. One said he feared an active shooting event at protests which would mow down those not in tactical gear and that he sought to carry arms to act protectively if need be.  One worked in a gun shop in Illinois where right-wing individuals would come in to buy guns while asking, "When will it be open season on liberals?"  Two women had been repeatedly beaten up by white supremacists in various protests.

Presence of tactical gear does not constitute conspiracy, nor does advising others to self-protect against armed counter protestors or overly violent security forces constitute terrorism.

Academic writing on the topic from 1988 does not establish a modern terrorist network relating to Black Bloc, but rather a desire to survive being assaulted or fired upon by police or counter protestors.

Right-wing extremists absolutely "mask up" too, and in a highly self-conscious, stylized way. One major example is the so-called "skull mask" neo-fascist accelerationist network that grew out of the Iron March forum. Groups like Atomwaffen Division, The Base, Feuerkrieg Division, and related organizations developed a shared visual identity around black-and-white skull masks and Waffen-SS–style shield insignia.

These masks were not just for concealment: they functioned as a badge of membership in a militant elite committed to "accelerationism" and apocalyptic violence. As H.E. Upchurch shows, Iron March created a transnational online space where young neo-fascists bonded, built local cells, and then moved from activism to terrorism, with the skull mask aesthetic signaling participation in this clandestine, terror-oriented subculture. [3]



At the more public, street-movement level, groups like Patriot Front use a different but related masking strategy. Their members typically appear at rallies in matching uniforms with white face coverings, sunglasses, and baseball caps—again, not only to hide identities from law enforcement and employers, but to project discipline, unity, and menace and white supremacy. Taken together, the skull-mask network and Patriot Front-style formations show that masking is not a uniquely "left" or anarchist tactic. Far-right extremists also rely heavily on masks, whether skull imagery or plain white coverings, to anonymize participants, build a shared group identity, and create an intimidating visual spectacle around their organizing and their violence.[4]



### 7.    Context Matters

"Security culture" blogs exist because surveillance and political retaliation exist. Currently foreign visitors to the U.S. have had their phones scrutinized for anti-Trump statements and denied entry if such exists on their phones.

Jail support is common across civic movements.

Faraday bags are an ordinary privacy tool and are used by a wide variety of individuals, not extremists. [5]

Guides for at-risk journalists, human-rights workers, and security professionals often recommend Faraday bags as one layer of protection against tracking, interception, or spyware command-and-control.[6]

There's a visible consumer market: phone sleeves, laptop envelopes, and wallets sold directly to general customers, usually marketed around, location-tracking concerns, stalkerware / abusive partners, general "opsec" / privacy culture.

A big mass-market for use of Faraday bags are to protect in case of keyless car theft. In the UK, for example, 94% of tracked stolen vehicles in 2023 were taken via relay attack on keyless systems, prompting insurers and auto orgs to promote Faraday pouches for key fobs.[7] U.S. theft data are similar in trend (with a big growth in keyless theft), and U.S. insurance/security companies also market Faraday key pouches,

Police and forensic examiners routinely use Faraday bags to seize phones, tablets, laptops, key fobs, etc. to prevent remote wiping or network connections during investigations. This is such standard practice that forensics papers explicitly evaluate different Faraday pouches and boxes for effectiveness.[8]

· Concrete data as to the numbers of faraday bag users in the US is a bit thin because Faraday bags represent a much smaller, specialized subset of the privacy/security world, used heavily by law enforcement and forensics units, some journalists/activists and security professionals, and a niche but growing consumer segment (car key pouches, phone sleeves). Even if we cannot quantify, we can confidently say that Faraday bags are commonly and consistently used in policing and forensics and are recommended by serious security professionals as a legitimate way to reduce risk in certain contexts and these are not for terroristic purposes.

Using encrypted messaging is an ordinary and standard practice for journalists, politicians and lawyers and was recently the subject of a government scandal involving senior level government officials communicating via Signal.

Consider an example from 2025. On March 15, the world learned in the afternoon that the United States was launching airstrikes on Houthi targets in Yemen. But hours earlier, the Secretary of Defense, Pete Hegseth, had already shared detailed plans for the operation which included weapons packages, targets, and timing, via the encrypted messaging app Signal.[9] If the mere use of Signal were a red flag for extremism, we would be forced into the absurd conclusion that the sitting secretary of defense is a terrorist for using a standard secure channel. High-ranking officials use encrypted apps for the same reason everyone else does: to reduce the risk of interception, espionage, and data theft.

In fact, respected federal officials have explicitly recommended that Americans use encrypted tools to protect themselves.[10] Jeff Greene, executive assistant director for cybersecurity at CISA, urged the public to adopt encrypted messaging and voice apps as a basic security measure. The same security state that increasingly invokes "extremism indicators" is simultaneously telling ordinary Americans to encrypt their communications.

WhatsApp, which uses end-to-end encryption by default, surpassed roughly 100 million monthly active users in the United States in 2025, making the U.S. one of its fastest-growing markets.[11] According to a survey by Statista, 9% of people in the United States use Telegram regularly.[12] Signal has reached around 7.6 million monthly active users in the U.S. on iOS and Android combined at peak usage.[13] 7.6 millions antifa extremists Mr. Shideler might suggest.

8.    **Violence & Proportionality**

Antifascist shootings are extremely rare compared to right-wing political violence.  The available evidence supports that Benjamin Song acted alone and certainly without the defendant's expectation that he would be carrying a weapon, much less discharging it upon police.  No one else joined him in shooting at the Alvarado police officer.  In the group chat planning this noise demonstration on July 4, 2025, participants agreed that guns should not be carried. If affinity groups operate by consensus, then spontaneous unilateral action disproves Mr. Shideler's own theory of coordinated command. Moreover, many protesters do arm themselves due to credible threats, including multiple active shooter events at protests and police assaults on civilians.

**Comparative Analysis of Right-Wing vs Left-Wing Violence in the U.S. (1990–2025)**

The empirical record contradicts the popular assumption that far-left and far-right violent threats in the United States are parallel or symmetrical. Using 30 years of homicide data from the U.S. Extremist Crime Database, Celinet Duran (2021) found that 84.4% of ideologically motivated fatal violence between 1990 and 2020 was committed by far-right extremists, compared to 15.6% by far-left actors.[14] This disparity holds even when controlling for presidential era, demographic change, and ideological motivation, with at least one far-right fatal attack occurring every single year of the 1990-2020 study period, while far-left fatal attacks were present in only 17 out of 31 years. The long-term baseline threat is clear: right-wing extremism is consistent, persistent, and historically normalized within U.S. domestic terrorism patterns.

Center for Strategic and International Studies (CSIS) data and U.S. government assessments consistently show that violent far-right extremists, especially white supremacists and like-minded anti-government actors, are both more active *and* more lethal than far-left extremists. In the first eight months of 2020, far-right actors were responsible for 67% of all domestic terrorist plots and attacks, compared to 20% by anarchists, anti-fascists, and other far-left extremists, with the remainder split between Boogaloo adherents and Salafi-jihadists. Far-right attackers have increasingly used vehicles, explosives, and firearms against demonstrators, government and law-enforcement targets, and civilians selected for their race, religion, or politics, and they dominate recent plots such as the attempted kidnapping of Michigan governor Gretchen Whitmer.

Reflecting this pattern, the Department of Homeland Security in 2020 assessed that racially and ethnically motivated violent extremists, "specifically white supremacist extremists", remain the most persistent and lethal threat in the homeland, and the FBI has similarly identified racially and ethnically motivated violent extremists, including white supremacists, as the top domestic violent extremist threat. While far-left violence has risen in relative terms, the empirical record shows that far-right extremists still account for the bulk of incidents and the gravest risk of deadly violence.[15]



Figure 1. Ideologically motivated homicide incidents in the United States, 1990–2020 (n=269)



Figure 2. Ideologically motivated homicide victims in the United States, 1990–2020 (n=433*)

Duran's data also reveal crucial structural differences in the nature of violence. Far-right attacks were more ideologically intense, **62.6**% showed strong ideological motivation, versus 35.7% on the far-left, and more frequently targeted racial minorities, immigrants, religious groups, LGBTQ+ people, and social "out-groups." Even when the far-left did produce fatal violence, it was episodic and reactive, often emerging during specific political flashpoints such as the Trump administration years, rather than as a stable year-over-year phenomenon. Raw numbers show far-left lethality is dramatically lower, 78 deaths over three decadesversus523 attributed to the far-right**.**

Global comparative research reinforces this asymmetry. Jasko, LaFree, Piazza & Becker (2022)[16] found that left-wing extremists were least likely to use lethal violence at both U.S. and international levels**,** while right-wing and Islamist extremists demonstrated similar levels of violence within the United States. At the global scale, Islamist groups were most violent, but in the American context right-wing extremists remain uniquely dominant in frequency and sustained threat presence**.** This aligns with DHS and FBI threat assessments indicating that white supremacist and far-right movements, not Antifa, anarchists, or environmental militants, represent the most consistent domestic terrorism danger.

When contemporary alarm about left-wing violence emerges in political rhetoric or media cycles, it rarely reflects proportionate reality. The brief spike in far-left homicides during

2016–2020 resulted in headlines, policy reallocations, and public anxiety, while the far-right continued to produce more frequent, more ideologically cohesive, and more racially motivated attacks during the same period. Elevating isolated left-wing incidents into equivalence distorts public understanding, weakens counterterrorism targeting, and risks redirecting resources away from empirically demonstrated threats.[17]

      The claim that left-wing terrorism is "on the rise" in 2025 rests on a category error and a time-slice distortion, not on evidence of a meaningful shift in the domestic terrorism landscape. The CSIS data show that in early 2025, left-wing incidents marginally outnumbered right-wing incidents, important to note, "for the first time since 1994". However, this occurred not because left-wing violence surged, but because right-wing incidents temporarily declined following years of historic highs and sustained law-enforcement pressure. Left-wing activity rose from extremely low baselines (often 2–4 incidents per year).Even in 2025, left-wing incidents constitute well under half of total terrorism cases. Fatalities, severity, and lethality remain overwhelmingly concentrated on the far right.



      A relative shift in proportions does not establish a substantive increase in threat. Longitudinal data from CSIS[9], *The Washington Post*[10], and federal sources show:

- Since 2015, right-wing extremists account for roughly 80% of domestic terrorism fatalities.

- Left-wing incidents are rarely lethal, often involving property damage, vandalism, or threats rather than mass-casualty violence.

- The deadliest domestic terror attack in U.S. history (Oklahoma City), the El Paso massacre, Charleston church shooting, Pittsburgh synagogue attack, Buffalo supermarket shooting, and Jan. 6 all originate from right-wing ideologies.

[9] Center for Strategic & Int'l Stud., *Ideological Trends in U.S. Terrorism*, https://www.csis.org/analysis/ideological-trends-us-terrorism
[10] The Washington Post. (2021). *Domestic terrorism data: Interactive overview of incidents and trends in the United States.* Retrieved from https://www.washingtonpost.com/investigations/interactive/2021/domestic-terrorism-data/

Counting "incidents" without weighting harm, fatalities, targets, or intent distorts risk assessment. Severity and lethality still overwhelmingly skew right.

CSIS's own methodology acknowledges that its database includes plots, threats, vandalism, and incomplete acts, many of which:

- Did not involve weapons

- Did not result in injuries

- Would not meet statutory terrorism thresholds under federal law

By contrast, right-wing incidents more frequently involve:

- Firearms

- Mass-casualty intent

- Explicit ideological manifestos

- Targeted violence against civilians, minorities, and government officials

Equating a firebombed empty building with mass murder is analytically indefensible. Thirty years of data show persistent right-wing dominance in domestic terrorism. One anomalous half-year does not reverse that trend.



Source: Data compiled by CSIS Transnational Threats Project.



Source: Data compiled by CSIS Transnational Threats Project.

Presenting left-wing violence as "overtaking" right-wing extremism creates a false symmetry that:

- Minimizes decades of right-wing mass-casualty violence
- Enables ideological laundering of white-supremacist threats
- Encourages misallocation of law-enforcement resources

As even CSIS acknowledges, right-wing terrorism remains structurally dominant and historically lethal and could rapidly rebound. There is no evidence of a sustained rise in left-wing terrorism in the United States. What exists is a temporary proportional shift driven by a decline in right-wing incidents, combined with definitional expansion that inflates low-harm events into "terrorism." To frame this as a reversal of decades-long patterns is analytically unsound, statistically premature, and policy-dangerous.

The conclusion supported across both data sets is clear:

Right-wing violence in the United States is more common, more ideologically stable, more lethal over time, and more woven into the fabric of domestic extremist homicide, while left-wing violence remains rarer, episodic, reactive, and significantly less fatal overall.

### 9.    White Supremacist Threats

Militant antifascism must be understood in relation to:

Oath Keepers, Proud Boys, Patriot Front

Mass-shooting plots by white supremacist cells

Right-wing political violence in the United States has remained a persistent and deadly threat, particularly exemplified through targeted attacks on politicians, judges, and government institutions. The most visible example was the January 6th Capitol attack, where far-right militants, conspiracy adherents, and white nationalist groups stormed the U.S. Capitol in an effort to overturn an election result they opposed, an act driven by political grievance rather than policy disagreement. This trend extends beyond mass events and into personal targeting of public officials.

The violent home invasion and hammer attack on Paul Pelosi, motivated by extremist ideology and conspiracy thinking, reflects a growing willingness among right-wing actors to act on dehumanizing rhetoric against elected officials.[18]Similarly, in Minnesota, the killing of state legislators, threats to judges presiding over politically sensitive cases, and plots to storm government facilities illustrate how political rage has translated into lethal action.[19]These cases are not isolated; they form part of a broader pattern where political dissatisfaction escalates into terrorism-style violence, directed specifically at individuals representing opposing viewpoints rather than at symbolic property alone.

While political anger exists across the ideological spectrum, the recent surge in right-wing attacks demonstrates a clear readiness among some to use intimidation, assassination attempts, and organized violence to achieve political aims, making this one of the most significant domestic security risks in the United States today.

Evidence of police infiltration by violent extremist groups includes:

o The leaked Oath Keepers membership rolls revealed the largest snapshot ever
  documented of far-right infiltration into American policing. Texas alone had 3,301 Oath
  Keepers sign-ups, the highest of any state, including 8 elected officials, 33 law-
  enforcement officers, 10 military personnel, and 7 first responders, 58 individuals in
  public-trust professions. These are current dangers too: Collin County Constable Joe
  Wright of Frisco, Texas openly listed his law-enforcement roles when joining the
  organization and remains in office today. [20]

o Nationwide, the Center for Extremism identified 373 active law-enforcement officers
  appearing in the Oath Keepers database. Among them were detectives, lieutenants,
  captains, at least ten chiefs of police, and eleven county sheriffs. In addition, 117 current
  military service members, 11 reservists, and 31 military contractors or civilian employees
  appeared in the same database.

o The FBI's 2006 intelligence assessment and its 2015 counterterrorism guide both
  explicitly cautioned that investigations of white supremacists, militia members, and
  sovereign citizen extremists "often have identified active links to law enforcement
  officers."

o Likewise, ICSVE's research shows that white supremacists and anti-government
  members target law enforcement[21] and military[22] for recruitment and often try to work
  with police to gain legitimacy and support for their goals.

o The FBI and Department of Homeland Security[23] consistently identify white
  supremacists as the deadliest domestic terror threat in the United States since 2000. This
  continues to be the case as UMD research shows.[24]

o Since 2000 officers have been exposed as having alleged ties to far right or white
  supremacist groups in Alabama, California, Connecticut, Florida, Illinois, Louisiana,
  Michigan, Nebraska, Oklahoma, Oregon, Texas, Virginia, Washington, West Virginia,
  and more.

o The Plain View Project further uncovered approximately 5,000 overtly racist, violent, or
  bigoted posts made by about 3,500 accounts linked to current or former law-enforcement
  officers across the country, evidence of explicit bias, not hidden extremism.[25]

o Historical and local examples mirror this trend. In Kentucky during the 1980s, a Klan
  leader claimed he ran a 40-member KKK subgroup inside law enforcement, half of them
  active officers. In Fruitland Park, Florida, three officers were forced out between 2009
  and 2014 for KKK involvement. A Nebraska state trooper active in a KKK chat room
  was fired (then briefly reinstated by arbitration). In Louisiana, an officer was
  photographed giving a Nazi salute at a Klan rally. In Michigan, a Muskegon officer was
  dismissed after homebuyers discovered Confederate flags and a framed KKK application
  in his house. Across multiple decades in Los Angeles County, the sheriff's department
  tolerated deputy gangs. beginning with the "Lynwood Vikings," described by a federal
  judge as a *"neo-Nazi, white supremacist gang."*

o Other cases reveal direct conspiracies with violent white supremacists. In 2017, three
  Florida prison guards were convicted for plotting with KKK members to murder a Black
  inmate. In Anniston, Alabama, police lieutenants participated in the white supremacist

League of the South for years while remaining on the force. And when extremist ideology surfaced through racist text messages, Facebook groups, or internal chats, disciplinary outcomes varied wildly: Philadelphia placed 72 officers on leave, Dallas disciplined 13, St. Louis put 22 on the prosecutor's "no-call" Brady list, and San Francisco uncovered two separate racist-text scandals involving 14 officers across several years.

o   Even U.S. Border Patrol suffered a 2019 scandal in which 62 agents, including the agency's chief, participated in a secret Facebook group posting racist and misogynistic content.

Taken together, these data points reveal a systemic pattern operating both nationwide and with particular salience in Texas: far-right and white-supremacist infiltration of U.S. law-enforcement institutions has been documented across multiple roles, including constables, sheriffs, chiefs of police, Border Patrol agents, corrections officers, military personnel, and deputies within some of the country's largest agencies. When combined with weak disciplinary mechanisms, inconsistent internal oversight, the absence of a comprehensive federal registry of misconduct, and the rarity of meaningful prosecution, this pattern produces a persistent structural risk. That risk falls disproportionately on communities of color, immigrants, and politically marginalized groups, and it steadily erodes public confidence in the legitimacy and neutrality of the American policing system.

Within this broader context, the protests undertaken by the defendants can be understood as a reactive response to perceived structural injustice rather than as evidence of coordinated terrorist intent. Feelings of being surveilled, dehumanized, and cornered by institutions viewed as unaccountable, particularly in immigration enforcement settings, create conditions in which protest emerges as an attempt to reclaim visibility, agency, and moral voice and insist on Constitutional rights. While such protests may at times be disruptive or confrontational, their genesis lies in perceived exclusion and vulnerability, not in an organized campaign of terror. This context is essential to distinguishing between expressive resistance driven by fear and marginalization, and deliberate, premeditated violence directed toward civilian populations or the state.

As a particularly glaring example of Kyle Mr. Shideler's persistent lack of information and context.  In the fight against ISIS in Syria, the U.S. military partnered with YPG/SDF, whom Mr. Shideler absurdly conflates with Antifa, to lead the fight against ISIS with YPG/SDF carrying out the ground actions with air and intelligence support from the US military alongside limited ground actions. YPG/SDF soldiers suffered 15,000 deaths fighting ISIS,[26] saving our soldiers from much of the battles on the ground.

## 10.    How Antifa is Classified Outside the United States

Across almost all of Europe, Antifa is not treated as a centralized organization, terrorist group, or single entity. Instead, governments consistently frame it as **a** decentralized, leaderless anti-fascist movement that only intersects with security frameworks when specific participants engage in violence. Nowhere is this clearer than in the European Union. In over a decade of Europol Terrorism Situation and Trend Reports (TE-SAT), Antifa has never been listed as a designated terrorist organization. When Europol discusses left-wing extremism, it does so using

terms such as *autonomous anarchist networks*, *violent left-wing extremists*, or *anti-fascist activists*, never "Antifa" as a proscribed body.

The Nordic countries, which have some of the most well-studied anti-fascist movements in the world, follow a similar approach. Sweden's security service (SÄPO) refers to the autonoma miljön ("autonomous milieu"), a broad anti-fascist activist scene in which only a small subset is monitored for violent confrontation with neo-Nazis. Norway's Police Security Service (PST) identifies anti-fascist activism as one of several left-wing currents, emphasizing the lack of hierarchy or structure and concluding that it is *highly unlikely* that left-wing extremists or anti-fascists will attempt terrorist attacks. PST notes that the most common activities involve protests, occasional clashes with right-wing extremists, or disturbances of public order, *not* terrorism.[27] Even when violence occurs, Nordic assessments position it within ordinary policing, not counterterrorism frameworks. In short, throughout Scandinavia, Antifa is recognized as a decentralized milieu, not a prohibited group.

Germany, because of its history of fascism and robust domestic intelligence infrastructure, has produced the most sophisticated classification model. German federal and state intelligence agencies describe the scene through concepts like the *Linksextremistische Autonome Szene* (left-wing extremist autonomous scene) and *Autonome Antifa-Gruppen*, meaning local, informal networks with no national leadership, membership registry, or central command. Anti-fascist activism, research, community organization, and demonstrations are protected under constitutional expression and association rights. Even Germany, with the most developed monitoring system in Europe, does *not* classify Antifa as a terrorist or banned organization.[28]

A broader EU designation remains highly unlikely. Antifa remains absent from the 2024[29] and 2025[30] Europol TE-SAT terrorism reports. Left-wing/anarchist terrorism accounted for only 6% of EU terror arrests, compared to 10% right-wing and 64% jihadist. EU legal structure further prevents designation because terrorist listing requires organizational structure, which Antifa lacks by definition. Even the European Commission explicitly states that Antifa is *"a collective name used by various autonomous and informal groups,"* meaning it cannot qualify under EU terrorism law. Without central leadership or coordinated strategic violence, Antifa fundamentally does not meet definitional thresholds.

In practice, European models overwhelmingly recognize Antifa as a protest movement, not an organization, and treat violence when it occurs as individual or local, not command-directed. Even where militant splinter cells exist, they are sanctioned independently, not as "Antifa" writ large. Unlike the United States, where political rhetoric has pushed for broad terrorism branding, European security doctrine remains anchored in definitional precision, organizational criteria, and proportional threat assessment.

In the United Kingdom, Antifa is *not* a proscribed terrorist organization. The UK Home Office maintains an official list of banned groups, containing primarily Islamist organizations, white supremacist networks, and Northern Ireland–related paramilitary movements. Antifa does not appear anywhere on that register.[31] Under UK counter-terrorism legislation, proscription requires a clearly identifiable organization, something Antifa does not meet by definition. To date, the UK government has taken no steps toward classifying Antifa as a terrorist organization.

As a result, Antifa as a movement is not designated as terrorism anywhere in the EU, Nordics, UK or Germany. The effort to designate "Antifa" as a terrorist organization runs

counter to the prevailing consensus among scholars, courts, and international institutions, none of which recognize Antifa as a coherent terrorist entity. This push can be understood not as the product of evidence-based assessment, but as an ill-conceived and inconsistently implemented governmental response that conflates ideology, protest tactics, and decentralized political expression with organized terrorism.

Such an approach reflects analytical overreach and weak methodological grounding, resulting in policies that are both legally vulnerable and operationally ineffective. Rather than enhancing public safety, this misclassification risks diverting resources from demonstrable threats, politicizing law enforcement, and undermining constitutional protections for lawful dissent.

## X.    CONCLUSION on Mr. Shideler's Testimony

Mr. Shideler's testimony fails to satisfy the requirements of *Daubert* because it reflects biased advocacy rather than independent expertise, relies on non-scientific and non-replicable methodology, and is grounded in ideological assumptions rather than empirical evidence. He does not employ recognized analytical frameworks from criminology, terrorism studies, or social science, nor does he apply systematic data collection, verification, or peer-reviewed methods. As a result, his opinions lack the reliability and rigor required of expert testimony.

At its core, Mr. Shideler's theory depends on transforming symbolic, expressive, and cultural behavior, such as political beliefs, literature possession, slogans, or protest aesthetics, into purported proof of membership in a coordinated criminal or terrorist organization. This expansion is not supported by evidence demonstrating organizational structure, command authority, operational coordination, or collective intent. Instead, it relies on ideological interpretation and guilt-by-association reasoning, substituting narrative inference for factual substantiation.

Because his conclusions are untethered from verifiable data and rest on overbroad assumptions, they collapse under scientific scrutiny and offer little assistance to the trier of fact. Moreover, by conflating protected expression with criminal conduct, his testimony risks confusing the issues before the court, improperly prejudicing defendants, and introducing legal conclusions that fall outside the proper scope of expert opinion. For these reasons, Mr. Shideler's testimony is unreliable, irrelevant, and inadmissible under *Daubert* and should be excluded in its entirety. His theory depends entirely on expanding symbolic, expressive, and cultural behavior into proof of coordinated criminal organization. That expansion relies on ideological interpretation, lacks a foundation in evidence, and collapses under scientific scrutiny.

### Conclusion to the Full Report

A loosely organized, non-hierarchical collection of individuals concerned about ICE violence while lacking critical mass cannot plausibly be responsible for the level of coordinated harm alleged in this case. The issue is not the historical emergence of antifascist activism, but rather a dangerous and perfidious pursuit of political power marked by a retreat from core constitutional values. In this matter, the government's theory proceeds by first associating Mr. Evetts with "Antifa," then effectively manufacturing a novel terrorist designation for that label, and finally stretching statutorily impermissible interpretations of federal law, specifically 18 U.S.C. § 2339A and 18 U.S.C. § 2331, to convert conjecture into criminal fact. Such a prosecutorial approach does not merely jeopardize the rights of a single defendant; it threatens to

irreparably damage the rule of law and erode the foundational protections that sustain American democracy itself.

Sharing similar values with other persons, such as upholding the American value of being against fascism, taking part in public protests, exercising one's first amendment rights, and taking protective measures to ensure one's safety from counter protestors or security officials themselves are not signs of terrorism. As the FBI and others have clearly stated in 2020, Antifa is a decentralized movement, described by FBI Director Christopher Wray as an ideology not an organization. [11]Belonging to an ideological group in and of itself is not a crime in the United States and the FBI does not investigate ideology. Hence there is no Antifa terrorist group nor a coherent ideology or terrorist strategy in enacting violence promoted by such. To argue otherwise is to promote a fiction. However, there is growing public anger and unrest in regard to the current administration's anti-immigration policies and deployment of ICE in selective Blue states without regard to existing civil rights protections and wide girth to enact violence upon both immigrants and protestors. That protestors are angered and acting with urgency is understandable in light of such circumstances. Destroying fascism is arguably one of the most historically American actions imaginable. To label this desire and legal actions to do so as terrorism is highly unAmerican.

Please let me know if I can be of further assistance in this case.


Respectfully submitted,

*A Speckhard*

Anne Speckhard, Ph.D.

---

[1] https://x.com/ShidelerK

[2] https://nypost.com/2015/08/11/heavily-armed-oath-keepers-inject-new-unease-to-ferguson/

[3] Upchurch, H. E. (2021, December). The Iron March Forum and the Evolution of the "Skull Mask" Neo-Fascist Network. CTC Sentinel, 14(10). https://ctc.westpoint.edu/the-iron-march-forum-and-the-evolution-of-the-skull-mask-neo-fascist-network/

[4] Reuters. (2020, February 9). Masked white nationalists march in Washington with police escort. Reuters. https://www.reuters.com/article/world/us/masked-white-nationalists-march-in-washington-with-police-escort-idUSKBN20301G

---

[11]**Congressional Research Service.** *Domestic Terrorism: An Overview of CRS Reports.* CRS Report IF10839. Retrieved from https://www.congress.gov/crs-product/IF10839

[5] FaradayBags.com. (n.d.). What is a Faraday bag? https://faradaybag.com/what-is-a-faraday-bag/

[6] Boom Live. (2024, April 22). Defending digital space: Journalist's manual for search and seizure scenarios. https://www.boomlive.in/explainers/defending-digital-space-journalists-manual-for-search-and-seizure-scenarios-23270

[7] https://www.fleetnews.co.uk/news/keyless-car-theft-concern-with-fake-faraday-pouches-being-sold?utm_source

[8] Lennox-Steele, A., & Nisbet, A. (2016). A forensic examination of several mobile device Faraday bags and materials to test their effectiveness. Australian Digital Forensics Conference. Edith Cowan University. https://ro.ecu.edu.au/cgi/viewcontent.cgi?article=1165&context=adf

[9] Goldberg, J. (2025, March 24). The Trump Administration accidentally texted me its war plans. The Atlantic. https://www.theatlantic.com/politics/archive/2025/03/trump-administration-accidentally-texted-me-its-war-plans/682151

[10] Collier, K. (2024, December 3). U.S. officials urge Americans to use encrypted apps amid massive cyberattack. NBC News. https://www.nbcnews.com/tech/security/us-officials-urge-americans-use-encrypted-apps-cyberattack-rcna182694

[11] Sinch. (2025). WhatsApp in the U.S.: Potential. https://sinch.com/blog/whatsapp-in-the-us-potential/

[12] Statista. (2024, April 3). Number of paying subscribers of Telegram worldwide from July 2022 to January 2024 (in millions). Statista.
https://www.statista.com/statistics/1344164/telegram-paying-subscribers/

[13] Angrej Singh. (2025, March 26). What is Signal, the app Trump officials used to discuss war plans. Axios. https://www.axios.com/2025/03/25/signal-app-trump-official-yemen-atlantic

[14] Duran, C. (2021). Far-left versus far-right fatal violence: An empirical assessment of the prevalence of ideologically motivated homicides in the United States. Criminology, Criminal Justice, Law & Society, 22(2), 33–49. https://scholastichq.com/criminology-criminal-justice-law-society

[15] Jones, S., Doxsee, C., Suber, J., & Hwang, G. (2020, October 22). The War Comes Home: The Evolution of Domestic Terrorism in the United States. CSIS Briefs.
https://www.csis.org/analysis/war-comes-home-evolution-domestic-terrorism-united-states

[16] Jasko, Katarzyna & Lafree, Gary & Piazza, James & Becker, Michael. (2022). A comparison of political violence by left-wing, right-wing, and Islamist extremists in the United States and the world. Proceedings of the National Academy of Sciences. 119. 10.1073/pnas.2122593119.

[17] Jensen, M., & Cooter, A. (2025, October 21). Correctly assessing left-wing terrorism and political violence in the United States. Just Security.
https://www.justsecurity.org/122278/correctly-assessing-left-wing-terrorism-and-political-violence-in-the-united-states/

[18] BBC News. (2024, September 16). David DePape: Paul Pelosi hammer suspect was into conspiracies. BBC. https://www.bbc.com/news/world-us-canada-67372363

[19] Epstein, K. (2025, June 17). *What we know about the attack on two Minnesota lawmakers*. BBC News.https://www.bbc.com/news/articles/cdeden6r9ddo

[20]Anti-Defamation League. (2022). Oath Keepers data leak: Unmasking extremism in public life. https://www.adl.org/resources/report/oath-keepers-data-leak-unmasking-extremism-public-life

[21] Speckhard, A., Ellenberg, M., & Garret, T. M. White Supremacists Speak: Recruitment, Radicalization & Experiences of Engaging and Disengaging from Hate Groups. International Center for the Study of Violent Extremism. https://icsve.org/white-supremacists-speak-recruitment-radicalization-experiences-of-engaging-and-disengaging-from-hate-groups/

[22] Speckhard, A., & Ellenberg, M. (2022). An analysis of active-duty and veteran military members involved in white supremacist and violent anti-government militias and groups: 2017–2022. International Center for the Study of Violent Extremism. https://icsve.org/an-analysis-of-active-duty-and-veteran-military-members-involved-in-white-supremacist-and-violent-anti-government-militias-and-groups-2017-2022/

[23] U.S. Department of Homeland Security. (2020, October 6). Homeland Threat Assessment. https://www.dhs.gov/sites/default/files/publications/2020_10_06_homeland-threat-assessment.pdf

[24] Beutel, Alejandro. 2017. "Key concepts to understand violent White supremacy." College Park, Md. April.

[25]German, M. (2020, August 27). Hidden in Plain Sight: Racism, White Supremacy, and Far-Right Militancy in Law Enforcement. Brennan Center for Justice. https://www.brennancenter.org/our-work/research-reports/hidden-plain-sight-racism-white-supremacy-and-far-right-militancy-law

[26] EBSCO Staff. (n.d.). Syrian Democratic Forces. EBSCO. https://www.ebsco.com/research-starters/military-history-and-science/syrian-democratic-forces

[27] Police Security Service (PST). (2023). National Threat Assessment 2023 [PDF]. https://pst.no/globalassets/2023/ntv/ntv_2023_eng_web.pdf

[28] The Guardian. (2025, November 25). Germany trial begins for seven alleged members of Antifa Ost "Hammergang." The Guardian. https://www.theguardian.com/world/2025/nov/25/germany-antifa-ost-hammer-gang-seven-alleged-members-trial

[29] Europol. (2024). European Union Terrorism Situation & Trend Report (TE-SAT 2024) [PDF]. https://www.europol.europa.eu/cms/sites/default/files/documents/TE-SAT%202024.pdf

[30] Europol. (2025). European Union Terrorism Situation & Trend Report (TE-SAT 2025) [PDF]. https://www.europol.europa.eu/cms/sites/default/files/documents/EU_TE-SAT_2025.pdf

[31] House of Commons Library. (2025, June 27). *Proscribed Terrorist Organisations* (Research Briefing SN00815) [PDF].https://researchbriefings.files.parliament.uk/documents/SN00815/SN00815.pdf