IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | CAUSE NO.: 4:25-cr-00259-P |
| § | |
| ZACHARY EVETTS (02) § | |

### DEFENDANT ZACHARY EVETTS'S RESPONSE TO THE GOVERNMENT MOTION IN LIMINE TO PRECLUDE DEFENDANTS FROM PRESENTING THE DEFENSES OF SELF-DEFENSE AND DEFENSE OF ANOTHER

Defendant Zachary Evetts files this Response to the Government's Motion in Limine to Preclude Defendants from Presenting Legally Invalid Defense (ECF 334). For the following reasons, the Government's Motion in Limine should be denied.

**I.**

The Government has alleged that, on 4 July 2025, five of the codefendants conducted a coordinated attack upon the Prairieland Detention Center ("PDC"). Counts Five, Six, and Seven allege the specific intent to commit attempted murder (Defendant Song) and the specific intent to facilitate attempted murder by aiding and abetting Defendant Song in making that attempt (Defendants Arnold, Evetts, Morris, and Rueda). Thus, the specific intent and knowledge of these five Defendants is at the core of the Government's case.

On 27 February 2026, halfway through their case-in-chief, Government counsel filed the instant motion in limine. Testimony has now been adduced from its own witnesses that raises reasonable doubt about its theory of a coordinated attack by "North Texas Antifa Cell" members who shared homicidal intent. Defendant Evetts and his counsel learned for the first time in trial last week that there is evidence of self-defense and defense of another as it applies to the person who shot at Lieutenant Gross, and thus to those alleged to have aided and abetted him.

According to the testimony of Alvarado Police Lieutenant Gross on 24 February 2026, he arrived at the PDC on 4 July 2025 on a call stating a lone person was attempting to enter the building, when Lieutenant Gross emerged from his squad car with pistol raised in one hand, walkie talkie in the other, Lieutenant Gross noticed someone running away from him, dressed in black and apparently unarmed. In that instant, Lieutenant Gross thought the person running away from him may have had something to do with words spray-painted on an unoccupied guard shack he had also seen at that same moment. Lieutenant Gross testified that he pointed his pistol, loaded with a round in the chamber, at the back of the fleeing person.

The video of that incident shows that Defendant Song, the alleged shooter, fired a rifle at Lieutenant Gross, and Lieutenant Gross fired back, all within six seconds of Lieutenant Gross's arrival. On 26 February 2026, the testimony of Alvarado Police Officer McDonald included a description of the rifle seized at that scene, which appears to be the rifle that Defendant Song used to fire at Lieutenant Gross. Officer McDonald testified that the magazine containing rifle rounds was not removable because a bullet had struck that magazine, contorting it sufficiently to make it unremovable. Thus, logically, since Lieutenant Gross was the only person, other than Defendant Song, to fire at that scene, and certainly within those six seconds, Lieutenant Gross must have been pointing his pistol at Defendant Song as the latter held his rifle in a manner that exposed that side of his magazine to being hit by Lieutenant Gross's bullet.

Thus on 24 February 2026, the defense learned for the first time that Lieutenant Gross took action that could give rise to the alleged shooter exercising lawful defense of another, and on 26 February 2026, Defendant Evetts and his defense counsel learned for the first time that Lieutenant Gross may have pointed his pistol at Defendant Song, prior to the latter firing at Lieutenant Gross, since this all happened in the space of six seconds. Further, it is entirely

reasonable to surmise that Lieutenant Gross was incorrect in his testimony that he first pointed his pistol at the fleeing suspect, and in fact, he was pointing his pistol at a person, Defendant Song, who was not engaged in any unlawful activity; not trespass, nor assault, nor use of explosives.

The testimony has raised the issue of the propriety of Lieutenant Gross's actions in the first moment of his stop at the PDC guard shack. There is also evidence that Defendant Song reasonably could have perceived that he had a lawful defense of another or himself. This raises issues about whether the shooting of Lieutenant Gross, seconds after his arrival on the scene, was planned by the Defendants as alleged, or could have been an unplanned reaction by Defendant Song to Lieutenant Gross's behavior.

In its Motion in Limine, the Government addresses the propriety of raising self-defense or defense of a third party ("D3P"). While the proper remedy for an unavailable defense is the denial of a jury instruction on that defense, the Government seeks to preclude any cross-examination on the entire subject in advance. The Government advances two arguments. First, that self-defense/D3P is unavailable because Defendants were not "free from fault" in prompting the use of force by Lieutenant Gross. Second, that it is unavailable because Defendants "cannot establish" that Lieutenant Gross's own use of deadly force was unreasonable.

The Government claims that if a criminal defendant prompts a law enforcement response, he may not claim self-defense against law enforcement. That is not an accurate statement of law. It would possibly be an accurate statement of the law, in civil rights cases, that the unlawful conduct of a plaintiff might not justify his firing on a law enforcement officer who ultimately fires back.

It is not accurate to state that protestors or demonstrators lawfully exercising their First

Amendment rights lose any right to self-defense/D3P as soon as law enforcement "responds" to the site of the protest or demonstration.  The Government's Motion in Limine cites cases that do not match the legal questions in this case.  The Government bases this claim primarily upon a case involving the federal siege of the Branch Davidian compound in Waco, Texas in 1993, *United States v. Branch*, 91 F.3d 699 (5th Cir. 1996), but that reliance is largely misplaced.

Defendant Evetts agrees with the Government that there must always be a sufficient foundation in the evidence at trial to support a jury instruction relevant to that evidence.  Since the Government's case-in-chief is only approximately half complete, the time to weigh the propriety of various special instructions prompted by the evidence is not yet upon us.  This is especially true since new evidence can, and has, brought up new information that was not provided in discovery.

The Government's reliance on *Branch* is misplaced when referring to what it says about a defendant's "prompting" the use of force by law enforcement.  It correctly quotes *Branch* in its Motion in Limine (ECF 334, p. 1) for the proposition that self-defense is not available where a defendant prompted law enforcement's *use of force*.  But the Government then, in the next sentence, states that the defendant's "unlawful actions" "ultimately triggered the law enforcement *response*." *Id*.

The distinction between "use of force" and general "response" is critical.  Lieutenant Gross's response by arriving at the scene is not at issue.  His use of force is.

## II.

The facts developed at trial from both Lieutenant Gross and Alvarado Police Sergeant McDonald raise different issues involving both self-defense and D3P, viewed from the perspective of alleged shooter Defendant Song.  These issues were not foreseeable from a review

of the discovery prior to trial; they only came to light upon cross-examination of Lieutenant Gross and both direct and cross-examination of Officer McDonald at trial. The issue of D3P will be discussed first.

This analysis is based upon Lieutenant Gross's act of unholstering his service weapon and aiming it at the back of someone running away, as he testified he did. This act occurred within the view of Defendant Song. Again, this evidence was provided to defense counsel for the first time when Lieutenant Gross testified on 24 February 2026.

Per his prior statement and his testimony in court, Lieutenant Gross was called to PDC upon a report of someone "trying to get into the building." When he arrived, he also observed that some vandalism had taken place, to include "Fuck ICE" spray-painted on a guard shack next to a knocked down sign. Though the Government refers to "firing explosives at a federal detention facility," (ECF 334, p. 1), Lieutenant Gross had neither heard nor seen such evidence as he pulled up to PDC. There is nothing about what Lieutenant Gross had heard through dispatch, or saw when he arrived, that should have prompted him to aim his drawn firearm at the back of someone fleeing the area, as he testified he did.

Because Lieutenant Gross's act was unprompted by the behavior of the fleeing subject, it was objectively unreasonable. In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court held that deadly force is only allowed to apprehend felons who the police officer has probable cause to believe pose a "significant threat of death or serious physical injury" to them or to the public. *Garner*, 471 U.S. at 2. In that case, the officer was found to have violated the Fourth Amendment by shooting a fleeing burglary suspect, who did not appear to be armed, in the back of the head. *Id*, at 4. The officer in *Garner* had yelled, "police, halt" and the suspect was continuing to flee when the officer shot him from behind. *Id*.

The Court in *Garner* held that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Id*., at 7. The Court was unequivocal: a police officer "may not seize an unarmed, nondangerous suspect by shooting him dead." *Id*., at 11. Even under common law prior to the Fourth Amendment, the Court observed, the "use of deadly force to apprehend a misdemeanant" was forbidden as "disproportionately severe." *Id.*, at 15. Though a burglary is a "serious crime," *Id.*, at 21, it is not "so dangerous as automatically to justify the use of deadly force." *Id*.

Here, Lieutenant Gross was presented with a situation that, in the moment, he had no reason to believe involved a felony at all, let alone one in which a person already running away from him was likely to present a "significant threat of death or serious physical injury." *Id*., at 2. Even if someone "trying to get in" to PDC could have warranted Lieutenant Gross's response, the individual at whom he took aim was running in the opposite direction. Lieutenant Gross's act of aiming his firearm at the back of an unarmed fleeing person, a misdemeanant at best and a nonviolent felon at worst, was objectively unreasonable under the Fourth Amendment.

The Government cites civil rights case law for the proposition that the Defendants are "barred from claiming self-defense where their own crimes prompted federal officials to respond with force." ECF 334, p. 7. Self-defense and defense of another are considered from the point of view of a reasonable person in the shoes of the defendant. Additionally, any "show of force," ECF 334, p. 10, in the form of aiming his weapon, would have been unobservable by the person he aimed at, since that person was facing the other way and running away from him, and that is the only person whom Lieutenant Gross then believed might have committed a crime.

Lieutenant Gross's conduct with his firearm was observable by Defendant Song during those six seconds, as Lieutenant Gross confirmed their clear line of sight to each other. From

Defendant Song's perspective, Lieutenant Gross was either imminently about to fire at the fleeing person's back or at Defendant Song. Doing so under the circumstances would have constituted an immediate use of unlawful force on the part of Lieutenant Gross and a lawful use of force by Defendant Song.

In the Fifth Circuit:

> The use of force is justified when a person reasonably believes that force is necessary for the defense of oneself or another against the immediate use of unlawful force. However, a person must use no more force than appears reasonably necessary under the circumstances. Force likely to cause death or great bodily injury is justified in self-defense [or] defense of another only if a person reasonably believes such force is necessary to prevent death or great bodily harm. Pattern Jury Instructions (Criminal Cases), §1.39.

If Defendant Song fired his weapon at Lieutenant Gross in response to observing Lieutenant Gross about to shoot an unarmed fleeing person, Defendant Song has the right to an instruction on the law of defense of another, as do the other four defendants charged with being vicariously liable. Defendant Song's reaction to Lieutenant Gross could reasonably be seen as the reason he fired at all, not as part of a premeditated plan and conspiracy to do so.

As to the issue of Defendant Song's own self-defense, we also learned for the first time in the testimony of Officer McDonald on 26 February 2026 that Defendant Song's rifle was struck in the upper magazine area by a bullet. Since the evidence demonstrates that Defendant Song and Lieutenant Gross were the only two shooters that night, and that Defendant Song's rifle was in his hands, that means that at some point in those initial six seconds, Lieutenant Gross's weapon was necessarily aiming at Defendant Song when Lieutenant Gross fired the bullet that struck the rifle. Discovery provided to Defendant Evetts before trial said that the magazine was jammed in the rifle and the magazine had an indentation; there was no statement that the damage was caused by a bullet, much less a bullet fired during this six-second interval.

The testimony was that the damage to Defendant Song's rifle did not render it inoperable; he continued to fire until the weapon jammed.  It is therefore reasonably possible that the bullet that struck Lieutenant Gross was fired after Lieutenant Gross's bullet had already struck the rifle.  This would have been a return of fire in a chaotic and fast-moving event in six seconds, not the culmination of a planned conspiracy as alleged by the Government.  And this would be just as true even if Defendant Song were not found to be justified in firing in self-defense.

We do not know, and cannot know, halfway through the Government's case-in-chief, what the bulk of the evidence may ultimately show as to Defendant Song's thoughts at the time.  When we do, the Court should entertain appropriate valid argument and valid requests for instructions, as is routinely done.  But to do so at this stage, as the Government urges the Court to order, is not appropriate.  The Government's motion seeks to preclude not only affirmative defenses of self-defense and D3P, but also evidence directly impacting the *mens rea* of all defendants charged with attempted murder and aiding and abetting attempted murder.

### III.

Two other issues alluded to in the Government's Motion in Limine must be addressed.  First, the Government invokes the conference in which the parties jointly worked on a jury charge and complains that this issue was not raised at that time.  Considering when the evidence supporting those defenses arose, Defendant Evetts could not have reasonably anticipated them.

At the time of that conference, Lieutenant Gross had not yet testified and been subject to relevant cross-examination that exposed the details of his conduct on the scene.  Officer McDonald had not yet testified about the bullet strike to the rifle believed to be Defendant Song's rifle that shot at Lieutenant Gross.  Defendant Song had not yet elected whether to take the stand in his defense and still has not.

Thus, the issue of self-defense/D3P was not foreseeable in a review of the evidence prior to trial. We do agree that now, after Lieutenant Gross's testimony under cross-examination as well as the testimony by Officer McDonald regarding the shooter's rifle having been struck in the upper magazine area by a bullet (likely fired from Lieutenant Gross's service weapon), the issue of self-defense/D3P has fairly been raised. The Government cannot claim unfair surprise as it is now also aware of the issue and has flagged it in its Motion in Limine.

### IV.

Second, and finally, the Government expresses concern that one or more Defendants will argue "jury nullification." We will not. That is not germane to the matter of raising defenses.

In exploring how the shooting of Lieutenant Gross took place, and how the facts unfolded in real time, the evidence at trial has given rise to reasonable doubt about the *mens rea* elements upon which the Government bears the burden to prove beyond a reasonable doubt. Defendants were surprised by testimony that was not predictable from the evidence given in discovery. The Defendants have a duty to fully explore this evidence and exercise effective assistance of counsel to their clients, and the Court has a similar duty to instruct on the law of self-defense and D3P, if the evidence gives rise to those instructions.

The Government relies upon language in *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993), and its reference to the "siren song of nullification." *Id*. But both *Sepulveda* and its internal citation to *United States v. Garcia-Rosa*, 876 F.2d 209 (1st Cir. 1989) dealt with that "siren song" sung in closing argument (*Sepulveda*) and in a properly denied request for jury instructions (*Garcia-Rosa*), respectively, not during the presentation of evidence and cross-examination of witnesses, as is the circumstance before us here.

Arguing for jury nullification is clearly prohibited. Effective cross-examination of

Government witnesses is required of defense counsel to elicit testimony that can raise reasonable doubt as to an element of an offense. Effective assistance of counsel demands it. See generally *Strickland v. Washington*, 466 U.S. 668 (1984).

Wherefore, Defendant Evetts respectfully requests the Court deny the Government's Motion in Limine.

Respectfully Submitted,

*/s/ Patrick J. McLain*
Patrick J. McLain
Attorney for Zachary Evetts
Texas State Bar Number: 13737480
900 Jackson Street, Suite 640
Dallas, Texas 75202
telephone: (214) 416-9100
patrick@patrickjmclain.com

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above and foregoing Reply was delivered via electronic mail to the office of the United States Attorney for the Northern District of Texas, Fort Worth Division, and counsel for the other eight defendants in this case on 2 March 2026.

*/s/ Patrick J. McLain*
Patrick J. McLain