IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| V. | § § | |
| CAMERON ARNOLD a/k/a "Autumn Hill" | § § | |
| ZACHARY EVETTS | § | NO. 4:25-CR-259-P |
| BENJAMIN SONG | § | |
| SAVANNA BATTEN BRADFORD MORRIS a/k/a "Meagan Morris" | § § § | |
| MARICELA RUEDA | § | |
| ELIZABETH SOTO | § | |
| INES SOTO | § | |
| DANIEL ROLANDO SANCHEZ-ESTRADA | § § | |

**EXPERT REPORT OF MAX KROCHMAL**

# INTRODUCTION

Max Krochmal, Ph.D.
Department of History
University of New Orleans
2000 Lakeshore Dr
New Orleans, LA 70148

Tolbert & Associates, PLLC
511 E John W Carpenter Fwy
Suite 500
Irving, TX 75062

This report responds to your request to review the documents and information supplied and to provide an expert opinion in the above-refenced matter. As instructed by Tolbert & Associates, I offer opinions regarding:

- Types and forms of protest (e.g. nonviolent, direct action, civil disobedience, demonstrations) and its intended outcomes and effects based on its methods
- Specificity between a riot vs. a protest

1

- Historical context and relevance of protests or social movements deemed anti-government, anti-fascism/"antifa", or anarchist in nature
- Protest Norms/Protocols (e.g. security culture, wearing a mask, first aid/medical supplies, black bloc)

My expert opinions on these subjects are based on my review of the documents and other primary evidence listed below, as well as my education, knowledge, and fifteen years of experience as a full-time faculty member in the field of U.S. history and interdisciplinary social sciences, specializing in community organizing, civil rights, and social movements. I state these opinions to a reasonable degree of professional certainty. I reserve the right to amend and/or supplement these opinions as further discovery is obtained.

## QUALIFICATIONS

In researching and presenting this report, I draw on my formal graduate training as well as my work as a practicing, award-winning professional historian, public scholar, and university professor. I have a deep knowledge of Texas and U.S. social and political history, having written one monograph and two collaborative books centered on the overlapping histories of African Americans and Mexican Americans in the Lone Star State. I am also working on a new project on activism in New Orleans. My complete Curriculum Vita is attached to this report as Appendix A.

My Duke University Ph.D. dissertation focused on the above subjects and formed the foundation of my 2016 book, *Blue Texas: The Making of a Multiracial Democratic Coalition in the Civil Rights Era*. While the book's title evokes present-day political formations, the text itself centers on the historical efforts of Black, Latinx, and white civil rights and labor organizers beginning in the 1930s. It demonstrates the gradual process by which activists in all three groups came together to challenge the state's traditionally conservative and segregationist Democratic Party. After a series of setbacks, including intra-racial conflicts, African American and Mexican American civil rights activists discovered inter-racial coalitions as the secret weapons in their hitherto separate, decades-long battles against Jim Crow and "Juan Crow" (systemic, often state-sanctioned, discrimination against Latinx Americans; see below for additional information on "Juan Crow"). The book ends in the 1960s, when civil rights activists succeeded in breaking open the state's political system but also confronted the limits of independent political representation for Black and Latinx communities. Much of the book centers on voting rights—how activists engaged with voter registration despite the poll tax, how they built political capacity in their communities, and how they won a semblance of independent political representation for their long-neglected neighborhoods.[1]

---

[1] Max Krochmal, *Blue Texas: The Making of a Multiracial Democratic Coalition in the Civil Rights Era*, Justice, Power, and Politics (University of North Carolina Press, 2016).

My second book project extends these themes via a statewide oral history project and collaborative anthology, *Civil Rights in Black and Brown: Histories of Resistance and Struggle in Texas*. Based on over 500 new life history format interviews (featuring open-ended questions and lasting approximately 1-2 hours each), the book explores the meaning of civil rights among African Americans and Mexican Americans across Texas, from the large metropolitan areas to the cities of the Panhandle Plains, from along the Rio Grande to the small towns of East Texas. The interviews and accompanying archival sources provide incontrovertible evidence of the long histories of systemic racism in Texas, the presence and persistence of both Jim Crow and Juan Crow, and the equally omnipresent resistance to racial discrimination by residents in communities across the state. It unveils the centrality of state-enacted and state-sanctioned physical violence in maintaining inequality, the importance of educational equity and political opportunity to Black and Latinx communities, and a wide range of coalitions, cooperation, and at times conflict between the two groups.[2]

I have also worked closely with government agencies, nonprofits, and grassroots community leaders to recover, present, and teach the histories of African Americans and Mexican Americans in Texas. One such collaboration with Fort Worth Independent School District produced another book, *Latinx Studies in the K-12 Classroom: A Practical Guide*.[3] Other projects led to public programs, exhibits, websites, and the creation of new archives.[4] My work as a public scholar has also compelled me to attend many meetings of local government bodies, giving me firsthand experience participating as a community member, and teaching me how to observe the political process. These included meetings of the Tarrant County Commissioners Court, City of Fort Worth, and Fort Worth Independent School District. I have also been a close observer of Texas state politics.[5]

---

[2] Max Krochmal and J. Todd Moye, eds., *Civil Rights in Black and Brown: Histories of Resistance and Struggle in Texas* (University of Texas Press, 2021).

[3] David Colón and Max Krochmal, *Latinx Studies Curriculum in K-12 Schools: A Practical Guide* (Texas Christian University Press, 2022).

[4] For example, see Max Krochmal and Moisés Acuña Gurrola, eds., *Viva Mi Historia: The Story of Fort Worth Latino Families*, https://holatarrantcounty.org/vivamihistoria/. This website, now hosted by the grassroots nonprofit HOLA Tarrant County, grew out of a collaboration with the City of Fort Worth Human Relations Unit and Library and numerous local nonprofits with *Latino Americans: 500 Years of History* grant funding from the National Endowment for the Humanities and the American Library Association. It also led to the creation of a new archive at the city library, *Latino Americans: 500 Years of History*, http://www.fortworthtexasarchives.org/digital/collection/p16084coll25.

[5] This participant-observation led me to write op-eds on each of these levels of government. See Max Krochmal and J. Todd Moye, "A draft congressional map lays out one future for Texas. But there is a better path," *Washington Post*, September 28, 2021, https://www.washingtonpost.com/outlook/2021/09/28/draft-congressional-map-lays-out-one-future-texas-there-is-better-path/; Max Krochmal, "Tarrant sheriff needs to give straight story on immigration program's costs, drawbacks," *Fort Worth Star-Telegram*, June 17, 2019, https://www.star-telegram.com/opinion/opn-columns-blogs/article231638593.html; Max Krochmal, "The Texas Senate Race Is Not 'Historic,'" *Los Angeles Review of Books*, November 4, 2018, https://lareviewofbooks.org/article/the-texas-senate-race-is-not-historic/; and Max Krochmal, "Texas Democrats must get back to their progressive roots," *TribTalk* (*Texas Tribune*), November 21, 2016, https://www.tribtalk.org/2016/11/21/texas-democrats-must-get-back-to-their-progressive-roots/.

I spent more than a decade as a professor of history at Texas Christian University (TCU) and am a former resident of Fort Worth, Texas. I am now a full professor of history at the University of New Orleans (UNO), where I also hold the Czech Republic Endowed Professorship in Urban Studies and direct an interdisciplinary graduate program in Justice Studies. Tolbert & Associates PLLC is compensating me for my work on this report at the rate of $200 per hour. My compensation is not dependent upon my findings nor on the outcome of this case, and I am free to reach any conclusions warranted by the evidence and my interpretations and scholarly training. I am completing this work outside of my normal employment with the University of New Orleans, and with the university's approval. All opinions expressed are my own and not those of my employer. This is my second experience serving as an expert witness in federal court, having previously been admitted as an expert in *Petteway v. Galveston County*, Southern District of Texas, no. 3:22-cv-57.

My methodology for the present study mirrors the normal practices in my profession, guided by my graduate training at Duke and the standards of the American Historical Association.[6] I evaluate as much primary evidence as possible, and I also consult secondary sources produced by other scholars. As historians, we are often forced to interpret events in the past based on a fragmentary documentary record. To mitigate against errors in collecting evidence, we try to find sources from a variety of authors and contexts. We cast our nets widely and try to be as comprehensive as possible everywhere that we search.

Such limitations aside, using the standards of our discipline, historians can infer, deduce, and ultimately narrate history even while some questions remain. We use all the information we can gather to make informed, evidence-based decisions on what happened in the past and why and how events took place. We establish facts and interpretations based on a preponderance of sources, using a sort of qualitative algorithm to wrangle the many layers of sometimes divergent historical sources into a coherent statement of truth. These careful approaches—that together comprise the "historical method"—allow us to make educated, accurate claims about the causes of historical events and about continuity or change over time.[7]

I am also trained to draw on my own fieldwork and experiences as a participant-observer of protests in Texas and beyond. I completed doctoral-level coursework and a preliminary examination field in sociology at Duke University, and I have contributed to interdisciplinary social science programs since 2015, at both TCU and UNO. Previously, I conducted ethnographic field research in the U.S.

---

[6] See American Historical Association, *Statement on Standards of Professional Conduct*, updated 2019, https://www.historians.org/jobs-and-professional-development/statements-standards-and-guidelines-of-the-discipline/statement-on-standards-of-professional-conduct.

[7] For more on historical methods, see Thomas Andrews and Flannery Burke, "What Does It Mean to Think Historically?," *Perspectives on History*, January 2007, https://www.historians.org/research-and-publications/perspectives-on-history/january-2007/what-does-it-mean-to-think-historically; William Kelleher Storey, *Writing History: A Guide for Students*, 4th edition (Oxford University Press, 2012); Peter N. Stearns, *Thinking History* (American Historical Association and Oxford University Press, 2004).

and Ecuador while a student at the University of California, Santa Cruz, completing a research project that produced a senior thesis that won the institution's top undergraduate student award.[8] Overall, I have been studying and observing a wide range of protests and social movements, past and present, for more than twenty-five years.

## MATERIAL REVIEWED

To prepare this report and arrive at my conclusions, I reviewed the following documents and other sources:

- Second Superseding Indictment for this case, filed December 10, 2025
- Coverage of the incident and case in the mass media, including but not limited to articles published in *The Guardian*, *New Republic*, and *KERA* public media.
- Publicly-available court documents, including the pleas entered by Baumann and Sikes.
- A shared Dropbox folder titled "Discovery for Experts" furnished by Tolbert & Associates. The folder included scattered documentary evidence apparently compiled by the prosecution, including photographs of physical evidence, reproductions and reports from the defendants' Signal chats, witness statements and examples of 'zines collected by law enforcement, and surveillance videos from the Prairieland Detention Center recorded on the evening on July 4, 2025. See the attached Appendix A listing all discovery items that were provided in this folder.
- Secondary sources (books, articles, etc.) written by other historians and social scientists focusing on the history of social movements, policing, protest tactics, and state responses to social movements.

## FACTUAL SUMMARY

The evidence provided in the "Discovery for Experts" Dropbox folder offers a window into what happened outside the Prairieland Detention Center on the evening of July 4, 2025. After viewing the videos and analyzing the photographs from the scene, I observe that a demonstration did in fact take place outside of the facility, in which a small number of people wearing black clothing and masks spent most of their time setting off fireworks outside the detention center's perimeter fence, at times with trajectories in the direction of the detention center.

One surveillance video shows a pair of people wearing black clothing spray-painting a number of apparently civilian vehicles in the parking lot. Another surveillance video includes sound, including a

---

[8] "Student Awards," Currents, June 14, 2004, https://currents.ucsc.edu/03-04/06-14/student_awards.html.

couple loud bangs that may have been gunfire. In this video, two apparent correctional officers can be seen running through the frame. Yet another surveillance video shows the front entrance of the detention center, the arrival of a police vehicle, and the shooting of a police officer.

The folder also includes a video that appears to be a body camera apparently attached to a police officer who was called to the scene, exited his vehicle, yelled, "Get on the ground!," and then fell down as a series of loud bangs ring out. He said, "Fuck! I'm hit," suggesting that the noises were gunfire and that he sustained a wound.

All of the videos contained internal time-stamps from the evening of July 4, 2025. I have made educated guesses about their original sources and circumstances of their creation, but I do not know how exactly they were recorded, preserved, or other questions of provenance that are normally part of the preservation process for historical archives and also essential for how historical researchers evaluate their usefulness as sources.

Photographs in the provided Dropbox folder display several themes. A pair of photographs show close-ups of what appears to be gunshot wounds on a victim's neck or shoulder. Other photographs in the folder show a box of fireworks (of the type commonly available on any roadside in Texas), close-ups of the vandalized civilian cars in the parking lot, several pictures of a van with deflated tires and a possible hole in a sidewall, and a knocked over barricade. The indictment itself includes a photograph of graffiti on what appears to be a small guard station hut, but I did not receive a copy of the original photograph. The folder also contained photographs of a first aid kit (labeled "Ex 19") and its contents, a banner reading "RESIST FASCISM – FIGHT OLIGARCHY," a collection of black clothing (labeled "13"), and an unidentified, undated clipping of a seemingly low-circulation newspaper or magazine (likely a "'zine") with a highlighted article that provides instructions on how to make a face-covering mask using a t-shirt. The photographs did not include time-stamps, and I am not aware of their exact mode of creation, storage, or provenance.

The plea deals that I reviewed (from publicly accessible court records linked in media reports) contained somewhat contradictory accounts of what exactly was said on the evening of July 4, 2025. All of them do suggest that Benjamin Song was among the group's de facto leadership and a principal advocate for the possession of firearms.

The superseding indictment and other evidence made available to this reviewer claim that the protestors constituted a "North Texas Antifa Cell," but neither the document nor the discovery folder provides clear evidence to support this claim. The 'zines and Signal chats that I reviewed display a range of opinions and ideologies related to the protest and a lack of agreement or details regarding specific tactics and strategy.

## OPINIONS

Based on this relatively small evidentiary base, and on my extensive training and experience using historical and allied social scientific methods, I can offer several informed opinions related to the protest that took place on July 4, 2025, with a reasonable degree of professional certainty.

**Types and Forms of Protest, including "Riots"**

I have been asked to "provide historical and sociological context to assist the jury in understanding the structure and characteristics of decentralized protest movements and commonly observed protest practices," so I will begin with a very brief overview of the history of these activities across U.S. history. A full understanding would require semesters of course work.

Across all of U.S. history, ordinary residents have used a wide repertoire of tactics to protest social conditions and/or to express their positions in political arenas. Sometimes small groups take action on their own, while other protests attract large masses of people. Some protests are carefully planned, while others are spontaneous. Participants in protests often have sharp disagreements with one another, and the people who show up at a given protest or action may not be fully aware of the organizers' plans. Some protests can accurately be labeled "terrorism" if they use violence to influence politics. Some protests are indeed executed by a cohesive "cell" acting in concert, but these incidents are relatively rare in the annals of history. Some large protests can accurately be labeled "riots" by historians—a term that differentiates these moments from other forms of protest—while others do not fit the commonly accepted definitions used by historians and social scientists.

The tradition of protest in U.S. history predates the nation's independence and the ratification of the Constitution and its First Amendment. In colonial Massachusetts in 1713, for example, over two hundred people, mostly women, protested economic policy and deprivation by engaging in "bread riots" in which they seized food and other household goods from small businesses and warehouses. In the 1730s and 1740s, nearby farmers and merchants engaged in widespread protests against restrictions on commerce and taxation by the British crown. Similar actions took place across colonial era America. Most famously, in 1773, a relatively small and cohesive group of activists calling themselves the "Sons of Liberty" crept onto private vessels in the Boston harbor, stole valuable property transported in international commerce, and destroyed it by dumping it into the sea. This became known as the Boston Tea Party, an event that historians and lay people recognize as a key precursor to the American Revolution.[9]

The term "terrorism" entered the U.S. lexicon after the Civil War when the federal government sought to protect the voting rights of all citizens in the face of vigilante attacks exacted by the Ku Klux Klan against both Black and white citizens. U.S. military troops were stationed across the

---

[9] See Billy G. Smith, ed., *Down and Out in Early America* (Penn State University Press, 2004); Jack Tager, *Boston Riots: Three Centuries of Social Violence* (Northeastern University Press, 2000).

South, and the Klan frequently attacked and damaged federal government property and officers. Ordinary Black and white veterans of the war organized themselves in "Union Leagues" to defend their vision of a biracial democracy with voting rights for all men. In order to make sure that their members could register to vote and then actually cast a ballot on election day, the Union Leagues at times organized military-style parades in county seats across the region, actions in which armed citizens marched through the cities to escort voters to the polls. At times, violence broke out when the Ku Klux Klan attacked the Union Leagues and/or the federal troops stationed in the South to protect democracy. In response to Klan attacks, Congress held high profile field hearings and passed three Enforcement Acts aimed at curbing the Klan's reign of domestic terror. Yet despite the passage of the Fifteenth Amendment, extralegal violence continued to curb Black voting until most Southern states disfranchised virtually all African Americans (along with many poor whites) via new state constitutions, grandfather clauses, literacy tests, understanding tests, poll taxes, and other legal mechanisms. These prohibitions persisted until the passage of the Voting Rights Act of 1965 and the ratification of the Twenty-Fourth Amendment shortly thereafter.[10]

In the Civil Rights Era, protests challenged all aspects of segregation and helped restore the franchise to African Americans in the South. Most Americans are familiar with the March on Washington for Jobs and Freedom in 1963, in which Dr. Martin Luther King Jr. led an unprecedented and peaceful mass march on the Lincoln Memorial. The event was carefully organized by a coalition of civil rights groups, most of which gave clear instructions on nonviolent marching tactics to the legions of participants who rode buses from across the country to the capital. They sought to prevent violence by training their members, and they were successful on that day.[11]

Yet the civil rights movement was much larger than Dr. King and that one March on Washington. Most importantly, beginning in 1960, ordinary students took "direct action" by organizing nonviolent sit-ins at segregated lunch counters across the South. These tended to begin with small, tight-knit groups of young people who discussed the tactic extensively before taking action. The protests were illegal under state laws, and merchants typically called the police, who often arrested and sometimes beat the protestors (or looked the other way while counter-protesting mobs enacted violence against the demonstrators). The initially small groups of highly-trained sit-in demonstrators quickly attracted hundreds and then thousands of supporters who took to the streets to support them. In Nashville and elsewhere, the core group of student activists launched a series of training meetings in which they brought their new recruits up to speed on nonviolent tactics. In April, 1960, the leaders of the protests came together and founded the Student Nonviolent Coordinating

---

[10] On the Union Leagues and white supremacist terrorism, see Steven Hahn, *A Nation Under Our Feet: Black Political Struggles in the Rural South, from Slavery to the Great Migration* (Belknap Press of Harvard University Press, 2003). On the violence of the Ku Klux Klan and the Congressional response, see Shawn Leigh Alexander, ed., *Reconstruction Violence and the Ku Klux Klan Hearings*, Bedford Series in History and Culture (Bedford/St Martins, 2015).

[11] David Garrow, *Bearing the Cross: Martin Luther King, Jr., and the Southern Christian Leadership Conference*, Reprint edition (William Morrow, 2004); William P. Jones, *The March on Washington: Jobs, Freedom, and the Forgotten History of Civil Rights* (W.W. Norton, 2013).

Committee (SNCC). The group continued to build networks and provide training for sit-in demonstrators, expanded after playing a key role supporting the Freedom Rides of 1961, and launched widespread voter registration projects in Mississippi, Alabama, and Georgia.[12]

Despite the inclusion of "nonviolent" in the group's name, SNCC activists working in the Deep South often depended on armed residents or allied groups to protect them as they registered voters and opened freedom schools. This tendency wasn't entirely new. In the late 1950s, Robert F. Williams and the Monroe, North Carolina, branch of the National Association for the Advancement of Colored People (NAACP) used armed self-defense to repel white supremacist terrorist attacks on their community. Although many SNCC organizers held deeply felt philosophical opposition to violence in all forms, many of the farmers and sharecroppers who housed them insisted on standing guard on their porches each night with their shotguns. The allied activists had to agree to disagree. Still, white supremacist violence resulted in the deaths of Black and white activists, young and old, and took a major toll on the civil rights movement.[13]

By the late 1960s, despite the passage of new federal laws, many African Americans had grown impatient with the slow pace of change, and some disavowed the nonviolent tactics of earlier years. SNCC itself joined this trend, dropping "nonviolent" from the organization's name before merging with the Black Panther Party for Self-Defense. Across the country, Black communities engaged in rebellions against lingering racial and economic inequality in incidents that were usually triggered by instances of police brutality. Many contemporary observers labeled these conflagrations "race riots," but other observers at the time and since have called them "urban disorders" or "rebellions" due to their clear political motivations and connotations. Protestors in these uprisings often engaged in property destruction, at times attacked police or government property, and frequently suffered violence at the hands of law enforcement. Regardless of one's opinion on the politics of these incidents, it is clear that they constituted mass protests involving hundreds or thousands or tens of thousands of people. In a commonsense definition, these were "riots" on an unprecedented scale.[14]

The late 1960s and 1970s also witnessed the rise of self-identified radical groups who did, in fact, seek to enact domestic terrorism by acting in small, disciplined cells. The most well-known of these is the Weather Underground, an offshoot of the antiwar liberal group, Students for a Democratic Society. These "Weathermen" manufactured homemade explosives, one of which exploded in their own New York City townhouse, and claimed responsibility for dozens of bombings targeting

---

[12] Clayborne Carson, *In Struggle : SNCC and the Black Awakening of the 1960s* (Harvard University Press, 1987); Wesley C. Hogan, *Many Minds, One Heart: SNCC's Dream for a New America* (University of North Carolina Press, 2007).

[13] Charles E. Cobb Jr., *This Nonviolent Stuff'll Get You Killed: How Guns Made the Civil Rights Movement Possible* (Duke University Press, 2016); Timothy B. Tyson, *Radio Free Dixie: Robert F. Williams and the Roots of Black Power* (The University of North Carolina Press, 2001).

[14] Elizabeth Hinton, *America on Fire: The Untold History of Police Violence and Black Rebellion Since the 1960s* (Liveright, 2022); Charles E. Jones, ed., *The Black Panther Party (Reconsidered)* (Black Classic Press, 1998).

government properties that they believed were connected to the U.S. military. The group clearly articulated its motivations, ideology, and tactics in a manifesto, *Prairie Fire*. No deaths have been attributed to their activities—only widespread property destruction. Members of the group operated wholly underground—that is, they did not own or rent housing or offices or cars in their own names, and they generally avoided all public demonstrations or any visible presence that could be observed or detected by law enforcement. In other words, this was a clear example of a domestic terrorist group based on a cell structure—a series of small, disciplined groups loosely connected across the country that claim credit for specific acts of property destruction (with great tactical discipline) based on a clearly articulated ideology and self-published manifesto. Notably, they did not organize or participate in visible protests nor seek out confrontations with law enforcement.[15]

Since 2013, activists across the U.S. have rallied under the banner of "Black Lives Matter." Unlike SNCC or Dr. King's Southern Christian Leadership Conference, the key coordinating group, the Movement for Black Lives, encompasses hundreds of independent local organizations, each with its own leadership and legal status. Local affiliates of this network agree on core principles and work together to plan national legislative strategy, but the central office of the Movement for Black Lives does not direct the main activities of affiliated local organizations. This decentralized structure reflects both the community organizing tradition that inspired SNCC on the ground and the incorporation of some feminist and anarchist principles that had been revived in activist circles since the 1970s.

Contrary to many media reports, local affiliates of the Movement for Black Lives do not initiate riots. Rather, they engage in a wide range of advocacy work and at times organize mass demonstrations, typically following the killing of African Americans by law enforcement. In Ferguson (Missouri), Baltimore, Minneapolis, and nationwide, police have at times responded to these peaceful demonstrations by declaring them illegal and attempting to disperse large crowds using rubber bullets, tear gas, or other aggressive riot control tactics. On occasion, some individuals or small groups of protestors motivated by the ideas of the Movement for Black Lives have engaged in vandalism and property destruction, including burning vehicles and chain drug stores. Many attacks targeted Confederate monuments. Still, by any measure, the urban disorders of the past thirteen years pale in comparison to the rebellions of the late 1960s and early 1970s, or to the uprisings following the acquittal of the police who killed Rodney King in 1992—far less property has been destroyed in recent years, and far fewer people were injured or killed in the protests.[16]

While I am not a lawyer and cannot speak to the legal definition of "riot," it's clear to me that what took place at Prairieland Detention Center on July 4, 2025, was nothing like the Watts or Detroit uprisings of 1965 and 1967, respectively, or of the Los Angeles "riots" in 1992. It's also clear that

---

[15] Dan Berger, *Outlaws of America: The Weather Underground and the Politics of Solidarity* (AK Press, 2006).

[16] Barbara Ransby, *Making All Black Lives Matter: Reimagining Freedom in the Twenty-First Century* (University of California Press, 2018); Keeanga-Yamahtta Taylor, *From #BlackLivesMatter to Black Liberation* (Haymarket Books, 2016).

the defendants did <u>not</u> act like a domestic terror cell akin to the Weather Underground of the 1970s, or even the Sons of Liberty in the 1770s. My review of the security camera footage, Signal texts, 'zines, and other evidence instead reveals a rather disorganized protest that centered on setting off fireworks to make noise that could be heard by the detainees held inside. As an historian, if I were to review these same sources but in reference to an event that occurred in the past, I would not be able to substantiate claims that the protestors had planned together to use violence against law enforcement, and I would not label this demonstration a "riot." (Note that I am using commonly understood historical or social scientific definitions of those terms, not their legal definitions.)

**Historical Context of Antifascist, Anarchist, or other Anti-Government Social Movements**

Both anarchism and antifascism have deep roots in American history. Anarchism—a philosophy that advocates for direct democracy and voluntary cooperation made possible by the absence of coercive state power—emerged in Europe in the late 19th century as an alternative to and rival of Marxism. Migrants from Europe carried some of these ideas to the U.S., but anarchist concepts were also refashioned by many people of diverse ethnicities as they sought responses to the excesses of early industrial capitalism. Many anarchists such as Emma Goldman were also trade unionists who sought to organize working people to win better wages and working conditions and, as they put it, freedom from domination by both the state and capital. These radical beliefs made anarchists easy targets for suppression by hostile government administrations. In 1886, during a mass movement to win the eight-hour day for workers in Chicago, prosecutors blamed anarchists (among others) for a melee that resulted in a police officer being killed at the Haymarket Square. In 1919, the U.S. Attorney General launched a series of raids on anarchist offices and homes along with those of an anarcho-syndicalist union, the Industrial Workers of the World (IWW). This constituted a key moment in what historians call the "First Red Scare."[17]

Left-leaning activists in the U.S. rediscovered anarchism following the mass movements for civil rights and against the Vietnam War that took place in the 1960s. While those struggles often invoked the importance of "participatory democracy" and "group-centered leadership," anarchists wished to extend these concepts to their movement and to all of society. The political left fragmented in the 1970s, but small groups of anarchists continued to advocate for "direct action" tactics to help enact the non-hierarchical world they envisioned. They did not need to wait for elections—they could simply gather with like-minded people to start a new cooperative, community-based clinic, free school, or needle exchange to immediately begin remedying society's ills while empowering others to get involved.

---

[17] James R. Green, *Death in the Haymarket: A Story of Chicago, the First Labor Movement and the Bombing That Divided Guilded Age America*, 1st ed (Pantheon Books, 2006); Melvyn Dubofsky, *We Shall Be All: A History of the Industrial Workers of the World*, 2nd ed (University of Illinois Press, 1988).

Anarchists gained new visibility during and after the mass demonstrations against the World Trade Organization in Seattle in 1999. Tens of thousands of people clogged the city's streets and disrupted the global financial meeting, forcing it to adjourn without any new agreements. Trade unionists formed an unlikely alliance with environmental groups (the "Teamster-turtle" coalition), and they were joined by hundreds of other social justice organizations. Groups of anarchists donned "black bloc" clothing to distinguish themselves and their radical politics from those of the more mainstream liberal groups that were present. This pattern continued at subsequent protests against corporate-driven globalization and in the movement against the second war in Iraq starting in 2003. At times there were tensions between anarchists and other factions, and some black bloc groups acted independently and outside the wishes of the antiwar protests' main organizers. In Oakland and other locales, small groups that seemingly had affinities for anarchism smashed windows during otherwise nonviolent marches. Many liberals today continue to associate anarchism with this type of disorder. Yet a more complete reading of anarchism in the U.S. today would include a wide range of anarchist-inspired mutual aid projects in addition to periodically disruptive protest tactics.[18]

For its part, antifascist organizing in the U.S. began soon after the rise of Benito Mussolini's fascist government in Italy in the 1920s. Diverse activists on the left—self-identified communists, socialists, anarchists, social democrats—could often agree on nothing except their opposition to fascism. When Francisco Franco's nationalist movement in Spain plunged that country into civil war, American antifascists joined the Republican armed forces in an ultimately vain attempt to preserve its democracy. After Adolf Hitler built on Mussolini's fascist ideas as leader of the National Socialist movement (the Nazis), many Americans came together to defeat fascism's threat to Europe. The United States formed an alliance with the communist Soviet Union to fight the fascist alliance led by Nazi Germany and Mussolini's Italy. African Americans rallied under the slogan of "Double V"— victory in Europe against fascism and for democracy and victory in the U.S. against racism and for democracy. The Allies' victory in World War II temporarily erased the threat of fascist world domination, and the rise of the Cold War led U.S. authorities to again target communists and other leftists in what historians call the "Second Red Scare" or the era of McCarthyism. Anticommunists believed that Soviet spies were hiding in every government agency and under every bed in the suburbs. Recent archival findings reveal that there was in fact an extensive Soviet spy network in the U.S., and it is true that the Communist Party organized secretive cells in order to influence unions and other political parties and coalitions in this period. Yet the vast majority of the individuals who were fired from their jobs or evicted from their homes or blacklisted from public life did not participate in such cells and had no actual connections to Moscow.

In any case, following World War II, antifascism receded from public life, with a handful of exceptions. In the early 1970s, the Black Panther Party for Self-Defense formed a new alliance, the

---

[18] Janet Thomas, *The Battle in Seattle: The Story Behind and Beyond the WTO Demonstrations* (Fulcrum Publishing, 2000); Kevin Danaher and Roger Burbach, eds., *Globalize This!: The Battle Against the World Trade Organization* (Common Courage Press, 2000).

National Committee to Combat Fascism, which mobilized to defend political prisoners and victims of police brutality. In the late 1980s, members of Anti-Racist Action began using "antifa" as part of their wide-ranging, disconnected local activities, and they adopted many anarchist or antiauthoritarian ideologies. Antifascism reappeared as a more potent social force around the time of the first election of Donald Trump to the presidency in 2016. Scholars on all sides of the political spectrum continue to debate the value of the analogy linking Trump to fascism or "neofascism," but it is clear that some groups of activists have adopted the shortened "antifa" as a symbol of their opposition to Trump that also connects them to earlier anarchist and other leftist positions. Antifa signs pop up at virtually all large rallies today. I view them as primarily a rhetorical device—a reminder of past popular resistance to authoritarianism. The people I have talked to that carry them do not participate in any particular organization. They just dislike Trump.[19]

Today "antifa" is largely a symbol for loosely connected web of leftist ideologies, rather than a cohesive social movement. There are no formal coordinating organizations such as the Movement for Black Lives or SNCC. There is no website. However, antifascism persists as inspiration for decentralized protest organizations in which small groups of activists connect with one another on the local level, often to share ideas or plan direct actions. While some self-identifying antifascists do engage in protests that include property destruction, direct actions that include violence are rare and often understood as a last resort.[20] I am not aware of any examples of operational antifa "cells" that are actively engaging in or advocating violent protest anywhere in the country. As a scholar of social movements in Texas with my ear to the ground, I am unaware of any functioning cells of any kind in the state. It is possible that they exist and are hiding underground like the Weathermen of old, but I suspect that today's digital technologies and surveillance systems would make it very difficult to remain undetected. Moreover, I suspect that any activist who might claim to be part of an antifa cell in Texas is exaggerating the group's size, cohesion, and readiness to engage in protests of any kind.

On the other hand, the old anarchist ideas of mutual aid and direct action have had a bit of a renaissance among activists on the left and among a wide swath of liberals who oppose the Trump administration. People do come together to develop ways to put antifascist ideas into practice in a variety of manners, but neither the local groups nor larger loose networks bear any resemblance to the most significant, close-knit, far-reaching, and disciplined terrorist organization in U.S. history: the Ku Klux Klan after the Civil War.

---

[19] Mark Bray, *Antifa: The Anti-Fascist Handbook* (Melville House, 2017); Bill Mullen and Christopher Vials, eds., *The US Antifascism Reader* (Verso, 2020); Maurice Isserman, *Reds: The Tragedy of American Communism* (Basic Books, 2024).

[20] Cait Caffrey, "Antifa," EBSCO Knowledge Advantage Research Starters - History, 2025, https://www.ebsco.com/research-starters/history/antifa.

**Protest Norms/Protocols**

The protestors who are visible in the videos at Prairieland on July 4, 2025, wore black clothing and masks and, collectively, seem to have brought fireworks, a first aid kid, and firearms to the demonstration. Based on the information contained in the indictment, surveillance videos, and Signal chats, it is clear that the demonstrators took security precautions to conceal their identities and mitigate the risks of both arrest and also confrontation with law enforcement.

Wearing black and donning face masks are common practices among protestors on the political left, especially those that identify with anarchist ideas and with greater prevalence since the "Battle in Seattle" in 1999. Since the COVID-19 pandemic, a wide range of activists have begun using facemasks both for health reasons and to at least partially mask their identities. Security cameras now predominate urban landscapes, and facial recognition software—now combined with artificial intelligence—makes it so anyone who walks around a city, campus, or government facility without wearing a mask is readily identified by law enforcement. Many people who participate in all sorts of political activities do not want to be surveilled and identified in this manner. Indeed, federal agents working in the Immigration and Customs Enforcement agency in recent weeks have reasserted their need to cover their faces to avoid being identified or doxed by unknown parties.

The Prairieland activists also employed a series of precautionary measures that are not at all unusual among protestors in U.S. history, including in recent decades. Because peaceful protests do sometimes encounter violence from counterdemonstrators or law enforcement, it is common for activists to carry first aid supplies. Organizers also carry first aid kits to be able to help protest participants who may suffer from heat exhaustion or dehydration, or who might slip and fall, or who might have a health crisis or episode related to a preexisting condition. Most organizers are concerned with keeping all participants safe. More generally, first aid kits can be found at virtually any large gathering, political rally, sporting event, or performance. As an historian, I opine that it is a logical and evidentiary fallacy to suggest that the presence of a first aid kit indicates a person's or a group's intent to use violent protest tactics.

Protestors in Texas and nationwide often carry firearms and at times use bombastic rhetoric in their internal discussions, but it is extremely rare for gunshots to be fired at a demonstration. Throughout my time living in Fort Worth, and especially after 2020, I recall seeing ordinary people publicly displaying firearms while participating in peaceful protests—even though it made other participants who advocated nonviolence uncomfortable. Even small protests often included participants with divergent views on this contested topic. Of course, many Texans of all backgrounds pride themselves on exercising their rights under the Second Amendment and the permissive firearm laws of the state. The fact that someone brought firearms to a protest and discharged them does not indicate that all participants agreed with the use of such tactics, much less that they all helped to plan such activities.

The indictment points to the defendants' use of Signal chats as evidence of a conspiracy. However, it is my informed opinion that the use of Signal today is extremely widespread and does not suggest

an intent to riot, incite violence, or any other sweeping claim, including but not limited to political ideologies. The Signal application promises end users a free form encrypted communication, and in today's age of digital surveillance and artificial intelligence, many law-abiding people use it for everyday purposes in lieu of standard SMS text messaging. In my experience, most present-day activist conversations take place on the platform, including mainstream groups supporting major political parties. Its use alone does not signify any form of political orientation or intent.

Moreover, a careful review of the chats—using the same methods I would use to analyze historic primary sources—shows that the users displayed a wide range of ideas and opinions. There was no unanimity. Users joined and left the chats frequently. In the hours leading up to the evening demonstration at Prairieland, the chats did not show evidence of careful planning nor a clear intent to use violence. The chats do suggest that most of the active participants agreed to hold a noise demonstration and to set off fireworks, with the goal of attracting the attention of, and displaying solidarity with, detainees. The Signal chats also reveal that the activists planned to wear black clothes to avoid being identified. At the same time, the chats demonstrate that most of the participating activists sought to avoid confrontation and conflict with law enforcement.

## CONCLUSION

This report provides historical and social scientific context related to the general anatomy of protest movements, past and present. I do not provide legal opinions. As an historian, I make comparisons between social movements over time and space, recognizing the shifting context. I use commonplace understandings and historical terminology to suggest that "riots" usually involve large numbers of people, that "cells" are usually disciplined in their activities, and that anarchist and antifascist movements have long precedents in U.S. history that also include frequent repression by the government. Historically speaking, the presence of violent tactics or vandalism at a protest does not indicate unanimity among the protest's participants. Activists disagree. But protesting is itself a longstanding American tradition, from the Boston Tea Party to the civil rights movement, and beyond.

# Appendix A – Contents of Dropbox Folder, "Discovery for Experts"

| Description/Title | Bate Number |
| --- | --- |
| Daytime Protest Flyer | GOV_P1_00000414 |
| Daytime Protest Flyer Facebook Group | GOV_P1_00002879 |
| Four Black Medical Kits/Bags Photo | GOV_P2_00000450 |
| Medical Supplies Photo | GOV_P2_00007161 |
| Tourniquet (2) Photo | GOV_P2_00007164 |
| Resist Fascism Flag Photo | GOV_P2_00007207 |
| Fight Oligarchy Flag Photo | GOV_P2_00007208 |
| Batten Jail Property Photo | GOV_P2_00007293 |
| CCTV Footage of Officer Shooting | GOV_P2_00007784 |
| How to Make a Mask Flyer | GOV_P3_00000084 |
| Emma Goldman Bookclub Photo | GOV_P3_00000081 |
| Emma Goldman Bookclub Instagram Profile Review | GOV_P1_00001261 |
| Revolutionary Meditations Zine Photo | GOV_P2_00007416 |
| Open Letter to Fellow Incarcerated Persons Zine Photo | GOV_P2_00007421 |
| 50 Strategies of Revolution Zine Photo | GOV_P2_00007427 |
| 50 Strategies of Revolution Zine Photo | GOV_P2_00007428 |
| What Does Freedom Look Like? Zine Photo | GOV_P2_00007429 |
| What Does Freedom Look Like? Zine Photo | GOV_P2_00007430 |
| Why Anarchy? Zine Photo | GOV_P2_00007434 |
| What is Anarchism Anyways Page Photo | GOV_P2_00007435 |
| Radar Journal Front Cover Photo | GOV_P2_00007439 |
| Radar Journal In This Issue Page Photo | GOV_P2_00007440 |
| Mongoose Distro Catalog Photo | GOV_P2_00007449 |
| Mongoose Distro Catalog Photo | GOV_P2_00007450 |
| The Abolition of Law Book Photo | GOV_P2_00007457 |
| Come and Take It Zine Photo | GOV_P2_00007459 |
| Other Legal Self Defense Items Page Photo | GOV_P2_00007460 |
| Acrid Black Smoke Zine Photo | GOV_P2_00007461 |
| Seth Sikes Proffer Interview | GOV_P3_00000001 |

| Description/Title | Bate Number |
| --- | --- |
| Seth Sikes Proffer Interview | GOV_P3_00000072 |
| Susan Kent Proffer Interview | GOV_P3_00000060 |
| Nathan Baumann Proffer Interview | GOV_P9_00000963 |
| JCSO Deputy Graham Interview Summary | GOV_P1_00001449 |
| APD Sergeant Mello Interview Summary | GOV_P1_00001399 |
| APD Officer Zapato Interview Summary | GOV_P1_00001525 |
| APD Officer Solis Interview Summary | GOV_P1_00001301 |
| APD Officer Bell Interview Summary | GOV_P1_00001370 |
| CCTV Night Parking Lot Video | GOV_P2_00007786 |
| Front Entrance Property Damage Photo | GOV_P2_00000244 |
| Tyrant Spray Paint on Red Vehicle Photo | GOV_P2_00000354 |
| Bigot Spray Paint on White Vehicle Photo | GOV_P2_00000357 |
| ICE Pig Spray Paint on White Vehicle Photo | GOV_P2_00000360 |
| ICE Pig Spray Paint on White Vehicle Photo | GOV_P2_00000361 |
| Traitor Spray Paint on Red Vehicle Photo | GOV_P2_00000364 |
| White Van Property Damage Photo | GOV_P2_00007663 |
| Broken Camera Damage Photo | GOV_P2_00007664 |
| Side Entrance Property Damage Photo | GOV_P2_00007666 |
| Slashed Tire Photo | GOV_P2_00007700 |
| Rear Left Flat Tire on White Van Photo | GOV_P2_00007704 |
| Planning Core Chat Transcript Signal | GOV_P1_00000409 |
| Gear Check Chat Transcript Signal | GOV_P1_00001463 |
| Socialist Rifle Association DFW Signal Chat Screenshots | GOV_P3_00000139 |
| Gunshot Wound Photo | GOV_P2_00007585 |
| Gunshot Wound Photo | GOV_P2_00007587 |
| APD Officer Gross Shirt Photo | GOV_P2_00007588 |
| APD Officer Gross Shirt Photo | GOV_P2_00007590 |
| Officer Gross Body Camera Footage | GOV_P2_00007819 |
| Fireworks and Cooler Night Photo | GOV_P2_00000224 |

| Description/Title | Bate Number |
| --- | --- |
| Fireworks and Cooler Night Photo | GOV_P2_00000226 |
| Fireworks and Cooler Photo | GOV_P2_00004805 |
| CCTV Fireworks Video | GOV_P2_00007787 |
| CCTV Fireworks Video | GOV_P2_00008056 |
| Superseding Indictment December 10, 2025 | |