**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | |
| | § | |
| CAMERON ARNOLD | § | |
| a/k/a "Autumn Hill" | § | |
| ZACHARY EVETTS | § | NO. 4:25-CR-259-P |
| BENJAMIN SONG | § | |
| SAVANNA BATTEN | § | |
| BRADFORD MORRIS | § | |
| a/k/a "Meagan Morris" | § | |
| MARICELA RUEDA | § | |
| ELIZABETH SOTO | § | |
| INES SOTO | § | |
| DANIEL ROLANDO | § | |
| SANCHEZ-ESTRADA | § | |

**EXPERT REPORT OF JONATHAN PINCKNEY**

**<u>INTRODUCTION</u>**

Jonathan Pinckney

c/o University of Texas at Dallas

800 W Campbell Rd,

Richardson, TX, 75080


Tolbert and Associates, PLLC

511 E John W Carpenter Fwy, Suite 500

Irving, TX 75602


This report is in response to your request to review the documents and information supplied and provide an expert opinion in the above-refenced matter. Specifically, I intend to offer opinions regarding protest norms and protocols (e.g. whether practicing operational security or "opsec," wearing a mask or "black bloc" clothing, bringing medical supplies to a protest, setting off fireworks, or bringing firearms are indicative of normal protest or indicative of intent engage in violence), types and forms of protest, and differences between a riot and a protest. These opinions are based on my review of the documents, information, and things listed below, as well

as my education, knowledge, and 14 years of experience in the field of political science, specifically the study of protest movements. I state these opinions to a reasonable degree of professional certainty. I reserve the right to amend and/or supplement these opinions as further discovery is obtained. I am providing my expert opinion as a private consultant, based on my personal expertise in the subject matter. Neither the writing of the report, nor any expert testimony are in any way part of my responsibilities as an employee of the University of Texas at Dallas. My opinions are my own, and not those of the University of Texas at Dallas.

## QUALIFICATIONS

I have been a political scientist focusing on the onset, dynamics, and outcomes of protest movements since 2012, when I began my graduate studies at the University of Denver. As a graduate student, I supervised data collection on the Nonviolent and Violent Campaigns and Outcomes (NAVCO) data project and Social Conflict Analysis Dataset (SCAD), two of the world's leading datasets on protest movements. I received my PhD in 2018 based on a dissertation focused on the connections between nonviolent resistance and democracy. This research was later published as the book *From Dissent to Democracy* by Oxford University Press, one of the top academic publishers in the world.

Since receiving my PhD I have worked in both academic and applied research, including as a Senior Researcher at the United States Institute of Peace, a role in which I advised both the State Department and US partners in places such as Venezuela, Myanmar, and Sudan on the dynamics of protest movements. I have published 18 peer-reviewed journal articles in leading political science and sociology journals, nearly all of which focus on the dynamics and outcomes of protest movements, with particular focus on questions of violence and nonviolence in protest. I continue to regularly speak and consult on questions related to protest for many private organizations and government agencies. I am currently an Assistant Professor and Director of Graduate Studies for political science at the University of Texas at Dallas.

## MATERIAL REVIEWED

To prepare this report and reach my opinions, I reviewed all the documents, information, and things listed in the Discovery Appendix table provided at the end of this report.

To place the events in context, I also reviewed one major external resources: the Crowd Counting Consortium (CCC) dataset, which is one of the most highly respected sources of data on contemporary protest in the United States.[1] I downloaded and analyzed the data myself, particularly variables related to protest violence and the *participant_measures* variable, which is an open text string briefly describing protester actions. CCC data begins in 2017 and continues to the present, with regular updates.[2] The version of the data I downloaded goes through January 31, 2026 and includes a total of 256,091 protests. I also extensively reviewed media and scholarly articles on relevant questions, with all sources footnoted in the opinion below when referenced.


## FACTUAL SUMMARY

The facts as I understand them are as follows:

1. During the night of July 4, 2025, several people, including the defendants, came to the Prairieland Detention Center at night with the stated intention of engaging in a noise demonstration to show solidarity with the people held in the facility. Some of the people attending the noise demonstration were there during a separate protest earlier in the day as well.

2. Several of the people who attended the noise demonstration had discussed logistics for the demonstration in Signal, an end-to-end encrypted messaging app. Some of them knew each other from previous demonstrations, inter-personal connections, or participation in groups such as the Emma Goldman Book Club or the DFW chapter of the Socialist Rifle Association.

3. These people dressed in all-black clothes, or mostly black clothes. Most wore masks. Some brought medical supplies with them. Some of them also brought firearms, and one

---

[1] The Crowd Counting Consortium data is produced by a multi-institutional research team primarily housed at Harvard University. The data is produced through aggregating hundreds of thousands of verified reports from both media and social media sources. The data is freely available to the public at https://ash.harvard.edu/programs/crowd-counting-consortium/. For more on the methodology behind the Crowd Counting Consortium data see Dana R. Fisher et al., "The Science of Contemporary Street Protest: New Efforts in the United States," *Science Advances* 5, no. 10 (2019).  Subsets of the data have been shown through cell-phone location data to accurately reflect on-the-ground protest dynamics (see Anton Sobolev et al., "News and Geolocated Social Media Accurately Measure Protest Size Variation," *American Political Science Review* 114, no. 4 (2020): 1343–51).

[2] The *participant_measures* variable in the CCC data, which I refer to several times below, was only collected beginning in 2021. Thus any statistics using this variable reported below apply only to protests from 1/1/2021 to 12/31/2026. The CCC data's variables on violence, including protester injuries, police injuries, and property damage, are included for the full dataset from 1/21/2017 until 1/31/2026.

of them stated (in an earlier Signal chat) that the purpose of bringing firearms was to deter or intimidate law enforcement.

4. As shown in video footage provided by the government and as described in witness testimony,[3] the noise demonstration primarily involved shooting small fireworks in the general direction of the facility as several people walked along its perimeter, as well as shouting slogans over a megaphone. At least two individuals (though not the full group) can also be seen in video footage provided by the government spray-painting slogans on cars parked in the detention facility parking lot.[4] One of the government's cooperating witnesses, Nathan Baumann, has stated that he was the individual conducting the spray-painting, and that he decided to do so in the moment at the event.[5]

5. Per bodycam footage, when an Alvarado police officer arrived on the scene he shouted at an unseen individual to "stop" and "get on the ground."[6] As he exited his police vehicle, there are sounds of indistinct shouting and then gunfire, after which the police officer fell to the ground and shouted that he had been hit.

## OPINIONS

It is my opinion, based on the evidence provided to me, to a reasonable degree of professional certainty, that the noise demonstration that took place on the evening of July 4, 2025 outside the Prairieland Detention Facility was a normal protest. I do not believe that the organizers or attendees planned to harm law enforcement officers or anyone else.

It is further my opinion, to a reasonable degree of professional certainty, that far from being the result of an intentional strategy to cause harm or destruction, the shooting of the Alvarado police officer was the result of split-second decision made by a single person in an emotionally heightened confrontational moment.

Further, it is my opinion that the noise demonstration organizers did not even plan any damage to property. While it appears clear from the video and photographic evidence provided and the

---

[3] See in particular the videos GOV_P2_00007787 and GOV_p2_00008056.
[4] This can be seen clearly in video GOV_P2_00007786.
[5] Proffer Interview of Nathan Josiah Baumann at Johnson County Sheriff's Office, 12/1/2025 (GOV_P9_00000963).
[6] The body cam footage in question is GOV_P2_00007819

witness statement from Nathan Baumann that at least two individuals engaged in some minor acts of vandalism, there is no evidence that such acts were orchestrated by the group, and indeed witness testimony strongly suggests the opposite. Thus, the noise demonstration was not, in any meaningful way, a "riot."

Finally, it is also my opinion that the description in the superseding indictment of the organizers and attendees at the noise demonstration as "operatives" of "the North Texas Antifa Cell"[7] is highly inaccurate and misleading.

These opinions rest on the fact that all the actions taken by the defendants as described in the indictment and in the discovery materials provided to me, the signal chats, witness statements, video footage and photographic evidence (e.g. violent anti-government rhetoric, practicing "opsec" by using an encrypted messaging app and keeping cellphones in Faraday bags, wearing masks and "black bloc" clothing, shooting off fireworks, some subset of protesters engaging in vandalism, and bringing firearms to intimidate law enforcement) are very normal parts of contemporary protest, and are in no way associated either with planned protest violence or with organized armed insurgent organizations.

I will present support for each element of my opinion in turn, beginning with a general overview of protest norms in the United States today and then moving through, in turn, noise demonstrations, violent rhetoric, "black bloc" clothing, mask-wearing, bringing medical supplies, practicing digital "opsec," and carrying firearms.

*General Protest Norm Overview*

Historically, protest in the United States tended to be tightly planned by organizations such as churches, labor unions, or issue-based advocacy groups and to focus on specific goals or demands. Most people attending protests knew each other and had typically been invited to attend through friends or family.[8] This is because it was difficult to mobilize and coordinate large

---

[7] USA v. Cameron Arnold aka Autumn Hill, et al. Second Superseding Indictment, 12/5/25
[8] Doug McAdam, "Recruitment to High-Risk Activism: The Case of Freedom Summer," *American Journal of Sociology* 57, no. 4 (1986): 64–90.

numbers of people. Spreading the word about a protest was difficult. Large protests often required months or years of planning and a very significant resource investment.

Protests in 21st century America are very different. Thanks to the rise of the internet and social media it is much easier to gather a group of people to hold a demonstration. This has had several well-known and well-understood effects.[9] First, big protests tend to be bigger. Second, protests of any kind tend to be more frequent. Third, protest mobilization tends to happen quickly, tends to spread across social media,[10] and tends to be brought together not by a single tightly-controlled organization with set members or operatives but instead by loose groups of lightly-affiliated individuals and organizations only unified by affinity with a set of shared goals and symbols.[11] Some people still go to protests with friends or with people they know from church or other social environments, or because they are members of an organization. But most people who go to protests do so because they have seen something about it online and because they support the general cause or symbols that the protest is drawing on.

For instance, the original "Tea Party" protests on Tax Day 2009 involved both events organized by leading conservative organizations and events where large numbers of people opposed to the Obama Administration's spending policies simply showed up because they had heard about the event online.[12] Similarly, the first "Women's March" on January 21, 2017 occurred after the responses to a single Facebook post spiraled out in a massive call for demonstrations, and demonstrations in 2020 both against COVID-19 restrictions and as part of the "Black Lives Matter" movement were organized by largely *ad hoc*, uncoordinated, informal groups.[13]

---

[9] John T. Jost et al., "How Social Media Facilitates Political Protest: Information, Motivation, and Social Networks," *Political Psychology* 39, no. S1 (2018): 85–118, https://doi.org/10.1111/pops.12478.

[10] Matthias Flückiger and Markus Ludwig, "The Structure of Online Social Networks and Social Movements: Evidence from the Black Lives Matter Protests," *Journal of Public Economics* 246 (June 2025): 105373, https://doi.org/10.1016/j.jpubeco.2025.105373.

[11] Zeynep Tufekci, *Twitter and Tear Gas: The Power and Fragility of Networked Protest* (Yale University Press, 2017).

[12] Andreas Madestam et al., "Do Political Protests Matter? Evidence from the Tea Party Movement," *Quarterly Journal of Economics* 128, no. 4 (2013): 1633–85.

[13] Marie Berry and Erica Chenoweth, "Who Made the Women's March?," in *The Resistance: The Dawn of the Anti-Trump Opposition Movement*, ed. David S. Meyer and Sidney Tarrow (Oxford University Press, 2018); Pamela M. Hong and Clayton D. Peoples, "The Ties That Mobilize Us: Networks, Intergroup Contact, and Participation in the Black Lives Matter Movement," *Analyses of Social Issues and Public Policy* 21, no. 1 (2021): 541–56, https://doi.org/10.1111/asap.12230.

This rapid, decentralized character of most 21st century protests means in turn that most protest events typically involve both planned and unplanned elements. Organizers may come with a certain set of priorities and planned tactics (such as to hold a noise demonstration), but they can only rarely strictly impose that set of priorities and tactics on all attendees. They may not even have clear avenues to communicate those priorities and tactics to all attendees. Actions by individuals at protests are often improvised, chosen based on spur of the moment decisions rather than through intentional planning in advance. Unplanned actions are particularly likely to occur in encounters with police or counter-protesters, when the heightened emotions of a confrontation can lead people to behave in unexpected ways.[14]

The Prairieland Detention Center noise demonstration, as described in the evidence I reviewed, fits this typical pattern of contemporary protest actions exactly. Some of the attendees, as can be seen in the organizing signal chats, knew each other through a mix of interpersonal relationships, membership in informal clubs or reading groups, or through meeting at past protest events. However, others were meeting each other for the first time.[15] They were united not by a common organizational membership but rather by a complex set of overlapping relationships, interests, and social media connections.

What they planned to do, as is described clearly in their Signal chats, was to hold a noise demonstration to show solidarity with the people detained inside the Prairieland Detention Center.[16] Other actions that occurred at the noise demonstration, including spray-painting cars and the shooting of the Alvardo police officer, best fit the evidence and what we know about general patterns of protest in contemporary America as unanticipated actions undertaken by specific individuals in the heat of the moment, not planned tactics by this disparate group of individuals.

I now describe several aspects of the Prairieland Detention Center noise demonstration, highlighting the ways in which each of these is a common element of normal protest in the

---

[14] David A. Snow and Dana M. Moss, "Protest on the Fly: Toward a Theory of Spontaneity in the Dynamics of Protest and Social Movements," *American Sociological Review* 79, no. 6 (2014): 1122–43, https://doi.org/10.1177/0003122414554081.
[15] For example, see Proffer Interview of Seth Sikes, 9/19/25, where Sikes describes chatting with Nathan Baumann about their names and hometowns.
[16] Planning Core Chat Transcript Signal (GOV_P1_00000409)

United States today, and in no way indicative of an intention to engage in violence or property destruction.

*Noise Demonstrations*

Several of the organizers described their intention was to hold a "noise demonstration." This is a common tactic in many different protest movements around the world.[17] The basic structure of a noise demonstration is very simple: at a pre-planned time and place a group of people make a series of loud noises. This is typically done using something more than just people's voices, for instance by banging together pots and pans, blowing whistles, or setting off fireworks.

The typical rationale for holding a noise demonstration is a situation where it would be impractical or unsafe for a large number of people to gather in the same place as the person or group to which they are attempting to communicate their message. Noise demonstrations may also be appealing to protesters for their rhetorical or symbolic value. Anyone who has attended a sporting event or concert and felt their emotions swell after a crowd has been asked to "make some noise" will appreciate the symbolic power of a group of people all making loud noises together.

The use of coordinated loud sounds as a form of protest has a long history. During the Soviet invasion of Czechoslovakia in 1968, people set off bells and sirens around the country to protest the Communist occupation.[18] Yet the tactic was largely popularized in the modern era by Latin American movements for freedom against military dictatorships, particularly in Argentina and Brazil.[19] These movements started noise demonstrations as a way of communicating people's demand for freedom when it was unsafe (because of government violence) to protest on the streets. At pre-specified times in certain cities around the country, people would stand on their balconies or outside their homes and make loud noises, often by banging pots and pans together.

---

[17] For some examples, see the cases of "symbolic sounds" listed in the Global Nonviolent Action Database. https://nvdatabase.swarthmore.edu/category/gene-sharps-198/028-symbolic-sounds.

[18] Gene Sharp, *The Politics of Nonviolent Action* (Porter Sargent, 1973).

[19] Though some scholars link the origins of the noise demonstration to the older tradition of *charivari,* a kind of ritualistic shaming, common across many European cultures Matthew Kerry, "The Death of 'Traditional' Charivari and the Invention of Pot-Banging in Spain, c. 1960–2020," *Past & Present* 263, no. 1 (2024): 249–82.

Because pots and pans were one of the most common implements used in such demonstrations, many began calling them *cacerolazo* or casserole protests.[20]

Noise demonstrations were used extensively around the world during the COVID-19 pandemic, when lockdown restrictions either prohibited or strictly limited public gatherings.[21] They have also been commonly used by protest movements opposed to various forms of incarceration, since the protesters wish to communicate a message of solidarity to people who are incarcerated and yet are unable to do so visually.[22]

As evidenced by this historical record, noise demonstrations are typically used precisely because they are considered "low risk." They are a common, and significantly less confrontational form of protest than, say, sit-ins or road blockades since they are not tied to directly putting one's body in harm's way. This is exactly how the tactic is described in the Signal chats leading up to the Prairieland Detention Center event.[23] People in these chats also describe other ways of making noise, including one participant suggesting bringing an instrument along or letting the protesters borrow it. This fits well with plans for a normal noise demonstration whose purpose was to make some loud symbolic sounds and then flee when law enforcement arrives. It fits extremely poorly with a planned attempt to violently confront law enforcement or intentionally damage or destroy property.

*Fireworks*

Many protests for diverse goals around the world have also set off fireworks, either as part of a noise demonstration or simply as a way of dramatically getting attention. In recent weeks, for instance, protests using fireworks have taken place in Italy by people upset over the effects of the Winter Olympics on rising housing costs,[24] and in Brussels by European dairy farmers on

---

[20] Stefan Christoff, "Beautiful Trouble: Cook Up a 'Cacerolazo' Ruckus," The Tyee, January 2, 2015, https://thetyee.ca/Culture/2015/01/02/Cacerolazo-Ruckus/.

[21] See, e.g. Daniella Byck, *People Are Banging Pots and Pans From Their Balconies in Solidarity With DC Protests - Washingtonian*, June 3, 2020, https://washingtonian.com/2020/06/03/people-are-banging-pots-and-pans-from-their-balconies-in-solidarity-with-dc-protests/.

[22] For a description of such a noise demonstration from an activist perspective, see Anonymous, "Noise Demos Ring In New Year Against Backdrop of Increasing Police Violence and Growing Prisoner Resistance," Action, *It's Going Down*, January 4, 2023, https://itsgoingdown.org/nosie-demo-round-up-nye-2022-against-backdrop/.

[23] See spreadsheet of chats in GOV_P1_00000403.xlsx

[24] Colleen Barry and Andrea Rosa, "Italian police fire tear gas as protesters clash near Winter Olympics hockey venue." *AP News,* February 7, 2026. https://apnews.com/article/winter-olympics-protest-milan-ice-demonstration-fb4df93ea831f8ddb67550ee9dfe7438

tractors who threw eggs and potatoes at police and set off fireworks to protest a new agricultural trade agreement between the European Union and South America.[25]

The CCC data (described above) includes 87 protests where these is explicit mention of fireworks being set off.[26] This number is almost certainly an undercount of the total number of protests in the United States during this time, since fireworks were not a focus of the data collection and thus the data only captures cases where the CCC team happened to note fireworks were used. The first protest in the data that mentions fireworks being used was by a group called "Oregon Women for Trump", who set off fireworks during a demonstration against COVID-19 restrictions in early 2021.[27] Fireworks are a dramatic form of noise demonstration. However, they are in no way associated with injuries to or attacks on police. In only 4 out of the 87 protests in the CCC data with fireworks were any police injuries reported.

The use of fireworks at a protest, thus, in no way necessarily implies the occurrence of a "riot," nor any necessary attempt to harm persons or property. Fireworks used as part of a "riot" are typically aimed or thrown directly at law enforcement, or at windows or other structures that can be easily damaged by them. As video footage from the protest shows, and as witness testimony reports, the fireworks set off at the Prairieland Detention Center were not used to harm ICE personnel or law enforcement or to damage the facility. Instead, video footage shows the fireworks being aimed high in the sky in the general direction of the PDC, and when ICE personnel emerge not only are they not directly targeted by fireworks, but the individuals shooting off the fireworks cease doing so and flee.[28]

---

[25] Sam McNeil, "Farmers block roads in Brussels to protest South American free-trade deal," *The Independent,* December 18, 2025. https://www.independent.co.uk/news/world/europe/european-union-brussels-mercosur-emmanuel-macron-italy-b2887115.html

[26] This number is drawn by searching the text of the "participant_measures" variable from CCC, which includes short text descriptions of actions taken by protesters during the protest. This variable was only collected beginning in 2021.

[27] Saphara Harrell. "In Salem, Trump Supporters Back Effort to Overturn Presidential Election." *Salem Reporter*, January 7, 2021. https://www.salemreporter.com/2021/01/07/in-salem-trump-supporters-back-effort-to-overturn-presidential-election/

[28] See, in particular the two CCTV Fireworks videos GOV_P2_00008056 and GOV_P2_00007787

*Violence-Evoking Rhetoric and Violence in Protest*

Many of the Signal chats and protest literature from participants in the Prairieland Detention Center, including anarchist zines, employ rhetoric that references violence, or is insulting or otherwise confrontational. In the superseding indictment, this is presented as a form of evidence that the protesters intended to engage in destruction of property and violent attacks on law enforcement. However, such claims fit very poorly with the dynamics of contemporary protest in the United States, as well as general attitudes toward political violence among the general US population. Rhetoric that references violence or involves insulting or confrontational language is common at protests across the political spectrum in the United States. This reflects rising patterns of *affective polarization*, in which political partisans view their opponents not just as political rivals but view them with fear, distrust, and animosity.[29]

Yet in almost all cases, such violent language serves a *rhetorical* purpose rather than indicating any real, planned intention to engage in violence. While violent rhetoric is very common, violence of any kind is exceedingly rare at protests in the United States. Out of 256,091 protests from 2017-2026 included in the CCC data, fewer than one percent had any incidents of harm to persons or property.[30]

The average American, even the regular protester, often grossly overestimates the amount of violence that takes place at protests. For example, while the wave of protests associated with the Black Lives Matter movement in the summer of 2020 were overwhelmingly peaceful (97% of protests had no violence whatsoever),[31] significant percentages of Americans incorrectly reported a belief to pollsters that such protests were largely violent.[32] People make these factual

---

[29] Nathan P. Kalmoe and Lilliana Mason, *Radical American Partisanship: Mapping Violent Hostility, Its Causes, and the Consequences for Democracy* (University of Chicago Press, 2022); Shanto Iyengar et al., "The Origins and Consequences of Affective Polarization in the United States," *Annual Review of Political Science* 22, no. 1 (2019): 129–46, https://doi.org/10.1146/annurev-polisci-051117-073034.

[30] The Crowd Counting Consortium (CCC) data records three types of violence at protests: harm to protesters, harm to police, and property damage. 2,530 protests, or roughly 0.9% of observations in the dataset record any one of these forms of violence.

[31] Jeremy Pressman et al., "Protests Under Trump, 2017-2021," *Mobilization: An International Quarterly* 27, no. 1 (2022): 13–26, https://doi.org/10.17813/1086-671X-27-1-13.

[32] Juliana Menasce Horowitz et al., "Views on the Black Lives Matter Movement," *Pew Research Center*, June 14, 2023, https://www.pewresearch.org/social-trends/2023/06/14/views-on-the-black-lives-matter-movement/; Geoffrey Skelley, "How Americans Feel About George Floyd's Death And The Protests," *FiveThirtyEight*, June 5, 2020, https://fivethirtyeight.com/features/how-americans-feel-about-george-floyds-death-and-the-protests/.

errors for a few well-understood reasons. General risk aversion makes people focus more intensely on possible harm rather than the absence of harm, over-estimating the frequency of dangerous but rare events.[33] Media amplification drives this tendency further.[34] There is a well-established tendency for media coverage of protest to focus heavily on instances of violent disruption, and to downplay (or simply report in vague summary terms) protests where no violence occurs.[35] Beyond general media focus on violence, partisan media or social media regularly attempts to inflate the levels of violence by their partisan opponents, or their opponents' violent intentions.[36]

On very rare occasions when people are physically harmed at protests, protesters are much more commonly harmed than police. The CCC data record 1,116 protests in which protesters were injured or killed, either by police or by counter-protesters. They record 399 protests in which police were injured or killed. Figure 1 shows the frequencies and overlaps of various forms of protest violence.

---

[33] Amos Tversky and Daniel Kahneman, "Availability: A Heuristic for Judging Frequency and Probability," *Cognitive Psychology* 5, no. 2 (1973): 207–32; Sarah Lichtenstein et al., "Judged Frequency of Lethal Events.," *Journal of Experimental Psychology: Human Learning and Memory* 4, no. 6 (1978): 551.

[34] Roger E. Kasperson et al., "The Social Amplification of Risk: A Conceptual Framework," *Risk Analysis* 8, no. 2 (1988): 177–87; https://doi.org/10.1111/j.1539-6924.1988.tb01168.x.

[35] Douglas M. McLeod and James K. Hertog, "The Manufacture of `Public Opinion' by Reporters: Informal Cues for Public Perceptions of Protest Groups," *Discourse & Society* 3, no. 3 (1992): 259–75, https://doi.org/10.1177/0957926592003003001; Douglas M. McLeod and Benjamin H. Detenber, "Framing Effects of Television News Coverage of Social Protest," *Journal of Communication* 49, no. 3 (1999): 3–23.

[36] Matthew Levendusky, "Partisan Media Exposure and Attitudes Toward the Opposition," *Political Communication* 30, no. 4 (2013): 565–81, https://doi.org/10.1080/10584609.2012.737435; Joseph S. Mernyk et al., "Correcting Inaccurate Metaperceptions Reduces Americans' Support for Partisan Violence," *Proceedings of the National Academy of Sciences* 119, no. 16 (2022): e2116851119, https://doi.org/10.1073/pnas.2116851119; Danielle K. Brown and Rachel R. Mourão, "No Reckoning for the Right: How Political Ideology, Protest Tolerance and News Consumption Affect Support Black Lives Matter Protests," *Political Communication* 39, no. 6 (2022): 737–54, https://doi.org/10.1080/10584609.2022.2121346.

**Figure 1: Frequency and Overlap of Types of Protest Violence**



*Diagram shows the frequency and overlap of three different categories of protest-related violence as recorded by the Crowd Counting Consortium. The size of each circle represents the total number of protest events where the specific type of violence was observed (property damage n = 1503, protester injury n = 1116, police injury n = 399), while the overlap areas indicate protest events where more than one type of violence occurred.*

This context is critical to making sense of many of the preparations undertaken by the individuals who attended the Prairieland Detention Center noise demonstration. Activists who regularly attend protests and who follow information on protest described in media and social media sources hear frequently about violence toward protesters perpetrated by law enforcement. For instance, there has been extensive media coverage of the killings of protesters Renee Good and Alex Pretti by ICE agents in Minneapolis. Thus, activists, particularly those who are skeptical of law enforcement or have ideological opposition to the idea of law enforcement, engage in a variety of strategies intended to protect themselves from the possibility of police violence. These strategies typically involve either (1) ways to escape a confrontation, (2) ways to reduce the harm associated with a confrontation, or - most controversially - (3) ways to deter or intimidate law enforcement. Many of the behaviors alleged in the superseding indictment fit into these categories, and thus, with appropriate context, are better understood not as strategies for

enabling rioting or any other form of violence but rather as strategies for the protesters who attended the Prairieland Detention Center noise demonstration to avoid the real (yet likely over-estimated) threat of police violence directed toward them.

*Black Bloc Aesthetics*

The first of these defensive measures is the wearing of all-black clothing. According to the witness statements, the people who attended the Prairieland Detention Center noise demonstration all wore such clothing. The organizing chat on Signal also includes several references to "black bloc" tactics. In the superseding indictment, the government claims that this is indicative of intention to engage in violent or destructive behavior, as well as evidence of membership in a coordinated violent organization. Neither contention fits the facts.

Black bloc is a well-understood protest tactic in which demonstrators dress entirely in black and often attempt to partially or fully conceal their identities.[37] The tactic was developed in the 1980s in the European autonomist movement's protests against squatter evictions, nuclear power, and restrictions on abortion. Specifically, in response to police attacks, radical activists developed the tactic of wearing black motorcycle helmets and ski masks and dressing in uniform black clothing, which allowed them to more effectively fend off police attacks without being singled out as individuals for later arrest and harassment. The tactic spread through activist networks and punk music, reaching the United States and Canada in the early 1990s, with the 1999 Battle of Seattle during the WTO Summit serving as a turning point in its wider dissemination.[38]

Black bloc is a tactic, not a cohesive group — it has no permanent membership and dissolves after each action.[39] It is intended primarily as a way for protesters to protect themselves from what they perceive as a likely violent response by law enforcement. It is also a way of building up protesters' confidence and sense of purpose. Seeing all of one's fellow protesters dressed similarly, particularly in an intimidating way, serves the same function as, for instance, wearing a

---

[37] Francis Dupuis-Déri, *Who's Afraid of the Black Blocs?: Anarchy in Action around the World* (PM Press, 2014).

[38] Francis Dupuis-Déri, "The Black Blocs Ten Years after Seattle: Anarchism, Direct Action, and Deliberative Practices," *Journal for the Study of Radicalism* 4, no. 2 (2010): 45–82.

[39] This emphasis on black bloc as a tactic rather than an organization can be seen in the organizing Signal chats leading up to the Prairieland Detention Center noise demonstration, where one person in the chat asks "we doing black bloc and rifles?" See Planning Core Chat, p. 56.

sports team's colors to a sporting event. It creates a feeling of collective identity and empowerment.

Black Bloc protests almost never lead to violence toward police and are most likely to be entirely peaceful (though often confrontational and sometimes incorporating property damage). The CCC data records 111 "black bloc" protests.[40] Figure 2 below shows the distribution of incidents of property damage and police injury at these protests.

**<u>Figure 2 Rates of Violence at "Black Bloc" Protests</u>**



*Diagram shows the frequency of different types of protester violence at protests where the Crowd Counting Consortium explicitly describes the presence of "black bloc" protest tactics. Damage to property n = 31, police injury n = 3, no property damage or policy injury = 79. Note that the number across columns sums to 113, while the total number of "black bloc" protests is 111 because 2 of the protests with police injuries also record property damage, and are thus included in both the "damage to property" and "police injury" columns.*

---

[40] As with the number of protests with fireworks reported above, this number is drawn by searching the participant_measures variable for all mentions of the phrase "black bloc." It is likely an undercount of the total number of black bloc protests during the period of study, since this approach only captures protests where the CCC coders happened to mention the phase. However, given both media focus on protest violence and the CCC's explicit focus on collecting data on property damage and police injuries, I am highly confident that all or close to all instances of protest violence are being captured.

*Wearing Masks*

One specific part of the "black bloc" clothing style adopted by the Prairieland Detention Center protesters is the wearing of masks or other face coverings that obscure one's identity. Mask-wearing at protests is a widespread and long-standing practice that cuts across the political spectrum. Activists on both the left and right of the political spectrum increasingly use masks to shield their identity.[41] On the left, protesters have worn masks at environmental demonstrations, anti-war rallies, pro-Palestine encampments, and labor actions; on the right, mask-wearing has appeared at anti-government protests and demonstrations against pandemic-era mandates. The mask has become an anti-establishment symbol wielded by ordinary people to register their dissatisfaction with the policies of the political elite, serving as a mainstream vehicle to communicate subversion and challenge those in power. Iconic protest masks — from the Guy Fawkes face associated with the Occupy movement to medical-grade N95s — have become recognizable features of political demonstration worldwide, used by people across ideological lines.[42]

The reasons protesters wear masks are varied and almost entirely peaceful in nature. Whether a person is afraid of catching an airborne illness from fellow protesters, or concerned about reprisals for expressing political opinions in public, wearing a mask is a perfectly legitimate and recognized form of surveillance self-defense during a protest, given the massive proliferation of surveillance camera networks, facial recognition technology, and databases of personal information.[43] A significant concern driving mask use is the worry over professional consequences — many people worry their political views or protest activities could get them fired or harm their career. Beyond personal protection, masks have a transformative and unifying quality — they foster a shared identity among participants and communicate collective strength, helping people feel emboldened to stand alongside others in a public demonstration. Governments often move to ban protest masks not because mask-wearers are inherently dangerous, but because masks are a powerful tool for building collective identity and increasing

---

[41] Nicholas Fandos, "In an Online World, a New Generation of Protesters Chooses Anonymity," New York, *The New York Times*, May 2, 2024, https://www.nytimes.com/2024/05/02/nyregion/college-campus-protests-anonymity.html.

[42] Andreas Beer, "Just(Ice) Smiling? Masks and Masking in the Occupy-Wall Street Protests," *European Journal of American Studies*, nos. 13–4 (December 2018), https://doi.org/10.4000/ejas.13982.

[43] Adam Schwartz and Matthew Guariglia, "Criminalizing Masks at Protests Is Wrong," Electronic Frontier Foundation, June 9, 2025, https://www.eff.org/deeplinks/2025/06/criminalizing-masks-protests-wrong.

the power of social movements — a recognition that the vast majority of people wearing masks at protests are doing so to participate, not to cause harm.[44]

*Medical Supplies*

Several of the protesters at the Prairieland Detention Center also brought medical supplies with them.[45] Someone unfamiliar with the general patterns of protest in the United States might reasonably ask the question of why bring medical supplies to a peaceful protest. Yet bringing medical kits to a protest is a well-established, mainstream, and widely advised practice — one endorsed by medical professionals, civil liberties organizations, nurses, and protest safety guides. Healthcare providers routinely advise that people planning to attend a protest should never assume they won't encounter dangerous situations, and recommend coming prepared with basic medical supplies.[46]  The reasoning is straightforward: large outdoor gatherings carry both routine risks including heat exhaustion, dehydration, crowd-related injuries, as well as the possibility of physical harm through exposure to crowd-control agents like tear gas, pepper spray, or rubber bullets. At physically demanding events, protesters can lose significant water through sweat and increased breathing, and dehydration can begin impacting mood, attention, and motor coordination before a person even feels thirsty. Guides from trained medical professionals all treat bringing a first aid kit to a protest as an obvious, responsible baseline — not an unusual or suspicious choice. The idea that bringing medical supplies signals an intent to engage in violence thus fundamentally misunderstands both the nature of protests and basic first aid logic.

The presence of protesters with medical supplies is oriented entirely toward *preventing* harm, not causing it. It would be as logically coherent to claim that someone attending a marathon with a first aid kit intends to cause injuries. In reality, the need for medical supplies at protests is more typically driven by the *response* to protesters — including the use of rubber bullets, pepper spray, and tear gas by law enforcement — rather than any action taken by the protesters

---

[44] Jennifer B. Spiegel, "Masked Protest in the Age of Austerity: State Violence, Anonymous Bodies, and Resistance 'In the Red,'" *Critical Inquiry* 41, no. 4 (2015): 786–810, https://doi.org/10.1086/681786; Lone Riisgaard and Bjørn Thomassen, "Powers of the Mask: Political Subjectivation and Rites of Participation in Local-Global Protest," *Theory, Culture & Society* 33, no. 6 (2016): 75–98, https://doi.org/10.1177/0263276416651685.
[45] See GOV_P2_00000450, GOV_P2_00007161, and GOV_P2_00007164.
[46] Sara Kiley Watson, "Essential First Aid Tips for Protesters." https://www.popsci.com/story/diy/first-aid-protest/, Chicago Action Medical "Street Medic Handbook" https://mutualaiddisasterrelief.org/wp-content/uploads/2020/04/kupdf.net_street-medic-handbook.pdf

themselves.[47] As mentioned above, it is much more common for protest *participants* to become injured by the police response to protests than it is for protesters to injure police.

*Operational Security/Opsec*

Several of the Prairieland Detention Center protesters participated in a chat on the end-to-end encrypted messaging app Signal, and practiced "opsec" procedures, including self-deleting messages, using pseudonyms rather than real names, and limiting participation in the "Core chat" where the protest was being organized. The superseding indictment describes the purposes of this behavior as "to hide their involvement in illegal activity." Yet this also does not fit well with how such behaviors are typically used in contemporary protest movements.

Digital organizing is a key part of protest movements from across the political spectrum in the United States and around the world – a natural pattern, given the centrality of social media and other forms of digital communication in the 21st century. And operational security practices associated with the digital platforms where organizing takes place is common, with a long, well-documented history. Operational security practices by protest organizers are rooted in practical necessity rather than any inherently suspicious intent. Civil rights activists in the 1960s passed notes and used pay phones to avoid FBI surveillance; today's organizers use Signal and encrypted email for the same basic reasons.

Academics, journalists, and civil liberties organizations like the American Civil Liberties Union (ACLU) and Electronic Frontier Foundation (EFF) routinely advise activists to use encrypted communications, not because protest activity is illegal, but because surveillance of political movements has a well-documented history of being used to disrupt legitimate dissent.[48]

---

[47] For a review of these kinds of health impacts see Rohini J. Haar et al., "Death, Injury and Disability from Kinetic Impact Projectiles in Crowd-Control Settings: A Systematic Review," *BMJ Open* 7, no. 12 (2017): e018154; Rohini J. Haar et al., "Health Impacts of Chemical Irritants Used for Crowd Control: A Systematic Review of the Injuries and Deaths Caused by Tear Gas and Pepper Spray," *BMC Public Health* 17, no. 1 (2017): 831, https://doi.org/10.1186/s12889-017-4814-6.

[48] Jennifer Earl et al., "The Digital Repression of Social Movements, Protest, and Activism: A Synthetic Review," *Science Advances* 8, no. 10 (2022): eabl8198, https://doi.org/10.1126/sciadv.abl8198; Federation of American Scientists, *Protecting Civil Rights Organizations and Activists: A Policy Addressing the Government's Use of Surveillance Tools*, n.d., accessed February 16, 2026, https://fas.org/publication/protecting-civil-rights-organizations-and-activists-a-policy-addressing-the-governments-use-of-surveillance-tools/; International Center for Not-for-profit Law, *Protesting in an Age of Government Surveillance*, February 16, 2023, https://www.icnl.org/post/analysis/protesting-in-an-age-of-government-surveillance.

In addition to being familiar with the general protest landscape on this question, I have also conducted my own research into digital security practices by activist groups around the world, including activists fighting against the dictatorship in Iran and digital security experts working in the United States, Vietnam, and sub-Saharan Africa. Among these activists and digital security experts who work with activists, using Signal, Telegram, or other end-to-end encrypted (E2E) communications is standard operating procedure – a baseline of digital security for everyone.[49]

Limiting organizing discussions to a small, trusted group of core participants is similarly standard practice across the political spectrum and has nothing inherently conspiratorial about it. Large organizing committees are inefficient and prone to miscommunication. It also reduces the risk that plans get distorted through the telephone-game effect of large group communication. Labor unions, political campaigns, and corporate PR teams all operate the same way — a small strategy group makes decisions, then communicates outward. For protest organizers specifically, there is the added consideration that movement history shows infiltration by law enforcement informants is a real phenomenon, and limiting the circle of trust is a rational, documented response to that reality. None of this implies illegal activity; it reflects a reasonable awareness that organizing politically visible events carries exposure, and that protecting participants is a legitimate priority.

*Carrying Firearms*

Finally, there is the question of bringing firearms to attend a protest. Why bring weapons if one isn't intending to use them? Many protest groups advise against bringing firearms to a protest, for the same reason that one would avoid bringing firearms into any situation: the introduction of a deadly weapon raises the stakes of any kind of confrontation. And bringing firearms to protests is relatively rare globally, since in most countries firearms are difficult to obtain and not culturally resonant.

---

[49] Matthew Cebul and Jonathan Pinckney, *Digital Authoritarianism and Nonviolent Action: Challenging the Digital Counterrevolution*, Special Report no. 499 (United States Institute of Peace, 2021), https://www.usip.org/publications/2021/07/digital-authoritarianism-and-nonviolent-action-challenging-digital; Matthew Cebul and Jonathan Pinckney, *Nonviolent Action in the Era of Digital Authoritarianism: Hardships and Innovations*, Special Report no. 506 (United States Institute of Peace, 2022), https://www.usip.org/publications/2022/02/nonviolent-action-era-digital-authoritarianism-hardships-and-innovations.

However, the importance of firearms in American culture and history, and the constitutional protections for the Second Amendment mean that the practice of bearing arms at political demonstrations has deep roots in American history. Protesters tend to carry firearms for two reasons: either to protect themselves from potential violence by police or counter-protesters, or as a symbolic element of their protest goals. These two reasons often overlap.

For example, during the civil rights movement of the 1960s, an armed Black American self-defense group called the Deacons for Defense and Justice provided security for civil rights activists and their families from white vigilantes and discriminatory police under Jim Crow laws. The group's members — mostly army veterans — carried pistols, rifles, and walkie-talkies. They worked out agreements to bring their guns to demonstrations and serve as security guards, deterring white violence and protecting demonstrators on multiple occasions. [50]

Pro-Second Amendment demonstrations by gun rights advocates are, perhaps unsurprisingly, one of the most common environments in which protesters openly carry firearms, primarily for symbolic reasons. For example, in 2003, gun rights supporters in Ohio armed with handguns engaged in a series of "defense walks" to pressure Governor Bob Taft to sign concealed carry legislation into law.[51] And gun rights groups in Virginia over the last several years have regularly organized "Lobby Day" rallies where they demonstrate with openly carried firearms outside the Virginia state capitol.[52]

Carrying firearms was also a common element in protests in 2020 against lockdown restrictions put in place in response to the COVID-19 pandemic. On April 30, 2020, demonstrators against Michigan's coronavirus restrictions — some openly carrying long guns and including militia members — entered the state capitol and confronted law enforcement, demanding to be allowed onto the floor of the legislative chamber. Armed militia members in tactical gear stood guard on the statehouse steps, and some armed protesters later entered the Senate gallery.[53]

---

[50] Charles E. Cobb, *This Nonviolent Stuff'll Get You Killed: How Guns Made the Civil Rights Movement Possible* (Basic Books (AZ), 2014).
[51] Buckeye Firearms Association, "Defense Walks Make History in Ohio," accessed February 14, 2026, https://www.buckeyefirearms.org/final-2003-ohio-open-carry-defense-walks-announced.
[52] Markus Schmidt, "Lobby Day in Richmond Highlights Divide over Gun Policy in Virginia," *Virginia Mercury*, January 20, 2025, https://virginiamercury.com/2025/01/20/lobby-day-in-richmond-highlights-divide-over-gun-policy-in-virginia/.
[53] Associated Press, "Michigan Militia Puts Armed Protest in the Spotlight," WXYZ Detroit, May 2, 2020, https://www.wxyz.com/news/coronavirus/michigan-militia-puts-armed-protest-in-the-spotlight.

Carrying firearms significantly raises the risk of violence at protests, compared to fully unarmed protests. One study focusing specifically on the 18-month period from January 2020 through June 2021 found that armed demonstrations were six times more likely to result in violence than unarmed demonstrations.[54] However, it is important to emphasize that even bringing firearms to a protest is only very rarely associated with any actual violence. The CCC data records 406 protests with explicit mention of firearms being used or carried by protest participants.[55] Out of these more than 400 protests, only in in a very small number of cases does the CCC report either destruction of property or violence toward police. See the distribution in Figure 3 below.



**Figure 3: Rates of Violence at Protests With Firearms**

---

[54] Everytown Research & Policy, "Armed Assembly: Guns, Demonstrations, and Political Violence in America," *Everytown for Gun Safety Support Fund*, August 23, 2021, https://everytownresearch.org/report/armed-assembly-guns-demonstrations-and-political-violence-in-america/.

[55] As with the black bloc and fireworks analysis above, these numbers are drawn from searching the *participant_measures* variable in the CCC data for mention of any of the four words "gun," "rifle," "pistol," or "firearm," and are likely an undercount of the number of protests where firearms were present but where no violence occurred. If a firearm is used for violence, it will almost certainly be captured in the data, whereas if firearms are present but not used (particularly if concealed) they would be unlikely to be captured in the data.

*Diagram shows the frequency of different types of protester violence at protests where the Crowd Counting Consortium explicitly describes the presence of firearms.. Damage to property n = 16, police injury n = 2, no property damage or policy injury = 390. Note that the number across columns sums to 408, more than the total number of protests with firearms (406) because both protests with police injuries also record property damage, and are thus included in both the "damage to property" and "police injury" columns.*

To return to the evidence related to the Prairieland Detention Center specifically, the Signal chats describe the protesters' motivation for bringing firearms to the noise demonstration: to intimidate law enforcement and deter law enforcement officers from violently attacking the protesters.[56] This stated motivation is very plausible, given the larger pattern of carrying firearms at protests around the United States.

## **CONCLUSION**

In conclusion, while understanding the larger context of protest in the United States does not change the facts of what occurred on July 4 at the Prairieland Detention Center, it does help put those facts in context. I summarize that context overall as follows:

Protests in the United States today are often organized by fluid groups with varying motivations and tactical preferences. Some aspects of them are planned and some are not. They often involve violent or confrontational rhetoric. They also involve many different kinds of tactics. Protest is not always a march down a street or a crowd gathering in a public place. Sometimes it is a group of people making loud noises and setting off fireworks. Neither violent rhetoric, nor possession of anarchist literature, nor bringing medical supplies to a protest, nor wearing "black bloc" clothing, nor practicing "opsec," nor using fireworks, nor even carrying firearms are reliable indicators that protest organizers intend to engage in violence. All these things are common. Violence at protests in the United States, even violence solely directed at property, is exceedingly rare.

As a scholar of protest, I have studied hundreds of thousands of protests both in the United States and around the world. I have personally observed many protests both at home and abroad as well. Having extensively reviewed all the materials on the planning and execution of the noise demonstration that occurred on July 4, 2025 at the Prairieland Detention Center I can quite

---

[56] "Planning Core Chat Transcript Signal" (GOV_P1_00000409), p. 77

confidently say that these events fall squarely in line with those hundreds of thousands of protests I have studied, and the many that I have personally observed.

Protest is often unruly and sometimes chaotic and destructive. But when unintentional violence emerges at protests it follows a couple of very distinct paths: either happening because isolated individuals make improvised choices in the moment, or because individuals turn to violence in moments of heightened confrontation. I believe both happened at the Prairieland Detention Center. The first path describes the damage done by spray-painting vehicles. The second describes the shooting of the Alvarado police officer.

**Dr. Jonathan Pinckney, 2/16/2026**

**Appendix A: Table of Discovery Materials Reviewed**

| Description/Title | Bate Number |
|---|---|
| Daytime Protest Flyer | GOV_P1_00000414 |
| Daytime Protest Flyer Facebook Group | GOV_P1_00002879 |
| Four Black Medical Kits/Bags Photo | GOV_P2_00000450 |
| Medical Supplies Photo | GOV_P2_00007161 |
| Tourniquet (2) Photo | GOV_P2_00007164 |
| Resist Fascism Flag Photo | GOV_P2_00007207 |
| Fight Oligarchy Flag Photo | GOV_P2_00007208 |
| Batten Jail Property Photo | GOV_P2_00007293 |
| CCTV Footage of Officer Shooting | GOV_P2_00007784 |
| How to Make a Mask Flyer | GOV_P3_00000084 |
| Emma Goldman Bookclub Photo | GOV_P3_00000081 |
| Emma Goldman Bookclub Instagram Profile Review | GOV_P1_00001261 |
| Revolutionary Meditations Zine Photo | GOV_P2_00007416 |
| Open Letter to Fellow Incarcerated Persons Zine Photo | GOV_P2_00007421 |
| 50 Strategies of Revolution Zine Photo | GOV_P2_00007427 |
| 50 Strategies of Revolution Zine Photo | GOV_P2_00007428 |
| What Does Freedom Look Like? Zine Photo | GOV_P2_00007429 |
| What Does Freedom Look Like? Zine Photo | GOV_P2_00007430 |
| Why Anarchy? Zine Photo | GOV_P2_00007434 |
| What is Anarchism Anyways Page Photo | GOV_P2_00007435 |
| Radar Journal Front Cover Photo | GOV_P2_00007439 |
| Radar Journal In This Issue Page Photo | GOV_P2_00007440 |
| Mongoose Distro Catalog Photo | GOV_P2_00007449 |
| Mongoose Distro Catalog Photo | GOV_P2_00007450 |
| The Abolition of Law Book Photo | GOV_P2_00007457 |
| Come and Take It Zine Photo | GOV_P2_00007459 |
| Other Legal Self Defense Items Page Photo | GOV_P2_00007460 |
| Acrid Black Smoke Zine Photo | GOV_P2_00007461 |
| Seth Sikes Proffer Interview | GOV_P3_00000001 |
| Seth Sikes Proffer Interview | GOV_P3_00000072 |

| | |
|---|---|
| Susan Kent Proffer Interview | GOV_P3_00000060 |
| Nathan Baumann Proffer Interview | GOV_P9_00000963 |
| JCSO Deputy Graham Interview Summary | GOV_P1_00001449 |
| APD Sergeant Mello Interview Summary | GOV_P1_00001399 |
| APD Officer Zapato Interview Summary | GOV_P1_00001525 |
| APD Officer Solis Interview Summary | GOV_P1_00001301 |
| APD Officer Bell Interview Summary | GOV_P1_00001370 |
| CCTV Night Parking Lot Video | GOV_P2_00007786 |
| Front Entrance Property Damage Photo | GOV_P2_00000244 |
| Tyrant Spray Paint on Red Vehicle Photo | GOV_P2_00000354 |
| Bigot Spray Paint on White Vehicle Photo | GOV_P2_00000357 |
| ICE Pig Spray Paint on White Vehicle Photo | GOV_P2_00000360 |
| ICE Pig Spray Paint on White Vehicle Photo | GOV_P2_00000361 |
| Traitor Spray Paint on Red Vehicle Photo | GOV_P2_00000364 |
| White Van Property Damage Photo | GOV_P2_00007663 |
| Broken Camera Damage Photo | GOV_P2_00007664 |
| Side Entrance Property Damage Photo | GOV_P2_00007666 |
| Slashed Tire Photo | GOV_P2_00007700 |
| Rear Left Flat Tire on White Van Photo | GOV_P2_00007704 |
| Planning Core Chat Transcript Signal | GOV_P1_00000409 |
| Gear Check Chat Transcript Signal | GOV_P1_00001463 |
| Socialist Rifle Association DFW Signal Chat Screenshots | GOV_P3_00000139 |
| Gunshot Wound Photo | GOV_P2_00007585 |
| Gunshot Wound Photo | GOV_P2_00007587 |
| APD Officer Gross Shirt Photo | GOV_P2_00007588 |
| APD Officer Gross Shirt Photo | GOV_P2_00007590 |
| Officer Gross Body Camera Footage | GOV_P2_00007819 |
| Fireworks and Cooler Night Photo | GOV_P2_00000224 |
| Fireworks and Cooler Night Photo | GOV_P2_00000226 |
| Fireworks and Cooler Photo | GOV_P2_00004805 |
| CCTV Fireworks Video | GOV_P2_00007787 |
| CCTV Fireworks Video | GOV_P2_00008056 |

| Superseding Indictment December 10, 2025 | |
|---|---|